IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

MICHAEL KOZIARA,

                              Plaintiff,                              OPINION & ORDER

        v.                                                           13-cv-834-jdp

BNSF RAILWAY COMPANY,

                              Defendant.

Plaintiff Michael Koziara was a 30-year employee of defendant BNSF Railway Company when he reported a workplace injury. In the course of BNSF's investigation of the injury, BNSF discovered that Koziara had taken some used railroad ties from the company, and BNSF fired him. Koziara contends that the firing was not a legitimate response to any rule violations related to the accident or to the alleged theft of the railroad ties, but that it was retaliation for his good-faith reporting of a workplace injury.

Koziara filed suit under the Federal Rail Safety Act's (FRSA) anti-retaliation provision, 49 U.S.C. § 20109. BNSF has moved for summary judgment dismissing Koziara's complaint entirely. Koziara has moved for partial summary judgment that he has made a prima facie case of retaliation. Both motions will be denied because two issues are genuinely disputed: whether Koziara's injury report was made in good faith, and whether BNSF would have terminated Koziara for the theft if he had not reported the injury.

ALLEGATIONS OF FACT

Unless otherwise indicated, the following facts are material and undisputed.

BNSF is a railroad company, engaged in the business of transporting freight by rail. Koziara began working for BNSF more than 30 years ago, in the company's Maintenance of

Way Department. By 2006, Koziara held the position of foreman and supervised a crew of workers who performed track maintenance.

On September 9, 2010, Koziara supervised a crew that was assigned to remove and reinstall crossing planks in East Winona, Wisconsin. Crossing planks (also referred to as crossing panels) are large pieces of timber—approximately 16 feet by 18 inches by 7 inches—used at railroad crossings to allow cars to drive over the tracks. Each plank weighs about 1,200 pounds. Crossing planks are secured to the track bed with large wood screws, or "lags." Typically, the lags are removed with a hydraulic tool before the plank is lifted to allow maintenance on the track. Koziara's crew, however, had difficulty removing the lags at the crossing on which they were working. George Zielke, one of Koziara's crewmembers, suggested using a front-end loader to pry the planks loose without removing the lags. Koziara approved the suggestion.

Zielke positioned the front-end loader on one side of the crossing and began prying up a plank while Koziara stood on the other side of the crossing, about five feet away. The plank abruptly came loose and struck Koziara in the left shin.[1] The impact did not knock Koziara down, and when he examined his leg, it was reddened in the area of impact, but Koziara did not think that he was seriously hurt. Later that same day, Koziara reported the incident to an assistant roadmaster, but he did not file a personal injury report or seek medical attention after going home that evening. The next day, a Friday, Koziara returned to work and completed his duties without incident.

Over the weekend of September 11 and 12, 2010, Koziara worked on his four-wheel ATV at his home. Sometime during the weekend, the plow on the front end of the ATV fell on his right toe, although the record does not indicate whether he was injured. On Monday,

---

[1] The parties dispute whether Koziara had moved toward the plank while Zielke was prying it up, but the details of whether Koziara was careless are not material to this case.

September 13, Koziara went to a previously scheduled doctor's appointment for an unrelated medical procedure. During a physical examination, Koziara told his doctor about the workplace incident, and the doctor recommended an x-ray. Koziara received the results of the x-ray that same day, and learned that he had sustained a fractured tibia in his left leg.

Once Koziara learned about the fracture, he called two of his co-workers, Bradly Underhill[2] and Tom Arentz, and informed them that he would have to miss work for as much as four weeks. Koziara told Underhill and Arentz, however, that the reason he would be out was because he injured his leg at home. In his deposition, Koziara explained that he decided to misrepresent the source of his injury because he was afraid of reporting a workplace injury to BNSF. After speaking with his co-workers, Koziara called Don Willings, a local chairman of the union to which Koziara belonged. Willings advised Koziara to report the injury as work-related and referred Koziara to Russ Ingebritson, a plaintiff's attorney affiliated with the union. Koziara called Ingebritson that same day, still Monday, September 13.

Shortly after speaking to Ingebritson, Koziara called Underhill and Arentz for a second time. During this round of phone calls, Koziara told his co-workers that he had been kidding about being injured at home, and that the real injury had happened at work. Koziara next called Roadmaster Michael Veitz to discuss the workplace accident. When Veitz asked why Koziara had waited five days to report the injury—in violation of BNSF's 72-hour reporting rule—Koziara explained that he had only just found out about the extent of his injuries that morning.

