UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * *

MICHAEL KOZIARA,

       Plaintiff,

-vs-                                    Case No. 13-CV-834-JDP

BNSF RAILWAY COMPANY,          Madison, Wisconsin
                                        March 2, 2015
       Defendant.          12:35 p.m.

* * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT OF FIRST DAY OF JURY TRIAL
AFTERNOON SESSION
HELD BEFORE JAMES D. PETERSON, and a jury,


APPEARANCES:

For the Plaintiff:
                    Nichols Kaster
                    BY:  MATTHEW MORGAN
                         JAMES KASTER
                         NICHOLAS THOMPSON
                    4600 IDS Center
                    80 South Eighth Street
                    Minneapolis, Minnesota  55402-2242

Also present:    Michael Koziara - plaintiff
                 Emilee Howe - paralegal




Lynette Swenson   RMR, CRR, CBC
U.S. District Court Federal Reporter
United States District Court
120 North Henry Street, Rm. 520
Madison, Wisconsin  53703
608-255-3821

1  APPEARANCES CONTINUED:

2  For the Defendant:
                    Ogletree Deakins
3                   BY:   BRUCE DOUGLAS
                          COLTON LONG
4                   Wells Fargo Center
                    90 South Seventh Street, Ste. 3800
5                   Minneapolis, Minnesota  55402

6  Also present:    Jennifer Lenander - Office
                         Administrator
7                   Jennifer Willingham - BNSF Counsel
                    Daniel Rankin - General Director
8                        of Line Maintenance

9

10                       *  *  *  *  *

11                      **I-N-D-E-X**

12  Court Instructions                              8-22
    Opening statement by Mr. Morgan                22-40
13  Opening statement by Mr. Douglas               40-60

14

15  <u>PLAINTIFF'S WITNESSES</u>        <u>EXAMINATION</u>       <u>PAGES</u>

16  MICHAEL KOZIARA          Direct by Mr. Morgan    60-136

17  AL MITCHELL              Direct by Mr. Morgan   137-150
                            Cross by Mr. Douglas   150-162
18                          Redirect by Mr. Morgan 162-165
                            Recross by Mr. Douglas    165
19
    MICHAEL KOZIARA          Cross by Mr. Douglas   166-214
20

21

22

23

24

25

1                        **E-X-H-I-B-I-T-S**

2     <u>PLAINTIFF'S EXHIBITS</u>                    <u>IDENTIFIED</u>/<u>RECEIVED</u>

3     Ex.  2      Personal Injury Report Form  117        118
          5      Rule 1.1.2                    70         71
4         7      Level S 30-day suspension     128        128
          8      Dismissal notice              134        134
5         9      Medical record                107        107
          11     Photo - crossing              87         88
6         12     Photo - end loader            92         93
          31     Investigative notice          130        130
7         33     Investigative notice          123        123

8     <u>DEFENDANT'S EXHIBITS</u>

9     Ex.  564    Photo - reenactment          155        ---
          577    Photo - boom truck            200        200
10        578    Photo - boom truck            ---        201
          579    Photo - boom truck            ---        201
11        580    Photo - boom truck            ---        201
          581    Photo - boom truck            ---        201
12        582    Photo - boom truck            ---        201

13        600    Photo - plank lifters         202        203
          601    Photo - hydraulic gun         201        201
14        658    Google earth map              176        176
          659    Photo - lag                   205        205

15

16                        * * * * *

17         THE COURT:  Is there anything for the court

18    before we begin?  I have one housekeeping matter for

19    counsel.

20         MR. DOUGLAS:  Your Honor, I do have two things,

21    if I may.

22         THE COURT:  Yeah.

23         MR. DOUGLAS:  First item:  Clarification on one

24    of the areas of testimony.  It looks like we're kind of

25    moving along more quickly and I'm trying to make sure I

1  get the right witnesses lined up and everything.

2         THE COURT:  Okay.

3         MR. DOUGLAS:  The Court may remember from the

4  Pretrial Conference and certain motions in limine there

5  was discussion about testimony about the Incentive

6  Compensation Plan, and I recall that in the Pretrial

7  Order, the Court indicated it did not want to spend a

8  half a day on that and was not inviting testimony on

9  that.  I guess just clarification to what extent, if

10 any, is the Court going to allow testimony about the

11 Incentive Compensation Plan so that both parties can

12 sort of plan ahead.

13        THE COURT:  Just give me the background on it

14 again.  Is this -- this is or is not related to the

15 points that are assessed?

16        MR. DOUGLAS:  This is unrelated to the points

17 that are assessed.  This goes to Mr. Koziara's -- the

18 plaintiff's claim that the managers may have an

19 incentive to discourage or deter injury reports because

20 somehow there's a component in the Incentive

21 Compensation Plan that relates to safety.

22        THE COURT:  Okay.  So like if they have reduced

23 number of workplace injuries, they get --

24        MR. DOUGLAS:  Yeah.  There's an overall

25 Incentive Compensation Plan, but it's for both the

1  managers and the scheduled employees.  The union people

2  also have an Incentive Compensation Plan.  The plaintiff

3  inquired as to this a little bit with one of the

4  30(b)(6) witnesses, Eric Weber.  He's not really the

5  person to testify about that, but there was some

6  testimony about it.  I just wanted to know how deeply

7  the Court is going to allow counsel to be getting into

8  that so that we can plan for what we may need to do.

9          THE COURT:  Okay.  I understood.  I recall this

10  as well.  I think it's -- to some extent it's fair game.

11  And I guess my ruling is, like a lot of these things in

12  cases like this, it's a potential waste of time, but I

13  don't think it's fair to say that it's not relevant.

14  This is plaintiff's theory about why there might be a

15  motive to retaliate.  So I think it's appropriate to go

16  into at least to acknowledge its existence, to describe

17  it in some -- at some level of detail, but I think it

18  is -- it tends to be sort of a side show.  So I guess

19  the guidance that I would give is that it's not

20  irrelevant, but it's probably not worth spending a

21  really long time on it.  So it gets to the point where

22  it's a 403 balance where my concern is not -- the

23  prejudice is I think it's fair cross-examination, fair

24  impeachment of your employees, but it seems to me it's

25  really a risk of a big waste of time if it gets too far

1  afield.  But if the essential elements of the

2  compensation suggest they have an incentive to

3  discourage reporting workplace injuries, that's the

4  essential point that needs to be conveyed and I hope it

5  doesn't take long.

6         MR. DOUGLAS:  Very well.

7         THE COURT:  You can stay seated.

8         MR. DOUGLAS:  Thank you, Your Honor.  One other

9  point, and this is perhaps a housekeeping measure.  I

10 want to be clear that we're not doing this to be harsh

11 or anything, but the plaintiff did request that

12 witnesses be sequestered and we would request at the

13 start of the testimony that Mrs. Koziara be excused from

14 the courtroom on that basis as well.

15         THE COURT:  I think that's fair.

16         MR. MORGAN:  Your Honor, we don't intend to

17 call Ms. Koziara as a witness in the liability phase of

18 the trial.  We did list her as a potential witness, but

19 we don't have any intention of calling her.  We are

20 going to call her if there's a damages phase, so I'm not

21 as --

22         THE COURT:  Does that allay your concern if

23 she's --

24         MR. DOUGLAS:  No, Your Honor.  Our desire is

25 that -- our request is that she be sequestered during

1  the trial.

2          THE COURT:  It's upon request.  I think it's,

3  you know, it's granted.  And you requested it at the

4  outset, so she'll be sequestered.

5          MR. MORGAN:  Okay.  She can stay for the

6  opening statement?

7          MR. DOUGLAS:  No objection to that.

8          THE COURT:  Very good.  Okay.  Anything from

9  the plaintiff?

10          MR. MORGAN:  No, Your Honor.

11          THE COURT:  Good.  One housekeeping detail that

12  I don't know if I recorded it.  I will take notes on the

13  proceedings here for my own purposes so I can decide on

14  motions, but I'm not going to maintain the official list

15  of exhibits that are in or out.  That responsibility is

16  yours.  So I would suggest that whoever is the proponent

17  of that evidence be pretty assiduous in making sure that

18  you make a record of the ruling.

19      If I rule and somehow there's a dispute about it

20  later, I'll just have to rule again.  I'd like to think

21  it's going to be somewhat consistent, but, you know, it

22  probably is a good idea for you guys, both sides, to

23  keep track of what evidence has been admitted so that we

24  can settle on it.  And then of course at the end of the

25  trial, we'll have to figure out what goes back to the

1   jury.  So keep careful notes on that.  But it's on you,

2   not me.

3       With that, I think we're ready to bring the jury

4   back.

5       (Jury brought in courtroom at 12:40 p.m.)

6           THE CLERK:  This Honorable Court is again in

7   session.  Please be seated and come to order.

8           THE COURT:  Thank you.  I notice you audibled

9   on the positions in the jury box.  Did everybody get

10  into their right seats?  It's kind of like elementary

11  school.  You've got to sit where you're -- legal motion

12  on the line there.

13      So Members of the Jury, we are about to begin the

14  trial of the case.  Before it begins, I will give you

15  some instructions to help you understand how the trial

16  will proceed, how you should evaluate the evidence, and

17  how you should conduct yourselves during the trial.

18      The party who begins the lawsuit is called the

19  *plaintiff*.  In this case the plaintiff is Michael

20  Koziara.  The party against whom the suit is brought is

21  called the *defendant*.  In this case the defendant is

22  BNSF Railway Company.  This case involves the Federal

23  Railroad Safety Act, a law that prohibits railroads from

24  retaliating against employees for reporting work-related

25  injuries.  Mr. Koziara claims that he suffered a

1  fracture to his left leg when he was supervising a work

2  crew at a location known as East Winona near La Crosse,

3  Wisconsin.   The crew was removing planks from a track

4  bed.   In the course of investigating Mr. Koziara's

5  injury, BNSF came to believe that he had stolen property

6  from the railroad company a week before his injury.

7  BNSF allegedly suspended Mr. Koziara for his involvement

8  in the accident that led to his injury and BNSF claims

9  to have terminated him for stealing company property.

10       In this case, Mr. Koziara claims that BNSF

11  suspended and then terminated him because he reported an

12  injury in violation of the Federal Railroad Safety Act.

13  BNSF claims that Mr. Koziara did not report his injury

14  in good faith and that BNSF would have suspended and

15  terminated Mr. Koziara regardless of whether he had

16  reported the injury.   You, the jury, will decide whether

17  Mr. Koziara reported his injury in good faith and you

18  will decide whether BNSF would have suspended and then

19  terminated Mr. Koziara regardless of whether he had

20  reported the injury.

21       I have some instructions concerning the conduct of

22  the case.   The case will proceed as follows:   First,

23  plaintiff's counsel will make an opening statement

24  outlining plaintiff's case.   Immediately after

25  plaintiff's statement, defendant's counsel will make an

1  opening statement outlining defendant's case.  What is

2  said in opening statements is not evidence.  It is

3  simply a guide to help you understand what each party

4  expects the evidence to show.

5      Second.  After the opening statements the plaintiff

6  will introduce evidence in support of his claim.  At the

7  conclusion of the plaintiff's case, the defendant may

8  introduce evidence.  The plaintiff may then choose to

9  introduce rebuttal evidence.

10      Third.  After the evidence is presented, the

11  parties will make closing arguments explaining what they

12  believe the evidence has shown and what inferences you

13  should draw from the evidence.  What is said in closing

14  argument is not evidence.  The plaintiff has the right

15  to give the first closing argument and to make a short

16  rebuttal argument after the defendant's closing

17  argument.

18      Fourth.  I will instruct you on the law that you

19  are to apply in reaching your verdict.

20      Fifth.  You will retire to the jury room and begin

21  your deliberations.

22      The trial day will run from 9 a.m. to 5:30 p.m.

23  You will have at least an hour for lunch and two

24  additional short breaks, one in the morning and one in

25  the afternoon.  The courtroom is often kept chilly.  You

1  are welcome to dress accordingly.

2      During recesses, you should keep in mind the

3  following instructions.  These are some of the ones that

4  I previewed for you when I sent you out before lunch.

5  First.  Do not discuss the case either among yourselves

6  or with anyone else during the course of the trial.  The

7  parties to this lawsuit have a right to expect from you

8  that you will keep an open mind throughout the trial.

9  You should not reach a conclusion until you have heard

10 all of the evidence and you have heard the lawyers'

11 closing arguments and my instructions to you on the law

12 and you have retired to deliberate with the other

13 members of the jury.

14     I must warn you in particular against commenting

15 about the trial in an email or a blog or Twitter or any

16 social media website.  There have been news accounts

17 recently about cases that have had to be retried because

18 a member of the jury communicated electronically about a

19 case during the trial.  You can imagine what this would

20 mean and the cost of a retrial, the inconvenience to

21 your fellow jurors whose work would have been done for

22 nothing, and the stress experienced by the parties.

23     Second.  Do not permit any third person to discuss

24 the case in your presence.  If anyone tries to talk to

25 you, despite your telling him not to, report that fact

1  to the Court as soon as you are able.  Do not discuss

2  the event with your fellow jurors or discuss with them

3  any other fact that you believe you should bring to the

4  attention of the Court.

5       Third.  Although it is a normal human tendency to

6  converse with people with whom one is thrown into

7  contact, please do not talk to any of the parties or

8  their attorneys or witnesses.  By this I mean not only

9  do not talk about the case, but do not talk at all, even

10  to pass the time of day.  In no other way can all the

11  parties be assured of the absolute impartiality they are

12  entitled to expect from you as jurors.  We have kind of

13  a small courthouse here, so it's not really an unusual

14  circumstance for you to be in the lobby at the same time

15  as any of the counsel.  They are instructed to act as

16  though you're not there and you should do the same to

17  them and it's a special suspense of our rule that we be

18  polite to each other normally, but just ignore them and

19  they will ignore you, but don't take it personally.

20       Fourth.  Do not read about the case in the

21  newspapers or listen to radio or television broadcasts

22  about the trial.  If a newspaper headline catches your

23  eye, do not examine the article further.  Media accounts

24  may be inaccurate and may contain matters that are not

25  proper for your consideration.  You must base your

1  verdict solely on the evidence presented in court.

2       Fifth.  No matter how interested you may become in

3  the facts of this case, you must not do any independent

4  research, investigation or experimentation.  Do not look

5  up materials on the internet or any other sources.

6  Again, you must base your verdict solely on the evidence

7  presented in court.

8       When the case is over, you can answer your friends'

9  and family's questions about what happened in court and

10  you can talk about it afterwards.  But until this case

11  is done, don't discuss it with anyone.  After you've

12  heard all of the evidence, I will give you some detailed

13  instructions about the law that you will apply.  But to

14  guide you as you hear the evidence, I will provide you

15  with a brief summary of the basic principles applicable

16  to this case right now.

17       Mr. Koziara's claims are based on the provisions of

18  the federal statute entitled *The Federal Railroad Safety*

19  *Act*.  We sometimes go crazy with acronyms and

20  abbreviations, so you might hear it referred to as the

21  FRSA.  That's the Federal Railroad Safety Act.  This

22  statute prohibits discrimination in the form of

23  retaliation against a railroad employee who, in good

24  faith, reports to his employer a workplace injury.

25       You will have two general issues to address in this

1   case.  The first issue is whether Mr. Koziara has proven

2   that he reported a workplace injury in good faith, which

3   means that Mr. Koziara actually and reasonably believed

4   that he had been injured on the job.  If you conclude

5   that Mr. Koziara has proven this element, then you will

6   address the second issue in this case:  Whether BNSF

7   would have taken the same unfavorable actions in the

8   absence of Mr. Koziara's injury report.

9        Let me stop right here to tell you that when you go

10  back to deliberate, you'll have a copy of these

11  instructions that I'm reading to you now and you'll also

12  have a copy of the more detailed instructions that I'll

13  give to you at the end of the case.  You'll have those

14  in writing.

15       Let's talk about what's going to happen when you're

16  hearing the evidence.  First subject is burden of proof.

17  You will hear the term *burden of proof* used during this

18  trial.  In simple terms, the phrase burden of proof

19  means that the party who makes a claim or asserts a

20  defense has the obligation of proving that claim or

21  defense.  Mr. Koziara has the burden to prove that he

22  reported his injury in good faith.  BNSF has the burden

23  to prove that it would have suspended and terminated

24  Mr. Koziara regardless of his injury report.  At the end

25  of the trial, I will instruct you on the proper burden

1  of proof to be applied in this case.

2      Credibility of witnesses.  In deciding the facts,

3  you may have to decide which testimony to believe and

4  which testimony not to believe.  You may believe

5  everything a witness says, part of it, or none of it.

6  In considering the testimony of any witness, you may

7  take into account many factors, including the witness's

8  opportunity and ability to see or hear or know the

9  things the witness testifies about; the quality of the

10 witness's memory; the witness's appearance and manner

11 while testifying; the witness's interest in the outcome

12 of the case; any bias or prejudice the witness may have;

13 any other evidence that may have contradicted the

14 witness's testimony, and the reasonableness of the

15 witness's testimony in light of all the evidence.  The

16 weight of the evidence does not necessarily depend on

17 the number of witnesses who testify.

18      Depositions.  During the course of the trial, the

19 lawyers may refer to and read from depositions.

20 Depositions are transcripts of testimony taken while the

21 parties are preparing for trial.  Deposition testimony

22 is given under oath, just like testimony given during

23 the trial.  You should give it the same consideration

24 you would give it had the witness testified here in

25 court.

1      Objections.  During the trial you will hear the

2  lawyers make objections to certain questions or to

3  certain answers of the witness -- answers of the

4  witnesses.  When they do, it is because they believe the

5  question or answer is legally improper and they want me

6  to rule on it.  Do not try to guess why the objection is

7  being made or what the answer would have been if the

8  witness had been allowed to answer it.  If I tell you

9  not to consider a particular statement that has already

10 been made, put that statement out of your mind and

11 remember that you may not refer to it in your

12 deliberations.

13     Questions.  During the trial I may sometimes ask a

14 witness questions.  Please do not assume that I have any

15 opinion about the subject matter of my questions.  If

16 you wish to ask a question about something you do not

17 understand, write it down on a slip of paper.  When the

18 lawyers have finished all their questions to the

19 witnesses, if your -- to each witness, if your question

20 is still unanswered to your satisfaction, raise your

21 hand and I will take the written question from you, show

22 it to counsel and decide whether the question is one

23 that can be asked.  If it cannot, I will tell you that.

24 I will try to remember to ask questions after each

25 witness -- to ask you about questions after each has

testified.  It's easy to forget for me.  So if you have a question when a witness is done, before I say you may step down, just raise your hand and I'll be able to see you do that.  But if you have a question, write it on a piece of paper and then send it over.  Sometimes juries ask really great questions and it's really, really very useful, so I'm happy to have your questions.  Sometimes you may ask a question about a subject that for whatever reason under the Rules of Evidence concerns some material that's not proper to consider in a proceeding like this, and if that's the case, I'll just say we can't ask that question.  So don't draw any inferences about why that's so.  The Rules of Evidence protect both parties' interest in a fair trial, so sometimes it restricts the information that we can get to you.  So don't forget, if you have questions, just raise your hand.  I'll see you.

Notetaking.  If you want to take notes, there are notepads and pencils next to the jury bench.  This does not mean you have to take notes.  Take them only if you want to and only if you think they will help you recall the evidence during your deliberation.  Do not let notetaking interfere with your important duties of listening carefully to all of the evidence and of evaluating the credibility of witnesses.  Keep in mind

1    that just because you've written something down, it does
2    not mean that the written note is more accurate than
3    another juror's mental recollection of the same thing.
4    No one of you is the secretary for the jury charged with
5    the responsibility of recording the evidence.  Each of
6    you is responsible for recalling the testimony and other
7    evidence.
8         Although you can see that the trial is being
9    recorded by a court reporter, you should not expect to
10   use the trial transcripts in your deliberations.  You
11   will have to rely on your own memories.
12        Evidence.  Evidence at a trial includes the sworn
13   testimony of the witnesses, exhibits admitted into the
14   record, facts judicially noticed, and facts stipulated
15   by counsel.  You may consider only evidence that is
16   admitted into the record.
17        In deciding the facts of this case, you are not to
18   consider the following as evidence:  Statements and
19   arguments of the lawyers; questions and objections of
20   the lawyers; testimony that I instruct you to disregard;
21   and anything you may see or hear when the court is not
22   in session even if what you see or hear is done or said
23   by one of the parties or by one of the witnesses.
24        Evidence may be either direct or circumstantial.
25   Direct evidence is direct proof of a fact such as

1    testimony by a witness about what the witness said or

2    heard or did.  Circumstantial evidence is proof of one

3    or more facts from which you could infer the existence

4    of another fact.  If the question were whether it was

5    raining on September 1st, direct evidence of this fact

6    would be a witness's testimony that they were outside

7    and they saw it raining that day.  Circumstantial

8    evidence of the fact that it was raining would be that

9    people came into a building carrying wet umbrellas that

10   day.  You should consider both kinds of evidence.  The

11   law makes no distinction to the evidence between direct

12   or circumstantial evidence.  You are to decide how much

13   weight to give any evidence.

14        Contradictory or impeaching evidence.  A witness

15   may be discredited by contradictory evidence or by

16   evidence that at some other time the witness has said or

17   done something or failed to do or say something that is

18   inconsistent with the witness's present testimony.  If

19   you believe any witness has been discredited, it is up

20   to you to decide how much of the testimony of that

21   witness you believe.  If a witness is shown to have

22   given false testimony knowingly, that is voluntarily and

23   intentionally, about any important matter, you have a

24   right to distrust the witness's testimony about other

25   matters.  You may reject all the testimony of that

1    witness or you may choose to believe some or all of it.

2         The general rule is that if you find that a witness

3    has said something before the trial that is different

4    from what the witness said at trial, you are considered

5    -- you are to consider the earlier statements only as an

6    aid in evaluating the truthfulness of the witness's

7    testimony at trial.  You cannot consider as evidence in

8    this trial what was said before the trial began.

9         There is an exception to this general rule for

10   witnesses who are the actual parties in this case.  If

11   you find that any party -- if you find that any of the

12   parties made statements before the trial that -- before

13   the trial began that are different from the statements

14   that they made at trial, you may consider as evidence in

15   this case whichever statement you find more believable.

16   So for witnesses generally, if somebody tries to point

17   out that they said something different before the trial,

18   that will help you decide if the witness is telling the

19   truth in this courtroom.  But if it's an actual party,

20   if it's Mr. Koziara or an employee of BNSF, if it turns

21   out that they said something different before the trial,

22   you can consider that earlier statement as actual

23   evidence in this case.

24        Drawing of inferences.  You are to consider only

25   the evidence in the case.  But in your consideration of

1  the evidence, you are not limited solely to what you see

2  and hear as the witnesses testify.  You are permitted to

3  draw from facts you find have been proved such

4  reasonable conclusions as seem justified in the light of

5  your own experience and common sense.

6      Experts.  A person's training and experience may

7  make him or her a true expert in a technical field.  The

8  law allows that person to state an opinion here about

9  matters in that particular field.  It is up to you to

10  decide whether you believe the expert's testimony and

11  choose to rely upon it.  Part of that decision will

12  depend on your judgment about whether the expert's

13  background, training and experience is sufficient for

14  him or her to give the expert opinion that you heard;

15  whether the expert's opinions are based on sound

16  reasons, judgment and information.

17      During the trial an expert witness may be asked a

18  question based on assumptions that certain facts are

19  true and then asked for his or her opinion based upon

20  that assumption.  Such an opinion is of use to you only

21  if the opinion is based upon assumed facts that are

22  proven later.  If you find that the assumptions stated

23  in the question have not been proven, then you should

24  not give any weight to the answer the expert gave to the

25  question.

1     That concludes my opening instructions.  You are

2  about to hear the opening statements of counsel.

3  Although these statements are not evidence, they should

4  help you understand the evidence that you will soon see

5  and hear.  With that, you may present.

6         MR. MORGAN:  Thank you, Your Honor.  May it

7  please the Court.  Counsel.

8      "This isn't good."  Those are the words BNSF

9  manager Bob Kramer spoke to plaintiff Mike Koziara when

10  he -- when Mr. Koziara handed Mr. Kramer a Personal

11  Injury Report Form on Thursday, or excuse me, Tuesday,

12  September 14th, 2010, after learning that he had

13  suffered a broken bone in his left leg when a 1200 pound

14  piece of wood hit it while Mike was working on the

15  railroad tracks.

16     You will hear that within exactly two months of

17  Mike suffering an injury and reporting it to BNSF, the

18  company suspended and then terminated Mike Koziara, who

19  at the time had been working at the company for 32

20  years.  That's what this case is about.

21     Now, all plaintiff, Mr. Koziara, has to prove to

22  you is that he reported the injury in good faith to

23  BNSF.  We intend to stay focused on that one issue

24  during this case and then we're going to sit down and

25  rest, and it will be BNSF's turn to try to prove to you

1  that it would have suspended and terminated Mike Koziara

2  even if he hadn't reported the injury.

3      I want to start by briefly walking through a

4  timeline that includes undisputed facts, undisputed

5  facts in this case.  On September 9, 2010, Mr. Koziara

6  was injured at work and later the same day reported the

7  injury to BNSF manager Don Jones.

8      On September 13th, that following Monday,

9  Mr. Koziara is diagnosed with a fractured bone in his

10  left leg.

11      Mr. Koziara then informs his direct supervisor,

12  Mike Veitz, about the fracture and is directed to fill

13  out a Personal Injury Report Form, which he does on

14  September 14th, 2010.  He completes and submits the

15  Personal Injury Report Form.

16      Two days later, on September 16th, 2010, BNSF

17  informs Mr. Koziara that he's under investigation for

18  failing to be "alert and attentive as well as for being

19  careless resulting in personal injury."

20      On October 5th, 2010, BNSF issues another notice,

21  this time informing Mr. Koziara that he's under

22  investigation for theft and dishonest conduct for

23  removing BNSF property.

24      October 18, Mr. Koziara receives a 30-day record

25  suspension for "failure to be alert and carelessness or

1  alert and attentive and carelessness resulting in

2  personal injury."

3      And lastly, on November 9th, two months after the

4  injury he suffered, BNSF terminates Mr. Koziara for

5  theft and dishonest conduct.  That timeline, Ladies and

6  Gentlemen, will be and is undisputed.

7      So who is Mr. Mike Koziara?  He's 55 years old.  He

8  just had a birthday this past Saturday.  He's been

9  married to Joan for 25 years.  He began working for BNSF

10 in 1978.  He started as a laborer, proceeded to become a

11 welder, and then was ultimately a foreman.  He worked in

12 the foreman role for the last several years before he

13 was terminated in 2010.

14     Mr. Koziara is also a member of the memberhood

15 of -- the Brotherhood of the Maintenance of Way, which

16 is a division of the Teamsters.  He was a member of this

17 union while he was employed by BNSF.  He held positions

18 such as Local chapter president and he held a

19 Legislative Director position at the time he was

20 terminated in the fall of 2010.

21     Mike's entire professional life literally within

22 months after he graduated from high school in 1978 was

23 devoted to BNSF.  It was spent mostly outside doing

24 manual labor, fixing and maintaining railroad tracks

25 from Wisconsin to Chicago to Kansas City to Paducah,

Kentucky, and all parts in between.  This work was

manual labor that involved heavy tools and equipment.

Accidents and injuries were a part of Mr. Koziara's

life.

     First instance in 1988, Mike was injured on the job

when he slipped and fell into a hole that was surrounded

by barbed wire.  Just as he did in this case, Mike

filled out a Personal Injury Report Form for that injury

to give to his supervisor.  His supervisor at the time,

who had possession of the form, came up to Mike,

confronted him, ripped the Personal Injury Report Form

in half, and threatened Mike with discipline.  Mike

never forgot that experience.

     As prevalent as accidents and injuries are, the

work rules that Mike Koziara and his fellow co-workers

out on the track have to comply with are equally

prevalent.  You'll see that I think BNSF has seven

different sets of rule books.  These are all the rule

books.  One of the rule books is the Maintenance of Way

Operating Rules.  And I've called that up on the screen.

One of the rules is Rule 1.1.2, the rule that says you

have to be alert and attentive.  And I've called that

rule on the screen.

     You will note that there is a reference to

preventing injuries and avoiding injuries in the very

1  rule.  That history dated back to 1988.  The context of

2  all of the workplace rules will be important for you to

3  consider as you're hearing about all the facts in this

4  case and deciding the facts of this case.

5      So now let's turn to September 9th of 2010.  Mike

6  was a foreman for a work crew of railroad maintenance

7  workers who were tasked to remove a set of crossing

8  planks from a railroad crossing near East Winona,

9  Wisconsin.  East Winona is just on the other side of the

10  -- the Wisconsin side of the Mississippi River just

11  across from Winona, Wisconsin.  One of the 1200-pound

12  crossing planks being lifted out of the ground shot

13  across the tracks and hit Mike's left leg in the shin

14  just above his ankle.

15      Another worker, a co-worker, Al Mitchell, who you

16  will also hear from in this trial, was standing within

17  several feet of Mike Koziara when Mike got hit.