---

[2] There is some confusion about when Koziara called Underhill. In his proposed findings of fact, Koziara stated that the call occurred on September 12, Dkt. 38, ¶ 39, and BNSF did not dispute the fact, Dkt. 57, at 10. In its own proposed findings of fact, however, BNSF stated that the call occurred on September 13, Dkt. 19, ¶¶ 59-60, and Koziara did not dispute the date of the call, Dkt. 53, at 15. Yet, in their respective replies, the parties have swapped positions; BNSF now contends that the call occurred on September 12, and Koziara contends that the call occurred the day after. The exact date of the call is largely irrelevant because it is not, as BNSF argues, dispositive evidence of what Koziara believed at the time he reported his injury to the company.

Veitz instructed Koziara to complete a BNSF Personal Injury Report. Koziara complied, and submitted a report the following day.

BNSF accepted Koziara's injury report and paid for his medical services. Although Koziara was eventually disciplined for careless conduct during the events of September 9, BNSF never disciplined him for filing an untimely injury report. Per company policy, Veitz investigated the incident and performed a "reenactment" of the accident. Veitz invited several members of Koziara's crew to participate in the reenactment, including Zielke, Underhill, and two others. After completing the reenactment, Veitz prepared a report of how the injury occurred, in which he concluded that Koziara had moved into work zone when he was hit:

> The [front-end loader] operator was having a difficult time getting the panel to move, so he applied slightly more pressure from the forks. The foreman then moved onto the crossing when the panel came loose and hit the foreman in the leg. . . . [Koziara] moved into the work zone of the end loader and was struck in the leg when the lags holding the crossing panel gave way.

Dkt. 35, at 53.

Veitz's investigation led to what BNSF considered to be another potential cause of Koziara's injury. Veitz interviewed members of Koziara's crew and obtained written statements from them. Those crewmembers reported seeing Koziara jumping off of or possibly falling from a trailer a week before the September 9 accident. They recounted seeing Koziara hopping around on one foot afterward, as if he were injured. During his deposition, Veitz testified that although he could not remember the details, the witnesses he interviewed about the earlier incident "seemed like [they] were getting nervous that something was not quite right, and [that Underhill] wanted to get it off his chest and tell me that possibly Mr. Koziara could also have got[ten] hurt at that location." Dkt. 30 (Veitz Dep. at 95:13-18).

4

Veitz's investigation also led to evidence of other potential wrongdoing by Koziara. Veitz learned that on the day that Koziara had jumped or fallen from the trailer, he had given away 20 used railroad ties to a local farmer without BNSF's permission. Koziara and his crew loaded the ties onto a pair of trailers, one belonging to Koziara and the other to the farmer.[3] Veitz referred the possible theft to BNSF's Resource Protection Department, which in turn referred the issue to the Buffalo County Sheriff's Department. The sheriff's department investigated, but did not bring criminal charges.

BNSF continued with its own disciplinary process against Koziara, holding two investigatory hearings. Both hearings were presided over by Michael Heille, a BNSF supervisor who was not involved in the underlying incident and did not have any supervisory authority over Koziara. The first hearing addressed Koziara's September 9 injury, and the second addressed his alleged theft of the company's ties. After the first hearing, Heille recommended a 30-day suspension because Koziara violated two of the company's operating rules concerning general safety. Specifically, Heille concluded that Koziara had placed himself in harm's way by moving toward the front-end loader while it was removing a crossing plank, in violation of Rules 1.1.2 and 1.6, which require employees to be attentive and careful to avoid injury.[4]

BNSF also assigned Koziara "points," pursuant to a policy that was in effect at the time. The parties dispute the purpose of these points: Koziara contends that they were used to single

---

[3] The parties dispute who owned the 20 ties at that time Koziara took them. BNSF contends that the ties were company property and that Koziara stole them. Koziara contends that he had permission to take the ties or, alternatively, that they were the property of a third-party contractor. The dispute is marginally relevant because this court does not need to decide whether BNSF was correct to conclude that Koziara stole company property.

[4] Rule 1.1.2 provides that "[e]mployees must be careful to prevent injuring themselves or others. They must be alert and attentive when performing their duties and plan their work to avoid injury." Dkt. 36-13, at 6. Rule 1.6 provides that "[e]mployees must not be . . . [c]areless of the safety of themselves or others." *Id.* at 11.

out employees for increased supervision and testing; BNSF contends that they were used to select employees for a non-disciplinary, customized safety program. Although Koziara was never enrolled in this program (and was apparently fired before he could have felt the effects of his points), the parties' dispute is material to the question of whether assigning points constituted a retaliatory action.

Koziara's alleged theft was the subject of the second hearing, which occurred about a month after the first. Both Veitz and Zielke were called to testify. Koziara maintained that he had received permission from Veitz to give the ties to a local farmer, and that Zielke had overheard the conversation. Koziara admitted that he used BNSF equipment and personnel to load the ties onto the two trailers during company time, but testified that it was common practice for employees to take used ties. But Veitz testified that Koziara had never asked for permission, although he noted that earlier in the year, Koziara had asked about a different set of ties. Zielke confirmed that he was aware of Koziara's first conversation with Veitz, but denied overhearing any later discussion.