18  Initially Mike thought his leg was only badly bruised.

19  You will hear him testify that he was in shock, that his

20  leg hurt, that after several minutes he went and sat

21  down, took off his boot to look at it and saw that it

22  was bruised and saw that it was cut, but he put a

23  bandage on it, wrapped it, and continued working that

24  day.  He thought he had only gotten bruised.  He was

25  able to walk on his foot still or on his leg.

1      On September 9th, at the end of the workday,

2   Mr. Koziara, because he was a 32-year employee, knew

3   that he had to report the injury; and although Al

4   Mitchell was standing next to him and also witnessed the

5   injury, Mike knew he had to report it himself, and he

6   did report it the day it occurred, September 9th, 2010.

7   When he talked to Don Jones back at the train depot that

8   afternoon, Mr. Jones says, "Either it's an injury or

9   it's not."  He says, "If you fill out the form, the

10  Personal Injury Report Form, BNSF will have to do a

11  reenactment," basically a replay of how the injury

12  occurred.

13      He also told Mr. Koziara that Mr. Koziara had 72

14  hours to fill out the Personal Injury Report Form.

15  Mr. Koziara didn't fill out a Personal Injury Report

16  Form on Thursday afternoon and he didn't because he

17  didn't know his -- he had fractured a bone in his leg.

18  He thought he had gotten lucky; he thought it was just a

19  bad bruise.  He was able to continue to walk on it.

20      So we fast forward to Friday, September 10th.

21  Mr. Koziara worked through the day.  He will tell you he

22  woke up; it felt stiff, it felt sore, but he wrapped it

23  and he was able to walk and he went to work.  He was in

24  pain and he walked with a little bit of a limp, but he

25  worked throughout the day.  And like I -- you'll hear

1  him testify he believed he got lucky.  He believed he

2  hadn't broken a bone and that it was just a bad bruise.

3      This is the last day that Mike Koziara ever works

4  on railroad tracks for BNSF Railway.  September 10th,

5  2010.  September 11 and 12 is a weekend.  Mr. Koziara

6  did not have to work that weekend.  He largely stayed

7  around the home, laid low, didn't do anything out of the

8  ordinary.

9      September 13, 2010, is a Monday.  He is previously

10  scheduled to be off of work that day.  He had a doctor's

11  appointment unrelated to the injury from the previous

12  Thursday, and he also had to attend to some union

13  business through his legislative position in Milwaukee.

14  And so that was a preapproved, prescheduled day off.

15      He went to his doctor's appointment, and he told

16  the doctor that he had hurt his leg.  And during the

17  routine physical, the doctor looked at the leg, noticed

18  it was tender, saw the bruise, saw the cut, and

19  recommended that Mike get an x-ray, and he did get an

20  x-ray.  And the x-ray revealed that he had a fractured

21  bone in his left leg.

22      This is P-9, which is Plaintiff's Exhibit 9.  It's

23  part of a medical record from Monday, September 13,

24  2010, and you can see Michael returns from x-ray and

25  there's a distal tibial fracture, which I had Dr. Chad

1  Harbour from orthopedics review.  And then the next

2  sentence says, "He was recommended a walking boot" and a

3  follow-up with him in two weeks.

4      Mike is going to tell you that that was a

5  significant moment in his life.  He was scared.

6  Although he reported the injury the previous Thursday to

7  Mr. Jones when it occurred, remember he didn't fill out

8  a Personal Injury Report Form and knew now that it was

9  diagnosed as a fracture, he had to fill out the report

10  form, the same report form that was ripped in two in

11  front of him in 1988.  He also believed he only had 72

12  hours to report the injury, because that's what

13  Mr. Jones told him, and he was past the 72 hours at that

14  point.  So he was scared.  He thought it was too late

15  and that he would be disciplined for late reporting.

16      After he left the doctor's office on Monday, the

17  13th, still thinking about what would happen if he

18  turned in the Personal Injury Report Form, he called two

19  of his co-workers, Brad Underhill and Tom Arentz.

20  They're not BNSF management, they're co-workers.  They

21  work maintenance on the railroad tracks just like Mike.

22  And he told Mr. Underhill and Mr. Arentz a different

23  story.  He said that he had gotten injured at home over

24  the weekend and that he was going to be off of work for

25  awhile.

1      Mike then placed two additional calls, one to a Don

2  Willing and one to a Russ Ingebritson.  Mr. Willing is

3  an officer with the union, the Brotherhood of

4  Maintenance of Way, and Mr. Ingebritson is actually an

5  attorney in the Minneapolis area who does railroad

6  litigation.  And he had talked to them both about this

7  injury and they instructed him to report it.  They told

8  him he had to report the Personal Injury Report Form.

9      So taking that information in, on the same day

10  Mr. Koziara calls Mr. Underhill and Mr. Arentz back and

11  he apologizes and said the real story is the injury that

12  happened last Thursday resulted in a broken bone in my

13  leg and I'm sorry I told you a different story.  He did

14  it that night.

15      Either late on the 13th or early September 14th,

16  Mr. Koziara, while in Milwaukee, called Mike Veitz, his

17  direct supervisor.  And he told Mr. Veitz about the

18  fracture; the x-ray and the fracture.  And Mr. Veitz, no

19  surprise, instructed Mr. Koziara to fill out a BNSF

20  Personal Injury Report Form.

21      Now Mr. Veitz was tending to a train derailment and

22  wasn't in the La Crosse area when he received the phone

23  calls from Mr. Koziara on the 14th in the morning.  He

24  was attending to a train derailment and he had a couple

25  of his managers with him at that train derailment.  One

1  of them was Dan Rankin, who's sitting in the courtroom

2  in the chair right behind counsel's table, and another

3  was Gary Wischover.  They are both there tending to the

4  train derailment.  And they instructed -- Mike Veitz get

5  off the phone with Mike and told them immediately about

6  the broken leg and they instructed Mr. Veitz to

7  immediately conduct a reenactment, just as Mr. Jones

8  predicted would happen the previous Thursday.

9       So on the 14th, Mike did what he was told, did what

10  he intended to do anyway, which was return to La Crosse

11  from Milwaukee.  He went to the La Crosse train depot.

12  He brought an individual by the name of James Schaitel

13  with him.  Mr. Schaitel was the former Local union

14  president, and he brought him there for support, and he

15  filled out the Personal Injury Report Form at the

16  La Crosse train depot and he submitted the Personal

17  Injury Report Form to Bob Kramer, a trainmaster with the

18  company, BNSF management.  And as he was handing

19  Mr. Kramer the Personal Injury Report Form, Mr. Kramer

20  says to him "This isn't good."

21       Submitting this Personal Injury Report Form started

22  a string of events that resulted in his suspension and

23  his termination.

24       You'll see on your screens before you Plaintiff's

25  Exhibit 33.  This is the notice dated September 16,

1    2010, just two days after he submits the Personal Injury

2    Report Form.  This is the language:  "You should attend

3    an investigation on Thursday, September 23rd, for the

4    purposes of ascertaining facts and determining your

5    responsibility, if any, in connection with your alleged

6    failure to be alert and attentive and carelessness when

7    you allegedly did not safely remove crossing board

8    resulting in your, your, Mr. Koziara's personal injury

9    while assigned as foreman."

10        So this notice got to him.  He had to go -- Mike

11   had to go into the depot and sign a form acknowledging

12   that he received the notice of investigation two days

13   after he submitted the report form.  It was also before

14   Mr. Veitz had even conducted the reenactment of what had

15   happened.

16        That happened the next day.  No other worker who

17   was at the site of the incident on September 9th

18   received a notice of investigation that you just saw,

19   just Mr. Koziara.  And no one else at the site of the

20   incident that day was charged with any rule violation,

21   just Mr. Koziara.

22        Here are the two rules that the notice refers to.

23   Now it doesn't refer to it by the specific number, but

24   by the words.  Alert and Attentive.  1.1.2.  You saw

25   this earlier in my remarks.  This was one of the rules

1  that he was being charged with violating, and the second

2  one was Rule 1.6, Conduct.  And you see under number one

3  there is a reference to carelessness of the safety of

4  themselves or others.

5       As I mentioned, the reenactment occurred the next

6  day, September 17th, 2010.  And it's supposed to be

7  done, the stated reason is to ascertain the facts of the

8  incident.  Mr. Koziara was not invited to the

9  reenactment and he didn't attend it.  Al Mitchell, who

10  was standing several feet next to Mr. Koziara when

11  Mr. Koziara was hit by the crossing plank, wasn't

12  invited and didn't attend the reenactment.

13       There was also a discussion that day during the

14  reenactment about Mr. Koziara giving away some old track

15  ties weeks earlier.

16       Now the investigation hearing with regard to the

17  allegations about failing to be alert and attentive and

18  carelessness occurred on September 23rd, 2010.  So he

19  received the notice on the 16th and one week later he

20  has his hearing.

21       Now you're going to hear about these investigatory

22  hearings at BNSF.  You're going to hear that the person

23  who presides over the hearing is BNSF management.

24  You're going to hear that Mr. Koziara didn't have a

25  right to an attorney at the hearing.  You're going to

1    hear that he didn't have the right to subpoena or compel

2    witnesses to attend the hearing.  You're going to hear

3    that the witnesses who did testify don't have to take an

4    oath, like they're going to over the course of the next

5    several days; like you did earlier this morning.  They

6    don't have to do that.

7         And Mr. Michael Heille, who is the officer in both

8    this first investigation and the next one that I'll tell

9    you about, estimated in his deposition, and I presume

10   will testify later this week, that of the hearings he

11   presides over, BNSF wins 95 percent of the time.  He

12   says 10 out of 200.  I did the math.

13        On October 5th -- so he has the hearing on the 23rd

14   regarding the incident that resulted in the injury, and

15   then on October 5th, he's given a second notice of

16   investigation.  This time for theft and dishonest

17   conduct.  This has to do with the discussion that

18   occurred at the reenactment on the 17th about

19   Mr. Koziara giving away some old track ties.  They're

20   actually switch ties, not track ties.  Switch ties are

21   longer than track ties and exist when the train is

22   moving from one rail to the other.  They call it a

23   switch.  So they're the longer ties.  He did take and

24   give away twenty ties, and we'll get to that.  But

25   that's what this notice dated October 5th, 2010, Exhibit

1    P31, is all about.

2         And you can see the reference to the timing, the

3    misuse they allege of company property for your personal

4    use while on duty in the morning of September 2nd or

5    3rd, a week before September 9th.  So the events, as I

6    indicated, occurred before Mr. Koziara was injured, and

7    Mr. Koziara will tell you that he received permission

8    from his direct supervisor, Mr. Michael Veitz, to take

9    and then give away the twenty switch ties.

10        You're going to hear Mr. Koziara say that he's

11   previously taken ties and he's gotten permission from

12   Mr. Veitz in the past and it's never been an issue; that

13   he had never been disciplined before for taking ties.

14        There were others that assisted in the removal of

15   these twenty switch ties that day, others from the

16   company, and you're going to hear them say Mr. Koziara

17   had others from the company help him, on work time,

18   using company equipment.  No other employee was or

19   received a notice of investigation for theft or

20   dishonest conduct, just Mike.

21        Now, the rule that BNSF relied on to allege that

22   Mike had committed theft and was dishonest is the same

23   rule, 1.6, that he was charged with with regard to the

24   incident.  But this time instead of subset one, they're

25   relying on subset four, which is dishonesty.

1    October 18th, if we continue the story and the

2  timeline, is the day he receives notice of discipline

3  for failing to be alert and attentive and careless.  He

4  lost his investigatory hearing, and so the company

5  issued a Level S 30-day record suspension.  They said

6  that he failed to be alert and attentive and he was

7  careless when he didn't remove -- safely remove a

8  crossing plank on September 9th resulting in your

9  personal injury.  That's Exhibit P7.

10    Ironically the very same day he received the

11  discipline, the 30-day record suspension, is the day he

12  has to attend the second investigation hearing, this

13  time for theft and dishonest conduct over this giving

14  away of twenty switch ties.  The same deal, conducted by

15  BNSF management; in fact, it was conducted by the same

16  officer.  Michael Heille conducted the first

17  investigatory hearing and he conducted the second.  But

18  in this case, in this hearing, just like in the first,

19  no right to an attorney, no right to compel witnesses to

20  testify, certainly not under oath.

21    Mr. Koziara lost that hearing too, and on November

22  9th, 2010, he received the dismissal notice ending his

23  32 years of employment at BNSF.  They say that he was --

24  his employment -- and that he "would be dismissed

25  effective immediately from employment for theft and

1   dishonest conduct when he was involved in the

2   unauthorized removal of property and misuse of company

3   equipment for personal use while on duty."

4        Below you can see the reference to MOWOR.  That's

5   the Maintenance of Way Operating Rule 1.6 that we talked

6   about.

7        So what will BNSF say in this case?  First, they're

8   going to tell you that Mr. Koziara didn't make a report

9   of a work-related injury in good faith.  But I'd ask you

10  to consider this information as you hear all of the

11  facts.  Mr. Koziara reported the injury on September

12  9th, the day it occurred.  BNSF won't dispute that.  In

13  fact, BNSF will bring someone here and admit that an

14  employee can report an injury precisely how Mike

15  reported the injury on Thursday, September 9th.

16       You'll also see and hear that at all relevant times

17  during this two-month period of time, that BNSF treated

18  the injury as a work-related injury.  This is an

19  internal email of theirs after Mike had been dismissed

20  where there's a discussion amongst several higher level

21  employees about how to characterize Mr. Koziara's

22  dismissal, and the quote I blew up shows "Only theft is

23  cited as reason for dismissal, nothing for failing to

24  report an injury."

25       Mr. Veitz will also admit that Mike Koziara got

1    injured on September 9th, 2010.  He just doesn't think

2    Mike broke his leg.  But he doesn't dispute that Mike

3    got injured that day.  BNSF though has no evidence that

4    Mr. Koziara injured his left leg in any other way other

5    than the way that Mr. Koziara has told -- has testified

6    to up to this point and what he'll testify to later this

7    afternoon, which is what I just explained happened on

8    Thursday, September 9th, at East Winona, Wisconsin.

9         Then BNSF will say well, we would have suspended

10   Mr. Koziara even if he hadn't been injured.  The

11   discipline notice that we saw says that he's being

12   disciplined for conduct that resulted in his personal

13   injury.  Uses the word *your*, but he's the recipient of

14   the notice.

15        Mr. Koziara is the only employee that got injured

16   on September 9th.  Al Mitchell was standing within

17   several feet of Mr. Koziara when the plank hit

18   Mr. Koziara and he wasn't charged with any rule

19   violation.  No other person was charged with any rule

20   violation.

21        So then BNSF will argue that we would have

22   terminated Mr. Koziara even if he hadn't been injured.

23   But Mr. Veitz gave Mr. Koziara permission.  Now

24   Mr. Veitz is going to deny that.  He's not going to say

25   that he blessed this.  But Mr. Koziara will tell you

1 that he did receive permission from Mr. Veitz, either

2 the day of or within a day or two prior to the taking,

3 and then he gives away the twenty switch ties.

4 You're going to hear it happened in the morning in

5 broad daylight. You're going to hear that the ties at

6 that point, once they are removed out of the ground and

7 are sitting in a pile next to the rail, aren't even BNSF

8 property anymore. They had to be disposed of in some

9 way. You will hear that Mike didn't keep any of the

10 switch ties, he gave them away to a farmer friend of

11 his. He had taken ties before; he was never

12 disciplined. In fact, BNSF has never disciplined or

13 terminated another employee for giving away old scrap

14 ties.

15 Lastly, they're going to say well, Mike had a

16 chance to appeal the dismissal before a review panel and

17 they sustained the dismissal and they sustained the

18 suspension. So what are we doing here? It's a separate

19 proceeding. It's not this case. You're the deciders of

20 fact in this case. Mr. Koziara didn't attend a hearing

21 before the review panel, and it was a review of the --

22 in part, the investigatory hearings that I've talked to

23 you about that Mr. Heille presided over.

24 Ladies and Gentlemen, Bob Kramer's words on

25 September 14, 2010, *this isn't good*, were prophetic.

1    Two months to the day after Mike's injury he's suspended

2    and fired.  Mike brought this lawsuit to challenge the

3    legitimacy of BNSF's conduct.  After 32 years of hard

4    work and dedication, mike deserves a fair assessment of

5    why he was suspended and why he was terminated.  This

6    case is about whether the suspension and the termination

7    were because he reported a work injury.

8        We're confident that you all will provide that fair

9    assessment.  Thank you very much for your time and

10   attention.      (1:30 p.m.)

11            THE COURT:  Thank you.  Mr. Douglas.

12            MR. DOUGLAS:  May it please the Court.

13   Counsel.  Good afternoon, Ladies and Gentlemen.  Just to

14   remind you, my name is Bruce Douglas and I'm one of the

15   attorneys for BNSF Railway Company.  I look forward to

16   this opportunity to speak to you today because this is

17   really one of only two opportunities that I, as an

18   attorney, get to speak to jurors.  I'll get another

19   opportunity at closing argument.  But for the rest of

20   the trial, you'll only hear me when I'm questioning a

21   witness or perhaps making an objection.  So I do welcome

22   this opportunity to give you BNSF's perspective on this

23   case.

24        I'd like to tell you a little bit about our case

25   and I'm going to tell you some facts that my esteemed

1  colleague, Mr. Morgan, did not tell you.  So let me

2  begin.  What do we think this case is all about?  We

3  think this case, first of all, is about danger, we think

4  it's about honesty, and we think it is about not having

5  permission to dispose of BNSF's property.

6      Now, let me pause here for a moment to tell you

7  what this case is not about in our view.  This is not

8  the occasion nor is this case about whether or not

9  BNSF's decision initially to give Mr. Koziara a 30-day

10 Level S record suspension.  That's a mouthful.  I'll

11 explain that in a moment.  Nor is it about whether or

12 not that decision was fair.  It's not about whether the

13 decision to discharge Mr. Koziara or dismiss him was

14 fair.  Those are decisions that were made by the

15 railroad and we don't come here today to second-guess

16 those decisions.  Instead, the only questions that have

17 to be answered are the ones that Mr. Morgan outlined for

18 you, and that is did Mr. Koziara make his injury report

19 in good faith and would we have taken the same action

20 against Mr. Koziara even if he had never filed an injury

21 report.  So it has nothing to do with the fairness of

22 some of the procedures that you've heard about, and I

23 will address that.

24     The other thing that I think is important is to

25 tell you how seriously BNSF takes certain matters.  The

1   first thing that it takes very seriously is that it

2   cares about its employees.  The second thing is it wants

3   employees to work safely.  It's the goal of BNSF to

4   prevent injuries.  It's the goal of BNSF to have

5   employees report to work, to go work -- go about their

6   work safely, and go home safely at the end of the day to

7   their families.  So yes, BNSF has rules.  And we have

8   about eight inches worth of rule books there.

9       But unlike things like employee handbooks that you

10   may receive at your job -- and we have a joke in the

11   field of employment law, both plaintiff's lawyers and

12   management lawyers, and that is that I've never met an

13   employee who actually has read the employee handbook

14   their employer gave them.  As employers, we all like to

15   think that employees read the handbooks.  We know that

16   that's really not case.

17       But the railroad is a different kind of business.

18   Employees have to read the rule books that they're

19   given.  And there are that many rule books because there

20   are different what we call *crafts* and *classes* of

21   employees on the railroad.  There are people who drive

22   the trains; conductors.  There are people who work with

23   locomotives.  There are people who lay the tracks, the

24   maintenances workers; Mr. Koziara's section or division,

25   the Brotherhood of Maintenance of Way Employes, and

1   there are others who do other types of work on the

2   railroad.   Each of those -- people who work in the yards

3   where the trains are assembled and switched and put

4   together, everybody has their own set of rules.   These

5   rules are published.   They're circulated to the union.

6   They're made available.   They're available on the

7   company intranet.

8        But more importantly, as we will show you during

9   the trial, these rules are studied and tested on every

10  year and the employees themselves receive operations

11  tests periodically by their supervisors.   We know

12  they're tested on it because they go online and they

13  take the courses and they certify that they've read the

14  rules and they've taken the tests and it goes into their

15  employee record, which is called an employee transcript.

16  And we'll show that to you during the trial.   So I think

17  it's unfair for someone to say we're minimizing the

18  rules that the railroad has and holding up seven inches

19  or eight inches of rules and saying well, it's a bunch

20  of paper.   It's not just a bunch of paper.

21       The other thing that you weren't told during

22  Mr. Morgan's opening statement, which is critical, is

23  that Mr. Koziara for quite awhile, and on the days that

24  we're going to talk about during this discussion, was a

25  foreman.   Now, he's not a member of management, but he

 1  was a foreman.  A foreman is a position that you achieve

 2  under the Collective Bargaining Agreement.  You bid on

 3  it, you get it on seniority, and based on your

 4  qualifications you become a foreman.

 5       Mr. Koziara was the foreman in charge on the two

 6  days in question that we're talking about, September

 7  9th, and what happened the week before.  And I'll be

 8  candid with you:  Nobody really knows the exact date

 9  that the ties were given away at Winona Junction, but it

10  happened during the week of August 30th to September

11  3rd.  Everybody agrees on that.  We do know the date of

12  the claimed injury, which was Thursday, September 9,

13  2010.

14       But Mr. Koziara was the foreman.  As the foreman,

15  he is responsible for overseeing the work.  When you're

16  working on crossings and so forth where train traffic

17  has to be stopped, he is the person responsible for

18  making the arrangements for train traffic to be stopped.

19  You're going to hear about something called a Form B.

20  It's a procedure by which the train traffic is stopped

21  while the men are working on the track.  He is to be

22  overseeing the work.  But more importantly, as a

23  foreman, one of his primarily duties while he's out

24  there is to ensure that everybody is a safe distance

25  away from any equipment and to do the job safely.

1        Now, it is because of how Mr. Koziara conducted

2    himself on September 9, 2010, that he received a 30-day

3    Level S record suspension.  I'll tell you what that is.

4    Level S means -- 30-day part everybody gets.  Level S

5    means it's a serious violation of the rules.  And the

6    rules were shown to you by Mr. Morgan in his opening.

7    It's a record suspension.  This is something that many

8    of you may not be familiar with in your line of work.  I

9    think all of you understand what a suspension is and

10   then what a dismissal is.  In the railroad industry, at

11   BNSF, sometimes some employees receive essentially a

12   black mark on their record, but they're not sent home

13   and they don't lose any pay.  That is what a record

14   suspension is.

15       One of the reasons for that of course has to do

16   with the fact that it's a unionized environment.  You're

17   dealing with unions and these types of things have been

18   established by the parties, but also for manpower needs.

19   It's not always feasible to send somebody home without

20   pay every time they make a small mistake.  This was a

21   larger mistake, so he received a 30-day record

22   suspension, and the notice of the suspension would say

23   to him, if you're found to have violated any more rules

24   within the next 12 months, the discipline will be even

25   more serious.

1    So what happened on that date?  On September 9,

2  2010, Mr. Koziara was directing a crew of workers who

3  were working on a crossing.  Mr. Koziara's crew was to

4  take up crossing planks.  Another crew, a tie gang

5  they're called, was working on the underlying railroad

6  tracks and the ties that go between the railroad track.

7  If you know, railroad tracks, you're going to hear

8  testimony, are about five feet apart and those track --

9  those ties that are perpendicular laying in the bed of

10  the truck are called *railroad tries*.  The particular

11  ties that we were dealing with here were crossing

12  planks.

13    Now what happened to make this dangerous?  The

14  first thing here is we're dealing with a large wooden

15  crossing plank.  I'm going to show you a picture of it

16  very shortly.  These planks, as you will see, are about

17  nine inches high, about 18 inches wide, and about 16

18  feet long and they weigh about 1200 pounds.  They are

19  fastened down to the crossing by essentially what are

20  large wood screws, metal screws, just like you would

21  fasten wood at home; you know, a little wood screw, you

22  drill it in, you put some wood, hang it to the wall.

23  Except that these wood screws can be anywhere from a

24  quarter-inch to half-an-inch, and they're about 16 to 18

25  inches long.  They're big screws.  They don't have a

1    screwdriver head on top.  Instead what they have is kind

2    of a square head and you use a devise that's essentially

3    a high-powered socket wrench to screw them into the

4    ground and to take them up.  And in order to get the

5    crossing planks up, you have to remove these things, and

6    these things are called *lags*.

7        On that day, there was -- Mr. Koziara was the

8    foreman.  He got to the work site and he was told by one

9    of the people who was working on the crew that there was

10   a problem with the hydraulic gun.  Hydraulic gun is

11   essentially a great big socket wrench that runs on

12   hydraulic power.  It was broken and the men were trying

13   to repair it.

14       Mr. Koziara then conferred with the person who was

15   running the front-end loader, a very large tractor.  His

16   name was Greg Zielke, and we expect that you're going to

17   hear from Mr. Zielke.  And Mr. Zielke and Mr. Koziara

18   decided, Mr. Zielke proposed it or Mr. Koziara proposed

19   it, but Mr. Koziara directed him to go ahead and use the

20   forks of this front-end loader to pry up this plank,

21   literally to pop it up out of the ground, and that's

22   what Mr. Zielke was trying to do.  The problem with this

23   is Mr. Koziara was standing only about five to seven

24   feet away from this near the front of the machine in the

25   line of fire from where that crossing plank could

1  possibly be popped up, and that, unfortunately for him,

2  is apparently what happened.  He was the foreman and so

3  forth.

4      This is the motto Burlington Northern has.  This

5  sign that you see here, this is posted on some of the

6  locations of Burlington Northern; may or may not have

7  been at La Crosse.  But Mr. Rankin, who is going to

8  testify in this case, will tell you that this particular

9  sign, which dates back many, many years, is actually

10 found at the back of his building in Galesburg,

11 Illinois.  That's a philosophy of the company that most

12 injuries are, in fact, preventable.

13     Now the plaintiff makes light of that.  The

14 plaintiff says that if Burlington Northern thinks that

15 injuries are preventable, then it really doesn't want to

16 know about injuries or somehow that is really a bad

17 thing.  It's not a bad thing for an employer to believe

18 that injuries are preventable and to train people to

19 work in a safe manner.

20     Now here's the crossing planks that we're talking

21 about.  This is a shot of the crossing planks.  This is

22 actually the crossing at a location called *East Winona*.

23 Now I'm going to tell you right now that we have two

24 locations that have the same word in them.  It's a

25 little confusing.

1      The first set of events that I'm going to tell you

2  about occurred at East Winona.  The next set of events

3  occurred at a place called *Winona Junction*, which is

4  several miles away.  We'll show you a map during the

5  trial.

6      To give you an idea of the heft, the size of these

7  crossing planks, as I told you, they're about nine

8  inches high, 18 inches wide, about 16 feet long.  They

9  weigh about 1200 pounds.  They are screwed into the

10  ground, maybe a little hard to see it, but there are

11  holes there.  They're screwed into the ground with these

12  lags.  And in order to get them up, you have to take the

13  lags out.  As a last resort, if the lags are stuck,

14  maybe the head is stripped, you can't get them out, then

15  it is not totally unacceptable to use the front-end

16  loader to pop them up.  But as you will hear from the

17  BNSF witnesses, that's really a last resort, and when

18  that is done, it has to be done very, very carefully.

19      Now you heard about reenactments.  My esteemed

20  colleague suggested to you these reenactments are some

21  type of a sinister thing that goes on.  Not so.  Every

22  time there's an incident, whether it involves damage to

23  property, whether it involves injury to an employee on

24  the job, there is performed by the supervisor as quickly

25  as possible a reenactment.  And a reenactment is exactly

1    what it sounds like.  You assemble the people who were

2    out there, you assemble the equipment that was out

3    there, you get everybody to tell you how it was lined

4    up, and then you take a photograph like this and you

5    write a report.  And we'll show you the entire report

6    which consists really of just one slide in a PowerPoint

7    presentation.

8        Mr. Veitz, the supervisor, his title was roadmaster

9    at this time and he's now retired from the company, but

10   you'll hear from him; went out and took this picture.

11   Now if you see the gentleman standing off to the right

12   in front of the front-end loader, that actually isn't

13   Mr. Koziara.  He was not there that day.  He was

14   unavailable because of his injury; he had claimed

15   injury.  He was off work.

16       This is another employee by the name of Brad

17   Underhill standing in for him.  Sitting in the cab is

18   Mr. Zielke, the front-end loader operator.  These are

19   the forks that were being used to pop up the plank.

20   Where the forks are touching that particular plank,

21   that's the plank that came up and that's probably the

22   same plank that Mr. Koziara says flew over the crossing

23   and struck him in the left leg.

24       The only thing that might be different, Mr. Koziara

25   does not think he was standing inside the track.  He

1  thinks he may have been standing about 12 inches back

2  just on the other side of the track.   Okay?

3        This is what the thing looked like on the day in

4  question.   This is what Mr. Veitz learned during the

5  construction of the reenactment.   Okay.