BNSF ultimately determined that Koziara had taken the ties without permission and that his theft warranted dismissal. In a termination letter dated November 9, 2010, BNSF dismissed Koziara "for theft and dishonest conduct [and] the unauthorized removal of BNSF property and the misuse of company equipment for personal use while on duty." Dkt. 35-24, at 4.

Koziara filed a complaint with the U.S. Occupational Safety and Health Administration (OSHA). He alleged that BNSF had retaliated against him for reporting a work injury. OSHA dismissed the complaint, finding that "[a] preponderance of the evidence demonstrates that [Koziara]'s decision to remove rail planks with lags still intact led to his injury and subsequent suspension. A preponderance of the evidence failed to establish that [Koziara] had authority to

6

remove scrap rail ties from [BNSF]'s property, resulting in his termination." Dkt. 36-18, at 4.

Koziara appealed to an administrative law judge, and when no decision issued within 210 days,

he pursued an action in this court. *See* 49 U.S.C. § 20109(d)(3). Koziara filed his complaint on

December 4, 2013, alleging unlawful retaliation. The court has subject matter jurisdiction under

28 U.S.C. § 1331 because Koziara's cause of action arises under federal law.


ANALYSIS

Both parties have moved for summary judgment. BNSF contends that it is entitled to

judgment as a matter of law because Koziara cannot prove the elements of a retaliation claim

under FRSA, or alternatively, because BNSF has affirmatively established that it would have

taken the same disciplinary action regardless of whether Koziara reported the injury. Dkt. 20, at

1-2. Koziara has moved for partial summary judgment, contending that he has established the

elements of a FRSA retaliation claim as a matter of law, and that the only question for trial is

whether BNSF would have taken the same action regardless of his injury report. Dkt. 39, at 1.

Summary judgment is appropriate if a moving party "shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the

governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986). To avoid summary judgment, the opposing party "must set

forth specific facts showing that there is a genuine issue for trial." *Id.* A party may not simply

rely on the allegations in its pleadings to create such a dispute, but must "demonstrate that the

record, taken as a whole, could permit a rational finder of fact to rule in [its] favor." *Johnson v.*

*City of Fort Wayne, Ind.*, 91 F.3d 922, 931 (7th Cir. 1996).

The court cannot necessarily grant summary judgment for one party or the other simply because there are cross-motions. Instead, the court "look[s] to the burden of proof that each party would bear on an issue of trial; [and] then require[s] that party to go beyond the pleadings and affirmatively to establish a genuine issue of material fact" as to that question. *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997). Here, Koziara will bear the burden of proving the elements of his retaliation claim, and BNSF will bear the burden of proving that it would have taken the same disciplinary actions regardless of Koziara's protected activity. The record contains factual disputes that preclude either party from receiving judgment as a matter of law, and so the court will deny both parties' motions. However, at trial, the undisputed elements of Koziara's prima facie case will be deemed to have been established.

## A.  Retaliation claims under FRSA

Congress passed FRSA in 1970 "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. After the law went into effect, however, Congress learned that railroad workers who complained about safety conditions were often retaliated against for their actions. *See Reed v. Norfolk S. Ry. Co.*, No. 12-cv-873, 2013 WL 1791694, at *3 (N.D. Ill. Apr. 26, 2013), *aff'd on other grounds*, 740 F.3d 420 (7th Cir. 2014). Congress responded with an anti-retaliation provision which, as now amended, provides that:

> A railroad carrier engaged in interstate or foreign commerce . . . may not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee if such discrimination is due, in whole or in part, to the employee's lawful, good faith act done, or perceived by the employer to have been done or about to be done . . . to notify, or attempt to notify, the railroad carrier or the Secretary of Transportation of a work-related personal injury or work-related illness of an employee.

§ 20109(a)(4).[5]

Retaliation claims under FRSA are governed by the rules and procedures set forth in 49 U.S.C. § 42121, part of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (AIR-21). *See* § 20109(d)(2)(A). Thus, to establish a retaliation claim under FRSA, Koziara must show by a preponderance of the evidence that: (1) he engaged in protected activity; (2) his employer knew that he engaged in the protected activity; (3) he suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor to the unfavorable action. *Harp v. Charter Commc'ns, Inc.*, 558 F.3d 722, 723 (7th Cir. 2009).[6] If Koziara establishes his prima facie case, BNSF can avoid liability if it proves by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of Koziara's protected behavior. *Id.* As indicated above, the parties' motions for summary judgment address both components of this burden-shifting framework. Ultimately, however, there are disputes of fact material to both Koziara's prima facie case and to BNSF's defense.