6        For that incident, Mr. Koziara received a notice of

7  hearing to report for an investigation.   Now I'll tell

8  you something that will come out in the evidence, we

9  expect it will come out in the evidence is this:   These

10  investigations are governed by rules, not necessarily

11  BNSF's rules, they're governed by rules in the

12  Collective Bargaining Agreement with the union.   There

13  is a rule, Rule 40, and we'll show it to you during the

14  case, and it specifies the timeline for conducting these

15  investigative hearings that you've heard about.   The

16  investigative hearing has to be held within fifteen days

17  after the incident.   The employee has to receive at

18  least five days advance notice, written notice of the

19  hearing, and the union does as well.

20        So the reason for the apparent haste to conduct the

21  hearing, the investigative hearing, are these timelines

22  are very strict under the Collective Bargaining

23  agreement, and that's how the hearings are held.

24        Now, you heard some material -- you've heard some

25  information from Mr. Morgan that says well, these

1    hearings aren't very fair.  These hearings aren't fair

2    because they're conducted by a BNSF person, in this case

3    Mike Heille, who happens to be in the Maintenance of Way

4    Department down in Illinois, and he conducts a lot of

5    hearings for the division that he works in.

6        It's not fair because Mr. Koziara didn't have a

7    lawyer.  He didn't have the opportunity to subpoena

8    people.  He didn't have the opportunity to do this or

9    that.  Although the fairness of that hearing is really

10   not the point because that's an investigative hearing

11   conducted by BNSF to decide what discipline to impose,

12   first of all, Mr. Koziara was represented at the hearing

13   by his union representatives.  In the first hearing, he

14   was represented by Mr. Chris Davis, who you will hear

15   from, we expect you'll hear from in this case.  At the

16   second hearing at his dismissal, he was represented by

17   both Mr. Davis and Don Willing, who was the Local

18   chairman.  You've heard that name already because he's

19   the gentleman that Mr. Koziara consulted with about

20   whether to file a personal injury report.

21       The hearings are not under oath, but they are

22   transcribed, just as what's happening in this courtroom.

23   There's an audio recording made and a transcript, and

24   after that the transcript, and any exhibits that anybody

25   wants to put in, is typed up and it's sent to the person

1  who is going to make a decision as to what to do with

2  the employee.  Was there a rules violation.

3        The investigation had nothing to do with how the

4  injury occurred.  It was not an investigation into the

5  injury.  It was not -- it wasn't the Star Chamber.  It

6  was an investigation for the purpose of finding out if

7  rules were violated, how they were violated, could it

8  have been prevented, how can it be prevented in the

9  future.  The outcome of these reenactments in

10  determining what happened at a particular site is very

11  important for BNSF because they use that information as

12  a teachable moment and they talk about it in safety

13  meetings that are held on almost a weekly basis with

14  everybody in the section or the department or the

15  division.  So they might say look what happened out at

16  East Winona last week.  Don't do it that way again

17  because it wasn't the best practice to do in the first

18  place.

19        All right.  The next incident that occurs -- and

20  this is something BNSF doesn't learn of until after the

21  time that Mr. Koziara reports his injury.  BNSF comes

22  into information that perhaps Mr. Koziara may have been

23  injured at another time, in another place.  They find

24  out that the week before, Mr. Koziara was seen by his

25  co-workers hopping around on one foot at Winona Junction

1   because he had either stepped off or fallen off two

2   trailers containing switch ties.  Mr. Veitz knew nothing

3   about any of that.

4        Mr. Veitz contacted the BNSF Police Department.

5   Yes, BNSF has its own police department.  It's a very

6   large system.  The tracks are all over the place, and

7   they have their own police officers.  They're not

8   certified police officers that make arrests outside, but

9   they are police officers nonetheless who are trained to

10  investigate; and they particularly deal with issues of

11  theft of property that is located on the BNSF property,

12  whether it's BNSF's property, whether it's an employee's

13  property, whether it's a contractor's property.

14       And what was discovered was that the week before,

15  Mr. Koziara was directing a crew repairing switch ties,

16  repairing a crossing -- they were removing some switch

17  ties.  Switch ties I will show you in just a minute.

18  They happen to look almost exactly like really nice

19  landscaping ties that you might be able to buy at

20  Menards or Lowes or something like that.  Mr. Koziara

21  decided to give away about twenty of those switch ties

22  to a local farmer, friend of his by the name of Russ

23  Hicke.  Mr. Hicke unfortunately is deceased so we can't

24  call him at this trial.

25       Mr. Koziara did not have permission to give away

1  that property.  Now, Mr. Koziara will offer you all

2  sorts of explanations for why it's okay to give away the

3  property or that at one time people could get permission

4  to give away the property.  But you will also hear

5  evidence in this case that it is the custom and a

6  longstanding practice at BNSF that if an employee was,

7  in the old days, was given ties or permission to take

8  ties, he also had to get a written release to take them.

9  And if there wasn't a written release in the old days,

10  verbal permission was okay.  But BNSF cannot think and

11  it has no information on anyone ever doing this on

12  working time, using company equipment, and, you know,

13  using company personnel on the clock.  And that's what

14  Mr. Koziara did.  And that's why he was fired:  For the

15  theft, for misusing company property, for misusing

16  company personnel on the clock.

17     These are what switch ties look like.  They come in

18  various lengths.  They can be 16 feet, 24 feet, et

19  cetera.

20     The reason that employees were not given permission

21  in 2010 any longer, and you'll hear evidence of this, to

22  either purchase or take ties is that these railroad ties

23  are creosote.  They have to be disposed in an

24  environmental friendly manner, and that means that BNSF,

25  if the ties are really no good for anything, they're

1  ground up and then they're incinerated.  They're sent

2  off for that purpose.  And yes, BNSF may have to pay

3  people to do that, but that's the way these ties under

4  the law have to be disposed of.

5       Now here is the other thing you weren't told in the

6  -- in Mr. Morgan's opening statement.  Now he said to

7  you -- if I may use the document camera, Your Honor?

8            THE COURT:  Sure.

9            MR. DOUGLAS:  One of the things Mr. Morgan said

10  to you a little while ago was that we wouldn't -- we

11  wouldn't dispute that Mr. Koziara was injured on

12  September 9th.  We do dispute that he was injured in the

13  way and to the extent that he claims on September 9th.

14  There may be evidence to show that the plank struck him,

15  but we don't believe that the actual break took place on

16  that date.  So where it says "BNSF has no evidence that

17  Koziara injured his leg in any other way," here is what

18  you weren't told.

19       Mr. Koziara is the one who created the other

20  evidence of this.  When he was at the doctor's office on

21  Monday, September 13th, as soon as he found out from the

22  x-ray report that he had a fractured tibia, he got on

23  the phone and called two of his co-workers, Brad

24  Underhill and Charlie Arentz, and told them that he had

25  been injured at home over the weekend.  And what he told

1  them was he had been working on the plow of his ATV and
2  the plow fell on his leg.  That's what he told them.
3      He then made a call to Don Willing, his union
4  chairman.  He then, after talking to Mr. Willing, made a
5  call to his lawyer.  After makes those calls, he then
6  called back Mr. Underhill and Mr. Arentz and said
7  essentially just kidding, it didn't happen that way.  I
8  wasn't injured at home.  And then after making those six
9  telephone calls, he finally calls his supervisor,
10 Roadmaster Veitz.  He didn't speak to him that day, but
11 he did speak to Roadmaster Veitz the next morning.
12 Mr. Veitz was up in Hager dealing with a derailment.  He
13 got a call at about quarter to seven in the morning, and
14 his immediate reaction was, as he will tell you, he
15 wanted to know why he hadn't been told of that injury
16 sooner.
17     Mr. Koziara explained it to him.  Mr. Veitz said,
18 "Well, get that report filed as soon as possible."
19 Mr. Koziara told him "I won't be able to do it today
20 because I'm out on union business."  And Mr. Veitz said,
21 "Get it filed as soon as possible."  Mr. Koziara then
22 filed the report later that day.
23     It has been suggested to you that somehow
24 Mr. Koziara was afraid of filing the report.
25 Mr. Koziara may have been afraid of filing a late

1    report.  He wasn't afraid of filing a report.  As a

2    matter of fact, he will tell you in his testimony that

3    on September 9, 2010, if he had wanted to file the

4    report that afternoon when he verbally told Don Jones

5    about the alleged injury, he had the report forms in his

6    desk.  He could have filed one any time he wanted.  And

7    in fact, in this case Mr. Koziara was never charged with

8    filing a late report and he was never disciplined for

9    filing a late report.

10        We will submit to you, Ladies and Gentlemen, that

11   this whole issue about being afraid of filing a late

12   report is a red herring because Mr. Koziara then again

13   changed his story.  And you will have -- you will hear

14   this, from going from the injury didn't happen over the

15   weekend when the plow fell on me to actually the plow

16   fell on me, but it landed on my right toe.

17        It is Mr. Koziara who's created this doubt.  It is

18   Mr. Koziara, who on his own, for whatever reason, has

19   come up with these alternating stories.

20        We will show you in this case why Mr. Koziara was

21   let go.  You've seen these rules before.  The rules

22   indicate dishonesty.  BNSF will show you that it was

23   dishonest of Mr. Koziara to give away the ties and give

24   away the property.  We will show you that the ties were

25   BNSF's property.  But at the end of the day, even if

1   they weren't BNSF's property, they surely were not

2   Mr. Koziara's property to give away.

3        There is also a rule in the MOWOR rules, 1.25, that

4   says in very plain language you cannot give away the

5   property of the company.  Mr. Koziara wasn't charged

6   with that rule, but Ladies and Gentlemen, I submit to

7   you that this rule is about the same as the signs that

8   you see in a bathroom at a restaurant that tells the

9   employees to wash their hands before they go back to

10  work.  I'm sure you've all seen those signs and I'm sure

11  you've all asked yourself why is that necessary, to tell

12  somebody they have to wash their hands before they go

13  back in the kitchen.  Is it really necessary to tell

14  people not to steal company property?  Well, apparently

15  it is.

16       This is what the plow looked like.  You'll hear

17  evidence that the plow was a Sun Country plow.  It's

18  about five feet wide, foot-and-a-half or so tall.

19       This is not Mr. Koziara's ATV.  It's another one we

20  got a picture of off the internet.  And there's an

21  example of the plow.

22       Ladies and Gentlemen, we will tell you this case is

23  about danger, it's about honesty or the lack of honesty,

24  and it's about not having permission to give away the

25  railroad's property.  I will also tell you that it is

1   for BNSF, and I'm sure you will hear this from the

2   employees that will come and talk to you, some of whom

3   are retired, some of whom are still employed, it is

4   indeed a very sad day when a 32-year veteran of the

5   railroad is dismissed for theft.

6          But I submit to you, Ladies and Gentlemen,

7   Mr. Koziara has no one but himself to blame for his

8   predicament.  Thank you for your time.      (1:59 p.m.)

9              THE COURT:  All right.  We'll just take a break

10  while we're standing here in place so we can move the

11  podium out of the way so that the plaintiff can prepare

12  to call his first witness.

13             MR. MORGAN:  Thank you, Your Honor.

14             THE COURT:  Jury can stand up for a moment if

15  you want to.

16       (Pause)

17             THE COURT:  All right.  Mr. Morgan.

18             MR. MORGAN:  Thank you, Your Honor.

19             THE COURT:  You may call your first witness.

20             MR. MORGAN:  Thank you.  Plaintiff calls

21  Michael Koziara, himself, to the stand.

22             **MICHAEL KOZIARA, PLAINTIFF, SWORN**,

23                    DIRECT EXAMINATION

24  BY MR. MORGAN:

25  A    I'm ready.
                    MICHAEL KOZIARA - DIRECT

1   Q     All right.  Would you introduce yourself, please.

2   A     My name is Michael James Koziara.

3   Q     And how old are you?

4   A     Just turned 55.

5   Q     You had a birthday this past Saturday; is that

6   right?

7   A     That's correct.

8   Q     Happy birthday.

9   A     Thank you.

10  Q     Are you employed?

11  A     No, I'm not.

12  Q     When were you last employed full time?

13  A     In the fall of 2010.

14  Q     What happened in the fall of 2010?

15  A     I had an injury at work and I was terminated from

16  the railroad.

17  Q     And when you say *the railroad*, what railroad were

18  you employed by in the fall of 2010?

19  A     Burlington Northern Sante Fe Railroad.

20  Q     BNSF?

21  A     BNSF.

22  Q     You may want to see, Mike, if you can pull the

23  microphone a little closer to you.

24  A     BNSF.

25  Q     All right.  That works.
                MICHAEL KOZIARA - DIRECT

1      Prior to your termination in the fall of 2010, how
2  long were you employed by BNSF?
3  A    32 years.
4  Q    Could you just generally describe the nature of the
5  work that you did over the 32 years.  Just big picture
6  for us, please.
7  A    Big picture.  In the early part of the years, I was
8  a laborer and I was on tie crews and rail crews that we
9  placed rails and the infrastructure of the railroad, tie
10  removal repair.  And then in the later years, like in
11  the 80s and 90s, I became a foreman and I also became a
12  certified welder for the railroad.  And I welded rails
13  back together and certain rail components.
14      And in my last several years with the railroad, I
15  was a track foreman.
16  Q    And how many years roughly did you perform as a
17  track foreman?
18  A    I got my rights back in 1990.  Up until 2010.  So I
19  had twenty years in.
20  Q    Were you a member of BNSF management?
21  A    No, I was not.
22  Q    Are you married?
23  A    I am married, yes, for 25 years to my wife Joan,
24  who is not here anymore.
25  Q    But she was seated here earlier?
              MICHAEL KOZIARA - DIRECT

1   A    She was.

2   Q    And do you have any children?

3   A    We have two step -- I have two stepchildren, Emily

4   and Kelly Ladone (ph), and they're both 36 years old.

5   Q    Twins.

6   A    Twins.  We're empty nesters now.

7   Q    And where did you live, Mr. Koziara?

8   A    I live in Holmen, Wisconsin, about 50 miles north

9   of La Crosse, if anybody is familiar with that.

10  Q    You were born and raised in Wisconsin?

11  A    Yes, I was.

12  Q    Where did you grow up?

13  A    I grew up in La Crosse, Wisconsin.

14  Q    Did you graduate from high school?

15  A    Yes, I did.  Central High in La Crosse.

16  Q    And what year did you graduate?

17  A    1978.

18  Q    What did you do after you graduated from high

19  school?

20  A    I went to a technical college for auto body and gas

21  welding, and then six months after that I got a job on

22  the railroad in August of 1978.

23  Q    And what railroad did you get hired by?

24  A    Burlington Northern Sante Fe or actually at that

25  time it was Burlington Northern.
                MICHAEL KOZIARA - DIRECT

1   Q    At some point did the company merge with another

2 railroad?

3   A    They did in '95 or '94/'95, somewhere in there.

4   Q    Fair to say from August of '97 until November of

5 2010 you worked for Burlington Northern?

6   A    Sante Fe.

7   Q    Or Sante Fe.  Burlington Northern Sante Fe.

8   A    Right.

9   Q    Do you hold or did you hold any certifications

10 while you were employed by BNSF?

11   A    I was a certified welder.

12   Q    And did you receive any higher education post-high

13 school while you were employed by the railroad?

14   A    Yes, I did.  I actually had some computer training

15 at UW-L, but I did -- most of my higher education came

16 from the railroad.  They sent me to Johnson Community

17 College down in Kansas City, Kansas for track

18 maintenance and welding.

19   Q    Excuse me.  Go ahead.

20   A    And welding.

21   Q    You touched on this a little bit already, but it

22 sounds like the first ten years or so of your career you

23 worked as a laborer for the railroad?

24   A    I worked on a lot of mobile gangs, mobile crews.  I

25 was all over from Chicago to Kansas City and parts of

MICHAEL KOZIARA - DIRECT

1    Illinois.  So I was everywhere.

2    Q    Just generally describe the nature of the work.

3    When you say you were working on mobile crews or mobile

4    gangs from here to Chicago to Kentucky, what sorts of

5    work are you doing?  What are you doing on a day-to-day

6    basis?

7    A    Day-to-day basis was tie removals, rail steel

8    removals.  I was operating mostly machinery that would

9    pull spikes or tamp ties or something that would put,

10   you know, we'd take out, remove, and then put it back

11   together so it was serviceable track.

12   Q    And what did you do after the laborer work?

13   A    About the late 80s I got into the welding

14   department, started doing more.  I guess I just got more

15   into the track maintenance.  Foreman.  I was one of the

16   older guys.  Again, you're starting to get up there in

17   age and you started to use your experience to, you know,

18   get yourself promoted or, you know, you get more pay if

19   you take a higher position.

20   Q    So you did welding for a period of time and then

21   transitioned to foreman in the early 90s?

22   A    That's correct.  I did both in the early 90s.

23   Q    And just briefly describe what it means to be a

24   foreman of a work crew for BNSF.

25   A    Depending what you were running, if I was running
                    MICHAEL KOZIARA - DIRECT

1  one of the big gangs or so, you would be in charge of

2  maybe 50 to 100 men.  Sometimes if you were in, like, a

3  small section like I was at the last part, you were in

4  charge of maybe four or five guys or you supported a

5  gang that was in 50 or 100 men.  So there was a lot of

6  people you were in charge of.  You made sure everything

7  was safe.  You gave briefings and made sure that

8  everything was where it was supposed to be.

9  Q    And you've referred a couple of times to the term

10 *gangs*.

11 A    Gangs, that's correct.

12 Q    What's a gang?

13 A    Gangs are the same as a work crew.  We just call

14 them gangs, but they're actually like a tie crew

15 removal.  They're the ones that came in and removed all

16 the ties.  There's rail gangs.  There's rail grinding

17 trains.  There's all sorts of different things to do

18 every day.

19 Q    Did you like working for the railroad?

20 A    I did.

21 Q    What did you enjoy about it?

22 A    I enjoyed being outside, different things to do.

23 It was a change every day.  It wasn't just -- every day

24 you didn't do the same thing.  You know, if there was a

25 tree fell on the tracks, you went out and got the tree

MICHAEL KOZIARA - DIRECT

1  off the tracks.  You know, it was just -- you were in

2  charge of maintenance.  So it was challenging.

3  Q    Were you also a member of a union during your

4  employment at BNSF?

5  A    Yes, I was.

6  Q    And what union were you a member of?

7  A    I was a member of the Brotherhood Maintenance of

8  Way Employees, division of the Teamsters.

9  Q    And did you hold any leadership position for the

10 union during your time at BNSF?

11 A    Yes, I did.  I was, at the time, I was our

12 president of our Local, and I was also the Legislative

13 Director for the Rail Division of the Teamsters for the

14 State of Wisconsin.  That was an elected position.

15 Q    Was that in 2010 when you were terminated, did you

16 hold those positions?

17 A    Yes, I did.

18 Q    Okay.  And what did you do in the legislative

19 position?

20 A    Legislative positions, I would come to either

21 Madison or DC and we would -- I would lobby on safety

22 bills due -- to help the employees or the State of

23 Wisconsin, anybody that we would affect along the

24 right-of-way.  I got us a couple bills passed

25 successfully into law, so I was proud of myself for

                    MICHAEL KOZIARA - DIRECT

1    that.  I was active.

2    Q    You were employed with BNSF in the August/September

3    2010 time frame; is that right?

4    A    That's correct.

5    Q    What position did you hold during those

6    August/September 2010 months?

7    A    I was a section foreman at Winona Junction.

8    Q    All right.  So section foreman.  Winona Junction.

9    A    Yes.

10   Q    And what is Winona Junction?

11   A    Winona Junction is where Highway 35 and Highway 54

12   meet as it goes over to Winona.  There's a depot right

13   there at the bottom of the tracks or the hill there,

14   right -- you've got to cross the bridge and that's where

15   the depot was.

16   Q    And was that -- and you said section foreman.  What

17   does a section mean?

18   A    Section foreman means you were in charge of a

19   section, a crew of men.  It could be anywhere from three

20   to five guys and you were in charge of a territory that

21   would run from like Trempealeau, Wisconsin all the way

22   up to like Nelson is what I was in charge of.  It was

23   double mains.  It was about 100 miles of track.

24   Q    And any issue that arose in that 100 miles worth of

25   track your crew was asked to help fix?

                MICHAEL KOZIARA - DIRECT

1    A    That's correct.  Or if there was an adjoining

2    section that needed help, we would go and help them too.

3    They could send us anywhere if they really wanted to.

4    Q    So focusing in on the August/September 2010 time

5    frame, give the jury a typical day for you in terms of

6    where you started the day and what you did next, all the

7    way through to the afternoon.  Just generally speaking.

8    A    Generally speaking we would meet at the section

9    house in the morning at seven o'clock.  We would wait

10   for the conference call where we would talk to the

11   roadmaster in charge, and then after he'd give us, ask

12   us what we were doing for the day, then the dispatcher

13   would come on because he'd want to know where we were

14   going to be so he could give us our track authorities.

15       We would -- whatever we had doing that day, that's

16   where we'd go.  We'd get the job done, and then debrief,

17   come home, and then we were done for the day.  At the

18   same time, we worked generally from seven to three, and

19   that was a day.

20   Q    Okay.  Did the company have rules that the

21   maintenance workers like yourself and your co-workers

22   out in the field had to follow?

23   A    Yes.

24       MR. MORGAN:  Would you call up Exhibit P5,

25   please.
                 MICHAEL KOZIARA - DIRECT

1  Q     Do you recognize P5?

2  A     I don't think this thing works.

3          THE COURT:  Hold on, I'll take care of that.

4          THE WITNESS:  There it is.  It's a little

5  fuzzy.

6          THE COURT:  That I can't help you with.

7  Q     I'm not sure I can either.

8  A     Okay.  Yes.

9  Q     Okay.  And what is P5?

10 A     P5 is the Maintenance of Way Operating Rules.

11         MR. MORGAN:  I would offer P5, Your Honor.

12         THE COURT:  Any objection?

13         MR. MORGAN:  No objection.

14         JUROR THOMPSON:  We don't have anything.

15         THE COURT:  You're going to get the rhythm of

16 this very shortly.  But after they offer it and there's

17 an objection that gets ruled on or no objection, then

18 this will happen and you'll see it.  There you go.

19         MR. MORGAN:  Is everyone able to see it now?

20         THE COURT:  Yep.  And if you're wondering, you

21 can check the gallery monitor.  Can you see that.

22         MR. MORGAN:  Thank you.

23 BY MR. MORGAN:

24 Q     Are you familiar with the Maintenance of Way

25 Operating Rules?
                    MICHAEL KOZIARA - DIRECT

1   A    Yes, I am.

2   Q    Is this one of the sets of rules you were required

3   to follow?

4   A    Yes, we are.

5   Q    Were you expected to know the Maintenance of Way

6   Operating Rules?

7   A    Yes, I was.

8   Q    Were you trained on them?

9   A    Yes, we were.

10  Q    Did you follow them?

11  A    Yes, I did.

12  Q    I want to switch gears a little bit and talk about

13  the hierarchy of employees that you worked with,

14  starting with the crew or gangs of employees.  Those are

15  -- those are the maintenance workers like yourself; is

16  that right?

17  A    That's correct.

18  Q    Okay.  And then there are various types of gangs or

19  work crews; right?

20  A    Yes, there are.

21  Q    You've identified some of them, the tie gang for

22  instance?

23  A    Right.  That would have like a foreman, an

24  assistant foreman on it because there was more than one

25  guy could handle, so they would have an assistant

           MICHAEL KOZIARA - DIRECT

1  foreman to help that.  The foreman used to take care of

2  just protection of the gang to make sure wherever you're

3  working you were not getting run over by the trains.

4  Q    How does a person become a foreman or an assistant

5  foreman?

6  A    You have to have a year's track experience first

7  and then if you qualify with your seniority, you can get

8  that job.

9  Q    And the foreman position is the position you held

10 in August/September of 2010?

11 A    That's correct.

12 Q    And then is there a first level of management that

13 the crew members, including the forepersons, report to?

14 A    Yes.  If the gang was big enough, they would have

15 an assistant roadmaster on it.  The gang would answer to

16 him first.  And then the roadmaster was in charge of the

17 territory.  He would be the -- he would be actually the

18 guy that -- whatever his territory is, like La Crosse to

19 Prescott was our territory under Mike Veitz, so he would

20 even have to answer to him.  So that's how it would

21 work.  And then it goes on from there to division

22 engineer and on up.

23 Q    And in terms of the breakout of the company, is the

24 company broken into divisions?

25 A    Yes, they are.
                      MICHAEL KOZIARA - DIRECT

1    Q    What division is Wisconsin in, do you know?

2    A    We're in the Chicago Division.

3    Q    And is there a division that Wisconsin is?

4    A    Yes.  We were in District 500.

5    Q    And I think you mentioned this.  You had

6    responsibility for a track, at least as a foreman of a

7    work crew, for a track in Wisconsin.

8    A    That's correct.

9    Q    And Mr. Veitz was your roadmaster in

10   August/September of 2010?

11   A    Yes, he was.

12   Q    Were there other roadmasters that you had the

13   occasion to work with during that time frame other than

14   Mr. Veitz?

15   A    Yes, there was.

16   Q    How did that work where you would work with a

17   roadmaster other than Mr. Veitz?

18   A    If I was -- if there was another roadmaster, if I

19   had to work with him, Mr. Veitz would instruct me to

20   work with that crew, with that roadmaster, and he would

21   be my supervisor at the time, my immediate supervisor.

22   I would switch to whoever it was.

23   Q    What sorts of specific work were your crews doing

24   in that August/September 2010 time frame?

25   A    We were supporting the tie gangs.  There was a mini

                    MICHAEL KOZIARA - DIRECT

1  tie gang and a large tie gang.

2  Q    Okay.  So there's a mini tie gang and a large tie

3  gang.  How many crew members make up or comprise

4  generally a mini tie gang?

5  A    Six people.

6  Q    And then how about the larger regular-sized tie

7  gangs?

8  A    Anywhere from 30 to 50.

9  Q    Okay.  And the mini tie gangs, generally what are

10  their responsibilities?  What do they do with the ties?

11  A    The mini tie gang came out and they were just

12  taking out the switch ties in front of the big tie gangs

13  so they didn't slow them down at all.

14  Q    Okay.  So let me stop you there.  And we saw it in

15  Mr. Douglas's opening.  I'm not sure if we did.  Yeah, I

16  believe we did see switch ties; is that right?

17  A    That's correct, we saw switch ties.

18  Q    So just briefly describe what a switch tie is and

19  how it's used on the track.

20  A    Switch ties are made of wood and they're basically

21  there to -- so when you go from one track to the other

22  track, the switch ties are longer, so it goes through

23  the switch so we've got something so the train can run

24  over it with one tie or one piece of wood.

25  Q    So the mini tie gang was responsible for replacing

                    MICHAEL KOZIARA - DIRECT

1  or removing switch ties?

2  A    That's correct.

3  Q    Okay.  And then the other set of tie gang or tie

4  crews is just the regular tie crew; right?

5  A    Right.  They came in and very rarely did they do

6  switch ties, but if they did, there was a few of them.

7  We also took care of that too.

8  Q    And what was their primary responsibility, the

9  regular tie gang?

10  A    Their primary responsibility is just to take out

11  the track ties.

12  Q    Just give the jury some comparison between the size

13  of a switch tie as opposed to a regular track tie.

14  A    A regular track tie is eight foot six inches long

15  and a switch tie can run anywhere from nine feet to

16  twenty-four feet long.

17  Q    And can you just generally describe how the tie is

18  removed from the track?

19  A    Well, first you have to pull the components off it,

20  like spikes or lags, whatever was holding the tie down.

21  Then there would be a machine that would come along and

22  they'd tear it out with what's called the *tie inserter*.

23  They would take it out with it.  That tie inserter would

24  put another tie back in it.  They'd come along, they'd

25  plate it, replate it, and then they'd respike it again

MICHAEL KOZIARA - DIRECT

1  or refasten it, whatever had to be done.

2  Q    Do ties get worn down?

3  A    Yes, they do.

4  Q    Do they become useless at some point?

5  A    Yes, they do.

6  Q    And they have to be replaced?

7  A    Yes, they do.

8  Q    Is that the same with regard to switch ties?

9  A    Yes, they do.

10 Q    Okay.  So both switch ties and track ties get worn

11 down.

12 A    Yes, that's correct.

13 Q    And have to be replaced.

14 A    Yes.

15 Q    And that's one of the purposes of the tie gangs,

16 both the regular size tie gang and mini tie gang, to

17 replace those ties?

18 A    That's correct.

19 Q    Where generally, once the ties are -- whether

20 they're switch ties or regular track ties, once they're

21 taken out of the ground, where are they placed?

22 A    They're placed alongside the tracks usually.

23 Q    And what happens to them after they're placed

24 alongside the tracks?

25 A    They're usually picked up by contractors.
             MICHAEL KOZIARA - DIRECT

1   Q    Are those the regular ties or the switch ties or

2   both?

3   A    Both.  It just depends on how many there are.  If

4   there's a small amount, we usually pick them up and

5   throw them in a pile.  Otherwise the contractors -- if

6   they're regular ties, the contractors will pick them up

7   and put them on their trucks.

8   Q    Mr. Koziara, in your 32 years at BNSF, have

9   employees taken old worn out track ties?