**B.  Koziara's prima facie case**

Neither party is entitled to summary judgment on the issue of whether Koziara can establish a prima facie case of retaliation. Koziara's task at this stage is not onerous. *See Araujo v. N.J. Transit Rail Operations, Inc.*, 708 F.3d 152, 159 (3d Cir. 2013) ("It is worth emphasizing that the AIR-21 burden-shifting framework that is applicable to FRSA cases is much easier for a plaintiff to satisfy than the *McDonnell Douglas* standard."). BNSF does not dispute that Koziara

---

[5] The parties agree that BNSF is a railroad carrier engaged in interstate commerce, and that Koziara qualified as an employee during the relevant time period. Dkt. 61, at 2.

[6] The parties refer to these four elements as Koziara's "prima facie case," and the court adopts their terminology for efficiency's sake.

has met the second and third elements of his prima facie case: Koziara's employer knew that he reported an injury, and Koziara suffered two adverse actions in the form of suspension and termination. However, BNSF disputes whether the points it assigned to Koziara constitute an adverse employment action because they were part of a now-defunct system, and because Koziara was never enrolled in the safety program associated with that system. More important, BNSF disputes whether Koziara satisfies the "good faith" requirement of the first element, and whether his injury report was a contributing factor to the adverse employment actions he suffered. Koziara responds that he has established all four elements. The court discusses all four elements in turn.

### 1. Protected activity

BNSF argues that Koziara cannot meet the first element of his prima facie case because his protected activity was not undertaken in good faith. FRSA only protects an employee's "*good faith* act done . . . to notify, or attempt to notify, the railroad carrier or the Secretary of Transportation of a work-related personal injury." § 20109(a)(4) (emphasis added). BNSF identifies two reasons why the court should conclude, as a matter of law, that Koziara's injury report was not made in good faith: (1) Koziara initially lied about his injury to his co-workers, and (2) the record suggests that Koziara may have been injured at some other time. The company asserts that these reasons preclude Koziara from establishing his prima facie case. BNSF's evidence is sufficient to create a dispute of fact on the issue, but the company is not entitled to judgment as a matter of law that Koziara did not report his injury in good faith.

The parties do not direct the court to any binding precedent that explicitly discusses the good faith requirement for FRSA retaliation claims. Other district courts that have considered the question, however, have held that "the relevant inquiry remains whether, *at the time he reported his injury* to Defendant, Plaintiff genuinely believed the injury he was reporting was

10

work-related." *Ray v. Union Pac. R.R. Co.*, 971 F. Supp. 2d 869, 884 (S.D. Iowa 2013) (original emphasis); *see also Davis v. Union Pac. R.R. Co.*, No. 12-cv-2738, 2014 WL 3499228, at *7 (W.D. La. July 14, 2014). ("[W]hen a plaintiff brings a claim under the FRSA alleging he was retaliated against for reporting a work-related injury, [he must have] actually believed, at the time he reported the injury, that it was work-related."). This rule emphasizes the subjective component of good faith, but this component makes up only half of the inquiry.

The Seventh Circuit—albeit, in the context of a different whistleblower statute—has held that good faith requires objective reasonableness. *Lang v. Nw. Univ.*, 472 F.3d 493, 495 (7th Cir. 2006) ("What Lang actually believed is irrelevant . . . The right question is whether her belief had a reasonable objective basis. . . . . [The False Claims Act] is not unique in this respect. Other anti-retaliation statutes . . . also are limited to the protection of objectively reasonable reports and do not prevent employers from discharging workers who enter fantastic realms."); *see also Gutierrez v. Norfolk & S. Ry. Co.*, No. 12-cv-2396, 2014 WL 551684, at *4 (N.D. Ill. Feb. 12, 2014) ("Under the FRSA, the employee must 'reasonably' believe in the unlawfulness of the employer's actions which he is reporting. . . . In addition, the 'reasonableness must be scrutinized under both a subjective and objective standard.'") (internal citations and quotation marks omitted). Thus, to establish his prima facie case, Koziara must identify evidence that: (1) he subjectively believed his reported injury was work-related; and (2) his belief was objectively reasonable. On these questions, there are factual disputes that preclude either party from being entitled to summary judgment.

The record contains evidence of Koziara's subjective belief that his injury was work-related, and evidence of the objective reasonableness of that belief. For example, BNSF does not dispute the basic nature of the accident (*i.e.*, that Koziara was struck by a 1,200-pound plank) or that a doctor diagnosed Koziara with a fractured tibia. The injury report that Koziara

submitted to BNSF is also evidence of his subjective belief; he described his injury as a fractured tibia and he identified the incidents of September 9 as the cause. From this evidence, a reasonable jury could conclude that Koziara reported his injury in good faith.