10  A    Yes, they have.

11  Q    You, as well as other employees that you know of?

12  A    Yes.

13  Q    Both switch ties and track ties?

14  A    Yes.

15  Q    Aside from the -- well, let me ask you this:  In

16  total how many times have you taken either switch ties

17  or track ties from BNSF?

18  A    I think about three times.

19  Q    And other than the incident at Winona Junction that

20  we'll talk about, those two previous times, were you

21  ever disciplined for taking ties?

22  A    No, I was not.  I got permission.

23  Q    And who did you get permission from?

24  A    Mike Veitz.

25  Q    And how recent was -- were the previous two times

                  MICHAEL KOZIARA - DIRECT

1  that you had taken the ties?

2  A    I believe one was earlier in the year.

3  Q    Earlier in 2010?

4  A    Yes.  Out at what we call *the milepost*.  It's about

5  four miles from Winona Junction.  It was way out at the

6  end of the road where it ends, there was ten ties out

7  there.  I asked him for them.  He said no problem, get

8  them out of there.

9  Q    Did you have to talk to a contractor?

10  A    No, I did not.

11  Q    Did you have to fill out a form?

12  A    No.

13  Q    Sign a release?

14  A    No.

15  Q    You just got permission from your supervisor;

16  right?

17  A    That's correct.

18  Q    And how about the other time?

19  A    That was a long -- that was a little bit longer

20  ago.  We were in the yards.  There was a few ties.  He

21  said go ahead.  Grab some.  Anybody could get them if

22  they wanted them.  He just wanted them out of the yards.

23  Q    Who's he?

24  A    That was Mike Veitz.  I'm sorry.

25  Q    When you say a while ago, could you --

                MICHAEL KOZIARA - DIRECT

1   A   I'm talking 1989.  I remember I took some, other

2   guys loaded their pickup trucks full with a tie crane

3   and loaded their trucks and got them out of there.

4   Q   Have you witnessed other employees loading ties,

5   aside from that instance in the late 80s, in the last

6   several years prior to your termination, did you

7   personally observe employees taking ties?

8   A   I didn't personally observe it, but I know they

9   took them from the hospital down there too, Luther

10   Hospital.  There was a bunch of ties there that some of

11   the guys took home.

12   Q   Have you ever heard of anyone being disciplined for

13   taking ties?

14   A   No.  Nobody.

15   Q   Do you recall -- do you recall the twenty switch

16   ties that were taken and then given away at Winona

17   Junction?

18   A   Yes, I do.

19   Q   Do you remember what day that occurred?

20   A   I believe it was like August 30th.

21   Q   Of 2010?

22   A   Of 2010, that's correct.

23   Q   You don't deny taking the ties, do you?

24   A   No, I do not.

25   Q   And why did you take the ties?
              MICHAEL KOZIARA - DIRECT

1   A     Because I asked for the ties and I got permission

2   to take them.  So at the time, we were short on a track

3   window, which we had so much time to take those ties out

4   of that switch.  He gave -- we were supposed to have

5   five hours, he gave me three hours.  And I --

6   Q     When you say he gave you three hours, who are you

7   referring about?

8   A     I'm sorry.  I'm saying the dispatcher gave us so

9   much time to take the ties out.  We were supposed to

10  have more time.  We did not get more time.  So I

11  utilized getting that -- that time was to get the ties

12  and it helped us get the track window done sooner by not

13  having to load ties and drive them all the way down to

14  East Winona two miles away.  So we got rid of the twenty

15  ties on the trailers and away they went.

16  Q     Let's just back up for a second.  What condition

17  were the switch ties in that day, the twenty switch

18  ties?

19  A     They were scrap.  They were just cracked and just

20  scrap.

21  Q     Were they able to be used on the railroad track?

22  A     No, you can't put those back in the railroad tracks

23  again.

24  Q     And where were the twenty ties sitting?

25  A     They were in -- we were picking them out of the

                    MICHAEL KOZIARA - DIRECT

1  switch.  Greg would go in and get them with the loader.

2  Q    Greg Zielke?

3  A    Greg Zielke would go get them with the loader, come

4  back out, and loaded the trailers up with them.

5  Q    And who did you get permission from to take the

6  ties?

7  A    Mike Veitz.

8  Q    And when did you receive permission from Mr. Veitz?

9  A    It was either that day or the day before.  I'm

10 pretty sure it was the day before.

11 Q    You're aware Mr. Veitz denies giving you

12 permission; right?

13 A    I think he doesn't remember if he doesn't write it

14 down, so yes.

15 Q    Was it during -- were you in person with Mr. Veitz?

16 Was it over the phone?  Was it in writing?

17 A    It was over the phone.

18 Q    And was anyone else on the phone call other than

19 you and Mr. Veitz?

20 A    Mr. Zielke was in the room, but he doesn't remember

21 when I handed the phone to him after I was done talking

22 to Mr. Veitz.  I thought he had heard the conversation,

23 so -- but no, that was about as best I could get.

24 Q    Were there more ties there that day?

25 A    There was eighty ties that day or more taken out.
                    MICHAEL KOZIARA - DIRECT

1    Q    And why did you only take twenty?

2    A    Because that's all I had permission for and that's

3    all that would fit on the trailer anyways.

4    Q    Did you keep any of the twenty switch ties?

5    A    No, I did not.

6    Q    What did you do with them?

7    A    I gave them to the farmer.

8    Q    Who is the farmer?

9    A    Mr. Hicke.

10   Q    Is he a friend of yours?

11   A    Yes, he was.

12   Q    Okay.  And did Mr. Hicke make a request of you?

13   A    He told me if I ever had a chance to get some ties,

14   let him know.  So I did.

15   Q    Did you make any money off of the giving away of

16   the ties to Mr. Hicke?

17   A    No.

18   Q    When did you -- when was the work being performed,

19   this three-hour window?  Was it at night in darkness or

20   was it in the daylight?

21   A    It was in the daylight.  It started off early in

22   the morning, eight or nine o'clock, somewhere in there

23   after my Form B started.

24   Q    And what is Form B?

25   A    Form B is a form of protection which gives you

                    MICHAEL KOZIARA - DIRECT

1  certain things from milepost to milepost.  Before a

2  train can pass that milepost, they have to ask me

3  permission first.  So they cannot go past a certain

4  point.

5  Q    Why is that?

6  A    That's so we can work in a spot and not have to

7  worry about getting run over by the train.

8  Q    Because workers are out on the track.

9  A    That's correct.

10 Q    Okay.

11 A    I was in charge of their safety.

12 Q    Were you trying to hide the fact that you were

13 taking these twenty switch ties to give to Mr. Hicke?

14 A    No, I was not.

15 Q    Were there others that assisted in the delivery of

16 the ties from the track to the trailer?

17 A    Yes, there was.  Well, Greg was running the end

18 loader.

19 Q    And that's Greg Zielke?

20 A    That's Greg Zielke, yes.

21 Q    Were there any other employees that assisted?

22 A    Brad helped move some on the trailer just to jostle

23 them around a little bit.

24 Q    Is that Brad Underhill?

25 A    Brad Underhill.  I'm sorry, yes.
                   MICHAEL KOZIARA - DIRECT

1   Q    So do you know what happened to the remaining 60

2   ties?

3   A    They were all put down at East Winona in a big

4   scrap pile.  As far as I know, they were all hauled off.

5   But I wasn't there when it happened.

6   Q    Okay.  But the 60 were taken down to East Winona?

7   A    That's correct.

8   Q    There were -- how many trailers were used to take

9   the ties off the or away from the railroad tracks?

10   A    Two five-by-ten trailers.

11   Q    Did you own one of the trailers?

12   A    Yes, I did.

13   Q    And who owned the other trailer?

14   A    Mr. Hicke.

15   Q    And so what did Mr. Zielke do with the switch ties

16   with the front-end loader?

17   A    He loaded them on the trailers.

18   Q    So he used the machine to load them on the

19   trailers?

20   A    That's correct.

21   Q    And then the trailers were driven away.

22   A    There was no place to put them down there for extra

23   time.  It was just a way of convenience of getting more

24   time by not having to travel.  There was no place to put

25   the ties in the wildlife refuge, so we put them on the

                    MICHAEL KOZIARA - DIRECT

1  trailers and got rid of them.

2  Q    I'm going to switch gears here a little bit, Mike,

3  and turn to September 9th of 2010.  Do you remember that

4  day?

5  A    Yes, I do.

6  Q    Why does that day stick out?

7  A    Because that's the day I broke my leg.

8  Q    Let's start from the beginning of the day.  You

9  were assigned as a foreman of a work crew?

10 A    Yes, I was.

11 Q    Okay.  And what was your crew supposed to do that

12 day?

13 A    We were supposed to go down and assist; support the

14 tie gang that day; assist them with taking the planks

15 out of the crossing, and taking some lags out of the

16 switch.

17 Q    And lags are those larger wooden screws?

18 A    These are different lags than the ones Mr. Douglas

19 described in the plank.  These are -- just like screws,

20 they're smaller screws that go in the plates.

21 Q    Okay.  Let's start from the beginning of the day.

22 What did you do first thing when you started working

23 that day?

24 A    We were at the depot.  We got our conference call.

25 We talked to the dispatcher so I knew where I was going

                    MICHAEL KOZIARA - DIRECT

1  to be.  I got down there.  I got on the tie gangs

2  authority because they had already had the track.  They

3  were already working down there.  They already had -- I

4  had to get underneath their permission.

5  Q    All right.  So I'm going to stop you there.  You

6  said you all met at the depot.  What depot that morning?

7  A    Just my group met at the depot.  I didn't meet with

8  the tie gang, I met with the tie gang down at the East

9  Winona -- the plank at the crossings.

10 Q    Okay.  But what depot did your crew meet in the

11 morning?

12 A    I'm sorry.  The Winona section or the Winona

13 Junction depot is where we meet every day.

14 Q    All right.  And you had a conference call that

15 morning?

16 A    Yes, sir.

17 Q    With whom?

18 A    With Mike Veitz and the dispatcher.

19 Q    Did Mr. Veitz tell you you would be working with a

20 certain roadmaster that day?

21 A    Yes, he did.

22 Q    And who did he tell you you would be working with?

23 A    Don Jones.

24 Q    And who is Don Jones?

25 A    He's the assistant roadmaster for the tie gang.

                    MICHAEL KOZIARA - DIRECT

1   Q    And what is your responsibility -- what was your

2   responsibility that morning as foreman of the crew at

3   the depot before your crew dispatched out to East

4   Winona?

5   A    I had to make sure that we had the truck loaded and

6   anything we needed for the job.  After we had our little

7   briefing in the morning, we went out to the job site.

8   Q    So did you do that?

9   A    We did.

10   Q    All right.  Then you went out to the job site?

11   A    Yes.

12   Q    When you got there how were things going?

13   A    Going good.  We had briefed with Al on our

14   authorities and, you know, the work crew was there, so

15   we had our plan of action.  And we were taking the

16   planks out, and then Elvin came over and told me that

17   one of the planks were stuck inside the or one of the

18   lags were stuck inside the plank.

19   Q    I'm going to stop you right there.

20        MR. MORGAN:  Could you call up P11, please,

21   Emilee.

22   Q    Mr. Koziara, I'm showing you what's been marked as

23   P11.  Do you recognize P11?

24   A    Yes, I do.

25   Q    What is P11?
                    MICHAEL KOZIARA - DIRECT

1    A    That's --

2    Q    It's Bates stamped 904.  Excuse me.

3    A    That's the East Winona plank crossing that we were

4    working at.

5         MR. MORGAN:  Go to BNSF 905, please.

6    Q    And do you recognize 905?

7    A    Yes, I do.

8    Q    And what is 905?

9    A    905 is the same crossing.

10        MR. MORGAN:  I'd offer the exhibit, Your Honor.

11   P11.

12        THE COURT:  P11 includes both those

13   photographs?

14        MR. MORGAN:  Yes, Your Honor, in addition to

15   several others, but I don't think it's --

16        THE COURT:  Is there any objection to P11?

17        MR. DOUGLAS:  No objection.

18        THE COURT:  No objection?  All right.  It's

19   admitted.

20        MR. MORGAN:  Emilee, go back to P11, please.

21   BY MR. MORGAN:

22   Q    So this is the crossing at East Winona, Wisconsin?

23   A    That's correct.

24   Q    You were mentioning that at some point in time,

25   Elvin -- is that Elvin Smothers?
                    MICHAEL KOZIARA - DIRECT

1   A      That's correct.

2   Q      -- had a conversation with you about an issue?

3   A      Yes.

4   Q      What do you recall him telling you?

5   A      He just said that it was -- that the lag was buried

6   into the plank and they couldn't get it out.  And then

7   the gun was broke, so they were going to go over and

8   work on the gun.

9   Q      All right.  So there was a lag that was stuck that

10  they couldn't get out.

11  A      That's correct.

12  Q      Where was the lag stuck, in where?

13  A      Inside the plank.

14  Q      Okay.  And what is the typical or normal way that

15  you remove a lag from a crossing plank?

16  A      With a hydraulic gun with a socket, and it usually

17  will -- you can get it out that way.  That's how you

18  normally do it.

19  Q      And what did Mr. Smothers say?  That wasn't

20  working?

21          MR. DOUGLAS:  Objection, Your Honor.  Hearsay.

22          MR. MORGAN:  It doesn't go to the truth.

23          THE COURT:  I'll overrule it.  Go ahead.

24  BY MR. MORGAN:

25  Q      Go ahead, Mr. Koziara.
                MICHAEL KOZIARA - DIRECT

1   A    He just said it was bent over inside the lag and he

2   couldn't get at it.

3   Q    You also said that the hydraulic gun was broken?

4   A    Yes, that's correct.

5   Q    What was the problem with it?

6   A    It just wouldn't work.  I don't know what was wrong

7   with it.  They were taking it apart.

8        MR. MORGAN:  Could you go to 906, please,

9   Emilee.

10  Q    Mr. Koziara, we've called up another picture from

11  Exhibit P11.  Do you recognize 906?

12  A    Yes, I do.

13  Q    Is that the crossing?

14  A    Yes, it is.

15  Q    All right.  And those big pieces of wood that we

16  see there, what are those?

17  A    You mean on -- those are planks on that crossing.

18  Q    All right.  And then the smaller pieces that look

19  like they're connecting the two rails, what are those?

20  A    Oh, that's the ties.

21  Q    Those are normal track ties.

22  A    That's correct.

23  Q    All right.  So the bigger pieces of wood are the

24  crossing planks.

25  A    That's correct.
                    MICHAEL KOZIARA - DIRECT

1    Q    And roughly how heavy are those planks?

2    A    They're roughly 1200 pounds.

3    Q    At some point did you discuss the issue that

4    Mr. Smothers raised with you with anyone else from your

5    work crew?

6    A    Yes.  I told Greg Zielke about it.  He said he

7    could get the ties out and he said he could take the

8    whole crossing out really quickly, and I thought --

9    Q    How did he propose to do that?

10   A    With the end loader.

11   Q    The front-end loader?

12   A    That is correct.

13   Q    Now who is Mr. Greg Zielke?

14   A    Mr. Greg Zielke is the front-end loader operator

15   out of La Crosse, Wisconsin.

16   Q    You had worked with Mr. Zielke in the past?

17   A    I have.

18   Q    For how many years have you worked with Mr. Zielke?

19   A    On and off in various different positions for the

20   last -- he started in 1989 on a steel gang and then

21   became a welder.  I had worked with him in other

22   positions besides just being the end loader operator.

23   Q    So over twenty years.

24   A    Over twenty years, yes.

25   Q    So Mr. Zielke tells you that he can get the plank

                    MICHAEL KOZIARA - DIRECT

1  out with a front-end loader?

2  A     That's correct.

3  Q     Okay.

4        MR. MORGAN:  Could you call up P12, please.

5  I'd offer P12.

6        THE COURT:  Any objection?

7        MR. DOUGLAS:  Yes, Your Honor.  It's not the

8  front-end loader I believe that was used that day.

9        THE COURT:  All right.  You'll have to

10 establish a little foundation for this exhibit, if you

11 would.

12       MR. MORGAN:  Okay.  Fair enough.  I didn't

13 think that this exhibit was objectionable.

14       THE COURT:  Understand.  But it was, so let's

15 lay the foundation.

16 BY MR. MORGAN:

17 Q     Do you recognize the machinery on P12?

18 A     Yeah, it's a front-end loader.  I mean it's --

19 Q     Does it accurately depict the front-end loader that

20 was used on September 9, 2010?

21 A     Yes, it says Caterpillar on it.

22       MR. MORGAN:  I'd offer P12.

23       THE COURT:  This isn't the front-end loader

24 that was involved in the September 2010 incident, is

25 that what you're saying?
                 MICHAEL KOZIARA - DIRECT

1          THE WITNESS:  This is the one, yes.

2          THE COURT:  That is the one that was involved.

3          THE WITNESS:  Sure.  You can't tell unless you

4    see the numbers from the back side or whatever, but yes,

5    it should be the one.

6          THE COURT:  Okay.

7          THE WITNESS:  It just doesn't have the forks on

8    it.

9          THE COURT:  Understood.  Okay.

10          MR. DOUGLAS:  No objection.  Let it in.

11          THE COURT:  All right.  P12 is in.

12          MR. MORGAN:  Thank you, Your Honor.

13    BY MR. MORGAN:

14    Q    Okay.  So what we see here, the machine has another

15    device on the front of it; correct?

16    A    That's correct.  That's a bucket.

17    Q    And what is that?  Excuse me?

18    A    That's just a work bucket.

19    Q    Okay.  Can that work bucket be removed from the

20    front-end loader?

21    A    Yes, it can.

22    Q    Can other devices be attached to the front-end

23    loader?

24    A    Yes, sir.

25    Q    And what was attached to the front-end loader on
                    MICHAEL KOZIARA - DIRECT

1  September 9, 2010?

2  A    A set of forks.

3  Q    So after Mr. Zielke made that suggestion to you,

4  what did you do?

5  A    I told my work crew to back up so he could -- so

6  Greg could remove the planks.

7  Q    And when you say you told your work crew, who did

8  that all involve?

9  A    That was Elvin Smothers and Matt Kjos that were

10 working down there.

11 Q    Did you think that the proposal Mr. Zielke made was

12 reasonable in light of the circumstance that presented

13 itself with regard to the lag and the crossing plank

14 that day?

15 A    No, not at the time it didn't.  I seemed like the

16 reasonable thing to do.

17 Q    You believed it was reasonable?

18 A    As long as we discussed it, that's supposed to be

19 the BN way of doing things.

20 Q    What do you mean by that?

21 A    As long as we discussed it in the job briefing and

22 we decided a course of action that was safe and we went

23 with it.

24        MR. MORGAN:  Could you call back up P11,

25 please.  906, please.  Okay.
            MICHAEL KOZIARA - DIRECT

1    Q    So this is a picture again, Mr. Koziara, of P11 at

2    906, the crossing plank; correct?

3    A    That's correct.

4    Q    Okay.  So could you describe, using this picture

5    for the jury, where the front-end loader -- well, first

6    what plank was stuck?  Excuse me, what lag was stuck in

7    what plank?

8    A    The lag was stuck on this -- on the --

9         THE COURT:  Mr. Koziara, if you touch the

10   screen, it will leave a little mark.

11        THE WITNESS:  I didn't touch it.  I thought

12   about that.

13        THE COURT:  No, it's okay.  You can go ahead.

14   I'm encouraging you to just -- you can circle the

15   location on the picture that you want to illustrate, if

16   you just circle it.

17        THE WITNESS:  Okay.  It would be the plank on

18   the -- well, there's a river side/bluff side.

19        THE COURT:  Go ahead and put your finger on it

20   and circle it.

21        THE WITNESS:  Oh, like this?  (Complying)

22        THE COURT:  Yep.

23        THE WITNESS:  Okay.  Right there.  (Indicating)

24   That was the plank.  And about where the arrow is at,

25   that's where the lag was stuck.

                    MICHAEL KOZIARA - DIRECT

1  BY MR. MORGAN:

2  Q    Okay.  And so -- that's pretty nifty.

3          THE COURT:  You're John Madden.  If you want

4  that to go away, you see in the corner it says *clear all*

5  or *clear next*.  It's not a button.  You just touch the

6  screen in the corner of the screen and it will go away.

7          THE WITNESS:  All right.

8  BY MR. MORGAN:

9  Q    You got that?

10  A    Yeah.

11  Q    Okay.  So can you next tell us where Mr. Zielke's

12  front-end loader was located.

13  A    Well, Greg was actually located back this way, he

14  was back here, and he brought his machine up to here --

15  Q    Okay.

16  A    -- to take the plank out.

17  Q    All right.  So not at the end of the plank, sort of

18  inside away from the viewer on this photograph a little

19  bit; is that right?

20  A    Right.  That's where he was located when we showed

21  up.

22  Q    Okay.  And how did he use the forks then?

23  A    He first got in there, he went horizontal and

24  popped the plank straight up and I was giving him

25  directions over here.

                    MICHAEL KOZIARA - DIRECT

1   Q      Okay.   That's going to be my next question, where

2   you were standing.

3   A      Right here is where I was standing.   (Indicating)

4   Q      Okay.   On the left-hand side of the screen you've

5   marked an arrow.

6   A      That's correct.

7   Q      All right.   And so the forks came up underneath the

8   crossing plank?

9   A      That's correct.

10   Q      Okay.   And did he lift the plank?

11   A      Yes, he did.

12   Q      On the first attempt?

13   A      Yes.

14   Q      Okay.   And then what happened?

15   A      Well, then he set it back down, and I could see him

16   in the controls, he actually lifted the forks up.   When

17   he lifted the forks up, he was trying to -- I don't know

18   if he was scooping up or what he was doing, but when he

19   lifted them up, that's where he put pressure on that

20   plank.   In all my years, I've never seen a plank fly

21   across and hit anybody.   It always just tips over or

22   something.   It's a heavy plank.   It's never shot across

23   to the distance where I was.   It should never have even

24   touched me.

25          And I was already in the process of trying to move

                    MICHAEL KOZIARA - DIRECT

1  off of that to the center of the track to go over to

2  talk to Mr. Zielke to just tell him that he had already

3  gotten it up and I was going to put the plank on his

4  forks and let him move away, but it was too late.  I got

5  hit.

6  Q    So where the arrows are, is that where you were

7  standing when you got -- when the plank shot across the

8  tracks and hit you in your left leg?

9  A    That's correct, on the double arrows.

10 Q    And what you were describing is you were trying to

11 go around so that you were going to -- just tell the

12 jury.  Were you going to walk across the planks or --

13 A    I was walking this way.  I was walking into the

14 center of the track to go around Mr. Zielke so I could

15 go to his door, which was on that side, and talk to him.

16 Q    And where did the crossing plank hit you,

17 Mr. Koziara?

18 A    Hit me right here.    (Indicating)

19 Q    Okay.  So just above the ankle on the left shin?

20 A    That's correct.

21 Q    Did it hit anyone else?

22 A    No, it did not.

23 Q    Was anyone standing within two or three feet of you

24 at the time you were hit?

25 A    Al Mitchell was.  He was right behind me.
                MICHAEL KOZIARA - DIRECT

1   Q    When you say behind you, was he physically standing

2   right behind you?

3   A    I didn't see where he was, but I could hear him

4   when he saw me get hit.  He was close.

5   Q    Okay.  Who's Al Mitchell?

6   A    Al Mitchell is the assistant foreman on the tie

7   gang.

8   Q    Did Al Mitchell get hit?

9   A    No, he did not.

10  Q    What was your reaction when the crossing plank hit

11  your left shin?

12  A    Shock, and it hurt.  And I just stood there for a

13  minute and then I sat down and took my boot off to check

14  it out.

15  Q    All right.  And when you checked it out, you're

16  sitting down off to the side of the tracks at this

17  point?

18  A    Yes.

19  Q    Okay.  And so you took off your boot and what did

20  you see?

21  A    I saw it was bruised and a little cut up, and I

22  kind of felt around there.  I didn't think it was broke.

23  So I thought I got lucky.  I had a bandage on my right

24  ankle.  I took that off and put it on my left ankle and

25  continued to do my job that day.
            MICHAEL KOZIARA - DIRECT

1   Q    While you were sitting down assessing the damage,
2   did anyone from either your crew or the tie crew come
3   over to you?

4   A    Yes.

5   Q    Who did?

6   A    Al.  Al did and Greg came over and apologized for
7   hitting me.

8   Q    Okay.  So Al Mitchell came over?

9   A    That's correct.

10  Q    Do you recall Mr. Mitchell saying anything to you?

11  A    No, not -- I don't remember -- I don't recall what
12  he said.  He just said it didn't look good.

13  Q    And then Mr. Zielke came over?

14  A    Yes.

15  Q    And what did he say to you?

16  A    He just said he was sorry it hit you.  Are you
17  okay?  And I just said I think I am.

18  Q    So what did you do after that?

19  A    Bandaged up my foot and walked around on it and
20  just kind of limped around that day and it seemed to be
21  okay.  It seemed like I could walk on it.

22  Q    Was it still hurting?

23  A    A little bit, yes.  Oh, yeah.

24  Q    Did you make it through the day?

25  A    Yes, I did.
                   MICHAEL KOZIARA - DIRECT

1  Q     At some point did you report the incident to BNSF

2  management?

3  A     I did.

4  Q     And when did you first report the injury to BNSF

5  management?

6  A     When I was back at the depot, we were about ready

7  to go home, I seen Don Jones down there and I thought I

8  better show it to him.

9  Q     And what day was that?

10  A     That was on the same day, on September 9th, 2010.

11  Q     So you saw Mr. Jones back at the depot?

12  A     Yes.

13  Q     And Mr. Jones was the assistant roadmaster that you

14  were working with that day?

15  A     Yes, it was.

16  Q     And why did you report the injury incident?

17  A     Well, I asked him if I could get a Band-Aid report

18  and they said they didn't have any Band-Aid reports

19  anymore.

20  Q     What's a Band-Aid report?

21  A     Well, there used to be a Band-Aid report if you got

22  injured or cut yourself or hurt yourself real bad, you

23  could at least document it that you were hurt, and if

24  something came about it, then you would be okay with

25  later reporting.
                    MICHAEL KOZIARA - DIRECT

1    Q    Did you think it was important to report this
2    injury?
3    A    Yes.
4    Q    And why is that?
5    A    It was bruised.  It was -- you know, it wasn't your
6    normal little bump.  I just thought it was important to
7    show it to Mr. Jones.
8    Q    Okay.  And you did show him the bruise?
9    A    I did.
10   Q    Did you tell Mr. Jones how it happened?
11   A    I did.
12   Q    Did you tell him that a front-end loader was used
13   to try to remove a crossing plank from a rail crossing?
14   A    Yes, I did.
15   Q    Did he tell you that that was wrong?
16   A    No, he did not.
17   Q    That it was a rule violation?
18   A    No.  He said if we had to file an injury report,
19   we'd have to do a reenactment if he was going to take me
20   to the hospital.
21   Q    And what is a Personal Injury Report Form?
22   A    A Personal Injury Report Form is where they have
23   the -- it's a federally reported injury report that goes
24   in to the company and gets reported to the FRA.
25   Q    And you could have filled one out that day.
              MICHAEL KOZIARA - DIRECT

1    A    I could have.

2    Q    And you chose not to.

3    A    I didn't think it was that bad.  I was walking on

4    it.

5    Q    What did you do after you spoke with Mr. Jones?

6    A    I went home.

7    Q    Did you tell your wife?

8    A    I did.

9    Q    Did you do anything that evening?

10   A    No.

11   Q    Did you go for additional treatment for the leg

12   that evening?

13   A    No, I did not.

14   Q    Did you do anything to care for your leg that

15   evening?

16   A    I put some ice on it, figured the swelling would go

17   down.

18   Q    Fast forward to September 10th of 2010.  That's the

19   Friday.  How was your leg feeling that morning when you

20   woke up?

21   A    It was okay, I guess.  I just thought it was a

22   little swollen yet and I thought I'll just wrap it up

23   and go to work.

24   Q    Did you put a bandage on it?

25   A    I put an Ace bandage on it.
                    MICHAEL KOZIARA - DIRECT

1  Q    Was it hurting?

2  A    A little.

3  Q    You were able to walk?

4  A    Yeah.

5  Q    Did you show anyone your injury on that Friday?

6  A    I showed Elvin Smothers, Brad Underhill, and I

7  believe the signal maintainer.

8  Q    Do you recall work that day?

9  A    I don't really recall what I did that day.

10 Q    You were able to manage to work through the day?

11 A    Yes.  I don't think we did much that day, but I

12 know we were out there probably picking up after the tie

13 gang.

14 Q    So the weekend comes, September 11th and 12th.  Did

15 you work either of those days for BNSF?

16 A    No, I did not.

17 Q    Did you do anything out of the ordinary that

18 weekend?

19 A    No.  No, I didn't do anything out of the ordinary.

20 Q    Did you generally stay around the home?

21 A    Yes, I did.

22 Q    How was your leg feeling over the weekend?

23 A    It was fine.  It was just no different than it was

24 when I left.  It just -- it wasn't -- it just wasn't

25 swelled up as much anymore and I thought I was fine.
                    MICHAEL KOZIARA - DIRECT

1  Q    You have a four-wheeler or an ATV at home?

2  A    I do.

3  Q    Does it have a plow on it?

4  A    It does.

5  Q    Did it look like the picture that Mr. Douglas

6  showed us earlier during his opening remarks?