But a jury could also reach the opposite conclusion because there is other evidence in the record. Koziara admits that he initially did not think that the injury was that bad, and he was able to work the day after the accident. Moreover, Koziara admits that in his first set of phone calls, he told his co-workers that he would miss work because of an accident at home. When Veitz investigated the injury report, members of Koziara's crew alluded to an earlier workplace incident where Koziara fell or jumped off of a trailer and then hopped around on one foot as if injured. BNSF contends that the earlier accident might have been the real cause of Koziara's injury, and that a jury could therefore be skeptical of how sincerely he believed the later accident caused his fractured tibia.[7] There is also evidence in the record that on October 19, 2010, Koziara had a phone conversation with a Buffalo County Sherriff's Officer and stated that he was "currently off of work as he hurt himself on the day of [the alleged theft]." Dkt. 36-8, at 8. Koziara's initial evaluation of his leg, the misstatements he made to others, and the possible alternative cause of his injury all undercut his testimony that he subjectively believed the source and severity of his injury when he reported it to BNSF. A jury could view this evidence, even in light of a diagnosed fractured tibia, and reasonably conclude that Koziara did not report his injury in good faith. Thus, neither party is entitled to summary judgment on the first element of Koziara's prima facie case.

---

[7] BNSF also contends that Koziara may have injured himself at home, while working on his ATV. The record does not support this contention because the ATV plow fell on Koziara's *right* toe, but Koziara fractured and reported an injury to his *left* leg.

### 2. BNSF knew of Koziara's report

BNSF does not dispute that it knew about Koziara's injury report at the time it suspended and later terminated him. Dkt. 56, at 7, and Dkt. 57, at 28-29. Koziara has established the second element of his prima facie case.

### 3. Adverse personnel action

BNSF does not dispute that Koziara's suspension and termination qualify as adverse employment actions. Koziara can therefore proceed with his prima facie case using these two actions. But BNSF argues that the points it assessed against Koziara do not constitute an adverse action. It is not clear to the court why, in light of the two undisputed adverse actions, the points matter in this case. Nevertheless, the court will consider the issue.

The company explains that: (1) the safety program associated with the points was not part of BNSF's "disciplinary process;" (2) Koziara did not know about the points until years after his termination; and (3) Koziara did not identify the points as an adverse action in his filing with OSHA. Dkt. 60, at 5 n.2. Koziara responds that BNSF's points policy *per se* violates FRSA "because it distinguishes between employees who engage in protected activity and employees who do not." Dkt. 39, at 7. Koziara further contends that assigning points constitutes an adverse action because it discourages employees from reporting safety violations to BNSF. Koziara's reading of the points policy lacks factual support, as does his assertion that the points materially altered the terms of employment at BNSF.

The Supreme Court defines an "adverse action," as a consequence "that a reasonable employee would have found [to be] materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal citations and quotation marks omitted). Courts have applied this definition in whistleblower cases. *See, e.g.,*

*Halliburton, Inc. v. Admin. Review Bd.*, 771 F.3d 254, 260 (5th Cir. 2014) ("[An] antiretaliation claim requires an 'adverse action' that meets *Burlington's* definition of material adversity, *i.e.,* an action harmful enough that it well might have dissuaded a reasonable worker from engaging in statutorily protected whistleblowing."); *Schlicksup v. Caterpillar, Inc.*, No. 09-cv-1208, 2010 WL 2774480, at *3 (C.D. Ill. July 13, 2010) ("To determine whether an employee suffered an 'unfavorable personnel action,' Courts apply the adverse employment standard used in Title VII retaliation claims.") (internal citations omitted). Here, receiving points and increasing the likelihood of enrollment in a safety program falls short of the standard for an adverse action because Koziara has not introduced evidence that BNSF used the points in making disciplinary decisions or that participation in the company's safety program was such an onerous burden as to dissuade employees from reporting injuries.

Koziara is incorrect to assert that the policy *per se* violates FRSA. The policy assigns points for injuries and safety violations. *See* Dkt. 40-16, at 2. But the policy does not impose discipline for accumulating points, and a BNSF supervisor testified that under the policy, if an employee accumulated a certain number of points, the employee "would be involved in a program with their supervisor requiring them to sit down and develop a safety process to ensure the safety going forward of this employee." Dkt. 32 (Rankin Dep. 89:3-9). The supervisor further testified that the points had "nothing to do with the discipline process." *Id.* (Rankin Dep. 102:19-20). Koziara does not direct the court to evidence that contradicts the supervisor's summary of the points program, nor does Koziara explain how being forced to participate in the safety program would materially alter the terms of employment at BNSF, such that a reasonable employee would be dissuaded from reporting injuries.