7  A    No.  That's a lot bigger than the one I've got.

8  Q    Okay.  That weekend did a plow -- did you get

9  injured that weekend?

10 A    No, I did not.

11 Q    Did you hurt your left leg in any way that weekend?

12 A    No, I did not.

13 Q    Did you get injured at all, regardless of body

14 part, did you get injured at all that weekend?

15 A    No, I did not.

16 Q    Is there a plow that is attached to the ATV or the

17 four-wheeler?

18 A    Yes.

19 Q    Did you drop a plow on your foot?

20 A    No, I did not drop a plow on my foot.

21 Q    Did you work with a plow that day or that weekend?

22 A    I messed around with it a little bit tightening

23 bolts and stuff with it, you know.  I set the plow on my

24 steel toed boot, but it didn't hurt me.

25 Q    Monday, September 13th, 2010.  Were you scheduled
                MICHAEL KOZIARA - DIRECT

1   to work that day?

2   A    No, I was not.

3   Q    Why not?

4   A    Because I was scheduled for a doctor's appointment

5   and I had some union business down in Milwaukee.

6   Q    Did you attend your doctor's appointment?

7   A    Yes, I did.

8   Q    Did you -- did you receive a physical examination

9   that day?

10  A    Yes, I did, for a colonoscopy.

11  Q    And tell us about the physical.  What happened,

12  relative to your left leg?

13  A    I told her about my injury at work.  She saw the

14  bruise, she felt my leg, and she told me to go down and

15  do x-rays.

16  Q    Did you tell her that your leg was still hurting?

17  A    Yes.  Well, she could see that.

18  Q    Did you have an x-ray done?

19  A    Yes, I did.

20       MR. MORGAN:  Would you call up P9, please.  I'd

21  offer P9.

22       THE COURT:  Mr. Koziara, while they're

23  reviewing that document, if you would touch the screen

24  to clear the screen.  It's already taken care of.  Thank

25  you.

               MICHAEL KOZIARA - DIRECT

1        THE WITNESS:  I got it.  I was looking for it.

2        MR. DOUGLAS:  No objections.

3        THE COURT:  All right.  P9 is admitted.

4 BY MR. MORGAN:

5 Q    All right.  Do you recognize P9 as one of your

6 medical records, Mr. Koziara?

7 A    Yes, I do.

8 Q    Okay.

9        MR. MORGAN:  Can you turn to the second page,

10 please, Emilee.

11 Q    And is this the second page of the medical record?

12 A    Yes, it is.

13 Q    Okay.

14        MR. MORGAN:  Emilee, can you blow up the

15 *Addendum* section.  The bottom part under *Addendum*,

16 please.

17 Q    And the note reads that you returned from x-ray and

18 there's a distal tibial fracture.  Is that what you

19 understood was broken in your left leg on September

20 13th, 2010, Mr. Koziara?

21 A    That's correct.

22 Q    Okay.  Were you provided a walking boot?

23 A    Yes, I was.

24 Q    It also says, "Michael informed me that he will not

25 be claiming this as a worker's compensation injury."  Do

MICHAEL KOZIARA - DIRECT

1   you see that?

2   A    Yes, I do.

3   Q    Did you tell the doctor that?

4   A    I told her we don't have workman's comp.

5   Q    What do you mean by that?

6   A    We have FELA, which is called the Federal Employee

7   Liability Act.  We don't have workman's comp.

8   Q    And is that why you told the doctor that?

9   A    That's what I told her.

10  Q    Were you provided a walking boot that day?

11  A    Yes, I was.

12  Q    This says, "I had the pleasure to see Michael, age

13  50, for the above.  He had labs prior to his visit that

14  we reviewed.  Michael sustained an injury at work but

15  has not reported it there."

16       Do you see that notation?

17  A    That's correct, yes.

18  Q    Okay.  Did you talk to the doctor about reporting

19  your injury?

20  A    Yes, I did.

21  Q    And what did you tell the doctor?

22  A    I hadn't filled out the injury report yet.

23  Q    And then it says, "He was hit in the left shin and

24  ankle.  It is quite bruised and tender though has

25  gradually gotten better.  The injury occurred on
                MICHAEL KOZIARA - DIRECT

1   September 9"; correct?

2   A    That's correct.

3   Q    And you told the doctor that as well?

4   A    Yes, I did.

5   Q    All right.  On that day, did you receive any

6   medical care for your right foot?

7   A    No, I did not.

8   Q    Did you receive any medical care for any other

9   injury that you had sustained within the last several

10  days?

11  A    No, I did not.

12  Q    What was going through your mind at that point when

13  you learned that you had a broken bone in your left leg?

14  A    Fear.

15  Q    Why do you say that?

16  A    Because I was after the 72 hours that Don Jones had

17  told me that I had to fill out an injury report and I

18  was past the 72 hours and I thought for sure that I was

19  going to get fired for late injury reporting.

20  Q    Had you filled out injury report forms in the past?

21  A    I have.

22  Q    Do you recall filling an injury report form out in

23  1988?

24  A    I do.

25  Q    Do you recall the incident that gave rise to your
                    MICHAEL KOZIARA - DIRECT

1  filling out an injury report form in 1988?

2  A    Yes.  I filled one out and I had the supervisor rip

3  it up --

4  Q    Let me stop you there.  Do you remember the

5  incident that gave rise to you having to fill one out?

6  A    Yes.

7  Q    Okay.  Just briefly describe for the jury what had

8  happened that day.

9          MR. DOUGLAS:  Objection, Your Honor.

10  Relevance.

11          THE COURT:  I'll overrule that.  Go ahead.

12  Very briefly though.

13          THE WITNESS:  Okay.  It was -- it was an injury

14  where I had fell into a hole or a ditch made by the

15  bridge and builders guys.  I got tangled up in the barb

16  wire and I went into the hole.  I turned in an injury

17  report to the foreman; he turned it in to the

18  roadmaster.  He came out, screamed at me "What the eff

19  is this?"  And then tore off my face and says, "You're

20  going to get 30 days off."

21      I found out later after he had tore it up that he

22  was in more trouble than I was.  So that's what happened

23  there.

24  BY MR. MORGAN:

25  Q    Did you think about that experience at the doctor's
                    MICHAEL KOZIARA - DIRECT

1  office that day?

2  A    Yes.  It was -- and there was another one too that

3  I thought about.

4  Q    What was that?

5  A    I had another -- I had a late injury report that I

6  had turned in.  And the roadmaster at that time was Tom

7  Dean, who told me I was going to get five days off no

8  matter what.  And the reason that happened is because I

9  reported the injury, but there was no forms in the depot

10  to fill out.  So when I went home, they said I filed it

11  late after I had been -- I had been to the hospital

12  early that day.

13  Q    And that happened in what year?

14  A    That happened in 1993 or -4, somewhere in there.

15  Q    And did you get disciplined that time for filling

16  out a late form?

17  A    Yes, I did.

18  Q    And how much discipline did you receive?

19  A    I received five days off.

20  Q    So did you have your left leg then in a walking

21  boot when you left the doctor's office that day?

22  A    Yes, I did.

23  Q    Were you on crutches or a wheelchair or anything

24  like that?

25  A    No.

                    MICHAEL KOZIARA - DIRECT

1    Q    You were able to walk out on your own volition?

2    A    That's correct.

3    Q    Did you also have previously scheduled union

4    business on that Monday?

5    A    I did.

6    Q    Did you go to Milwaukee?

7    A    I did.

8    Q    That day did you also place a series of phone calls

9    after you learned about the bone in your left leg?

10   A    Yes, I did.

11   Q    Did you call -- who did you first call?

12   A    I believe I first called Tom Arentz.

13   Q    And who is Tom -- Tom Arentz; right?

14   A    Tom Arentz.  He's a fellow worker at work.  He's

15   the clerk.  I just told him I wasn't going to be in, I

16   was going to get a doctor's notice for being time off.

17   Q    Did you tell him anything else about how you got

18   injured?

19   A    I think I told him I got injured at home.  I also

20   told that to Brad Underhill.

21   Q    Okay.  We'll stay with Mr. Arentz.  Did you tell

22   Mr. Arentz anything else?

23   A    Not that I remember.

24   Q    And then did you make a second phone call?

25   A    Yes, I did.
                    MICHAEL KOZIARA - DIRECT

1    Q    Who did you call?

2    A    Brad Underhill.

3    Q    And who is Brad Underhill?

4    A    Brad Underhill is my relief foreman for when I go

5    to my political stuff.  I told him he'd be the foreman

6    in charge afterwards.

7    Q    And what did you tell Mr. Underhill?

8    A    I told Brad he was just going to have to show up to

9    work.  Brad likes to miss work.  But anyway I told him I

10   got hurt on the ATV at home.  I made up a story.  I was

11   afraid.

12   Q    Did you place additional calls that day after you

13   spoke with Mr. Arentz and Mr. Underhill?

14   A    Yes.

15   Q    Who did you call?

16   A    I called our vice general chairman of the union,

17   Don Willings, and the lawyer Charlie or Russ

18   Ingebritson.

19   Q    He's a lawyer that does railroad litigation?

20   A    He does -- yeah, he's -- he's the actual designated

21   attorney for our Local.

22   Q    Okay.  And do you recall or remember the call with

23   Mr. Willing?

24   A    Yes, I do.

25   Q    Okay.  And could you tell us what was discussed?
                    MICHAEL KOZIARA - DIRECT

1  A    He told me that you need to turn in that injury

2  report, and he also told me I should call Russ

3  Ingebritson because he knows the law better.  And when I

4  called -- can I go to --

5  Q    Sure.  Go ahead.

6  A    When I called Russ, he told me that it was a

7  federal law and that I had to turn that injury report in

8  for that injury.

9  Q    So what did you do after you spoke with Mr. Willing

10  and Mr. Ingebritson?

11  A    I called Mr. Arentz and Mr. Underhill back.

12  Q    Did you call them back the same day?

13  A    I did.

14  Q    And what did you tell Mr. Arentz?

15  A    I just apologized for not telling him the truth,

16  because your word is everything, and I just felt bad

17  about it and I just wanted to let him know that it was

18  done at work.

19  Q    And how about Mr. Underhill?  What did you say to

20  him?

21  A    He called me actually and I told him the same

22  thing, that I was sorry and I was just kidding and it

23  was actually done at work.

24  Q    Is this the same Mr. Underhill who saw the injury,

25  at least the bruise on your left leg on Friday,

                    MICHAEL KOZIARA - DIRECT

1  September 10th?

2  A    That's correct.

3  Q    After those series of calls, who did you call next?

4  A    After I was done with my union business, I called

5  Mr. Veitz either that night or the next morning.

6  Q    So either the night of the 13th or the morning of

7  the 14th?

8  A    I remember calling him from the motel room and told

9  him I was going to come and report the injury.

10  Q    Did you tell Mr. Veitz about the injury?

11  A    Yes.

12  Q    Did you tell him how it occurred?

13  A    Yes.

14  Q    Did you tell him that a front-end loader was used

15  to try and lift the plank?

16         MR. DOUGLAS:  Objection, Your Honor.  Leading.

17         THE COURT:  Sustained.

18  BY MR. MORGAN:

19  Q    Just tell us what you told Mr. Veitz about the

20  injury that day.

21  A    I told him I got hurt at work with -- a plank hit

22  my leg from the end loader and that I told Don Willing

23  or Don Jones, the roadmaster, that I had gotten hurt

24  that day and I was going to report the injury.

25  Q    Did you ever tell Mr. Veitz that you got injured at

                MICHAEL KOZIARA - DIRECT

1    home?

2    A    No, I did not.

3    Q    Why not?

4    A    Because I didn't get hurt at home.

5    Q    What was Mr. Veitz's response?

6    A    He just said he was at a derailment and he couldn't

7    be there and he was going to be -- and he couldn't be

8    there for the injury report.  And I just told him that I

9    could give it to somebody else that's management at

10   BNSF.

11   Q    Did you do that?  Did you fill out an injury

12   report?

13   A    I did.  I came back to La Crosse from Milwaukee and

14   filled out the report immediately.

15   Q    And when was that?  What day was that?

16   A    That was the 14th.  September the 14th, 2010.

17   Q    Were you able to work that Tuesday?

18   A    Yes, I was able to work -- no, I wasn't able to

19   work that Tuesday because I already had a walking boot

20   on.  But I was trying to remember what the attorney said

21   too.  He said that -- he said about the 72-hour rule, he

22   said it was -- he said it was point of discovery is what

23   was -- why they couldn't get me for the late injury

24   reporting, because it was a point of discovery is when

25   you can turn your injury report in.  So I didn't know I

                    MICHAEL KOZIARA - DIRECT

1   was injured until that day.  That's why I reported that

2   injury.

3   Q    So on the 14th, where did you fill out the Personal

4   Injury Report Form?

5   A    I filled it out in La Crosse, Wisconsin.

6   Q    Okay.  And where in La Crosse, Wisconsin?

7   A    At the La Crosse, Wisconsin depot.

8   Q    Did you have somebody accompany you to the

9   La Crosse depot?

10  A    Yes, I had a friend.

11  Q    And who accompanied you?

12  A    He was named Jim Schaitel.

13  Q    And who is Mr. Jim Schaitel?

14  A    Mr. Schaitel used to work out there.  He's a

15  retired old welder and he was our old Local chairman.

16  He was the only one I knew was off.  I just kind of

17  wanted somebody with me.

18       MR. MORGAN:  Would you call up P2, please.

19  Q    Do you recognize Exhibit P2, Mr. Koziara?

20  A    Yes, I do.

21  Q    There's another page.  Turn to the second page.  Is

22  that part of Exhibit 2 as well, the second page,

23  Mr. Koziara?

24  A    Yes.  Yes, sir, it is.

25  Q    Is this a true and correct copy of a document you

                    MICHAEL KOZIARA - DIRECT

1   filled out and submitted on September 14th, 2010?

2   A     That is correct.

3           MR. MORGAN:  I'd offer P2.

4           THE COURT:  Any objection?

5           MR. DOUGLAS:  None.

6           THE COURT:  P2 is admitted.

7           MR. MORGAN:  Okay.  Let's go back to the first

8   page, Emilee.

9   BY MR. MORGAN:

10  Q     So this is the BNSF Railway Personal

11  Injury/Occupational Illness Report Form; correct?

12  A     That's correct.

13  Q     Is that your handwriting?

14  A     Yes, it is.

15  Q     And you filled this out; correct?

16  A     Yes, it is.

17  Q     Mr. Schaitel didn't fill it out?

18  A     No, he didn't.

19  Q     And you provided this to a Mr. Kramer?

20  A     Yes, I did.

21  Q     And did Mr. -- what was Mr. Kramer's position at

22  the time you handed him this form?

23  A     Mr. Kramer was a trainmaster.  He was in charge of

24  the train crews.

25  Q     Management?

                    MICHAEL KOZIARA - DIRECT

1   A     Management, that's correct.

2   Q     Did Mr. Kramer say anything to you as you submitted

3   it to him?

4   A     When I went to his office to submit it to him, he

5   said "This isn't good."

6   Q     Did you ask him what he meant by that?

7   A     No.  I pretty much knew what he meant by that.

8   Q     What did you believe he meant by that?

9   A     Well, this was just going to be more trouble down

10  the road.

11  Q     At the bottom of P2 it asks you --

12        MR. MORGAN:  Could you call up the lower third

13  of the exhibit, please, Emilee.

14  Q     So what we're looking at here, it says, "Important.

15  List all persons who witnessed the injury or who can

16  give any information about it."

17        Do you see that?

18  A     Yes, I do.

19  Q     Is this your handwriting, the names you listed

20  here?

21  A     Yes, it is.

22  Q     Okay.  So you list Al Mitchell; correct?

23  A     That's correct.

24  Q     And why did you list Al Mitchell first?

25  A     Because he was standing behind me.
              MICHAEL KOZIARA - DIRECT

1  Q    And then you also have Don Jones, amongst others,

2  listed there; correct?

3  A    That's correct.

4  Q    Okay.  And you identify him as roadmaster; right?

5  A    Correct.

6  Q    And then it says Holmen was notified day of

7  incident.  Did you write that?

8  A    Right.  That's where he lives, in Holmen, and I

9  just wrote it down there to make sure they had it.

10 Q    Is that your signature?

11 A    Yes, it is.

12 Q    And the date of September 14th; correct?

13 A    That's correct.

14 Q    Did you have any other discussion with Mr. Kramer

15 on September 14th other than the one comment he made to

16 you?

17 A    No, I did not.

18 Q    Did you do anything else at the depot that day?

19 A    No.  I left.

20 Q    With regard to the injury and the incident on

21 September 9th, 2010, what happened next?

22 A    Two days later I got a notice of an investigation.

23 Q    All right.

24       MR. MORGAN:  Call up P33, please.

25       THE COURT:  Mr. Morgan, I'd like to take a

                    MICHAEL KOZIARA - DIRECT

1   break some time between now and 3:30, so I'll let you

2   decide when you're at an appropriate spot for that.

3            MR. MORGAN:  This is as good a time as any.

4            THE COURT:  Why don't we take our afternoon

5   break.  We'll take a break.  We will come back at 3:30.

6   And remember not to talk about the case.  Don't do any

7   research on the case.  You can leave your notebooks

8   here, just put them on your seat.  They'll be there when

9   you get back.  And we'll see you in just over fifteen

10  minutes.

11           MR. MORGAN:  Thank you, Your Honor.

12       (Jury excused from courtroom at 3:14 p.m.)

13           THE COURT:  We'll see you back here at 3:30.

14       (Recess    3:14-3:34 p.m.)

15           THE COURT:  Are we ready to bring the jury

16  back?

17           MR. MORGAN:  In 30 seconds, please.

18           MR. KASTER:  Forgot his binder in the other

19  room.

20           MR. MORGAN:  Your Honor, before the jury

21  arrives, Mr. Mitchell is here.  He's who we intended to

22  call second.  He lives in Lake Pepin, which is about a

23  three-hour or so drive.  Mr. Douglas and I spoke.  I'd

24  like to get him out today so he doesn't have to stay

25  overnight, so...
                 MICHAEL KOZIARA - DIRECT

1          THE COURT:  So is your suggestion that you

2    defer the cross of Mr. Koziara?  Is that where we're

3    going with this?

4          MR. DOUGLAS:  Yeah.  That's okay.

5          MR. MORGAN:  Yeah, as long as the Court doesn't

6    have a --

7          THE COURT:  I have no objection to that.  I

8    think it's a courtesy to the witness.  I'll be happy to

9    do that as long as -- I wouldn't do it without defense

10   consent to it.

11         MR. DOUGLAS:  Sure.

12         THE COURT:  But with it, I have no trouble from

13   my perspective.

14         MR. MORGAN:  Thank you, Your Honor.

15         MR. DOUGLAS:  And again, depending on the time

16   period, I could begin my cross today after Mitchell is

17   done if the Court would like so we can fill out the day.

18         THE COURT:  Oh, yeah.  Let's use the whole

19   clock.

20         MR. DOUGLAS:  Okay.

21         THE COURT:  Okay?  Let's bring the jury back.

22   Thank you.

23      (Jury brought in courtroom at 3:35 p.m.)

24         THE CLERK:  This Honorable Court is again in

25   session.  Please be seated and come to order.
                    MICHAEL KOZIARA - DIRECT

1          THE COURT:  All right.  Mr. Morgan, you may

2   continue.

3          MR. MORGAN:  Thank you, Your Honor.

4   BY MR. MORGAN:

5   Q    Mr. Koziara, when we left off, we were talking

6   about what happened next relative to the injury

7   investigation; correct?

8   A    Correct.

9   Q    All right.

10          MR. MORGAN:  Could you call up P33, please.

11  Q    Do you recognize P33, Mr. Koziara?

12  A    Yes, I do.

13  Q    And what is it?

14  A    That is the investigation notice for my alert and

15  attentiveness.

16          MR. MORGAN:  I'd offer P33.

17          THE COURT:  Any objection?

18          MR. DOUGLAS:  No objection, Your Honor.

19          THE COURT:  Thank you.  P33 is admitted.

20          MR. MORGAN:  Thank you.

21  BY MR. MORGAN:

22  Q    Did you receive this notice on September 16th,

23  2010?

24  A    Yes, I did.

25  Q    And how did you receive the notice?
                    MICHAEL KOZIARA - DIRECT

1   A    I was called into the office in La Crosse,

2   Wisconsin at the depot, in Mike Veitz's office.

3        MR. MORGAN:  Emilee, perhaps you could blow up

4   the body of the letter starting at *Arrange to* to the

5   bottom just so it's easier to read.  Thank you.

6   Q    Who called you to the depot?

7   A    Mike Veitz.

8   Q    And what happened when you arrived?

9   A    He says I have an investigation notice for you.

10  Q    And did he hand you this copy?

11  A    Yes, he did.

12  Q    Did he say anything else?

13  A    No.  Just sign it.  You have to sign this.

14  Q    Did you sign it?

15  A    I did.

16  Q    How did you feel when Mr. Veitz handed you this

17  Exhibit P33?

18  A    I was a little upset.

19  Q    Why is that?

20  A    I didn't feel I was unalert or inattentive like it

21  says on there, and I figured this was just another way

22  for them going after me for breaking my leg.

23  Q    Did you communicate any of that to Mr. Veitz?

24  A    No.

25        MR. MORGAN:  Could you call up P5, please,
              MICHAEL KOZIARA - DIRECT

1    Emilee, and turn to page 537.  This is in evidence, Your

2    Honor.

3            THE COURT:  5 is already in?  All right.

4            MR. MORGAN:  Would you blow up 1.1.2, please.

5    BY MR. MORGAN:

6    Q    Do you recognize Rule 1.1.2, Mr. Koziara?

7    A    Yes, I do.

8    Q    Was this one of the rules that you were under

9    investigation for?

10   A    Yes, I was.

11   Q    At least as you understood it?

12   A    That's correct.

13   Q    Are you familiar with rule -- Operating Rule 1.6,

14   Mr. Koziara?

15   A    Yes, I am.

16   Q    Okay.  "Conduct.  Number 1:  Careless of the safety

17   of themselves or others."

18        Are you familiar with that rule?

19   A    That's correct.

20   Q    Did you understand this was the other rule that you

21   were under investigation for?

22   A    Yes, sir.

23   Q    Mr. Koziara, to your knowledge did anyone else

24   receive a notice of investigation for the incident

25   involving your leg on Thursday, September 9, 2010?
                  MICHAEL KOZIARA - DIRECT

1    A    Nobody else did.

2    Q    To your knowledge was anyone else injured that day?

3    A    No one else but me.

4    Q    How about Al Mitchell?  To your knowledge did he

5    get charged with any rule violations?

6    A    No, he did not.

7    Q    How about Greg Zielke, the individual driving the

8    front-end loader that day?  Did he get charged with any

9    rule violations?

10   A    Not a one.

11        MR. MORGAN:  Now the notice of investigation,

12   if you could pull that back up, please, Emilee.  P33.

13   And the first paragraph, please.

14   Q    The notice of investigation references to attend a

15   hearing.  Is that a hearing?

16   A    That's correct.

17   Q    On Thursday, September 23, 2010, in La Crosse.  Did

18   you attend that hearing?

19   A    Yes, I did.

20   Q    On September 23, 2010?

21   A    Yes, I did.

22   Q    Did someone preside over the hearing?

23   A    Management did.  Michael Heille.

24   Q    Did you have any input in assigning Mr. Heille as

25   the hearing officer that day?
                 MICHAEL KOZIARA - DIRECT

1    A    No, I did not.

2    Q    You did have someone accompany you to the hearing?

3    A    Yes, I did.

4    Q    Who was there on your behalf?

5    A    It was a Local chairman Chris Davis, and Don

6    Willing was there to kind of supervise them.

7    Q    Is Mr. Davis to your knowledge an attorney?

8    A    No, he's not.

9    Q    Can you bring an attorney to the hearing?

10   A    No, you can't.

11   Q    Could you -- do you know whether you had the right

12   to subpoena or compel witnesses to attend?

13   A    No, you don't.

14   Q    Is there someone that represents BNSF at the

15   hearing?

16   A    Yes, sir.

17   Q    Who?

18   A    Michael Heille.

19   Q    The same person that is the hearing officer.

20   A    That's correct.

21   Q    Did he ask you questions?

22   A    Yes, he did.

23   Q    What was the result of that hearing on September

24   23rd?

25   A    I was given a 30-day record suspension for that and

                    MICHAEL KOZIARA - DIRECT

1  a year probation.

2  Q    A year of probation as well?

3  A    Yes.

4       MR. MORGAN:  Call up P7, please.  Could you

5  blow up the first three paragraphs, please.

6       I'm sorry.  We offer P7.

7       THE COURT:  Any objection?  No objection?

8       MR. DOUGLAS:  No objection.

9       THE COURT:  Okay.  Admitted.

10      MR. MORGAN:  Thank you, Your Honor.  Sorry

11 about that.

12      THE COURT:  That's all right.

13 BY MR. MORGAN:

14 Q    Is this the Level S 30-day suspension that you

15 received?

16 A    Yes, it is.

17 Q    And you received it on October 18th, 2010?

18 A    That's correct.

19 Q    What is a 30-day record suspension?  Level S 30-day

20 record suspension.

21 A    Well, Level S is a serious violation, which if you

22 have so many in a special time period, you'll be

23 terminated.  The 30-day record suspension is just

24 another black mark on your record.  And they have

25 progressive disciplinary, so the more time you have, the
                MICHAEL KOZIARA - DIRECT

 1   more you'll get.  And then with the one-year probation,

 2   if anything happens, they can just terminate you.

 3   Q    And then it says, "It has been determined through

 4   testimony and exhibits brought forth during the

 5   investigation that you were in violation of MOWOR 1.1.2

 6   Alert and Attentive and MOWOR 1.6 Conduct."

 7        Do you see that?

 8   A    I do.

 9   Q    And those are the rules that we just looked at a

10   couple minutes ago?

11   A    That's correct.

12        MR. MORGAN:  Could you call up 1.1.2, Emilee,

13   please.  It's that P5, 537.

14   Q    Did you tell Mr. Heille at the investigation that

15   you gave a briefing to the work crew before the

16   front-end loader was used?

17   A    Yes, I did.

18   Q    Did you tell Mr. Heille that you told your crew to

19   move away?

20   A    Yes, I did.

21   Q    Did you tell Mr. Heille that it was Mr. Zielke's

22   idea to use the front-end loader?

23   A    Yes, I did.

24   Q    Did you also, during this injury investigation,

25   receive a second notice of investigation?
                  MICHAEL KOZIARA - DIRECT

1    A    Yes, I did.

2              MR. MORGAN:  Can you call up P31, please.

3    Q    Do you recognize Exhibit P31?

4    A    Yes, sir.

5    Q    And what is P31?

6    A    It's another investigation notice for theft and

7    dishonesty.

8    Q    Did you receive a copy of this letter?

9    A    Yes.

10              MR. MORGAN:  I'd offer P31.

11              THE COURT:  Any objection?

12              MR. DOUGLAS:  No objection.

13              THE COURT:  P31 is admitted.

14              MR. MORGAN:  Thank you, Your Honor.  Could you

15   blow up, please, the first full paragraph, Emilee.

16   BY MR. MORGAN:

17   Q    This references a requirement for you to attend

18   another investigation hearing on Monday, October 18th,

19   2010; correct?

20   A    Correct.

21   Q    Okay.  And is this the notice you received in

22   connection with the twenty switch ties that you gave

23   away?

24   A    That's correct.

25   Q    That we discussed earlier, that incident?
                    MICHAEL KOZIARA - DIRECT

1    A    Yes, sir.

2    Q    Did you -- where did you receive this notice?

3    A    I had to go and sign for this, again, down at the

4    La Crosse depot at Mike Veitz's office.

5    Q    So did you receive a call from Mr. Veitz?

6    A    Yes, I did.

7    Q    And what did he tell you?

8    A    He says "I have something for you to sign," and he

9    gave me that paper.

10   Q    And what was your reaction when you received a copy

11   of this at the depot?

12   A    I was very upset.

13   Q    And why is that?

14   A    Because I just kind of said, "What do you think you

15   guys are doing?"  You know, I was upset.  I just signed

16   the paper and out the door I went.  I was pissed.

17   Q    Why were you so upset?

18   A    Because it was just another way of them lining me

19   up to fire me.  They already gave me an investigation

20   notice before for alert and attentive, then a year

21   probation, and then now I have this.

22   Q    Did you attend a second hearing on October 18,

23   2010?

24   A    Yes, I did.

25            MR. MORGAN:  Could you call up P5, please.
                MICHAEL KOZIARA - DIRECT

1  Page 542.  Could you blow up 1.6.

2  Q    You're familiar with 1.6, Mr. Koziara?

3  A    Yes, I am.

4  Q    And the dishonesty section of 1.6?

5  A    Correct.

6  Q    Is this the rule you understood BNSF was charging

7  you with potentially violating?