Instead, Koziara selectively quotes from Heille's deposition testimony to argue that points were a factor in his disciplinary decisions. The argument is unpersuasive. Heille testified

14

that, per standard instructions, he included a copy of Koziara's injury record in the disciplinary recommendation that he submitted to his superiors. The record presumably listed the points that Koziara had accumulated while at BNSF. When asked whether he looked at the injury record, Heille responded that he "may have" because BNSF had a policy that allowed a shorter probationary period after a rules infraction for employees who had at least five years of injury-free and disciplinary-free service. Dkt. 48 (Heille Dep. 85:22). Koziara does not suggest, however, that an employee's number of points determines the length of the probationary period. Instead, the record establishes that the points were designed to identify and assist employees with unsafe behaviors. Koziara has failed to adduce other evidence which would enable a reasonable jury to conclude that receiving points would dissuade BNSF employees from reporting injuries, and so Koziara cannot use the points as an adverse action in making his prima facie case; he can rely only on his suspension and termination.

### 4. Contributing factor

For the final element in his prima facie case, Koziara must show a causal connection between his injury report and BNSF's adverse actions. Congress purposefully selected a low standard for causation in FRSA claims because it "recognized that employees in the transportation industry are often best able to detect safety violations and yet, because they may be threatened with discharge for cooperating with enforcement agencies, they need express protection against retaliation for reporting these violations." *Formella v. U.S. Dep't of Labor*, 628 F.3d 381, 388-89 (7th Cir. 2010). Thus, Koziara does not need to show that his report was the "but-for" cause of BNSF's adverse actions, only that it was a "contributing factor." "[A] 'contributing factor' is something less than a substantial or motivating one;" instead, the term means "'any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision.'" *Addis v. Dep't of Labor*, 575 F.3d 688, 691 (7th Cir. 2009)

15

(quoting *Marano v. Dep't of Justice,* 2 F.3d 1137, 1140 (Fed. Cir. 1993)). Under FRSA's "contributing factor" standard for causation, "a prima facie case does not require that the employee conclusively demonstrate the employer's retaliatory motive. . . . But the contributing factor that an employee must prove is intentional retaliation prompted by the employee engaging in protected activity." *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 791 (8th Cir. 2014) (internal citations and quotation marks omitted). Koziara has cleared this hurdle because the undisputed evidence shows that his injury report triggered the investigation which led to both his suspension and termination.

BNSF does not dispute that it suspended Koziara because of his negligence and inattentiveness in the accident that led to his injury—the very accident that Koziara described in his report to the company. BNSF's own proposed facts tell a straightforward story: Koziara was injured and he reported his injury; BNSF investigated and held a hearing to discuss the incident; and then, BNSF suspended Koziara. *See* Dkt. 19, ¶¶ 79, 85-91, 118-19. Koziara's report set the subsequent investigation and disciplinary process in motion, and this undisputed chain of events is sufficient evidence that Koziara's report contributed to his suspension. *See Smith-Bunge v. Wis. Cent., Ltd.*, No. 13-cv-2736, 2014 WL 5023471, at *7 (D. Minn. Oct. 8, 2014) (employee's injury report was a "contributing factor" in a railroad's decision to suspend him for failing to timely report injuries).

For the same reasons, Koziara has presented sufficient evidence from which a jury could conclude that his injury report was a contributing factor to his termination. Koziara's injury report led Veitz to investigate, and it was during that investigation that BNSF learned about Koziara's alleged theft. Again, BNSF's own proposed facts confirm that Koziara's injury report was the triggering event for the company's investigation and resulting discipline. *See* Dkt. 19, ¶ 94 ("*During his investigation* of the events of September 9, 2010, Roadmaster Veitz learned of

[Koziara] removing about ties [sic] and providing them away to a local farmer.") (emphasis added).

Koziara's termination is less entwined with his injury report, but a contributing factor is *any* factor that *tends* to affect the outcome of the decision. *Addis*, 575 F.3d at 691. For example, in *Ray*, another district court considered a similar "chain of events" approach to causation under FRSA. 971 F. Supp. 2d at 888. *Ray* involved a railroad worker who lied to his supervisor about whether his knee injuries were work-related. *Id.* at 872. When the worker finally reported his injuries as work-related, he was fired for dishonesty and failure to timely report an injury. *Id.* With regard to causation, the court found that "if Plaintiff had not reported the alleged work-related injury, Defendant would not have undertaken an investigation into either the honesty of Plaintiff's statement to [his supervisor] in October 2009 or the timeliness of Plaintiff's injury report, and Plaintiff would not have been terminated." *Id.* at 888.[8] Koziara, like the worker in *Ray*, can satisfy the final element of his prima facie case because his injury report was the first link in a chain of events that culminated in BNSF's termination decision.