8  A    Yes.

9         MR. MORGAN:  Could you go to page 544, please.

10  Blow up 1.19.

11  Q    Says this is *Care of Property*.  1.19.  Are you

12  familiar with this rule?

13  A    Yes.

14  Q    The last sentence says, "Employees must not use

15  railroad property for their personal use."

16       Do you see that?

17  A    Yes, I do.

18  Q    Did BNSF charge you with violating this rule?

19  A    No, they did not.

20         MR. MORGAN:  Go to 538, please.  Excuse me.

21  That's okay.  I don't need it.

22  Q    You were just charged with violating Rule 1.6.

23  A    That's correct.

24  Q    So when you attended the investigation, did you

25  have the same hearing officer?
              MICHAEL KOZIARA - DIRECT

1  A   Yes, I did.

2  Q   Did you bring someone with you?

3  A   Yes, I did.

4  Q   And who did you bring with you?

5  A   Jim McGill.

6  Q   And was Mr. Davis with you that day?

7  A   No, he was not.

8  Q   And who is Mr. McGill?

9  A   Mr. McGill is the Local chairman out of Chicago.

10 Q   To your knowledge is he a lawyer?

11 A   No, he's not.

12 Q   Were you able to subpoena or compel witnesses to

13 testify at that hearing?

14 A   No, we weren't.

15 Q   Could you -- did you describe -- strike that.

16     Did you tell Mr. Heille that you got consent from

17 Mr. Veitz?

18 A   Yes, I did.

19 Q   Did you tell him that you had taken ties in the

20 past?

21 A   Yes, I did.

22 Q   Did you ever deny taking the twenty switch ties on

23 August 30th of 2010?

24 A   No, I never did.

25     MR. MORGAN:  Would you go to P8, please.
                MICHAEL KOZIARA - DIRECT

1           THE COURT:  Is this one in?  Okay.

2   Q    Do you recognize P8, Mr. Koziara?

3   A    Yes, I do.

4   Q    And what is it?

5   A    It's my dismissal notice.

6   Q    Did you receive a copy of this?

7   A    I got it in the mail.

8           MR. MORGAN:  I'd offer P8.

9           THE COURT:  Any objection?

10          MR. DOUGLAS:  No objection, Your Honor.

11          THE COURT:  P8 is admitted.

12          MR. MORGAN:  Could you blow up the first half

13  of the letter, starting with the date at the top down to

14  the second full paragraph, please.

15  BY MR. MORGAN:

16  Q    So you received this in the mail did you say?

17  A    That's correct.

18  Q    And it says in the letter that it was determined

19  that you were in violation of MOWOR 1.6 Conduct;

20  correct?

21  A    That's correct.

22  Q    Do you remember receiving this dismissal letter?

23  A    Yes, I did -- I do.

24  Q    Tell us what you remember about it.

25  A    I remember getting it that day and I remember my
                    MICHAEL KOZIARA - DIRECT

1  stepdaughter being there and she just cried and said

2  that's the only job she ever knew I had.  And I just --

3  there goes my career.  Everything went down -- my job,

4  my chance of being -- going all the way through for

5  retirement all the way to the end with full benefits,

6  you know.  And it just -- it was just crushing that day.

7  It was all my whole dreams were just crushed because I

8  had gotten that dismissal notice.  I didn't expect to

9  get dismissed for anything like this.

10 Q    You had identified other employees of BNSF who

11 assisted in the removal of the switch ties on that

12 August 30th; right?

13 A    Yes.

14 Q    Did anyone who assisted you in the removal of the

15 ties get charged with discipline to your knowledge?

16 A    Nobody got charged.  Nobody.

17 Q    In your 32 years, are you aware of anyone being

18 terminated for giving away twenty used switch ties?

19 A    No, sir.  Nobody has ever been dismissed for giving

20 away scrap ties that I know of.

21 Q    You mentioned that prior to August 30th you had

22 taken ties on a couple of other occasions.

23 A    That's correct.

24 Q    And you received consent from Mr. Veitz?

25 A    That's correct.

                    MICHAEL KOZIARA - DIRECT

1    Q    Were you ever disciplined for those two occasions?

2    A    No, I was not.

3    Q    Were you injured when you got permission from

4    Mr. Veitz on those previous two occasions?

5    A    No, I was not.

6         MR. MORGAN:  That's all I have for you,

7    Mr. Koziara.  Thank you very much.

8         THE COURT:  Thank you, Mr. Koziara.  I

9    understand that we're going to defer Mr. Koziara's

10   cross-examination; is that right?

11        MR. DOUGLAS:  Yes, sir.

12        THE COURT:  Ladies and Gentlemen of the Jury,

13   as a courtesy between counsel, which I greatly

14   appreciate, to accommodate the schedule of another

15   witness, we're going to move to that witness now.

16   Mr. Koziara will be cross-examined by one of the

17   attorneys on behalf of BNSF, but just because we've got

18   somebody on a tight schedule, we're going to take that

19   witness and then we'll get back to the cross-examination

20   of Mr. Koziara.  So I appreciate the courtesy that

21   counsel have shown to each other on this.

22        (Witness excused at 3:55 p.m.)

23        THE COURT:  And you may call your next witness.

24        MR. MORGAN:  Plaintiff calls Al Mitchell to the

25   stand.
              MICHAEL KOZIARA - DIRECT

1       **AL MITCHELL, PLAINTIFF'S WITNESS, SWORN,**

2                        <u>DIRECT EXAMINATION</u>

3   BY MR. MORGAN:

4   Q     Good afternoon, Mr. Mitchell.

5   A     Good afternoon.

6   Q     Nice to see you again.  My name is Matt Morgan.  I

7   represent Mr. Michael Koziara in this case.  Do you

8   understand that?

9   A     Yes, I do.

10  Q     Okay.  And we took your deposition last year and I

11  asked you some questions then; correct?

12  A     That is correct.

13  Q     All right.  Mr. Mitchell, where do you live?

14  A     Pepin, Wisconsin.

15  Q     And where is that?

16  A     About three hours north of here.

17  Q     Okay.  So you drove here today to testify?

18  A     Yes.

19  Q     Thank you.  Are you employed?

20  A     Yes, I am.

21  Q     And who is your employer?

22  A     BNSF Railroad.

23  Q     What do you do for BNSF?

24  A     Right now I'm a surface gang foreman.

25  Q     And what does that mean?
                    AL MITCHELL - DIRECT

1  A    I have to reinstall track where I have the two guys

2  underneath me and we use machines to level it off and

3  straighten it out.

4  Q    How long have you been the surface gang foreman?

5  A    Two years now.

6  Q    What did you do before that?

7  A    I was foreman for a tie gang.

8  Q    And how long have you worked for BNSF?

9  A    It will be 19 years June 1st.

10  Q    So what year does that mean you started?

11  A    1996.

12  Q    Okay.  So in August/September of 2010 time frame,

13  what position would you have held for the company?

14  A    I was assistant foreman for a tie gang.

15  Q    What tracks do you mostly work on?  Are there

16  located in Wisconsin?  Minnesota?  Where do you work

17  typically?

18  A    Most -- last five/six years I've been all over the

19  western half of the U.S.

20  Q    Outside fixing track?

21  A    Right.

22  Q    Do you know Mike Koziara?

23  A    Yes, I do.

24  Q    How do you know Mr. Koziara?

25  A    Worked together.
                        AL MITCHELL - DIRECT

1   Q    And just generally describe the occasions that you
2   would work with Mr. Koziara.
3   A    Well, at one point in time there was two foremens
4   in Winona and he happened to be one and I was the other.
5   And then on different occasions we worked together
6   fixing track and repairing stuff.
7   Q    Fair to say that you've known Mr. Koziara, worked
8   with Mr. Koziara, and have known him since you began
9   working at BNSF?
10  A    Pretty much, yes.
11  Q    Are you familiar with the Operating Rules at BNSF?
12  A    Yes, I am.
13  Q    Are you familiar with the on-track rules at BNSF?
14  A    Yes, I am.
15  Q    Do you try to comply with those rules,
16  Mr. Mitchell?
17  A    Yes, I do.
18  Q    In your 19 years as an employee of BNSF, have you
19  ever been disciplined for violating an Operating Rule?
20  A    Yes.
21  Q    And when were you disciplined for violating an
22  Operating Rule?
23  A    Last Friday, because I had a flag for a Form B that
24  fell down, and I didn't know it, but they brought it to
25  my attention, so I failed an ops test.
                    AL MITCHELL - DIRECT

1  Q     You were disciplined by your roadmaster?

2  A     No, it was not my roadmaster, it was another

3  roadmaster and a company rep.

4  Q     Other than this incident last Friday, had you ever

5  received discipline for violating an Operating Rule?

6  A     No.

7  Q     Do you recall working on a tie gang, as the

8  assistant foreman for a tie gang in the August/September

9  2010 time frame?

10  A     Yes, I do.

11  Q     Specifically on September 9 of 2010, at East

12  Winona, Wisconsin at a rail crossing?

13  A     Yes.

14  Q     You recall that date?

15  A     Pretty much.  Some things are faded away, but --

16  Q     It's been a number of years since then.

17  A     Yes.

18  Q     I understand.  Was your gang working with

19  Mr. Koziara's gang that day?

20  A     Well, we had a system tie gang in and he was the

21  section foreman for East Winona.

22  Q     And what was the tie gang trying to do?

23  A     We were putting in new ties, taking out old and

24  putting in new ties.

25  Q     And what was Mr. Koziara's crew doing?
                    AL MITCHELL - DIRECT

1   A    They were taking out crossings and helping with

2   some of the other stuff for switch plates and that.

3   Q    At some point were there attempts to remove a

4   crossing plank that were unsuccessful?

5   A    Yes.

6   Q    Do you recall the use of a front-end loader with --

7   as an attempt to remove the crossing plank?

8   A    Yes, I do.

9   Q    Okay.

10          MR. MORGAN:  Would you call up P11, please.

11          THE COURT:  I think this is in already; right?

12          MR. MORGAN:  It is, Your Honor.

13   Q    So Mr. Mitchell, you'll see on your screen there's

14   an exhibit, and I'll represent to you the picture you

15   see has been identified as the crossing that the crew --

16   the work crew, Mr. Koziara's work crew was working on on

17   September 9, 2010.

18       Does that look familiar to you?

19   A    Yes.

20   Q    You recognize it?

21   A    Yes.

22   Q    Okay.  And can you -- did you observe the front-end

23   loader that day?

24   A    Yes, I did.

25   Q    Trying to remove the plank from the ground?
                    AL MITCHELL - DIRECT

1  A    Yes, I did.

2  Q    Okay.  And could you describe for us where you

3  recall the front-end loader on this screen?

4  A    It would be on the -- I've got to get my bearings

5  straight.  It would have been on the right-hand side of

6  the crossing.

7  Q    Okay.  As we're looking at the picture?

8  A    Right.

9  Q    Okay.  And then with your -- you can touch the

10  screen and there will be a little mark there.  Could you

11  identify where you were standing when the front-end

12  loader was trying to lift the plank?

13  A    I would have been way back in here somewhere.

14  (Indicating)

15  Q    Okay.  And where do you recall Mike Koziara

16  standing?

17  A    I believe he was standing right up here.

18  (Indicating)

19  Q    Okay.  What was the distance between you and

20  Mr. Koziara when the crossing plank tried to lift or the

21  front-end loader tried to lift the crossing plank off

22  the ground?

23  A    It was probably close to 20/25 feet.

24  Q    Okay.  At some point did you stand closer to

25  Mr. Koziara?

                    AL MITCHELL - DIRECT

1   A      No.  Because I had machines and I was trying to get

2   them -- keep them going too.

3   Q      When Mr. Koziara got hit by the crossing plank, how

4   close were you?

5   A      I was probably 20/25 foot away from him.

6              MR. MORGAN:  Your Honor, may I approach the

7   witness?

8              THE COURT:  You may, yes.

9              MR. MORGAN:  Does the Court want the original?

10             THE COURT:  No, that's all right.  I've got a

11  copy of the deposition.

12  BY MR. MORGAN:

13  Q      Could you turn -- do you remember when I took your

14  deposition in October of 2014?

15  A      October?  That would have been in La Crosse?

16  Q      Yeah.

17  A      Yeah.  Yes.

18  Q      Okay.  Do you remember I had asked you some

19  questions about the injury that day?

20  A      Yes.

21  Q      Okay.  Could you turn to page 25, please.  At line

22  four I asked you a question:

23         "Question:  You were standing right next to him,

24  huh?"

25             And your answer was:
                        AL MITCHELL - DIRECT

1        "Answer:  I was right next to him, but I didn't

2   receive no discipline."

3        Do you see that?

4   A    Yes.

5   Q    And then I asked you at line seven:

6        "Question:  So when you say you were standing right

7   next to him, how close to him were you?"

8        And your answer was:

9        "Answer:  Oh, probably three/four foot away.  In

10  the same vicinity."

11       Do you see that?

12  A    Yes.

13  Q    Okay.  Does that help refresh your recollection as

14  to how close you were standing when Mr. Koziara got hit

15  by the crossing plank that afternoon or that morning?

16  A    I believe I was that close to him at one point in

17  time, but I think when they were prying the plank out I

18  was further away.

19  Q    Okay.  So do you think your recollection was better

20  when I took your deposition in October about how close

21  you were or today?

22  A    It's about the same.

23  Q    Okay.  Because in your deposition you say that you

24  were standing only three or four feet from Mr. Koziara

25  at the time he got hit; right?
                    AL MITCHELL - DIRECT

1   A    I can't remember.

2   Q    Okay.  Did the crossing plank hit you?

3   A    No, it did not.

4   Q    Did it hit anyone else?

5   A    No, it did not that I can recall.

6   Q    Did you talk to Mike after the plank hit him in his

7   left leg?

8   A    Yes, I did.

9   Q    Let me step back.  Did you observe the plank hit

10  him?

11  A    I just seen him jump and I believe the plank hit

12  him and I asked if he was okay.

13  Q    And what did he tell you?

14  A    He goes that it hit him and he don't think nothing

15  is broken, but then when he lifted up his pant leg, it

16  was bleeding pretty good.

17  Q    Did you say anything else to him?

18  A    I just asked if he wanted to go anyplace for help

19  and he goes "I'll be okay."

20  Q    Did you observe or overhear Mr. Koziara have any

21  conversations with anyone else?

22  A    No, I did not.

23  Q    Did you continue working that day?

24  A    Yes, I did.

25  Q    Did you see Mike Koziara later that day?
                    AL MITCHELL - DIRECT

1    A    Later in the afternoon.

2    Q    Right.  Did you see him?

3    A    Yes.

4    Q    Did you talk with him?

5    A    A little bit.  I just asked him how it was and he

6    goes it was sore.

7    Q    Did you observe Mr. Koziara walking?

8    A    No, I did not.

9    Q    Did you ask Mr. Koziara if he had reported the

10   injury?

11   A    No, I did not.

12   Q    At some point were you asked to report what you

13   saw?

14   A    Yes, I was.

15   Q    Who made that request?

16   A    It was a roadmaster and then it was some official

17   from Minneapolis.

18   Q    Did you submit a statement?

19   A    I just give it over the phone what I seen.

20   Q    Do you know who Mike Veitz is?

21   A    Yes, I do.

22   Q    And who is Mike Veitz?

23   A    He used to be roadmaster north of La Crosse.

24   Q    Did you have the occasion to work with Mr. Veitz on

25   the various crews that you worked on?

                    AL MITCHELL - DIRECT

1   A    Occasionally.

2   Q    Was Mr. Veitz on site when Mr. Koziara got hit by

3   the crossing plank?

4   A    I can't recall.

5   Q    Did you speak with Don Jones the day Mr. Koziara

6   got hit by the crossing plank?

7   A    Very little.

8   Q    Do you recall what you discussed?

9   A    It was more a job briefing about what we were going

10  to do.

11  Q    Do you know what an investigation is?

12  A    Yes.

13  Q    What's an investigation?

14  A    That's when they try to reenact what happened to

15  see if it could have been preventable.

16  Q    Do you know whether BNSF started an investigation

17  on Mr. Koziara following this incident on September 9th?

18  A    I heard they did.

19  Q    Do you know whether -- let me ask you this:  Did

20  BNSF start an investigation on you regarding this

21  incident?

22  A    No, they did not.

23  Q    Do you know whether they started an investigation

24  on anyone else other than Mr. Koziara as a result of

25  this incident?
                    AL MITCHELL - DIRECT

1   A    Not to my rec -- recall.

2   Q    Do you know what an reenactment is, Mr. Mitchell?

3   A    Yes.  It's when you try to simulate the same thing

4   that happened to get all the facts and how you could

5   have did something different or not to prevent it.

6   Q    Do you know whether Mr. Veitz conducted a

7   reenactment of this incident?

8   A    No, I do not.

9   Q    Were you ever asked to attend a reenactment of this

10  incident?

11  A    No, I was not.

12  Q    Were you ever disciplined at all for your role in

13  this incident?

14  A    No, I was not.

15  Q    In your 19 years as an employee of BNSF, have

16  maintenance workers to your knowledge taken old scrap

17  ties?

18  A    Yes, they have.

19  Q    Have you?

20  A    Yes, I have.

21  Q    Are you aware, other than Mr. Koziara, of anyone

22  ever getting fired for taking old used scrap ties?

23  A    Not to my recall.

24  Q    Are you aware of anybody other than Mr. Koziara

25  ever getting disciplined, forgetting about termination,

                    AL MITCHELL - DIRECT

1  even disciplined for taking old ties, whether they're

2  the regular ties or switch ties?

3  A    Yeah, I've heard of people getting disciplined for

4  it.

5  Q    But not terminated.

6  A    Right.

7  Q    Were you ever disciplined for taking track ties?

8  A    No, I wasn't.

9  Q    You certainly weren't terminated for taking track

10  ties.

11  A    No, I was not.

12  Q    Have you ever discussed the issue of taking old

13  scrap ties with anyone from BNSF management?

14  A    No, because I always got them from the contractors

15  after they picked them up.

16  Q    Okay.  Did you ever talk to Mr. Veitz about taking

17  old track ties?

18  A    I have.

19  Q    Okay.  And what do you recall about that

20  discussion?

21  A    He said you should have a form filled out, but he

22  goes there are getting so many laying around, he said if

23  you need five or six, take them.

24  Q    And when did he tell you that?

25  A    Oh, jeepers, that would have been way before this

                AL MITCHELL - DIRECT

1  incident.

2  Q    Okay.  Approximate?

3  A    2000.

4  Q    Okay.  But before this incident.

5  A    Right.

6  Q    Do you recall anything else from your discussion

7  with Mr. Veitz about the ties, taking old track ties?

8  A    Back then, the biggest thing was don't be taking no

9  new ones, but you can have the old ones that were taken

10 out.

11 Q    And that's what you understood the policy to be?

12 A    That's correct.

13        MR. MORGAN:  I don't have anything more for

14 you.  Thank you, Mr. Mitchell.

15        THE WITNESS:  You're welcome.

16        THE COURT:  Any cross-examination, Mr. Douglas?

17        MR. DOUGLAS:  Yes, Your Honor.

18                 CROSS-EXAMINATION

19 BY MR. DOUGLAS:

20 Q    Good afternoon, Mr. Mitchell.  My name is Bruce

21 Douglas and I'm an attorney for BNSF Railway.  How are

22 you doing this afternoon, sir?

23 A    Nervous.

24 Q    Yes, I see that.  Well, let me try to be fairly

25 brief, if I can.  I'd like to clarify a few points with
                 AL MITCHELL - CROSS

1  you.  First of all, let's cover the business about

2  taking used ties.  Okay?  You've been with the railroad

3  a long time; right?

4  A    Correct.

5  Q    On those occasions that you told Mr. Morgan that

6  you took used ties, did you have permission from someone

7  to take the ties?

8  A    Most of the time I got them right from the

9  contractors and they loaded them for me.

10  Q    All right.  So you weren't taking -- so on those

11  occasions if you got them from the contractors, where

12  did you get the ties -- where did you collect the ties

13  from?

14  A    Well, I was running Form B forms so they could take

15  them off the track sides, and one day, he wanted to take

16  the whole works that he picked up up to my place because

17  they were running out of room, didn't have no place to

18  put them, and I said well, I'll bring my trailer

19  tomorrow and you can put some on it because I don't want

20  too many, and they did that.

21  Q    So on those occasions, were those what we called --

22  are you familiar with the term *program ties*?

23  A    Well, yeah, that's -- they would have been the old

24  ones taken out, getting replaced with new.

25  Q    So you got permission to take the ties from the

                    AL MITCHELL - CROSS

1    contractor; correct?

2    A    That is correct.

3    Q    Okay.  And on other occasions did you ever get

4    permission from your roadmaster or from your supervisor

5    to take ties?

6    A    Yes, I have.

7    Q    Was there a time when you had to have a piece of

8    paper in writing to get permission to take ties?

9    A    At very first when I started there was, so I never

10   took none.  I didn't want the hassle.

11   Q    Do you remember what that form was called?

12   A    It was a Release Form.

13   Q    If I -- would the term Release and Indemnity Form

14   ring a bell?

15   A    I've never actually seen the form.  I just heard

16   about it.

17   Q    All right.  So you knew there was a piece of paper

18   involved.

19   A    Right.

20   Q    Okay.  So let me ask you a question.  Mr. Morgan

21   asked you this question, he said did you ever know of

22   people taking ties.  I think the question was actually

23   did you ever hear of maintenance workers taking scrap

24   ties.  Do you remember him asking you that?

25   A    Yes.

                    AL MITCHELL - CROSS

1    Q    You answered yes to that question.  But let me ask

2    you, sir, did you know of any maintenance workers taking

3    scrap ties without permission either from their

4    supervisor or from the contractor?

5    A    I'm sure there was.

6    Q    But do you personally know of anyone who did that?

7    A    Not offhand.

8    Q    And you never took ties without permission, did

9    you?

10   A    No, I didn't.

11   Q    Okay.  Now Mr. Mitchell, let's clarify where -- you

12   were present on September 9, 2010, at East Winona; is

13   that correct?

14   A    That's correct.

15   Q    Do you remember the names of any of the other

16   people who were there, the employees?

17   A    Mike, and then there was Greg Zielke, Roadmaster

18   Jones was there, and there was a few guys from the tie

19   gang.  Boy, it's hard to remember because a lot of guys

20   are gone since then.

21   Q    Certainly.  When you said *Mike*, you're referring to

22   Mr. Koziara?

23   A    That's correct.

24   Q    Thank you.  The employees from the tie gang, were

25   they waiting for Mr. Koziara's gang to take the crossing

                    AL MITCHELL - CROSS

1　planks up so they could do their work?

2　A　I believe there was two or three machines waiting.

3　All the rest were further down the track.

4　Q　Did you observe Mr. Zielke operating a front-end

5　loader that day?

6　A　Yes, I did.

7　Q　Do you recall what he had on the end loader, what

8　kind of thing?  Did he have ties or forks or a bucket,

9　do you remember?

10　A　He had tines.

11　Q　Tines.

12　A　Yeah.

13　Q　Like the fork; correct?

14　A　Right.

15　Q　Do you remember what kind of front-end loader it

16　was?

17　A　John Deere, I believe.

18　　　　THE COURT:  Mr. Douglas, can I ask you to clear

19　the red marks by hitting the corner of the screen that

20　says clear all?

21　　　　MR. DOUGLAS:  Okay.  Thank you, Your Honor.

22　Before we -- all right.  Can you just call up just the

23　picture part for me?

24　　　　All right.  We'd like to display -- this is the

25　same photograph I used in opening.  Any objection to

　　　　　　　　　　AL MITCHELL - CROSS

1  displaying this, Counsel?

2          MR. MORGAN:  No, Your Honor.  Nope.

3          MR. DOUGLAS:  Okay.

4          THE COURT:  All right.  If you would make a

5  record so we can identify what this document is.

6          MR. DOUGLAS:  Certainly.  This is from Exhibit

7  No. -- this is part of the Defendant's Exhibit 564.  I'm

8  just showing the witness the photograph part of it.

9  Thank you.

10 BY MR. DOUGLAS:

11 Q    Mr. Mitchell, I'll represent to you that this is a

12 photograph that was taken at the reenactment.  I

13 understand from your earlier testimony you were not at

14 the reenactment; correct?

15 A    That is correct.

16 Q    But taking a look at the machine, as you look at

17 that machine, is that the machine that you saw

18 Mr. Zielke operating on September 9, 2010?

19 A    I don't remember.

20 Q    Looking at the tines or the forks, is that the type

21 of mechanism that was on the front of the machine?

22 A    Yes, it was.

23 Q    Okay.  Thank you, sir.  Looking at the person who

24 is standing there at the corner of the screen wearing

25 the hard hat and the orange shirt and the blue jeans,
                    AL MITCHELL - CROSS

1  that person was placed there for the reenactment, but as

2  you're looking at that, is that where you remember

3  Mr. Koziara was standing?

4  A    It would be very close.  I wouldn't say yes or no.

5  Q    Okay.

6  A    But it's close.

7  Q    Close meaning give or take a foot or so?

8  A    Correct.

9  Q    Thank you.  You were standing -- well, let me just

10  ask you, sir.  At the time you observed Mr. Koziara jump

11  when the plank came to him, where were you standing?

12  A    I was probably right about here.  (Indicating)

13  Q    Right about there.

14  A    Yeah.  I was on the other side of the rail.

15  Q    And how far behind Mr. Koziara were you?

16  A    When I seen him prying it, I was a lot further away

17  than when we were first starting it.

18  Q    So when Mr. Zielke applied pressure and was prying

19  up the planks, where were you?

20  A    When he was applying the pressure, I was back in

21  here because I knew something was going to happen bad.

22  Q    How far away from the front-end loader would you

23  estimate that that second arrow is, sir?

24  A    It would be right close to 12 feet.

25  Q    All right.  Now you indicated that you were

                        AL MITCHELL - CROSS

1  standing some 25 feet away.  When was that, sir?

2  A    That was right after it started to come up, because

3  then I backed up.

4  Q    Okay.  So you saw Mr. Zielke lifting the plank and

5  you recognized there might be some problem and you

6  backed up further; correct?

7  A    That's correct.

8  Q    So is it correct then that at the time Mr. Zielke

9  lifted the plank, you were 20/25 feet away from the

10 front-end loader?

11 A    Yes.

12 Q    Thank you.  Did you consider it to be safe to stand

13 -- be standing where Mr. Koziara was standing while

14 Mr. Zielke was operating that front-end loader?

15 A    Well, actually the end that come up first was this

16 end, and then when he applied more pressure, just kind

17 of like all of a sudden jumped right up out of the

18 ground.

19 Q    But you, sir, backed up to 20/25 feet away; is that

20 right?

21 A    That's correct.  But there was also a truck in

22 there too.

23 Q    And where was the truck located?

24 A    Because that's what Mr. Koziara was leaning against

25 when I noticed that it hit him.

                    AL MITCHELL - CROSS

1  Q    There was a truck there.  Where was the truck, sir?

2  A    That would have been up here because he backed up

3  to the truck right up in here.  Because he backed up to

4  the truck and he sat on the bumper of it.

5  Q    Was that the boom truck?

6  A    Correct.

7  Q    Is that where the people, the other people were

8  working on repairing the hydraulic gun?

9  A    I don't know nothing about that.

10 Q    Okay.  You said that you saw Mr. Koziara jump when

11 the plank hit him?

12 A    That's correct.

13 Q    Did you actually see him hit -- strike that.

14     Did you actually see the plank strike Mr. Koziara

15 or was your attention drawn to him because he jumped?

16 A    I mostly drew to him because he jumped.

17 Q    Is it possible, sir, that he might have tripped on

18 the plank?

19 A    Well, I don't think so, not that day.

20 Q    And then when you looked at the leg and you saw it

21 was red and it was bruised; is that correct?

22 A    Correct.

23 Q    And Mr. Koziara sat down a little bit and pulled

24 his boot off and looked at it; correct?

25 A    He just pulled his pants up.  He didn't have to

                    AL MITCHELL - CROSS

1  take the boot off.

2  Q   I see.  And did he continue working after that,

3  sir?

4  A   I couldn't tell you because I went with the rest of

5  the gang because we had to get ready to load machines.

6  Q   So after you saw Mr. Koziara checking his leg,

7  that's the last you saw of him that day?

8  A   I come back later and asked if it was okay.

9  Q   And what did Mr. Koziara -- asked Mr. Koziara if it

10  was okay?

11  A   That's correct.

12  Q   And what did he tell you?

13  A   He said it's sore.

14  Q   He didn't indicate -- he didn't tell you it was

15  broken though?

16  A   No.

17  Q   One -- couple final points, sir.  You mentioned at

18  the beginning that you had an ops test last week; is

19  that right?

20  A   That's correct.

21  Q   And you failed one of the ops test; is that right?

22  A   That's correct.

23  Q   If I use the term ops test, is that shorthand for

24  operations test?

25  A   That's correct.

                 AL MITCHELL - CROSS

1  Q    And how often are operations tests conducted for

2  you, for example?

3  A    A lot of times it's hard to say.  This is the first

4  time I've ever had somebody come out and actually talk

5  to me about it.