BNSF essentially tries to escape this result by listing the horribles that will follow if railroad workers can construct prima facie retaliation claims using a "chain of events" theory of causation. According to BNSF, Koziara's approach to FRSA would leave the company unable to ever discipline any employee who reports an injury. Dkt. 56, at 8-10, and Dkt. 60, at 5-6. Specifically, BNSF fears that "employees [will file] preemptive personal injury reports in the face of impending discipline for unrelated performance issues," and use the reports "as a shield

---

[8] BNSF correctly observes that *Ray* must yield to the Eighth Circuit's decision in *Kuduk*. Dkt. 56, at 5 n.5. But *Kuduk* simply confirmed that "a contributing factor is 'any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision,'" and explained that "more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation." 768 F.3d at 791-92. BNSF does not explain how *Kuduk* invalidates *Ray*'s discussion of causation.

against discipline for a rules violation." Dkt. 56, at 9. The argument is unpersuasive because BNSF conflates the two separate aspects of FRSA's burden-shifting framework.

Permitting Koziara to establish causation through a "chain of events" theory does not, as BNSF contends, prevent the company from ever disciplining its employees. Nor does it impose "strict liability" on a railroad carrier any time it disciplines an employee who filed an incident report. Under § 42121(b)(2)(B)(ii), which FRSA incorporates, employers are not liable for retaliation if they "demonstrate[], by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absence of [the employee's protected] behavior." Thus, when an employee establishes a prima facie case of retaliation, he does not automatically win his case, as BNSF apparently fears; the burden simply shifts to the employer to explain why its actions were lawful. *See Harp*, 558 F.3d at 723, 726. Although BNSF is correct that the Seventh Circuit views "temporal proximity between an employee's protected activity and an adverse employment action [as] rarely sufficient to show that the former caused the latter," *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011), Koziara offers more than mere temporal proximity in this case. His injury report *initiated* the events that led to his discipline, and was therefore a contributing factor to the adverse actions that he suffered.

BNSF may, understandably, disagree with the low causation requirements for railroad employees who allege retaliation, but the legislative histories of FRSA and other whistleblower statutes confirm that Congress crafted these requirements with a purpose in mind. Koziara has produced evidence by which a reasonable jury would have to conclude that his injury report was a contributing factor in BNSF's disciplinary decisions, and he is therefore entitled to summary judgment that he has met the fourth element of his prima facie case.

## C.  BNSF's defense to liability

BNSF has moved, in the alternative, for summary judgment on its defense against Koziara's claim. Specifically, BNSF contends that even if Koziara can prove his prima facie case, it would have taken the same disciplinary action regardless of whether Koziara had reported his injury. If BNSF can prove its contention by clear and convincing evidence, then Koziara's retaliation claim fails as a matter of law. *See* § 42121(b)(2)(B)(ii); *Harp*, 558 F.3d at 723, 726.

At this stage, "the employer must show that 'the truth of its factual contentions [is] highly probable.'" *Araujo*, 708 F.3d at 159. BNSF faces a "steep burden," *id.* at 162, because Koziara is the non-moving party, and so the court construes all facts in his favor. But to withstand summary judgment, Koziara must create a genuine dispute of fact as to whether his injury report motivated BNSF to retaliate against him. *See Kuduk*, 768 F.3d at 791 ("FRSA provides that a rail carrier may not discharge or in any other way *discriminate* against an employee for engaging in protected activity. . . . As the [Supreme] Court explained in *Staub*, the essence of this intentional tort is 'discriminatory animus.'") (original emphasis) (internal citations and quotation marks omitted). The same "chain of events" theory that Koziara advanced with regard to causation will not, by itself, suffice at this stage in the analysis.

BNSF states that it suspended, and later terminated, Koziara because he violated workplace rules. Even if the company's justification is facially legitimate, BNSF cannot obtain summary judgment if the record suggests that discriminatory animus crept into its disciplinary decisions. *Araujo*, 708 F.3d at 163 ("While the facts in the record may show that [the employee] was technically in violation of written rules, they do not shed any light on whether [the company's] decision to file disciplinary charges was retaliatory."). Koziara can therefore withstand summary judgment by identifying evidence that BNSF selectively enforced its rules,

19

investigated him for the purpose of manufacturing a rule violation, or otherwise discriminated against him in retaliation for his injury report.

Koziara contends that BNSF has selectively enforced its rules against him, and the record contains disputes of fact on this issue. With regard to Koziara's suspension, BNSF admits that it never disciplined the co-worker who was standing next to Koziara when he was injured on September 9. Dkt. 57, at 16. Although the co-worker was apparently uninjured—and so did not file an injury report—he was standing just as close to the front-end loader as Koziara was, and so he presumably violated the same rules. BNSF asserts that its "basis for finding that Koziara allegedly violated Rule 1.1.2 and Rule 1.6 was that he was standing too close to the front-end loader," *id.*, so the fact that the company did not discipline another employee who engaged in nearly identical conduct undercuts the assertion that BNSF would have suspended Koziara regardless of whether he reported his injury. BNSF notes that Koziara, unlike the other employee, was a foreman, but the company does not otherwise defend its uneven treatment. Dkt. 60, at 7. A jury could accept BNSF's response, but could just as easily reject it, and find that discriminatory animus motivated the company's actions.