6  Q    Okay.  You said you failed an OPS test; is that

7  right?

8  A    That's correct.

9  Q    Because a flag fell down?

10  A    That's correct.

11  Q    As a result of that, you were not -- you did not

12  receive any discipline for that though, did you, sir?

13  A    No, I did not.

14  Q    Okay.  There's no investigation pending against

15  you, is there?

16  A    No, there's not.

17  Q    That just goes on your record as having failed an

18  ops test; correct?

19  A    That's correct.

20  Q    And during the course of the year, would you say

21  that you go through a dozen ops tests?

22  A    I would say some years there's more than others.

23  Q    But it's a fairly routine thing to go through

24  operations testing or ops tests; is it not?

25  A    That's correct.
                    AL MITCHELL - CROSS

1  Q    All right, sir.  And that's not a disciplinary

2  process as you understand it, is it, sir?

3  A    No.  It's just more or less to make you aware of

4  that there is somebody watching.

5  Q    Okay.  Thank you, sir.  One final thing.  You were

6  not asked to come to the reenactment; is that correct?

7  A    That's correct.

8  Q    Do you know why you weren't asked to come to the

9  reenactment?

10  A    Because I believe I was in southern Illinois.

11  Q    So you were a long distance away; correct?

12  A    Correct.

13  Q    Does that seem unusual to you that because you were

14  that far away, you weren't invited to come to the

15  reenactment?

16  A    That part of the company I don't know how they do

17  that.

18  Q    But you were asked to provide a report or some

19  information to Mr. Veitz; is that correct?

20  A    I didn't give nothing to Mr. Veitz, I gave it to a

21  guy out of the Cities.

22  Q    Okay.  But you did provide some type of a report;

23  correct?

24  A    That's correct.

25  Q    So -- thank you very much.
                    AL MITCHELL - CROSS

1          MR. DOUGLAS:  All right.  I have no further

2    questions.  Thank you.    (4:38 p.m.)

3          THE COURT:  Does the cross-examination prompt

4    any redirect?

5          MR. MORGAN:  Yes.  Thank you, Your Honor.

6                    REDIRECT EXAMINATION

7    BY MR. MORGAN:

8    Q    Mr. Mitchell, have you talked to anybody about the

9    fact that you were going to give testimony here in the

10   last several weeks to a month?

11   A    Just you.

12   Q    Okay.  You and I talked?

13   A    Well, whoever called me on the phone.

14   Q    Okay.  About arranging a time for you to show up?

15   A    Right.

16   Q    Anybody from BNSF that you've talked to about your

17   testimony?

18   A    I just told the roadmaster I had to come down here

19   Monday, possibly Tuesday.

20   Q    And which roadmaster was that?

21   A    Ben Burnell Zachary (ph).

22   Q    And did he say anything to you?

23   A    He wanted to know what it was for.

24   Q    And did you tell him?

25   A    Yes.
                   AL MITCHELL - REDIRECT

1  Q    And what did he say?

2  A    You have to go.

3  Q    Is he the only one you talked to about giving

4  testimony at this trial?

5  A    Then -- well, I told Sheldon Everson that I'd be

6  gone today so they'd have to find somebody to take my

7  place.

8  Q    Who is Sheldon Everson?

9  A    He's the other foreman on the construction gang.

10  Q    Anyone else?

11  A    No, that's it.

12  Q    Okay.  I just want to talk a little bit more.  You

13  made some other arrows on that photograph that

14  Mr. Douglas was showing you and you talked a little bit

15  more about where you were standing when Mike got hit

16  with the plank; correct?  Do you recall that?

17  A    Well, I didn't actually see the plank hit him, but

18  I think what you drew my attention is when he did jump

19  back.

20  Q    Right.  But my questions were that Mr. Douglas

21  asked you some questions about where you were standing?

22  A    Right.

23  Q    Can you turn to page 26 of your deposition, please.

24  Starting at line three.  Now when I took your

25  deposition, Mr. Mitchell, did you swear to tell the

                    AL MITCHELL - REDIRECT

1   truth?

2   A      Yes.

3   Q      Okay.  Did you try your best to tell the truth that

4   day?

5   A      Yes.

6   Q      Okay.  At line three I say:

7          "Question:  About three feet."

8          And you say "Correct."

9          Is that right?

10  A      That's right.

11  Q      And then I say:  "You were about this distance from

12  him when the injury occurred.  Farther away.  Closer."

13  And your answer is what?

14  A      "Probably a little bit closer."

15  Q      "Because we was talking"; right?

16  A      Correct.

17  Q      So then I ask you:  "So maybe two feet?  Two to

18  three?"

19         And what is your answer?

20  A      "Two to three."

21  Q      And then my question is:  "At the time he got

22  injured."  And what is your answer?

23  A      "Correct."

24  Q      All right.  So that was your testimony under oath

25  in October of 2014 when I was asking you questions about

                    AL MITCHELL - REDIRECT

1  how close you were standing to Mr. Koziara at the time

2  the plank hit him; right?

3  A    Correct.

4          MR. MORGAN:  I don't have anything else.

5          THE COURT:  Thank you.  Before you step down

6  I'm going to check in with the jury to see if the jury

7  has any questions for Mr. Mitchell.

8          MR. DOUGLAS:  Your Honor, if I may.

9          THE COURT:  Any questions?  Okay.  Very

10  briefly, Mr. Douglas.

11                  RECROSS-EXAMINATION

12  BY MR. DOUGLAS:

13  Q    Mr. Mitchell, just a couple of questions.  I think

14  you just told us that -- I want to be clear.  You didn't

15  actually see the plank strike Mr. Koziara; correct?

16  A    No, I did not.

17  Q    Thank you, sir.  And you are appearing here today

18  voluntarily without any subpoena or any order of the

19  Court to be here; is that correct, sir?

20  A    That is correct.

21          MR. DOUGLAS:  Nothing further, sir.  Thank you.

22          THE COURT:  Thank you, Mr. Mitchell.  Drive

23  carefully.  You're finished.

24          THE WITNESS:  Thank you.

25      (Witness excused at 4:32 p.m.)
                AL MITCHELL - RECROSS

1        THE COURT:  All right.  I think we were

2   prepared to resume with Mr. Koziara; is that correct?

3        MR. DOUGLAS:  Yes, Your Honor.

4        THE COURT:  All right.  Mr. Douglas, you may

5   begin your cross-examination of Mr. Koziara.

6   Mr. Koziara, you can take the witness stand again.

7        **MICHAEL KOZIARA, PLAINTIFF, RESUMES**,

8        THE COURT:  Mr. Douglas, you can clear the

9   arrows again, if you would.

10                    CROSS-EXAMINATION

11  BY MR. DOUGLAS:

12  Q    Good afternoon, sir.

13  A    Good afternoon.

14  Q    I think we've met before at your deposition,

15  Mr. Koziara, so I will -- I don't think it's necessary

16  for me to introduce myself again.  All right?  I would

17  like to follow-up and ask you some questions, and I know

18  Mr. Morgan asked you a lot of questions and he was very

19  thorough, but I do have some cross-examination for you.

20       You've worked for Burlington Northern for a long

21  time, didn't you, sir?

22  A    Yes, I did.

23  Q    A little over thirty years?

24  A    Correct.

25  Q    And I take it that you liked working for the
                    MICHAEL KOZIARA - CROSS

1  railroad; is that correct?

2  A    That's correct.

3  Q    You enjoyed your job?

4  A    Yes, I did.

5  Q    Now during the years that you worked at BNSF, and

6  maybe not for the entire time, but perhaps, were you a

7  member of a labor organization?

8  A    Yes, I was.

9  Q    You were a member of the union; correct?

10 A    Yes, sir.

11 Q    And is that the Brotherhood of Maintenance of Way

12 Employes Division?

13 A    Correct.

14 Q    The acronym is the BMWED; correct?

15 A    That's correct.

16 Q    And that's affiliated with the International

17 Brotherhood of Teamsters; correct?

18 A    Correct.

19 Q    And you joined -- became a member of the union

20 shortly after you started at BNSF or a predecessor

21 company; correct?

22 A    Correct.

23 Q    Actually when you joined the railroad, it was

24 Burlington Northern; is that correct?

25 A    That's correct.
                    MICHAEL KOZIARA - CROSS

1  Q    At some later time, Burlington Northern merged with

2  the Sante Fe; is that correct?

3  A    That's correct.

4  Q    If I suggest to you that that was in about 1996,

5  does that seem consistent with your understanding?

6  A    Yes, somewhere in that time frame.

7  Q    Thank you.  Now during the years that you worked at

8  BNSF, most of the time I think your official position or

9  your title was -- well, let me double-check this.  Was

10 trackman your official title or position?  Welder or

11 grinder, which would it be?

12 A    Trackman, and then I was mostly a grinder or a

13 welder.

14 Q    Okay.  So let's just, for the jury's sake because I

15 think we've glossed over it on your direct examination.

16 So when we say a trackman, what kind of a position is

17 that?  What do you do?

18 A    A trackman as far as a basic laborer?  Laborer

19 just, when I first started, was pounding spikes, putting

20 on anchors, general track maintenance, you know, change

21 ties out, crip switches.  It was all sorts of things to

22 do to fix the tracks.

23 Q    So when we talk about the maintenance of way, when

24 we talk -- the word *way* is kind of referring to the

25 track areas, the right-of-way through which the tracks

                  MICHAEL KOZIARA - CROSS

1    go; is that right?

2    A     That's the correct termination.

3    Q     Thank you, sir.  So your group of people, the whole

4    Maintenance of Way Division is responsible for track

5    maintenance; correct?

6    A     That's correct.

7    Q     And that can include a variety of things; correct?

8    A     Correct.

9    Q     So you have some employees in that division who

10   would actually lay the tracks; correct?

11   A     Correct.

12   Q     You have people who would actually lay the ties;

13   correct?

14   A     Correct.

15   Q     Other people who would put in the spikes and the

16   plates that hold the rails to the track bed; correct?

17   A     Correct.

18   Q     Other people who bring in the ballast and service

19   the ballast, which is the gravel that we see; correct?

20   A     Correct.

21   Q     And then you have other people who actually do some

22   welding for the rails; correct?

23   A     Correct.

24   Q     And you have people who do the grinding.  And I

25   take it the grinding is to make the rails nice and

               MICHAEL KOZIARA - CROSS

 1  polished in certain places, but to make them line up

 2  where they butt together; correct?

 3  A    Correct.

 4  Q    And you were trained in all those things over the

 5  years by BNSF; correct?

 6  A    Yes, I was.

 7  Q    And in fact, the railroad sent you at one time to

 8  out-of-state classes to become certified.  I believe

 9  they were classes in welding, were they not, sir?

10  A    Correct.

11  Q    So is it fair to say, sir, that the railroad did

12  make some investment in you over the years that you

13  worked there?

14  A    Yes, they did.

15  Q    Now at some point in time you became a foreman; is

16  that correct?

17  A    Correct.

18  Q    Now, is that a management position, sir?

19  A    No, it's not.  It's a scheduled employee.

20  Q    That's a new term.  I think we want to use --

21  explain that to the jury.  So what's you understanding

22  of the term scheduled employee, sir?

23  A    Scheduled employee is somebody employed by the or

24  the unionized worker for the railroad.

25  Q    So when we talk about management or officers,
                    MICHAEL KOZIARA - CROSS

1  that's -- those are people like, for example, Roadmaster

2  Veitz; correct?

3  A    Correct.

4  Q    And when we say scheduled employees, that would be

5  people like yourself and others who are covered by a

6  Collective Bargaining Agreement?

7  A    Correct.

8  Q    The foreman position is a Collective Bargaining

9  Agreement position, isn't it, sir?

10  A    Correct.

11  Q    And it's done based on seniority and

12  qualifications; is that correct?

13  A    Correct.

14  Q    And there are foreman positions.  Those jobs are

15  posted and bid on; is that right?

16  A    Correct.

17  Q    And if you're interested in that job, you sign a

18  posting and depending on your seniority date or

19  basically your hired date and your qualifications, you

20  might get that job; right?

21  A    Correct.

22  Q    At least you'd get that job over all the senior

23  people -- less senior people; correct?

24  A    Correct.

25  Q    Thank you.  Is there an additional bump in pay for

                    MICHAEL KOZIARA - CROSS

1  a foreman's position under the Collective Bargaining

2  Agreement?

3  A    A bump in pay as you mean as far as wage scale?

4  Q    Yes, sir.

5  A    Yes.

6  Q    Okay.  Approximately -- can you tell us in the year

7  2010 when you were a foreman, what was the pay

8  differential between being a foreman and a member of the

9  crew that you were supervising in dollars per hour?

10  A    I believe the foreman was $24.10.  Truck driver was

11  like 22.  Laborer I don't remember.

12  Q    All right.  So there are several dollars involved

13  in being a foreman; correct?

14  A    Correct.

15  Q    Now you testified earlier, I believe, and I want to

16  be clear on this, that the foreman who supervises --

17  you're supervising the men on the crew that day;

18  correct?

19  A    Correct.

20  Q    And not to be sexist about this, but if there are

21  any women on the crew, you're supervising them as well;

22  correct?

23  A    Correct.

24  Q    When you're the foreman, I think you had told us

25  that you do have responsibility for the safety of the

                 MICHAEL KOZIARA - CROSS

1  crew; is that correct?

2  A    That's correct.

3  Q    And that's part and parcel of your job; right?

4  A    Correct.

5  Q    You're familiar with the Maintenance of Way

6  Operating Rules, are you not, sir?

7  A    Yes, I am.

8  Q    That's one of those great big booklets that your

9  attorneys have shown us.  They've put it up on the

10  screen, and I'm not going to do that right now.  But if

11  I refer to those as M-O-W-O-R, MOWOR, is that okay with

12  you?

13  A    That will work.

14  Q    Is that how you folks refer to it out in the field?

15  A    Yes.

16  Q    Now you get -- you're familiar with them because

17  you actually receive training on those rules, do you

18  not?

19  A    Once a year.

20  Q    Okay.  And when you do that training, how is that

21  training conducted?  What's the format for the training?

22  A    We have a safety guy show up.  He gives a class on

23  some of the rules, some of the new protections or

24  procedures they have, and we take a test.  You have to

25  pass with 90 percent and you're qualified.

                MICHAEL KOZIARA - CROSS

1    Q     That's a pencil and paper test?

2    A     Yes, it is.

3    Q     That's administered at one of the locations, a

4    section house of the depot or something like that?

5    A     It's usually open book.

6    Q     Okay.  But -- thank you.  Where is the test

7    typically given?

8    A     Usually at -- we were given it up at Drugan's,

9    which is -- it wasn't at the depot, it was at a facility

10   that they used, a place where you can get something to

11   eat later.

12   Q     Oh, okay.  So they would have an offsite meeting,

13   you'd take the training, you'd take a test, and then

14   they'd have lunch or something like that?

15   A     That's correct.

16   Q     Okay, thank you.  To your knowledge, sir, are

17   records of the tests that you're given and either your

18   pass/fail entered into your permanent record with BNSF?

19   A     I believe they are.

20   Q     Are you familiar with a document known as your

21   employee transcript, sir?

22   A     Yes.

23   Q     And are you -- do you know whether or not your

24   history of testing goes into your employee transcript?

25   A     I believe it is.
                   MICHAEL KOZIARA - CROSS

1  Q    Now isn't it true, sir, that as a foreman that one

2  of the -- strike that.

3       Isn't it true, sir, as a foreman that you had to

4  carry around with you in your truck or car a copy of the

5  MOWOR rules?

6  A    Yes.

7  Q    Did you have to carry around with you any other

8  rules in your role as a foreman?

9  A    Not to my knowledge.

10 Q    You're familiar with some of the other rules that

11 were in place at BNSF when you worked there; correct?

12 A    Yes.

13 Q    Were you familiar with the engineering rules for

14 your division?

15 A    Yes.

16 Q    Did you carry a copy of the engineering rules with

17 you?

18 A    I think I kept my book in the depot.

19 Q    And when we're talking about the depot, let's

20 clarify for everybody which depot are we talking about?

21 A    This was the one at East Winona or the Winona

22 Junction depot.

23 Q    Okay.  I want to be clear on that because the two

24 locations are actually kind of far apart from one

25 another, aren't they?

                    MICHAEL KOZIARA - CROSS

1   A     Couple miles.

2   Q     Yeah.  Would it be okay if I -- I'd like to --

3           MR. DOUGLAS:  Do you have any objection to my

4   displaying this?

5           MR. MORGAN:  No, I don't.

6           MR. DOUGLAS:  We'll see if it works.

7   BY MR. DOUGLAS;

8   Q     Mr. Koziara, do you remember when we took your

9   deposition in September of last year?

10  A     Yes, sir.

11  Q     Do you remember seeing this exhibit, this Google

12  Earth map?

13  A     Yes, sir.

14  Q     Okay.  So --

15          THE COURT:  Mr. Douglas, why don't you put a

16  note in the record here that indicates what exhibit

17  we're looking at.

18          MR. DOUGLAS:  Certainly.  Exhibit number?

19  Thank you.  I'll mark it right now because it may not

20  be, sir.  I'm marking this as Defendant's Exhibit 658.

21  I'd move the admission of 658.

22          THE COURT:  Any objection?

23          MR. MORGAN:  No objection.

24          THE COURT:  Fine.  658 is admitted.  Go ahead.

25          MR. DOUGLAS:  Thank you.
                    MICHAEL KOZIARA - CROSS

BY MR. DOUGLAS:

Q    Mr. Koziara, just to be clear, I'm just using this to identify the locations for the jury.  Is that your handwriting where it says here East Winona or Winona?

A    Winona, that is.

Q    And you wrote that down for me at the deposition; correct?

A    That's correct.

Q    Okay.  And it's circled, so if we look at this -- thank you.  Pardon me.  So this area here, I'm going to point the pen to that.  You can't really see detail, but that would be East Winona; correct?

A    Correct.

Q    And there are milepost designations for some of these places along the track, is there not?

A    There is.

Q    Do you know where the mileposts begin?  Where is the zero point?

A    La Crosse.  Well, there's a zero point that starts further up, but for the northern section it starts at La Crosse.

Q    Okay.  What's the milepost in La Crosse?

A    Starts at 300.

Q    300.  Okay.  So these mile -- so if we say this is milepost what, 325.7 at East Winona; is that correct?

MICHAEL KOZIARA - CROSS

1  A     That is correct.

2  Q     So that's 25.7 miles from La Crosse, wherever the

3  marker is; right?

4  A     Yes.

5  Q     And this is going -- if we look at this, we're

6  pointing up.  This is pointing up where the pen point

7  is, that's north.  So this is the BNSF track here;

8  correct?

9  A     That's correct.

10 Q     And that's moving up over to this other black

11 circle where it says *Winona Junction*; correct?

12 A     That's correct.

13 Q     And that's your handwriting up here where it says

14 *Winona Junction*.

15 A     That's correct.

16 Q     What is the milepost for Winona Junction, if you

17 remember?

18 A     328.3 is the -- would be the depot.

19 Q     So it's two-and-a-half/three miles, something like

20 that between the two points; correct?

21 A     That's correct.

22 Q     All right.  Thank you, sir.  I just wanted to be

23 clear.  So when you say there's this depot or -- is it

24 sometimes, I believe, sir, that you refer to it as the

25 section house?

                    MICHAEL KOZIARA - CROSS

1   A    That's correct.

2   Q    Where is it located?

3   A    At 3 --

4   Q    I can put it back.  I mean is it located at East

5   Winona or Winona Junction?

6   A    It's located at Winona Junction.

7   Q    Okay.  So there's a building up there where you had

8   an office or you have office space to use; correct?

9   A    That's correct.

10  Q    And you were a foreman.  Did you have a private

11  office or just a desk?

12  A    Basically a desk.

13  Q    Okay.  So you had your own desk in there.  How big

14  a place is the section house?

15  A    I would say it was -- I shared it with the -- you

16  want the whole building or just the section part I had?

17  Q    That's a fair point.  Just generally speaking,

18  what's the size of the building?  So we get some idea.

19  A    I would say the building is probably twenty by

20  twelve maybe; not even.

21  Q    All right.  And is that the location where you

22  might report to work in the mornings?

23  A    Yes, that was the place.

24  Q    Okay.  Did you customarily report to work in the

25  mornings?

                     MICHAEL KOZIARA - CROSS

1    A    Yes.

2    Q    And your schedule was Mondays through Fridays

3    normally?

4    A    That's correct.

5    Q    So when you said that you had a conference call in

6    the morning, were you conducting -- were you taking that

7    conference call at the office at Winona Junction?

8    A    That's correct.

9    Q    So I just wanted to clarify that.  And these

10   conference calls that you have, are they regular

11   occurrences?

12   A    Yes, they are.

13   Q    Who conducted those conference calls?  I'll focus

14   my time frame on let's say the summer and fall of 2010.

15   A    It would be the roadmaster would conduct the calls,

16   and then the dispatcher would butt in and see what we

17   were doing after we got the news in the morning.

18   Q    Okay.  When you say *the roadmaster*, would that be

19   Roadmaster Veitz?

20   A    That's correct.

21   Q    Because he was in charge of your section, the

22   La Crosse section that you worked in; correct?

23   A    That's correct.

24   Q    And you reported to him?

25   A    That's correct.
                    MICHAEL KOZIARA - CROSS

1 Q    And these calls that you had in the mornings, what

2 time did they start?

3 A    They started at seven o'clock.

4 Q    How long did they typically last?

5 A    Twenty-five minutes to a half hour, depending on

6 when the dispatcher got on.

7 Q    What was the purpose of these calls, sir?

8 A    They were basically job briefings so we'd know

9 where we were going in the day or he would ask us what

10 we were doing, and then the dispatcher would get on

11 there to make sure he knew what we were doing so we

12 could utilize track time.

13 Q    Were these -- I'll use this term -- sort of

14 all-hands calls; in other words, every employee was

15 expected to participate in the calls?

16 A    Yes.

17 Q    So that included not only the roadmaster and

18 yourself, but everybody on your crew was expected to

19 either dial in or be present for the call; correct?

20 A    Correct.

21 Q    Did these calls sometimes include alerts or

22 warnings on safety issues?

23 A    Not that I remember.

24 Q    Did sometimes these calls include information on,

25 oh, problems that had arisen on the tracks overnight or

MICHAEL KOZIARA - CROSS

1  something like that?

2  A    Yes, if they had a derailment or something like

3  that they would mention it.

4  Q    And one of the purposes of the calls, is this where

5  your assignments then got handed out?

6  A    Sometimes.

7  Q    Sometimes you had your assignments previously;

8  correct?

9  A    Sometimes I knew what I was going to do, that's

10  correct.

11  Q    All right.  During the time that you worked at

12  BNSF, you were also active in your union, the BMWED;

13  correct?

14  A    Correct.

15  Q    I think you told us at one point you were the

16  president of the Local; is that correct?

17  A    That's correct.

18  Q    What Local number was that, sir?

19  A    Local 509.

20  Q    Where was Local 509's headquarters?

21  A    They weren't really headquartered anywhere unless

22  you wanted to call the Secretary/Treasurer's house the

23  headquarters.

24  Q    You had been active in the union for quite some

25  time; correct?

                    MICHAEL KOZIARA - CROSS

1    A    Yes.

2    Q    What positions prior to becoming the president of

3    the Local had you held?

4    A    I held the Legislative Director's job for the State

5    of Wisconsin since 1999.

6    Q    Did you hold any other officer positions in your

7    Local like Vice President or Treasurer or something like

8    that?

9    A    No.

10   Q    The Legislative Director job, that was a part-time

11   job with the union; correct?

12   A    Correct.

13   Q    That was in addition to your work at BNSF?

14   A    Correct.

15   Q    The job of the Legislative Director was actually a

16   paid position; correct?

17   A    Correct.

18   Q    What did that job entail?

19   A    Whatever the national director wanted or the

20   president of the international wanted to do on getting

21   bills passed or any kind of safety issues or if there

22   was, you know, meeting up with other unions, that was my

23   job.

24   Q    Okay.  I'd like to switch gears on you a little bit

25   at this point.  There are a number of people who either

               MICHAEL KOZIARA - CROSS

1  will testify or whose names have been mentioned in this

2  case and I just wanted to ask you some questions about

3  those individuals.  All right?

4  A    Okay.

5  Q    The first would be Michael Veitz.  He was your

6  roadmaster; correct?

7  A    Correct.

8  Q    How would you characterize or how would you

9  describe your relationship with Michael Veitz during the

10  years you worked under him?

11  A    We tried to be professional, but we had -- it was

12  strenuous at times.

13  Q    Strenuous in which way, sir?

14  A    I guess I wasn't on the buddy list.  I just did my

15  job the best I could.

16  Q    You weren't on the buddy list?

17  A    Correct.

18  Q    And what does that mean, sir?

19  A    It means I wasn't in his favorite group of people.

20  Q    And do you have some idea why you weren't in his

21  favorite group of people?

22        MR. MORGAN:  I'm going to object.  That calls

23  for speculation.

24        THE COURT:  I'll allow it.

25        THE WITNESS:  I wasn't there -- I wasn't there
                    MICHAEL KOZIARA - CROSS

1  all the time so he could count on me when -- most of the

2  time I was there to work.  I would come out any time I

3  could.  But if I was on my Legislative Director's job or

4  something, I wasn't there for him.

5  BY MR. DOUGLAS:

6  Q    So if Mr. Veitz had -- are you suggesting that

7  Mr. Veitz had a beef with you because you were absent

8  for your legislative duties?

9  A    He's had a problem with it before.

10  Q    Any other problem with Mr. Veitz?

11  A    No.  He just has a little temper, that's all.

12  Q    Did he ever use his temper on you?

13  A    Tried.

14  Q    What was he -- on that occasion what was he angry

15  about?

16  A    At the time we had a -- I had a machine break down

17  and the hydraulics sprayed all over me and he was more

18  upset about the machine than me being sprayed with

19  hydraulics fluid.

20  Q    And when was this, sir?

21  A    I don't remember.  It was in the past.  1990,

22  somewhere in there.

23  Q    1990?  Okay.  So that would be -- well, by today's

24  standards, that would be what?  30 -- 24 years ago?

25  A    Just remember you asked me.
                    MICHAEL KOZIARA - CROSS

1  Q    I am.  I'm just trying to make sure when you said

2  1990, we really meant 24 years ago.  All right.  Any

3  other issues with Mr. Veitz?

4  A    Not to my knowledge.

5  Q    You said he tried to act professional; is that

6  right?

7  A    We were in a really good basis.  I was a good

8  worker I thought.

9  Q    And did you consider him to be a good roadmaster?

10  A    He was fair, I guess.

11  Q    Are you familiar with the name Daniel Rankin?

12  A    Yes.

13  Q    Have you ever met Mr. Rankin?

14  A    Yes, I have.

15  Q    Okay.  When did you meet Mr. Rankin?

16  A    About three or four years ago at a meeting.  It was

17  a meeting they had for trying to keep people.  They had

18  a bunch of psychologists there and they were going -- it

19  was kind of like a foremans school for leadership.

20  Q    And you were included in that class.

21  A    Yes.

22  Q    Did you ever have any problems with Mr. Rankin?

23  A    I've only met him a couple times.

24  Q    And one of the times being at the leadership class;

25  correct?

                    MICHAEL KOZIARA - CROSS

1    A    That's correct.

2    Q    Do you know a gentleman by the name of Gary

3    Wischover?

4    A    Yes, sir.

5    Q    And who was Mr. Wischover?

6    A    Mr. Wischover was a division engineer about the

7    time I left after they replaced Brian Chatt (ph).  He

8    used to be the computer guy.  That's all I really knew

9    about him.

10   Q    Did you ever have any problems or any disagreements

11   with Mr. Wischover?

12   A    I never really talked to him.

13   Q    All right.  How about William Barbee?  Do you know

14   him?

15   A    Yes, I do.

16   Q    Okay.  What -- who is he?

17   A    Bill Barbee is a roadmaster.

18   Q    And is he -- what's his current job, if you know?

19   A    He's roadmaster in La Crosse.

20   Q    Just to kind of speed this up, at some point

21   Mr. Veitz retired from the company; is that correct?

22   A    That's correct.

23   Q    Is it your understanding that Mr. Barbee took his

24   position then?

25   A    That's correct.
                    MICHAEL KOZIARA - CROSS

1   Q     Did you ever have any problems or issues with

2   William Barbee?

3   A     When he first got here, he was a welding

4   supervisor, yes.

5   Q     Was Mr. Barbee in any way involved in the

6   disciplinary action and dismissal that BNSF took against

7   you?

8   A     I have no knowledge of it.

9   Q     Thank you, sir.  Do you know a gentleman by the

10  name of Jerry Weis?

11  A     Yes, I do.

12  Q     Did I pronounce that correctly?

13  A     Weis.

14  Q     Weis.  Thank you.  And who is Mr. Weis?

15  A     Mr. Weis is a welder for the BNSF, welding foreman.

16  He's also the secretary/treasurer of our Local.

17  Q     Mr. Weis is a close friend of yours, is he not,

18  sir?

19  A     Yes, he is.

20  Q     As a matter of fact, you've been friends since you

21  were young men; is that right?

22  A     Yes.

23  Q     Do you know a gentleman by the name of David

24  Bruring?

25  A     Yes.

                    MICHAEL KOZIARA - CROSS

1  Q    Who is David Bruring?

2  A    He's a BNSF employee.

3  Q    Just a co-worker of yours?

4  A    That's correct.

5  Q    Is he also in the Maintenance of Way Division?

6  A    Yes, he is.

7  Q    Was he ever working on your crew?

8  A    He was a truck driver at one time.

9  Q    Was Mr. Bruring involved in either of the incidents

10 that we've had testimony on today?

11 A    He wasn't involved in anything that I know of.

12 Q    Let me rephrase that for you.  Was he present at

13 either of the incidents, the one on September 9th at

14 East Winona or the earlier one at Winona Junction?

15 A    He was present at Winona Junction.  He was doing

16 ties.

17 Q    So he was present on the day that the ties were

18 given away to the farmer; correct?

19 A    Correct.

20 Q    Did you have any discussion with Mr. Bruring on

21 that day?

22 A    No, I did not, other than job briefing probably.

23 Q    Okay.  Do you know a gentleman by the name of

24 Bradley Underhill?

25 A    Yes, I do.
                    MICHAEL KOZIARA - CROSS

1  Q    Who is Brad Underhill?

2  A    Brad Underhill is a employee of BNSF and he holds a

3  foreman's position.  He was my relief foreman at the

4  time during the fall of 2010.

5  Q    So in 2010, September of 2010, did Mr. Underhill

6  work on your crew as a crew member or did he do

7  something else and then filled in as a foreman?  Would

8  you please help us understand that.

9  A    He would work as -- he -- multiple things.  When

10 they needed him for doing something else, he would fill

11 in that position.  If we had extra people, we didn't

12 need him.  Otherwise, if I was gone, he took over for

13 me.

14 Q    Okay.  Did he have a particular job title or main

15 job?

16 A    He was a foreman just like me.

17 Q    Okay.  So he was supervising a crew?

18 A    Correct.

19 Q    What crew was he supervising, sir?

20 A    Same one I was.

21 Q    Okay.  So were the two of -- I'm just trying to

22 understand this.  Were the two of you interchangeable on

23 the crew?  Is that how it worked?

24 A    That's correct.

25 Q    All right.  Thank you.  Do you know a gentleman by

                    MICHAEL KOZIARA - CROSS

1   the name of Chris Davis?

2   A    Yes, I do.

3   Q    Who is Chris Davis?

4   A    Chris Davis is the Local chairman and he's also a

5   track inspector for BNSF.

6   Q    And was Mr. Davis present with you during any of

7   the investigative hearings that were held in 2010

8   concerning these matters?

9   A    Yes, he was.

10  Q    And was he the union representative that came to

11  the hearing to represent you; is that right?

12  A    For the first one, yes.

13  Q    For the first one.  And he came along with

14  Mr. Willing for the first one; correct?

15  A    Don Willing, yes.

16  Q    All right.  Thank you.  Do you know Greg Zielke?

17  A    Yes, I do.

18  Q    Who was Greg Zielke?

19  A    He's employed for the Burlington Northern, but he's

20  also -- he was the only end loader operator at the time.

21  Q    Okay.

22  A    And he's a friend of mine.

23  Q    It's easy to get tongue tied at the end of the day,

24  sir.

25  A    Yeah.
                    MICHAEL KOZIARA - CROSS

1   Q    All right.  Continuing on.  If I may, let me direct

2   your attention to an incident that your counsel asked

3   you questions about that happened back in about 1988 I

4   think was the year.  Did I get that right?

5   A    That's correct.

6   Q    So you had an injury in -- an on-the-job injury in

7   1988; is that correct?

8   A    That's correct.

9   Q    What's the injury again?

10  A    I had a contusion and bruises.  I had just slipped

11  in a hole and I was all banged up from it.

12  Q    And you went to report that injury; is that right?

13  A    That's correct.

14  Q    Did you fill out a written injury report?

15  A    I did.

16  Q    You gave it to your roadmaster; correct?

17  A    I gave it to the foreman who gave it to the

18  roadmaster.

19  Q    Thank you for the correction.  And who was the

20  foreman, if you remember?

21  A    I can see his face.  I can't remember his name.

22  Q    All right.  Who was the roadmaster?

23  A    CD Schoonover.

24  Q    Okay.  So you said that somebody ripped up your

25  report.  Who was that?
                    MICHAEL KOZIARA - CROSS

1   A    That was the roadmaster, Mr. Schoonover.

2   Q    You then told us that Mr. Schoonover -- the

3   roadmaster got in more trouble that you did.  What

4   happened to the roadmaster because he ripped up your

5   report?

6   A    Nothing because I didn't press charges against him

7   or anything.

8   Q    Ahh.  What would have happened to him had you

9   pressed those charges, sir?

10          MR. MORGAN:  I'm going to object.  Calls for

11  speculation.

12          THE COURT:  You'll have to lay some foundation

13  for that.

14          MR. DOUGLAS:  Certainly.

15  BY MR. DOUGLAS:

16  Q    You testified that Mr. Schoonover or -- strike

17  that.

18      The roadmaster got in more trouble than you did

19  because he ripped up the report; correct?

20  A    Correct.

21  Q    What is the basis for your saying that he got in

22  more trouble than you did?

23  A    Well, after he threatened me with 30 days off and

24  then found out later after he had tore up the thing and

25  the union guy came over and said if you really wanted to

                    MICHAEL KOZIARA - CROSS

1  press this issue he would probably be terminated for

2  tearing up that injury report.

3         THE COURT:  And who was the union guy who told

4  you this?

5         THE WITNESS:  Gather Wischover -- Gary Holder.

6  And he's retired.  He has been retired for many, many

7  years.

8         THE COURT:  And what was his position in the

9  union?

10        THE WITNESS:  He was a -- he was the Vice

11 General Chairman at the time.

12 BY MR. DOUGLAS:

13 Q    So it was your understanding that if you had

14 pressed charges against that roadmaster -- Schoonover is

15 his name?

16 A    Correct.

17 Q    -- that you might have actually caused him to be

18 discharged by the railroad; correct?

19 A    Correct.

20 Q    Because what he did was wrong; right?

21 A    Correct.

22 Q    I take it that your report got written up and

23 processed some time later; is that right?

24 A    I don't know what happened.  I know I kept a copy,

25 but I had a claim agent come by later and that was it.

                MICHAEL KOZIARA - CROSS

1   Q    So your claim was processed and then you got taken

2   care of; is that right?

3   A    That's correct.

4   Q    All right.  Were you disciplined for anything in

5   connection with making that injury report?

6   A    No.

7   Q    Now Mr. Koziara, I'd like to turn your attention

8   now to the events of September 9, 2010.  I think we've

9   already heard some testimony on that, but let me be sure

10  that I've got it down pat.

11       What time did you start working that morning, if

12  you can recall?

13  A    It would be seven o'clock.

14  Q    Did you report to your office or section house at

15  Winona Junction?

16  A    That's correct.

17  Q    How long were you at the section house at Winona

18  Junction?

19  A    It would have been after eight o'clock.

20  Q    So for a little over an hour?

21  A    That's correct.

22  Q    During that time was there a conference call that

23  morning?

24  A    There was.

25  Q    And who, if you recall, who led the conference

                    MICHAEL KOZIARA - CROSS

1  call?

2  A    Mike Veitz.

3  Q    Who else was on the conference call, at least from

4  your group of people?

5  A    What do you mean from my group of people?  You mean

6  in my own section?

7  Q    Let me -- yes, sir.  I meant from your crew or your

8  section, who else was on the call if you know?

9  A    Well, it would have been Brad Underhill, Elvin

10 Smothers.  That would have been my crew at the time.

11 Q    Okay.  Mr. Smothers is now deceased; correct?

12 A    That's correct.

13 Q    So is it fair to say that you spent about an hour

14 at the section house; correct?

15 A    Or more.

16 Q    Or more.  All right.  Did you conduct a briefing

17 with any of the people on your crew prior to leaving the

18 section house?

19 A    Yes.

20 Q    With whom did you conduct the briefing?

21 A    Brad.  I told him to go put the forms out for my

22 Form B, and Elvin, to tell him where to go.

23 Q    I want to make sure I understood that.  When you

24 told him to go put the boards out?

25 A    Yes.

                 MICHAEL KOZIARA - CROSS

1   Q     Okay.  So what does that mean?

2   A     That means he has to go set the boards up.  The

3   Form B boards had to be set up.

4   Q     Would you please explain to us and help us

5   understand what is the Form B board?

6   A     The Form B boards is a protection I had requested

7   the day before so the train traffic would know the day

8   of the work what I was doing and where they could or

9   couldn't go without asking me permission first.

10  Q     Do these Form Bs go into something called a *General*

11  *Track Bulletin* to your knowledge?

12  A     Yes, they do.

13  Q     And to whom are those bulletins distributed?

14  A     To the train crews.

15  Q     So if something is put in that's listed as Form B,

16  that is how the train crews know where work is being

17  done on the tracks and that they either must stop before

18  they get there or they must contact somebody before they

19  cross that area; is that correct?

20  A     That's correct.

21  Q     And isn't it the case, sir, that the person whose

22  name appears in the Form B report is the person they are

23  supposed to contact?

24  A     That's correct.

25  Q     So on September 9, 2010, when you're working at

                    MICHAEL KOZIARA - CROSS

1    East Winona and working on the crossing planks, you had

2    put out the Form B request for that day; correct?

3    A    No.  You've got the wrong day.

4    Q    I'm sorry.  Who put out the Form B on September

5    9th?

6    A    September 9th, that was the tie gang.

7    Q    All right.  Let's back up for a moment because I

8    did ask you what you were doing at the section house

9    earlier.

10   A    No, I was on a different day.  Sorry.

11   Q    Okay.  All right.  Let's rewind this a little bit.

12   A    Okay.

13   Q    On the morning of September 9th, you had a

14   conference call and you spent about an hour or so in the

15   section house; correct?

16   A    Yes.

17   Q    All right.  You conducted a briefing at least with

18   Mr. Underhill; correct?

19   A    Yeah.  I think Brad had to go somewhere else, I

20   don't think he was at the work location.  And I had

21   Elvin Smothers and they were setting Matt Kjos up to

22   help me.

23   Q    Okay.  Was this all taking place at the section

24   house or at the job site?

25   A    This was taking place at the section house we were

                    MICHAEL KOZIARA - CROSS

1  talking about this, and then we got out to the job site.

2  We had to rebrief with the tie gang to go under their

3  protection of their Form Bs and stuff.

4  Q    Okay.  So I want to be clear on this.  You're at

5  the section house and you do some kind of a briefing and

6  then you depart for the job site, which that day is East

7  Winona; correct?

8  A    Correct.

9  Q    About -- do you remember about what time you left

10  the section house to go to East Winona?

11  A    It was after eight o'clock.

12  Q    Okay.  All right.  When you got to East Winona, did

13  anybody come to you to report that there were any

14  difficulties with the project out there?

15  A    No.

16  Q    Isn't it -- didn't Mr. Underhill or somebody come

17  to you to tell you that the hydraulic gun wasn't

18  working?

19  A    That was my truck driver, Elvin Smothers.

20  Q    Oh, I'm sorry.  Mr. Smothers came to you to tell

21  you that the hydraulic gun wasn't working; correct?

22  A    Correct.

23  Q    Just for the record, when we're talking about the

24  truck driving, Mr. Smothers operated something that is

25  known as a boom truck; is that correct?

                  MICHAEL KOZIARA - CROSS

1  A    That is correct.

2  Q    Tell us what that -- in the context of what you all

3  were doing that day at East Winona, what was the purpose

4  of the boom truck?

5  A    The boom truck had the hydraulics to take the lags

6  out.  We were going to back up and take the planks out

7  with the boom truck, and we didn't.  Greg said he could

8  do it with the loader.  We had the tie gang held up, and

9  he said he could do it and so that's what we agreed on

10  and he pulled the planks out.

11  Q    All right.

12       MR. DOUGLAS:  May I have 577, please.

13  Q    Mr. Koziara, are you able to see that photograph?

14  A    Yes, I am.

15  Q    Can you tell us what that is, please?

16  A    This is the back of the boom truck I had at the

17  time.

18  Q    Okay.

19       MR. DOUGLAS:  Move the admission of 577.

20       MR. MORGAN:  No objection.

21       THE COURT:  All right.  577 is admitted.

22       MR. DOUGLAS:  May I also have 578.

23       THE COURT:  So we don't keep the jury waiting,

24  is there an objection to 578?

25       MR. MORGAN:  No, Your Honor.
              MICHAEL KOZIARA - CROSS

1           MR. DOUGLAS:  Move the admission.

2           THE COURT:  578 is received.

3           MR. DOUGLAS:  Thank you.  579, please.

4           MR. MORGAN:  No admission.

5           THE COURT:  It's admitted.

6           MR. DOUGLAS:  And 580.

7           MR. MORGAN:  No objection.

8           THE COURT:  Very good.  It's in.

9           MR. DOUGLAS:  Admit.  Thank you.  All right.

10  581.

11          MR. MORGAN:  No objection.

12          THE COURT:  And it's in.

13          MR. DOUGLAS:  582.

14          MR. MORGAN:  No objection.

15          THE COURT:  It's in.

16          MR. DOUGLAS:  Fine.  Thank you.  May I ask for

17  the photo that has the hydraulic gun on the tailgate,

18  please.  It might be 601.  I'm not sure.  Any objection

19  to 601?

20          MR. MORGAN:  No objection.

21          THE COURT:  All right.  601 is admitted.

22          MR. DOUGLAS:  Thank you.

23  BY MR. DOUGLAS:

24  Q   Mr. Koziara, do you recognize -- I'm showing you a

25  picture of what's been marked as Exhibit 601.  Do you
                   MICHAEL KOZIARA - CROSS

1  recognize the device that's sitting on the tailgate

2  there?

3  A    Yes, sir.  That's one of my hydraulic guns.

4  Q    Is that similar to the hydraulic gun that was at

5  East Winona on September 9, 2010?

6  A    It could have been one of them.

7  Q    Do you happen to know by looking at it is that the

8  one that was broken and in need of repairs or is that

9  just the other one?

10 A    I have no idea.  I didn't look at it.

11 Q    Okay.  All right.  So this is a device that is used

12 to unscrew the lags that are in the crossing plank;

13 correct?

14 A    Correct.

15 Q    And I take it that these -- if we look at the hoses

16 on that, those hoses hook up to a pressure -- a

17 hydraulic system on the boom truck; correct?

18 A    Correct.

19 Q    All right.

20        MR. DOUGLAS:  Now may I also have 600, please.

21 Q    Can you tell me what's depicted in Exhibit 600?

22 A    Those are plank lifters.

23        THE COURT:  Any objection to 600?

24        MR. MORGAN:  No objection, Your Honor.

25        THE COURT:  Okay.  I'm going to show 600 to the
                    MICHAEL KOZIARA - CROSS

1    jury.  Would you like it in evidence?

2            MR. DOUGLAS:  I'd move to admit, Your Honor.

3            THE COURT:  Okay.  It's in.

4            MR. DOUGLAS:  Thank you.

5    BY MR. DOUGLAS:

6    Q    Mr. Koziara, can you tell us what is a plank lifter

7    and what is it used for.

8    A    It's used to lift planks out of crossings.

9    Q    So this device here, if I've got it correct, that

10   would hook on to something that it hooks on to the boom

11   truck; correct?

12   A    Correct.

13   Q    And this plank lifter is capable of physically

14   lifting one of those crossing planks that weighs 1200

15   pounds; correct?

16   A    Correct.

17   Q    So let me ask you, sir:  The use of the cross --

18   the use of the plank lifter, isn't that, in fact, the

19   preferred method for removing crossing planks?

20   A    Yes, it is.

21   Q    Thank you.  All right.  But that particular day you

22   weren't able to get that plank up; correct?

23   A    Correct.

24   Q    Perhaps we ought to at this point show -- let's

25   see.
                    MICHAEL KOZIARA - CROSS

1          MR. DOUGLAS:  Do we have a picture of the lag

2     that I could use?  No?  Okay.

3     Q    Mr. Koziara, I'd like to show you this picture.

4     Can you identify that for me?

5     A    Yes.

6     Q    Is that a lag?

7     A    That is a lag that they put in for switches.

8     That's not a crossing lag.

9     Q    Okay.  What would be the difference between a

10    crossing lag and a switch lag?

11    A    That's about six or eight inches long, and about an

12    inch around, and the crossing lag would be about 18

13    inches long and about a quarter inch around.

14          THE COURT:  Mr. Douglas, would you make a

15    record of what the exhibit is that you've shown him?  I

16    haven't shown it to the jury, by the way.  If you want

17    them to see it, you'll have to make a better record.

18          MR. DOUGLAS:  Yes.  This would be marked as

19    Exhibit 659.

20          THE COURT:  Is there any objection to that one?

21          MR. MORGAN:  Other than it's not the lag that

22    we're talking about, Your Honor.  I guess its relevance.

23          THE COURT:  I'll overrule that.  And I think,

24    Mr. Douglas, just make a clear record of what we're

25    looking at here.
                    MICHAEL KOZIARA - CROSS

1           MR. DOUGLAS:  Yes.

2    BY MR. DOUGLAS:

3    Q    Mr. Koziara, Exhibit 659 I think you've indicated

4    and you've agreed that that would be a lag that would be

5    used for switch crossing planks or switch planks?

6    A    Switch ties.

7    Q    Switch ties.

8    A    That's correct.

9    Q    Thank you.  You've indicated that the lags for the

10   crossing planks are a little longer and a little

11   narrower; correct?

12   A    Correct.

13   Q    I'll do my best to get a picture of one for you

14   tomorrow, okay?  Thank you, sir.  All right.

15        At some point after you arrived at East Winona on

16   September 9, 2010, you learned that the hydraulic gun

17   wasn't working and that they weren't able to get at

18   least one of the planks up; correct?

19   A    No.  Not one of the planks up.  One of the lags

20   were bent over into the plank, but they had gotten all

21   the rest out.

22   Q    Okay.  So it was just the one crossing plank;

23   correct?

24   A    Correct.

25   Q    And was that the crossing plank that was on the
                  MICHAEL KOZIARA - CROSS

1  outside of the rail?

2  A    Correct.

3       MR. DOUGLAS:  Can we have the same picture back

4  up if we can?

5       THE COURT:  Mr. Koziara, you said they had

6  gotten all the rest up.  Do you mean they had gotten all

7  the rest of the crossing planks out or they had gotten

8  all the other lags --

9       THE WITNESS:  Crossing lags out.

10       THE COURT:  Of that plank that you wanted to

11  move.  All the other lags were taken out of that plank;

12  is that correct?

13       THE WITNESS:  Yes.

14       THE COURT:  So the one -- the one bent lag was

15  left.

16       THE WITNESS:  Yes.

17       THE COURT:  Okay.  All right.  You're putting

18  that picture back up?

19       MR. DOUGLAS:  We are attempting.  Zoom in on

20  the picture, please.

21  BY MR. DOUGLAS:

22  Q    This is from Exhibit 564, I believe.  Mr. Koziara,

23  that is the -- do you recognize that photograph?

24  A    Yes.

25  Q    Do you recognize it as being the photograph from

                    MICHAEL KOZIARA - CROSS

1   the reenactment?

2   A   Yes.  Incorrect as it is.

3   Q   All right.  Well, let's talk about that for a

4   moment; all right?

5   A   Okay.

6   Q   First, let's see --

7           MR. DOUGLAS:  Is it published to the jury?

8           THE COURT:  It is, yes.

9           MR. DOUGLAS:  Okay.  Thank you.

10   Q   Let's see if we can't clear up any corrections; all

11   right?  First of all, I believe you told us -- you told

12   me previously in depositions and others that where this

13   person is depicted in the photograph is not exactly

14   where you were standing; correct?

15   A   That's correct.

16   Q   I think -- if you want to use your finger, where

17   were you standing at that time?

18   A   (Indicates)

19   Q   So you were standing just on the other side of the

20   rail on a crossing plank?

21   A   Yes.

22   Q   Okay.  And about how far distant would you be from

23   that point that you just put the arrow to where the

24   front-end loader was?

25   A   I would be probably five to seven feet from the

                    MICHAEL KOZIARA - CROSS

1  loader.

2  Q    And can you tell us, sir, I think you know this,

3  what is the width of the track?

4  A    It's eight foot.

5  Q    I'm sorry, sir.  The distance between the two

6  rails.

7  A    Oh, the inside or the outside?

8  Q    Either.

9  A    Okay.  The inside would be -- a normal gauge is

10  56-and-a-half inches.

11  Q    Thank you, sir.  So like four-and-a-half feet?

12  A    Correct.

13  Q    Okay.  Thank you, sir.  Now, let's take a look at

14  this picture.  You said there was something else that

15  was not correct in this reenactment.  What is not

16  correct in your view in this reenactment photo?

17  A    The angle of the forks is overexaggerated.

18  Q    So the forks were at a lower angle or a higher

19  angle?

20  A    They were lower.

21  Q    All right.  So that's one thing.  But where the

22  forks are touching that plank, is that the plank that

23  you had difficulty getting up?

24  A    That's correct.

25  Q    So aside from the angle perhaps not being correct,

                    MICHAEL KOZIARA - CROSS

1   when Mr. Zielke was operating the front-end loader, that

2   was the plank that he was trying to pop up; correct?

3   A    That's correct.

4   Q    And that's the plank that you testified came over

5   the top of the crossing at you; is that right?

6   A    That's correct.

7   Q    When you got to the site on September 9, 2010, walk

8   me through this, please.  What did you do when you got

9   to the site at East Winona?

10  A    I got to the site.  I got on the tie gang's

11  authority with Al Mitchell.  Job briefed with my crew

12  and told them we needed to take the lags out, which they

13  did, which they got all done mostly -- all the lag bolts

14  out of the crossing planks.  And then Elvin had told me

15  that they had one that was stuck in there.  So I told

16  that to Mr. Zielke, who said he could get it out faster

17  and pull the planks up.  I went back across to give him

18  hand signals and told the crew to go over and stay

19  safely out of the way.  And they were fixing the gun at

20  the time.

21  Q    Okay.  And where was the crew that was fixing the

22  gun at the time?

23  A    Could you go back to the one that has East Winona

24  on it?

25  Q    I can certainly try.

                  MICHAEL KOZIARA - CROSS

1  A    The next one.

2  Q    Would that be satisfactory?

3  A    That will work.

4  Q    Okay.  All right.  I'm going to, with your

5  permission, I'm going to clear these arrows.  Okay?

6  A    Yeah.

7  Q    Okay.  All right.  Can you tell us or put an arrow

8  where the boom truck was?

9  A    The boom truck would have been right about here.

10  (Indicates)

11        MR. DOUGLAS:  So let the record indicate the

12  witness has drawn two -- has drawn some arrows that are

13  on the same side of the track where the front-end loader

14  is in the other pictures, but closer to the crossing

15  sign that says East Winona.

16  Q    Is that fair, sir?

17  A    The front of the truck would have been where the

18  East Winona sign would have been, and it's about a

19  40-foot truck.

20  Q    Okay.  So the front of the -- would it have been

21  like parked up right against the sign?

22  A    At least.

23  Q    Okay.  Because it's a 40-foot truck.  I got it.

24  Okay.  So then the end of the truck was facing toward

25  us, if we're looking at the screen; correct?

                    MICHAEL KOZIARA - CROSS

1   A    Correct.  And that's the work area.

2   Q    All right.  And the hydraulic gun was on the

3   tailgate of the truck?

4   A    Correct.

5   Q    And the men, whoever was working on it was working

6   on it on the tailgate of the truck; correct?

7   A    Correct.

8   Q    So those people were -- how far away would you say

9   the end of the truck was from -- well, let me withdraw

10  that.  Okay.

11      So they're all working over there on the truck.

12  All right.  What happens next?

13  A    If I remember, I think Greg took out one of the

14  planks here (indicating) and then he came back over to

15  work on this one, and when he stuck his forks in

16  straightwise, he popped it up.  And I don't know why he

17  put it back down.  Then he just raised it up a little

18  bit and went into the rail with it and that's when it

19  popped across.  I'm sure it was pressure on the plank,

20  and it shot across and it got me on the other side.  I

21  was trying to readdress him and tried to rebrief with

22  him before he did anything else, but it was too late.

23  Q    So did you have a briefing with Mr. Zielke when you

24  arrived at the site?

25  A    Yes.

MICHAEL KOZIARA - CROSS

1    Q    And did you tell Mr. Zielke that the lags were

2    still in one of the planks?

3    A    Yes.

4    Q    Who made the decision to use the front-end loader

5    with the forks to pry up the plank?

6    A    Greg did.

7    Q    You were the foreman though; correct?

8    A    His machine.

9    Q    He reported to you, didn't he?

10   A    He listened to what I say, yes, because I'm the

11   foreman.

12   Q    He suggested using the front-end loader as to pry

13   up the plank; correct?

14   A    That's correct.

15   Q    And you approved it as the foreman.

16   A    That's correct.

17   Q    And you made sure that everybody else was out of

18   the way; correct?

19   A    Correct.

20   Q    And then you stood on the crossing plank just

21   across from the front-end loader; correct?

22   A    Yes.

23   Q    Did you have your walkie-talkie radio with you,

24   sir?

25   A    No, I did not.
                    MICHAEL KOZIARA - CROSS

1  Q    Isn't it customary for you, as the foreman, to have

2  had that walkie-talkie radio?

3  A    Not when I've got the truck sitting right behind

4  me.

5  Q    Are there alternative methods of communication with

6  someone like Mr. Zielke in the front-end loader that

7  were acceptable at the time?

8  A    Hand signals.

9  Q    And hand signals though would require line of

10  sight; correct?

11  A    Yes.

12  Q    Did you have line of sight with Mr. Zielke when he

13  was in the cab operating the truck?

14  A    I did until he was engrossed in his task.

15  Q    So when the forks of the truck were operating, you

16  no longer had line of sight with Mr. Zielke; is that

17  correct?

18  A    That's what I was trying to rebrief with him.

19  Q    And what you were trying to do was walk around and

20  get over to Mr. Zielke; is that correct?

21  A    That's correct.

22  Q    You could have waited for the hydraulic gun to be

23  repaired, couldn't you?

24  A    It wouldn't have mattered.  The lag was still bent

25  over inside the plank.

                  MICHAEL KOZIARA - CROSS

1   Q    Was the use of the forks then in your opinion the

2   only way to remove that plank?

3   A    Yes.

4   Q    But you didn't have to be standing where you were;

5   isn't that true?

6   A    No.  But the planks never go that far.  I've never

7   in my 32 years ever seen a plank do that.  Ever.

8   Q    Well, as they say, Mr. Koziara, there's a first

9   time for everything.

10          MR. DOUGLAS:  Your Honor, we're at about 5:30.

11   Would this be convenient to break at this time?

12          THE COURT:  It would be a perfect time to take

13   our break and we'll continue with Mr. Koziara's

14   cross-examination tomorrow morning.

15      Ladies and Gentlemen, thank you for your patience

16   today and your attention.  And remember not to talk

17   about the case or do any research.  And we will see you

18   back here so that we can start court again at nine

19   o'clock.  Thank you.  Have a good evening.

20      (Jury excused from courtroom at 5:29 p.m.)

21          THE COURT:  All right.  Very good.  I'm not

22   aware of anything that we need to address outside the

23   presence of the jury, but that's why I'm checking in.

24   So is there?

25          MR. KASTER:  We don't have anything, Your
                        MICHAEL KOZIARA - CROSS

1    Honor.  Is there a reason why you want us here early

2    tomorrow?

3              THE COURT:  I don't think.  Did we send out a

4    notice asking -- giving you a time early?

5              MR. KASTER:  No.  I just want to make sure.

6              THE COURT:  Yeah, no.  I don't -- unless you

7    have something -- unless you have a need to take

8    something up with the Court before the jury gets here,

9    nine o'clock is good for counsel as well as the jury as

10   far as I'm concerned.

11             MR. KASTER:  Thank you.

12             MR. DOUGLAS:  Thank you.

13             THE COURT:  Very good.  We will see you

14   tomorrow morning.

15        (Proceedings concluded at 5:30 p.m.)

16

17                        *  *  *  *  *

18

19

20

21

22

23

24

25

1        I, LYNETTE SWENSON, Certified Realtime and Merit

2   Reporter in and for the State of Wisconsin, certify that

3   the foregoing is a true and accurate record of the

4   proceedings held on the 2nd day of March 2015 before the

5   Honorable James D. Peterson, District Court Judge for

6   the Western District of Wisconsin, in my presence and

7   reduced to writing in accordance with my stenographic

8   notes made at said time and place.

9   Dated this 6th day of March 2015.

10

11

12

13                              /s/_____
                                Lynette Swenson, CRR,RMR
14                              Federal Court Reporter

15

16

17

18  The foregoing certification of this transcript does not
    apply to any reproduction of the same by any means
19  unless under the direct control and/or direction of the
    certifying court reporter.
20

21

22

23

24

25