Similar evidence of inconsistent application of the rules precludes BNSF from showing that it would have terminated Koziara for his theft regardless of his injury report. The parties disagree about whether BNSF would have ever learned of the alleged theft if not for the report, but their dispute is largely irrelevant at this stage of the case. At the second step of FRSA's burden-shifting framework, the question is: assuming BNSF had learned of the alleged violation, would it have taken the same action in the absence of Koziara's injury report? *See Ray*, 971 F. Supp. 2d at 888-89 (recognizing that there would not have been an investigation or discipline without the plaintiff's injury report, but nevertheless evaluating whether the defendant consistently applied its policies).

If BNSF had supported its motion by presenting evidence that employee theft inevitably results in severe discipline, the company might have been entitled to summary judgment. But BNSF has only identified one employee who stole scrap metal and was terminated. In contrast, Koziara has identified evidence that suggests that BNSF employees often took, or saw others take, used ties for personal use. Specifically, Koziara points to exhibits that he submitted during his disciplinary hearings and to deposition testimony from witnesses in this case. According to the testimony, many employees never asked BNSF's permission because they did not think they needed it, and others apparently took company property without consequences. *See, e.g.*, Dkt. 24 (Mitchell Dep. at 31:19-39:6) (explaining that it was common practice to take ties with permission from contractors and that BNSF supervisors did not need to give permission because the ties were not BNSF property); Dkt. 25 (Underhill Dep. at 24:19-25:4) (explaining that BNSF employees generally thought it was okay to take ties and that all of the "30 year" people had done it); Dkt. 36-4, at 87 (hearing exhibit explaining that employees and private citizens would take ties without permission).

In light of Koziara's evidence that other instances of theft went unpunished, and that BNSF did not always aggressively investigate employees who took ties without the company's permission, a jury could conclude that BNSF selectively enforced its rules against Koziara, or investigated him just to find a reason to terminate him. Either would be evidence of discriminatory animus, and so BNSF has not met its high burden of showing by clear and convincing evidence that it would have terminated Koziara even if he had not reported an injury. *Compare Ray*, 971 F. Supp. 2d at 891 (railroad failed to meet its burden when the evidence "demonstrate[d] that Defendant does not always permanently dismiss an employee for a dishonesty violation"), *with Kuduk v. BNSF Ry. Co.*, 980 F. Supp. 2d 1092, 1102 (D. Minn. 2013), *aff'd*, 768 F.3d 786 (BNSF met its burden when "[a] review of BNSF's past practices

involving similarly situated employees indicates that within the six month period following Plaintiff's June 9, 2010 violation, two other employees were dismissed for committing the same serious rule violation"). BNSF is not entitled to summary judgment on its defense.

Although Koziara did not move for summary judgment on BNSF's defense to liability, he informed the company that if *it* moved for summary judgment on the issue, then he would ask the court to *sua sponte* grant summary judgment in his favor. Dkt. 54-1, at 2. Koziara's brief in opposition to BNSF's motion makes this very request. Dkt. 52, at 16. Even if Koziara had properly briefed and presented the issue, he would not be entitled to summary judgment for largely the same reasons that BNSF is not entitled to summary judgment: there are genuine disputes of fact as to whether the company would have taken the same disciplinary action regardless of Koziara's injury report.

### D. Conclusion

To briefly summarize how the case now stands:

The parties filed cross-motions for summary judgment on the question of whether Koziara has proven his prima facie case. There is no dispute that: (1) BNSF knew about Koziara's protected conduct; (2) BNSF took two adverse actions against Koziara (suspension and termination); and (3) Koziara's protected conduct was a contributory factor in these actions. Koziara is entitled to summary judgment on these elements. However, there is a genuine dispute as to whether Koziara reported his injury in good faith. Koziara's motion will therefore be denied, as it pertains to this element, and BNSF's motion will be denied in full.

BNSF moved for summary judgment on the question of whether it would have taken the same adverse actions against Koziara despite his injury report. There is a genuine dispute of fact on this issue, and BNSF's motion will therefore be denied.

ORDER

IT IS ORDERED that:

1. Defendant BNSF Railway Company's motion for summary judgment, Dkt. 18, is DENIED.

2. Plaintiff Michael Koziara's motion for summary judgment, Dkt. 37, is DENIED in substantial part, consistent with the opinion above.

Entered January 9, 2015.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge