UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * * *

MICHAEL KOZIARA,

       Plaintiff,

-vs-                   Case No. 13-CV-834-JDP

BNSF RAILWAY COMPANY,     Madison, Wisconsin
                         March 5, 2015
       Defendant.      1:18 p.m.

* * * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT OF FOURTH DAY OF JURY TRIAL
AFTERNOON SESSION
HELD BEFORE JAMES D. PETERSON, and a jury,


APPEARANCES:

For the Plaintiff:
                Nichols Kaster
                BY:  MATTHEW MORGAN
                     JAMES KASTER
                     NICHOLAS THOMPSON
                4600 IDS Center
                80 South Eighth Street
                Minneapolis, Minnesota  55402-2242

Also present:     Michael Koziara - plaintiff
                Emilee Howe - paralegal

Lynette Swenson   RMR, CRR, CBC
U.S. District Court Federal Reporter
United States District Court
120 North Henry Street, Rm. 520
Madison, Wisconsin  53703
608-255-3821

```
 1   APPEARANCES CONTINUED:

 2   For the Defendant:
                     Ogletree Deakins
 3                   BY:  BRUCE DOUGLAS
                          COLTON LONG
 4                   Wells Fargo Center
                     90 South Seventh Street, Ste. 3800
 5                   Minneapolis, Minnesota  55402

 6   Also present:   Jennifer Lenander - Office
                        Administrator
 7                   Jennifer Willingham - BNSF Counsel
                     Daniel Rankin - General Director
 8                      of Line Maintenance

 9

10                      *  *  *  *  *

11                      I-N-D-E-X

12   DEFENDANT'S WITNESSES          EXAMINATION        PAGES

13   DANE FRESHOUR           Direct by Mr. Douglas     16-42
                             Cross by Mr. Kaster       45-54
14                           Redirect by Mr. Douglas   54-61

15   Instructions by the Court                         71-79

16   Closing argument by Mr. Morgan                    80-94
     Closing argument by Mr. Douglas                   94-112
17   Rebuttal argument by Mr. Morgan                   112-115

18   Verdict/polling of jury                           121-123

19                      E-X-H-I-B-I-T-S

20   DEFENDANT'S EXHIBITS                 IDENTIFIED/RECEIVED

21   Ex. 326      Injury Reporting Policy      58         ---

22       520      Internal Control Plan        57         58
         525      MOW rules                    24         25
23       532      Poster                       39         40
         539      Fact sheet                   37         38
24
         670      Policies                     20         20
25       675      HR 90.1                      60         60
```

1          (Afternoon session resumes.)

2          THE CLERK:  This Honorable Court is again in

3     session.  Please be seated and come to order.

4          THE COURT:  Mr. Brown, my clerk on this case,

5     is making his way down behind you to -- he's not here

6     yet, but I expect him any second with a draft of the

7     instructions that made the changes that we discussed

8     earlier.

9          I don't know if I saw a proposed limiting

10    instruction on the railroad benefits.  I got one from

11    plaintiff; I'm not sure I got one from defendant and --

12         MR. DOUGLAS:  I haven't seen the plaintiff's.

13         THE COURT:  You can disregard that because I've

14    already superseded it. So you're welcome to look at it,

15    but I have an instruction and Trevor is making copies

16    and he'll have those to you in a second.

17         MR. DOUGLAS:  Okay.

18         THE COURT:  So I won't require you to sign off

19    on it in two seconds, but you'll get a break before I

20    deliver it.  I will read it to you.  It's short and so I

21    will read to you now.  And I can tell you how I propose

22    to handle this.  And so -- there is Mr. Brown.  I'll let

23    him hand out the papers to you.  It's on page six, when

24    you get it.

25         MR. DOUGLAS:  Your Honor, not to cloud

1   anything, but may I speak to one point?  It may help

2   you.

3           THE COURT:  Pull the microphone down, if you

4   would, Mr. Douglas.

5           MR. DOUGLAS:  This may help before you read the

6   instruction.  Plaintiff's instruction looked pretty

7   good.  I just want to -- first of all, let me apologize

8   to the Court.  I apparently misinterpreted some

9   information when I came up to sidebar to indicate to you

10  about who would have to repay the benefits.  I now stand

11  corrected.  It is as we originally thought.  The RRB has

12  a lien on any recovery.  It would be Burlington

13  Northern's obligation upon the entry of a judgment or

14  payment to notify them, but it is, in fact, Mr. Koziara

15  who would be responsible for repaying benefits.

16          THE COURT:  Okay.  Great.  That makes it

17  simpler.  It doesn't obviate the need for the

18  instruction and so the instruction is still good.  I was

19  going to suggest that we do a motion to amend the

20  judgment if it turns out that BNSF is responsible for

21  repayment.  Apparently we don't have to worry about

22  that, so that's good.  The instruction is still needed.

23      And so the instruction is "Railroad Retirement

24  Board benefits.  You have heard evidence that

25  Mr. Koziara received benefits from the Railroad

1   Retirement Board.  You may consider whether Mr. Koziara

2   was disabled in determining whether he is entitled to

3   compensation for lost wages, but you may not increase or

4   decrease the amount of compensatory damages because of

5   any payments he received from the Railroad Retirement

6   Board."

7         You can contemplate that and we'll have a

8   pulse-and-temperature check on it before we commit to

9   it, but that's the current proposal.  The other changes

10  are made as we discussed.  So with that, I think we're

11  ready to bring the jury back.

12        Anything else before we bring them back?

13  Mr. Douglas.

14            MR. DOUGLAS:  Your Honor, plaintiff has rested.

15  May I make a Rule 50(a) motion?

16            THE COURT:  Sure.  Go ahead.

17            MR. DOUGLAS:  Thank you.  May it please the

18  Court.

19            THE COURT:  Yes.

20            MR. DOUGLAS:  Counsel.  At this time, Defendant

21  BNSF Railway moves, pursuant to 50(a), for judgment as a

22  matter of law on all of the claims for damages sought by

23  the plaintiff in this case, and I will take up each item

24  in turn.

25        First as to compensatory damages for lost wages.

1    It appears, based on the testimony given during this

2    phase of the trial, the plaintiff has failed to produce

3    reliable, credible evidence of, number one, what

4    position he would have held going into the future; how

5    long he might have held that position; whether he is

6    able to work in that position, and what his wage rate

7    would be.  Therefore, the jury is left merely with

8    speculation based on his last wage rate and has been

9    asked to assume and therefore extrapolate into the

10   future for an additional 39 months, I believe is the

11   number, that Mr. Koziara should be entitled to that

12   amount of money for 39 months.

13       However, in addition to that there is the evidence

14   from the testimony of Mr. Koziara and the RRB documents

15   that Mr. Koziara, in fact, has represented to the RRB

16   that he is permanently disabled.  Importantly, that

17   period of disability runs from September 10, 2010, which

18   was his last day of work, ongoing, according to

19   Mr. Koziara.

20       Beyond that, reinforcing his disability and

21   inability to work, there was the amendment and relation

22   back of the onset date of his disability to February 15,

23   2010, by the RRB based on additional medical evidence

24   that Mr. Koziara submitted to the government agency.

25       It is clear that if an individual is neither

1   capable of working in the work force or has retired by

2   voluntarily -- thereby voluntarily withdrawing from the

3   work force, that he is not entitled to recover any lost

4   wages.  We submit that Mr. Koziara is not entitled to

5   any recovery or an instruction for recovery of lost

6   wages because by his own admission and documentary

7   evidence he is permanently disabled or retired and has

8   withdrawn from the work force.

9       The additional reasons I've given that the position

10  he could hold, the amount of money he would earn, the

11  length that he would earn -- he would remain employed is

12  all based on the wishful thinking, if you will, of

13  Mr. Koziara that he would make the 30-60 deal under the

14  Railroad Retirement Act; in other words, 30 years of

15  service plus age 60.  That was his goal.  I applaud

16  that.  That's the goal of many employees on the

17  railroad.

18      However, in this particular case Mr. Koziara

19  indicated that he was no longer capable of doing his job

20  as early as February of 2010.  Whatever the conditions

21  that led to that, he then requested and received

22  classification of being permanently disabled from the

23  government agency and therefore we submit there is no

24  basis upon which -- no reliable basis upon which the

25  jury could award lost wages to Mr. Koziara.

1        Second item.  Compensatory damages for mental

2    anguish, pain and suffering, et cetera.  We submit again

3    that the evidence submitted by Mr. Koziara is far too

4    thin to go to the jury.  All we have is a modest amount

5    of evidence regarding sleepless nights, the occasional

6    anxiety.  All of these things are common when any

7    employee loses his job, as regrettable as that situation

8    may be, but the courts have uniformly recognized that

9    the law does not necessarily compensate for the typical

10   kinds of stress that may come about from changes in

11   employment.

12       Beyond that, any damages that might be claimed, and

13   there wasn't a number provided for the sale of the

14   house, although I think it's implied that Mr. Koziara is

15   seeking something for damages, compensatory damages on

16   the sale of the house, there is no credible evidence

17   upon which a jury could award him any money for losses

18   on the sale of the house.  Typically that's done by

19   introducing expert testimony, having comparators from

20   realtors, things of that nature.  All we have here is

21   evidence that Mr. and Mrs. Koziara sold their home, they

22   moved into another property, which while the house might

23   be smaller, the property is larger and they have a

24   tenant on the property.  The circumstances are close

25   enough that I think one could make the argument this is

1   almost equivalent, even though it may not be exactly

2   what they wanted, but there's really no evidence in the

3   record from which the jury could -- on which the jury

4   could base an award of damages for that.

5       So we would ask, for example, as to anything

6   related -- if the jury were to consider anything related

7   to the house, that should be excluded.  As to the garden

8   variety kind of pain and suffering, mental anguish and

9   so forth, I suppose there's enough in there.

10  Mr. Koziara testified to his sleepless nights.  But as

11  to the house, I would submit that that should not be an

12  element of anything the jury should consider.

13      Finally.  Punitive damages.  This was -- this phase

14  of the trial was to be devoted to damages and punitive

15  damages, and yet there was not one shred of evidence

16  introduced on the subject of reckless disregard or any

17  outrageous conduct by the defendant during the testimony

18  of Mr. and Mrs. Koziara.  In fact, the questions I asked

19  them were intended to elicit the fact that nothing

20  particularly outrageous was done by BNSF.  So we

21  eliminate that.  Mr. Koziara said he was upset and he

22  was -- upset when he received his letters in the mail,

23  but I asked him if specifically anybody from BNSF came

24  to his home and did anything and he said no.

25      In terms of the intentional disregard of his rights

1  under the law, the state of the evidence at this point,

2  based on the testimony of Mr. Koziara alone, is simply

3  that he filed an injury report; he was disciplined; he

4  was suspended.  That's simply the same testimony that

5  goes to liability.  There has been absolutely no

6  testimony put in at this stage of the trial to show that

7  Burlington Northern, BNSF, acted in reckless disregard

8  of his legal rights or with knowledge that its actions

9  might violate the law.

10      I think that's where we are on that and we would

11  ask the Court not allow an instruction on punitive

12  damages go to the jury at this time.  Thank you.

13          THE COURT:  Thank you, Mr. Douglas.  I am going

14  to -- let me give you what my ruling is going to be and

15  then I will check in with plaintiff on a couple points

16  though.

17      I'm going to deny the motion with respect to

18  compensatory damages.  The evidence that plaintiff has

19  to present to establish his damages doesn't have to be

20  as precise as the evidence required for liability, and

21  although there is some uncertainty as to what position

22  Mr. Koziara would occupy during the last

23  three-and-a-half years of his career, the range is not

24  that great.  If he ended up taking the position as

25  grinder, it would be a dollar or two less per hour; fair

1   argument to the jury about whether he should be

2   compensated at the foreman rate or the grinder rate.

3   But I think there's evidence from which a jury could

4   base a reasonable estimation of the damages on the

5   evidence that Mr. Koziara presented about what jobs he

6   would do.

7        As to the fact that he was permanently disabled,

8   again, fair argument for the jury, but a reasonable jury

9   could conclude that based on the RFC, which is the

10  residual functional capacity that Mr. Koziara had, that

11  he had the ability to lift 50 pounds occasionally, 25

12  pounds frequently; that he could stand at least six

13  hours a day; he could walk at least six hours a day;

14  that he was more than capable of performing the job of

15  the grinder.  So for argument, the jury could go either

16  way on it, but a reasonable jury could conclude that

17  even though he applied for disability, the meaning of

18  the term permanently disabled and totally disabled in

19  the context of the disability application would not

20  preclude him from actually performing work.  So I'll

21  deny that.

22        As to the motion on the anguish, I don't think

23  there's any requirement that Mr. Koziara has to submit

24  medical evidence or expert evidence.  I agree with you

25  that it's not -- it's not a really robust case for

1   extensive anguish, but I think that he's got enough to

2   demonstrate that he experienced some anguish that may be

3   compensable and it'll be up to the jury to decide how

4   valuable it was.

5        I agree with you about the sale of the home,

6   however, having instructed the jury that they're going

7   to be providing compensation for anything other than his

8   lost wages, the anguish and punitive damages.  So if

9   there were to be any argument that requested recovery

10  for the lost value of the home, I will instruct the jury

11  afterwards.  So that's one of the things I'll check in

12  with.  I haven't heard any indication from plaintiff

13  that they're going to --

14        MR. KASTER:  We're making no argument about

15  losses related to the sale of the home, Your Honor.

16        THE COURT:  As long as I don't hear any

17  argument along those lines because there has been no

18  evidence presented about the value of the home, so I

19  would agree with that.  So provided that I don't hear

20  any argument along those lines, I won't need the

21  instruction, but the instruction would be available if

22  needed.

23        As for the punitive damages, again, I think you

24  have a pretty good argument for the jury about whether

25  BNSF's conduct was so extreme or outrageous.  I agree

 1  with you that the basis for the outrageousness of BNSF's

 2  conduct or the reprehensibility of the conduct will have

 3  to come from the evidence presented in the liability

 4  phase of the trial.  But again, I think there's enough

 5  there to decide that given the extensive knowledge that

 6  the employees of BNSF demonstrated concerning the law

 7  barring retaliation, that the fact that they did

 8  nevertheless as a factual matter as determined by the

 9  jury retaliate against Mr. Koziara, I think that there's

10  enough to allow a reasonable jury to decide that they

11  did act either in conscious disregard or in reckless

12  disregard of Mr. Koziara's rights.  So your motion will

13  be denied with respect to the punitive damages as well.

14       So with that, are we ready to have the jury back?

15            MR. DOUGLAS:  Well, Your Honor, may I address

16  one point?

17            THE COURT:  Yes.

18            MR. DOUGLAS:  Okay.  As to the -- on the

19  punitive damage thing, just to be clear, I believe that

20  if it isn't in the instruction, we have certainly

21  proposed it, as I understand the law on punitive

22  damages, that if the employer has in place policies and

23  so forth and if employees violate the policies or act

24  contrary to the policies, the employer nevertheless may

25  not be held vicariously liable under the Kolstad

1  decision.

2        THE COURT:  I think you're right on that.  I

3  think there is an instruction that says if BNSF

4  implemented, made a good faith effort to implement and

5  comply with anti-retaliation policy, that the jury

6  shouldn't find punitive damages.  And I think there's a

7  factual issue based on what we have heard in the

8  liability phase, admittedly because Mr. Koziara and

9  Mrs. Koziara didn't put on any further evidence of

10  BNSF's conduct.  But on the basis of the evidence we've

11  heard, there's a factual question about -- not about the

12  policy, the policy was articulated, but whether BNSF

13  made a good faith effort to comply with that policy.

14  And there's evidence to suggest -- I think the jury

15  could conclude that based on the fact that although

16  every conviction for theft resulted in dismissal,

17  there's evidence to suggest that not every bit of

18  evidence or not every incidence of theft was pursued

19  with discipline.

20      And so on that basis, the jury could conclude that

21  the motivation for the discipline that Mr. Koziara

22  received really was retaliation for the fact that he was

23  the one who had reported a workplace injury.  And I

24  think it's also true about the suspension because he was

25  the foreman, but I think that the evidence was, too,

1   that I think Mr. Zielke was also in foreman rank and

2   that he was also responsible for the danger that

3   occurred at the plank removal incident, but that he

4   wasn't disciplined, and that the material distinguishing

5   fact between the two of those actors was that one of

6   them had filed a workplace injury report and one had

7   not.

8           MR. DOUGLAS:  I appreciate the explanation,

9   Your Honor.  Just for the record, Mr. Zielke was not in

10  a foreman position, he was a truck driver or machine

11  operator.

12          THE COURT:  Okay.  Even with that distinction,

13  his direct involvement in the incident suggests that the

14  distinguishing factor was his lack of --

15          MR. DOUGLAS:  All right.  Therefore, Your

16  Honor, with that then -- I trust that we have made our

17  record for purposes of Rule 50(a) at this time?

18          THE COURT:  Absolutely.

19          MR. DOUGLAS:  Thank you, Your Honor.

20          THE COURT:  Okay.  So are we ready for the

21  jury?

22          MR. DOUGLAS:  I believe that we are or I am.

23       (Jury brought in courtroom at 1:35 p.m.)

24          THE CLERK:  This Honorable Court is again in

25  session.  Please be seated and come to order.
                    DANE FRESHOUR - DIRECT

1          THE COURT:  All right.  We're now about to hear

2    the defendant's damages case, and so Mr. Douglas, you

3    may proceed.

4          MR. DOUGLAS:  Very well, Your Honor.  Thank

5    you.  At this time BNSF Railway calls Dane Freshour.

6    **DANE FRESHOUR, DEFENDANT'S WITNESS, SWORN**,

7          THE COURT:  Welcome.  And you don't have to

8    lean into the mic every time you talk, but if you keep

9    the chair close enough to the witness stand, you'll stay

10   close enough so we can hear you.

11         THE WITNESS:  Okay.  Thank you.

12         MR. DOUGLAS:  Thank you, Your Honor.

13                    DIRECT EXAMINATION

14   BY MR. DOUGLAS:

15   Q    Good afternoon, sir.

16   A    Good afternoon.

17   Q    And welcome.  Would you please tell us your name

18   and your occupation?

19   A    My name is Dane Freshour.  I am the Regional

20   Director of Human Resources for BNSF Railroad over the

21   north and central regions.

22   Q    Where do you office, sir?

23   A    My office is in Denver, Colorado.

24   Q    Welcome to Madison.

25   A    Thank you.
                    DANE FRESHOUR - DIRECT

1    Q    How long have you been employed by BNSF Railway?

2    A    I've been employed with BNSF for twenty years.

3    Q    Would you tell us a little bit about your

4    educational background, sir.  Do you hold any college

5    degrees?

6    A    Yes, I do.  I have an AS degree in agribusiness.  I

7    have a bachelor's degree in pastoral ministries, and I

8    have a master's degree in counseling psychology.

9         MR. DOUGLAS:  May we approach just briefly,

10   Your Honor?

11        THE COURT:  Sure.

12      (Discussion at sidebar at 1:37 p.m.)

13        MR. KASTER:  I think we have an oversight by

14   Mr. Weber.  He's in the courtroom.  He's sequestered.

15        MR. DOUGLAS:  He's testified.  Do you want him

16   sequestered now?

17        MR. KASTER:  He's testifying again though.

18        THE COURT:  Is he going to testify again?

19        MR. DOUGLAS:  Do you want him to be out?

20        THE COURT:  Yeah, I guess he should be

21   sequestered.

22        MR. DOUGLAS:  All right.  I'll tell him that.

23   Thank you.

24      (End of sidebar discussion at 1:38 p.m.)

25   BY MR. DOUGLAS:
                    DANE FRESHOUR - DIRECT

1   Q    All right.  Thank you.  We just had to attend to a

2   housekeeping matter, Mr. Freshour.  Thank you for your

3   patience.

4        During your twenty years with BNSF, what positions

5   have you held, sir?

6   A    I initiated my professional career with BNSF as an

7   EAP manager in Alliance, Nebraska, and my roles and

8   responsibilities were to cover and support employee

9   issues that came up, both on the exempt or managerial

10  side of the house, as well as the craft or our scheduled

11  employees, and dealt with family issues, alcohol and

12  drugs issues, those types of things.

13  Q    And how long have you been in your present

14  position?

15  A    Came into human resources in 2000, so I've been in

16  human resources for fifteen years.  As a regional

17  director, I've been a regional director since 2007.

18  Q    Thank you.  And would you describe for us just

19  generally your duties and responsibilities as a Regional

20  Director of Human Resources.

21  A    As a Regional Director of Human Resources we are

22  responsible for two big areas:  One would be the

23  recruitment area, and that would be hiring employees for

24  all crafts, as well as the promotional opportunities for

25  management individuals.  And the point that is probably

                  DANE FRESHOUR - DIRECT

1  most pertinent to this case would be the employee

2  relations section, and under that area, we would deal

3  with employee complaints, training, and education of our

4  management staff and our craft employees.

5  Q    As part of your duties and responsibilities, do you

6  conduct training or education for BNSF personnel?

7  A    Yes, I do.

8  Q    Does any of that training relate to matters

9  involving the various anti-retaliation law that we have?

10  A    Yes.

11  Q    Does any of that training relate specifically to

12  the Federal Railroad Safety Act?

13  A    Yes.  Under 20109, yes.

14  Q    Thank you.

15          MR. DOUGLAS:  Your Honor, at this time may I --

16  I'm going to put the exhibit here.

17  Q    Mr. Freshour, is this a document that contains --

18  tell me what is this document, sir?

19  A    This appears to be a exhibit that was submitted in

20  April of 2014 stating -- first sought compliance

21  efforts, and it's broken into several categories.  One

22  would be written policies and procedures.  There is an

23  area here under training as well.

24  Q    Okay.  And have you reviewed this document, sir?

25  A    Yes, I have.
                    DANE FRESHOUR - DIRECT

1  Q    And you're familiar with it?

2  A    Yes, I am.

3  Q    Will this document assist you in your testimony

4  today, sir?

5  A    Yes, it will.

6        MR. DOUGLAS:  We would move the admission of

7  670.

8        THE COURT:  Is there any objection?

9        MR. KASTER:  No objection, Your Honor.

10       THE COURT:  Very well.  670 is admitted.

11       MR. DOUGLAS:  Thank you.

12 BY MR. FRESHOUR:

13 Q    Mr. Freshour, you'll have to guide me along as we

14 go through this.  I'll try to make it as large for you

15 as possible.  I'll focus in on -- does that help you,

16 sir?

17 A    Yes, it does.

18 Q    So first of all, can you tell me, sir, does BNSF

19 have written policies that address the matters of

20 anti-retaliation?

21 A    Yes, they do.

22 Q    Can you tell us what some of those policies are,

23 sir?

24 A    Some of the more important policies are the policy

25 regarding equal opportunity employment.  The foundation

DANE FRESHOUR - DIRECT

1 for this piece was in the 1964 Civil Rights Act, and so

2 that is the underpinnings of the EEOC policy and has

3 been in our discussions for twenty years that I've been

4 involved with the railroad.  This does have very

5 specific requirements and statements and obligations

6 under the law regarding retaliation and retaliatory

7 behavior.

8      Secondly, the code of conduct is a policy that we

9 review on an annual basis.  Every officer of the company

10 must review on an annual basis; in fact, we're right in

11 that period of time right now of reviewing the code of

12 policy -- the code of conduct.  In this policy, there

13 are usually eighteen to twenty different areas.  We're

14 questioned on the content of those -- of that policy,

15 and we have to certify by answering those questions

16 correctly on an annual basis.  This is important because

17 there's a very specific area within this code of conduct

18 that addresses no retaliatory behavior from management

19 personnel.

20 Q    Mr. Freshour, I'm going to stop you there so that

21 we can just address the code of conduct briefly, okay?

22 Showing you the code of conduct, which is admitted as

23 518, are you familiar with the code of conduct for BNSF

24 Railway?

25 A    Yes, I am.

                    DANE FRESHOUR - DIRECT

1    Q    You referred to a retaliation provision in the code

2    of conduct; is that right?

3    A    Yes, sir.

4    Q    I'm showing you page seven from the code of

5    conduct.  Is this the No Retaliation Policy to which you

6    were referring a moment ago?

7    A    Yes, sir, that is correct.

8    Q    You indicated that each year certain people have to

9    certify on the code of conduct.  Would you explain what

10   that means?

11   A    Every exempt officer in the railroad must go

12   online.  They will -- it takes approximately an hour to

13   walk through the code of conduct.  There are a series of

14   questions associated with each one of these sections.

15   There are answers.  You're given multiple choice

16   opportunities to answer questions.  If you answer it

17   incorrectly, the reasons for the incorrect selection are

18   stated and the proper selection is acknowledged when you

19   make a proper selection.

20   Q    You said every exempt officer.  We have one exempt

21   officer in the courtroom now, Mr. Daniel Rankin.  Would

22   he be one of the exempt officers who has to certify on

23   this each year?

24   A    Yes, that is correct.

25   Q    What about someone in the position of roadmaster?

                    DANE FRESHOUR - DIRECT

1   A    Yes, they would also.

2   Q    And I think you said you certified on each year

3   too.

4   A    Yes.  I certify.

5   Q    Okay.  Is the code of conduct document, is that, in

6   addition to the officers, is that document generally

7   available to scheduled employees?

8   A    It is primarily associated -- they can access that

9   online.  It is posted online.  So it can be viewed at

10  any time by employees of the BNSF.

11  Q    Is there a internal website for BNSF where this is

12  posted?

13  A    Yes, there is.

14  Q    And what is that?  What page or what is it called?

15  A    Well, it's called the code of conduct.

16  Q    I'm sorry, the page.

17  A    The page is just called the internet page.  You

18  pull up the first page and there are several categories.

19  You can select departments, and code of conduct is one

20  of the tabs.

21  Q    Very well.  Thank you.  Let's return now to Exhibit

22  670, which is the list of the compliance efforts that we

23  were talking about.  The next two categories regarding

24  internal control plan and so forth, are these your areas

25  or would that better be addressed by another person?

                  DANE FRESHOUR - DIRECT

1  A    This would probably be better addressed by

2  Mr. Weber.

3  Q    All right.  Then we'll save that for him.  How

4  about the next category:  *Rules and Retaliation Rules*

5  *For Each Craft*.  Is that something that you're familiar

6  with and provide training on?

7  A    Yes, I can speak to that.

8  Q    All right, sir.

9  A    Craft employees -- every union is called a craft.

10  To give you an example, so we have thirteen different

11  unions, whether that be car men, whether that be

12  maintenance of way, whether that be train service.  And

13  every year there are safety rules that union employees

14  must acknowledge, read, and complete a test regarding.

15      Also officers of the company are required to

16  understand and know how to apply the safety rules that

17  are within this craft guideline.  There is a Rule 26.8

18  that would apply specifically to no retaliation.  It has

19  been in force for a significant period of time.

20  Q    Mr. Freshour, I'm showing you what has been marked

21  as Defendant's 525.  Do you recognize this document,

22  sir?

23  A    Yes.  This would be the cover sheet for the

24  maintenance of way safety rules.

25  Q    All right.

                 DANE FRESHOUR - DIRECT

1        MR. DOUGLAS:  We would --

2        MR. KASTER:  No objection.

3        THE COURT:  Very good.  525 is admitted.

4        MR. DOUGLAS:  All right.  May I ask that we put

5    up page 759.  26.8.  All right.  Thank you.

6    BY MR. DOUGLAS:

7    Q    Mr. Freshour, are you able to see that?

8    A    Oh, yes, now I can.

9    Q    You referred a moment ago to Rule 26.8; correct?

10   A    Yes, sir.

11   Q    Is this the rule that you were talking about?

12   A    Yes.

13   Q    All right.

14        THE COURT:  Can the jury see it?

15        MR. DOUGLAS:  Thank you, Your Honor.

16   Q    All right.  Tell us first of all what kind of

17   training do you provide on this particular rule?

18   A    This training is provided by the safety trainers

19   that cover every division and spend time on an annual

20   basis with employees.  This particular section of the

21   safety rules addresses the accurate reporting of all

22   accidents, injuries and occupational illnesses that

23   arise from the operation of the railroad.  And then as

24   it states, "The BNSF Railway is committed to completing

25   accurate reporting of all accidents and injuries,
                DANE FRESHOUR - DIRECT

1  occupational illnesses arising from the operation of the

2  railroad, harassment and intimidation of any person that

3  is calculated to discourage or prevent such a person

4  from receiving proper medical treatment or reporting an

5  accident injury, incident injury or illness has not or

6  will not be permitted or tolerated."

7  Q    This version of the maintenance of way safety rules

8  apparently dates back to 2005.  To your knowledge have

9  there been other versions of this prior to that?

10 A    There have probably been updates to the safety

11 rules over the years, yes.

12 Q    Has this provision been in the safety rules since

13 at least -- well, since at least 2005.  Has it been in

14 there longer?

15 A    Yes.  It is still in force.

16 Q    Okay.

17         MR. DOUGLAS:  Next page, top of the page.  760.

18 If you'd call out the top section, please.

19 Q    The rule is up there and I think folks can read it,

20 but tell us, if you will, aside from being in the book,

21 what type of training do you or people in your

22 department provide to BNSF personnel on this rule?

23 A    This is an important rule.  One of the things

24 that's critical in our safety sense of environment is

25 understanding what the safety risks are and mitigating

DANE FRESHOUR - DIRECT

1   those risks to the best of our ability.  And so it is

2   very important that employees have the freedom and have

3   many options to bring those concerns forward without

4   fear of retaliation or reprisals.  As a result of that,

5   our efforts are to improve the safety performance and

6   work -- safe work production of our work.

7        Over the years we've been able to make progress in

8   this area.

9   Q    Do employees -- there's a paragraph -- I direct

10  your attention to the third paragraph.  It indicates

11  that an employee who feels he or she has been the

12  subject of harassment or intimidation in violation of

13  the -- well, that's a different policy, I guess.  That's

14  corporate reporting; correct?

15  A    Yes, that is correct.

16  Q    The second paragraph deals with injuries.  Does

17  BNSF have available, for example, a mechanism by which

18  employees may report acts of intimidation or harassment

19  or retaliation in an anonymous fashion?

20  A    We have many areas that employees can exercise that

21  freedom.  One, the first and critical one would be to

22  pick up the system hotline.  This is a system that is

23  set up independent of the railroad.  It's an outside

24  vendor who actually mans the phones 24 hours a day.

25  Employees are able to report anonymously and they're

                DANE FRESHOUR - DIRECT

1  given a case number and they can check back in on the

2  status of that case.

3      That information is then taken in by the receiving

4  company.  It is then sent over to the corporate human

5  resource department, who makes a determination about

6  whether or not it's a safety issue, whether it could

7  fall under resource protection for police services;

8  maybe it's an HR issue that would be then investigated

9  and adjudicated under the policies and prevailing

10  procedures that oversee that process.

11     We also have the internal complaint resolution

12  process that is mentioned in this rule.  This internal

13  complaint can be submitted at any time to any HR

14  representative.  We have HR representatives that cover

15  our large geographic areas.  The HR directors, HR

16  managers and HR generalists are responsible for

17  investigating and resolving those complaints as they

18  come in through the internal complaint process.  Those

19  are then recorded, maintained, and followed up on within

20  the HR database.

21     Also our employees can call the supervisor's

22  supervisor.  We have listening posts where the RVP of

23  the region will go out over a region, sit down, and

24  employees are able to talk about the state of the

25  railroad, any issues that they have, and they can have

DANE FRESHOUR - DIRECT

1   one-on-one conversations with senior leadership

2   regarding any of the concerns that they might have as

3   well.  Our employees frequently use all these methods to

4   raise our concerns and bring their concerns to our

5   attention for resolution.

6   Q    Mr. Freshour, the last paragraph that we've called

7   out indicates something about the responsibility of the

8   officers.  Would you just read that paragraph out loud,

9   please.

10  A    "Officers of the company hold a position of trust

11  with respect to the execution of their duty to

12  appropriately apply all company policies.  Violation of

13  that trust will be viewed as a serious breach of trust,

14  and it is -- if such allegations are substantiated

15  through the resolution, procedure will constitute and

16  cause for significant penalty and possible dismissal."

17  Q    During your training programs on this, is that

18  message communicated to the officers in the program?

19  A    Yes.

20  Q    How do you communicate it to them?

21  A    Well, we talk about -- probably one of the most

22  effective ways to communicate that is to put up

23  scenario-based training and help people understand what

24  behaviors are inappropriate.  Sometimes people can't

25  quote verse and chapter of where rules are found, but

               DANE FRESHOUR - DIRECT

1  it's very important that they understand what behaviors

2  are acceptable and unacceptable.  And scenario-based

3  training is very helpful and instructive for individuals

4  to understand where the parameters are and what would

5  constitute a violation and their obligations under the

6  law.

7  Q    You mentioned something called *scenario-based*

8  *training*, and we'll talk more about that, but tell us in

9  a relatively quick way what is scenario-based training?

10  A    In a scenario-based training, you would pose -- for

11  example, you'd put out a situation, a scenario by which

12  an employee reports an injury, how would you handle

13  that.  You might have several different options on ways

14  they would handle that.  We would have the employees,

15  the managers talk, come up with their selections, and

16  then we would talk back and forth about why their

17  selection was or was not appropriate regarding that

18  scenario and their handling of that scenario.

19  Q    All right.  During your training programs, do you

20  emphasize this particular paragraph that we just

21  discussed?

22  A    Yes, I have.

23  Q    Do you believe that you make it clear to the

24  supervisors that their own employment could be in

25  jeopardy if they intimidate or harass employees

                    DANE FRESHOUR - DIRECT

1  regarding injury reports?

2  A    Yes, and I think this is also reinforced through

3  the code of conduct.  We also have frequent

4  presentations with the EEO law regarding their

5  responsibilities because the retaliation requirement has

6  been implied for many years through all these different

7  statutes.

8  Q    Thank you, sir.  Let's direct our attention once

9  again to our list of training, if we can.  Mr. Freshour,

10  we won't necessarily talk in detail about all of these,

11  the list is quite extensive, but would you tell me the

12  particular ones that -- by the way, is this an

13  exhaustive list or might there be something else you

14  would like to address as well?

15  A    This would be a nonexhaustive list of efforts to

16  educate and train individuals.

17  Q    Okay.  You're talking here that under training,

18  there's a heading that says *Part of Annual Rules*

19  *Training for Craft Employees*.  To what does that refer,

20  sir?

21  A    I'm referring to 20.6 -- or 20.8, excuse me, the

22  rule we just reviewed when it talked about the craft

23  employees training that was conducted to all craft

24  employees on an annual basis.

25  Q    So the craft employees receive training on the
                    DANE FRESHOUR - DIRECT

1    anti-retaliation procedures; is that correct?

2    A    Yes, they do, in their safety rule book.

3    Q    The next item is *EEO Training*.  What does that

4    refer to, sir?

5    A    EEO training, as I mentioned earlier, the

6    underpinnings of the EEO law are based in the Title VII

7    protections from 1964.  Also the Veterans Act and also

8    the ADA, and many of these laws and these statutes are

9    discussed and talked about during that presentation.

10   There's also a question-and-answer period of time when

11   we talk about special situations for each of those areas

12   as well:  Harassment, discriminatory behavior,

13   discrimination and what that means.  Retaliation has

14   been a longstanding element in that presentation of the

15   last twenty years to the best of my knowledge.

16   Q    Thank you.  The next item that's listed here was

17   code of conduct, and I think that we have covered that

18   one.  Is that true?

19   A    Yes, sir.

20   Q    Thank you.  Is there also something that you do for

21   new supervisor training?

22   A    Yes.

23   Q    It may not be on the list, but can you tell us --

24   A    It's not on the list here, but we do -- any time

25   that we bring new supervisors either from the craft into
                    DANE FRESHOUR - DIRECT

1   an exempt position, they go through a two-week training

2   called LPS.  During that LPS, there's

3   accident-and-incident handling and we do talk about

4   retaliation and anti-retaliation processes in that

5   process as well.

6       Also our frontline supervisors go in for annual

7   training every year, and during their training in

8   Ft. Worth they also participate in extensive discussions

9   regarding their way -- their responsibilities under the

10  law for conduct and anti-retaliation protections.

11  Q    All right.  The next item that's listed here, it

12  says *Operations All-hands Conference Call that was held*

13  *on 3-18-13.*  What can you tell us about that?

14  A    The all-hands call was held by the Vice President

15  of Operations, Mr. Fox.  Mr. Fox addressed retaliation

16  and the anti-retaliation policy, and specifically 20109

17  and its implications for all operations on that call.

18  And also the transportation leadership call, which is

19  right after that, was also discussed in this time frame

20  as well.

21  Q    Next we have a whole category of 20109 Training

22  Presentations.  Do you see that?

23  A    Yes, I do.

24  Q    To what does 20109 refer, just one more time?

25  A    This would be FRSA or the whistleblower law that

                   DANE FRESHOUR - DIRECT

1    OSHA is responsible for overseeing.

2    Q     Otherwise known as the Federal Railroad Safety Act?

3    A     Yes.

4    Q     Or the FRSA?

5    A     FRSA, yes.

6    Q     Thank you.  Now these various meetings, by whom are

7    these meetings conducted?

8    A     This long list of meetings is conducted by the law

9    department.  So these are corporate attorneys that are

10   giving these presentations across the system.

11   Q     Have you had occasion to attend any of those

12   meetings?

13   A     Yes, I have.  Actually in 2008, the HR Department

14   was trained under the FRSA 20109 law, and then every

15   year since 2011 on an annual basis the law department

16   comes in and makes a presentation to the HR Department

17   regarding our roles and responsibilities under the law.

18   Q     Let me ask you what was the occasion for the

19   training of the HR Department in 2008 about the FRSA?

20   A     This -- the whistleblower law was transferred

21   underneath the guidance and oversight of OSHA

22   approximately August of 2008, and then I think it was

23   amended in October of -- August of 2007 and then there

24   was an amendment in October of 2008.  And I think our

25   staff meeting coincided very closely to the pending

                    DANE FRESHOUR - DIRECT

1  amendment, so we were updated at that time.

2  Q    All right.  And is it your understanding of those

3  amendments that that's the change in the law that

4  allowed employees to bring charges under the FRSA to

5  OSHA?

6  A    Yes.

7  Q    So it looks like the law department has gone a

8  number of different places to talk about 20109.  Is that

9  fair?

10 A    Yes, sir.

11 Q    Did you attend any of these particular programs

12 that are listed here?

13 A    Not these that are currently listed that I can see.

14 Q    All right.  What other training -- let's go down to

15 *Other Training*.  Can you tell us a little bit about the

16 OSHA outreach meetings that are listed there?

17 A    You may want to scroll that form upwards so we can

18 see it.

19 Q    Sorry.  Thank you.

20 A    Okay.  On this view of the screen at the very top,

21 you can see the HR professionals were in a staff meeting

22 in 2008, and then annual summits and training since

23 2011, just to go back on that previous answer.

24 Q    All right.  Let's turn our attention for a moment

25 for the OSHA outreach meetings.  Tell us about that,

                  DANE FRESHOUR - DIRECT

1   please.

2   A    OSHA outreach.  I participated in the first OSHA

3   outreach meeting in Seattle.  I was residing in Seattle

4   at the time in 2011.  We met with OSHA officials, as

5   well as many of the high-ranking officers within BNSF,

6   and we had a broad discussion about the implications of

7   the protected activity under the 20109 area.

8   Q    Was that -- if I understand -- am I correct, did

9   you have OSHA people come in to present on this?

10  A    Yes.  Actually we went to the two OSHA offices.  I

11  set up the meeting and invited in our attorneys and some

12  of our HR professionals to speak directly with OSHA.

13  Since that time, we have voluntarily had OSHA come onto

14  BNSF property and make presentations.  I think the most

15  recent one was in Kansas City.  It does not show on the

16  list, but I know that occurred recently.  Also in

17  Nebraska and in other areas as well and projected to go

18  forward in the future.

19  Q    Is OSHA the agency that processes these kinds of

20  complaints when people file them there?

21  A    Yes, sir.  The whistleblower responsibilities were

22  transferred in 2007 to OSHA's oversight.

23  Q    So you have the agency come out to provide

24  education with you?

25  A    Yes.
                    DANE FRESHOUR - DIRECT

1    Q    Thank you.  The next item, is there anything that

2    you can tell us about the next item there, the *Select*

3    *Group*?

4    A    That is beyond the scope of my knowledge.

5    Q    All right.  Thank you.  Then we'll skip that.

6         In addition to the publications that we've talked

7    about, the rule books, the code of conduct, and the

8    training programs, the next -- in the category here is

9    *Postings*.  So what is that about?  What can you tell us?

10   A    Would you like to put that on the screen?

11   Q    Yes, sir.  Pardon me.

12   A    There we go.  We do have the OSHA postings up at

13   our on-duty points across the railroad where our

14   employees come to work.  We have an OSHA fact sheet.

15   There is also an OSHA fact sheet link on the labor

16   relations home page, and most of our craft employees go

17   to the LR website in order to get important information

18   regarding their contract, the PEPA policy.  Any of these

19   policies reside at this location.  So we do have a

20   direct link with instructions on how to contact OSHA

21   should they have a complaint and wish to file their

22   complaint with OSHA.

23   Q    Plaintiff 539, please.  Showing you what has been

24   marked as Exhibit -- Defendant 530, is this the fact

25   sheet to which you just referred?
                    DANE FRESHOUR - DIRECT

1  A    Yes, it is.

2        MR. DOUGLAS:  I'd like to move the admission of

3  530.

4        THE COURT:  Any objection?

5        MR. DOUGLAS:  539, I guess.

6        MR. KASTER:  Can I see the date on this?  I

7  can't read the document, Your Honor.

8        THE WITNESS:  It's very small, yes.

9        THE COURT:  Could you zoom in on the top half?

10  That might help Mr. Kaster see it.  A hard copy will be

11  fine.

12        MR. KASTER:  I just want to know if there's a

13  date on the document.

14        THE COURT:  I understand.

15        MR. KASTER:  I can't see it.  Thank you very

16  much.  I don't very any objection, Your Honor.

17        THE COURT:  Very good.  Exhibit 539 is admitted

18  and I put it up for the jury.

19        MR. DOUGLAS:  Thank you.

20  BY MR. DOUGLAS:

21  Q    Now you mentioned this poster.  Where is this

22  posted within BNSF?

23  A    This would be posted with our federal-required

24  postings on -- usually it's behind glass at on-duty

25  points for training service, maintenance of way, signal

                    DANE FRESHOUR - DIRECT

1  employees, mechanical employees when they come to work,

2  as well as the LR website.

3  Q    So in addition to being available electronically,

4  is it physically posted then in every BNSF office

5  location and work location?

6  A    Yes.

7  Q    Not in the field, but in buildings; correct?

8  A    Yes.

9  Q    All right.  Thank you.  The next thing you

10  mentioned is the -- EEO is the law poster.  What does

11  that refer to, sir?

12  A    This reflects back to the EEO law that is

13  established with the Civil Rights Act of 1964.  It is a

14  federally required posting that must be posted since we

15  are federal contractors, and we are required to have

16  this also at every on-duty point where employees come to

17  work, in lunchrooms, or where there's frequent traffic

18  so that employees are aware of their rights underneath

19  the Equal Opportunity Employment Law.

20          MR. DOUGLAS:  May I have 532 up, please.  Thank

21  you.

22  Q    Is this the -- showing you what's been marked as

23  532, Mr. Freshour.  Is that the poster, EEO poster to

24  which you just referred?

25  A    Yes.  This appears to be the federal poster.

                    DANE FRESHOUR - DIRECT

1          MR. DOUGLAS:  Move the admission of 532.

2          THE COURT:  Any objection?

3          MR. KASTER:  No.  No objection.

4          THE COURT:  532 is admitted.

5   BY MR. DOUGLAS:

6   Q    And just -- we won't need to go through it because

7   it doesn't necessarily address what's involved in this

8   case, but similarly where is this poster available to

9   employees at BNSF?

10  A    This is also available online on the intranet site,

11  but it's also required to be posted at every on-duty

12  site where employees come to work in their lunchrooms or

13  in a walkway where they will frequently pass.

14  Q    Thank you.  Moving on.  We have review of

15  discipline decisions.  Back to our camera.  What does

16  this refer to, sir?

17  A    This is a process that was established by the law

18  department for review of any discipline that was in

19  close proximity to an individual reporting an on-duty

20  injury.  This is somewhat fashioned after a process that

21  we developed in 2005 regarding the Civil Rights Act

22  where if someone reported a Title VII complaint, we

23  had -- we activated an anti-retaliation process by which

24  we would contact the RVP or CMO of that area and that we

25  would review any discipline before it was adjudicated
                DANE FRESHOUR - DIRECT

1  through the Collective Bargaining Agreement.

2  Q    Has this then been extended to matters involving an

3  employee injury?

4  A    Yes.  This is a direct result of the new law 20109

5  and it is activated by the law department and managed by

6  the law department, as well as LR.  Any claim that goes

7  in, LR always reviews that in the PEPA process, and if

8  we know that an individual has reported an on-duty

9  injury, that case is reviewed.

10 Q    And finally, I think that we've covered ways to

11 report concerns, so I won't go through that again with

12 you.  All right?

13 A    Okay.  Yes.

14 Q    All right.  So finally, Mr. Freshour, it seems like

15 you have quite a lot of efforts, policies and so forth

16 to address issues involving retaliation.  Why do you go

17 through all this work?

18 A    It's a requirement of the law and it's important

19 for our employees' well being.  I think employees need

20 to feel safe, to bring forward any safety concerns that

21 they have in the workplace, and the easier we can make

22 that and the more freedom they have to bring those

23 issues forward, the better off we are as a culture as we

24 work at making a safe work culture for our employees at

25 BNSF.  And we have made progress over the last few

                    DANE FRESHOUR - DIRECT

1  years.

2  Q     Thank you.

3           MR. DOUGLAS:  I have nothing further.

4           THE COURT:  Cross-examination, Mr. Kaster.

5           MR. KASTER:  Can we approach briefly, Your

6  Honor?

7           THE COURT:  Sure.

8        (Discussion at sidebar at 2:15 p.m.)

9           MR. KASTER:  I just -- I just want to make sure

10  I'm not treading on your ruling on legislative history.

11  I'm going to go through with the witness that one of the

12  reasons why Congress was concerned and passed this law

13  was about incentive compensation, which is specifically

14  addressed in the Congressional history.  I looked at his

15  deposition.  He researched the law.  That's part of his

16  training.  So I think in addressing a disregard for the

17  law, disregarding one of the principal underpinnings and

18  motivations for the law, it seems to me -- I don't mean

19  to be doing that.

20           THE COURT:  We've a microphone right there.

21           MR. KASTER:  So I just want the Court to know

22  that and --

23           THE COURT:  Mr. Douglas.

24           MR. DOUGLAS:  Your Honor, it is beyond the

25  scope of the direct.  I did not ask him anything about

                    DANE FRESHOUR - DIRECT

1  legislative history.  All he mentioned was when the law

2  changed, and that was in the context of indicating when

3  all the training programs are initiated.  The Incentive

4  Compensation Plan is something that had scant attention

5  during the case.  To go into this now with this witness

6  is going to do exactly what the Court ruled in its

7  motion in limine was not going to be allowed, and that

8  is to have testimony and information on legislative

9  history.  I didn't ask him questions about the

10  legislative history or the purpose of the law.  He

11  simply told us what the law is and its general purpose,

12  which is consistent with everything else we've heard in

13  the case.

14       THE COURT:  I'm going to instruct you to stay

15  away from the legislative history.  I don't think it's

16  really relevant to the issues in this case and I think

17  it risks prejudice.

18       MR. KASTER:  Okay.  But the incentive

19  compensation in particular, Your Honor, was something

20  that was addressed by Congress in the congressional

21  report as a reason why this law was passed.

22       THE COURT:  It wasn't -- as far as I know, it

23  wasn't -- it was the industry in general and not the

24  Incentive Compensation Program that's at issue in this

25  case.  You can attack the Incentive Compensation System

                    DANE FRESHOUR - DIRECT

1  if you want as it pertains to BNSF's compensation

2  system, but I don't want to hear about the legislative

3  history because that risks bringing in -- holding BNSF

4  responsible for the sins of all the other railroads.

5      As far as I know, BNSF was a saint in this and all

6  that really matters is the time frame in which we are

7  dealing with.  The legislative history is irrelevant and

8  prejudicial.

9      MR. KASTER:  Okay.  Well, I just want to make

10  clear that I'm -- so I can ask this witness about their

11  incentive compensation.

12      THE COURT:  Yes.

13      MR. KASTER:  All right.  Fair enough.

14      MR. DOUGLAS:  Your Honor, I'll object to that

15  -- I will object to it as beyond the scope.  There was

16  no testimony on it.  The witness was not called here to

17  testify about incentive compensation.  All he was called

18  to testify about was to establish under the Kolstad

19  factors that the company has policies and procedures in

20  place to make it reasonable so that therefore we can

21  take advantage of the Kolstad factors.

22      THE COURT:  Your record is made.  I'm still

23  going to allow the examination on the incentive

24  compensation system because the issue here is whether

25  they complied with -- made a good faith effort to comply

DANE FRESHOUR - DIRECT

1    with the anti-retaliation policy, and if there's a

2    structured incentive to disobey it, they are entitled to

3    try to bring that out.

4            MR. KASTER:  Okay.  Thank you.

5            (End of sidebar discussion at 2:18 p.m.)

6            THE COURT:  Whenever you're ready, Mr. Kaster.

7                        CROSS-EXAMINATION

8    BY MR. KASTER:

9    Q    Mr. Freshour, good afternoon.

10   A    Good afternoon.

11   Q    One of the things we looked at, Exhibit 539, and I

12   will put this back on the overhead, this was what was

13   you called the OSHA fact sheet; correct?

14   A    Yes, sir, that is correct.

15   Q    And I think we can all see that.  It tells us that

16   in August of 2007, the Federal Railroad Safety Act was

17   amended and passed to include the anti-retaliation

18   provisions that are sometimes known as 20109 or FRSA;

19   right?

20   A    Yes, sir.

21   Q    So I think counsel mentioned that this included a

22   transfer of some responsibilities to OSHA of overseeing

23   this anti-retaliation provision; correct?

24   A    To the best of my knowledge, yes.

25   Q    It also included a dramatic expansion of what was

                        DANE FRESHOUR - CROSS

1  protected activity?

2  A     There was an expansion, yes, of protected

3  characteristics, yes.

4  Q     And if we go down the protected activity paragraph

5  on this, and I put a little check mark on my copy, it

6  says here -- do you see where I'm pointing?

7  A     Yes, I do.

8  Q     "In addition, you are protected from retaliation

9  for reporting hazardous safety or security conditions,

10 reporting a work-related injury or illness"; correct?

11 A     Yes.

12 Q     And that was new, wasn't it?

13 A     To the old -- I do not recall the old statute site.

14 I'm not sure what the comparative data is.  But I know

15 that is a critical element, yes.

16 Q     And so one of the things that happened in this time

17 frame, August of 2007, was there was this significant

18 expansion of the anti-retaliation provisions to include

19 this category of protected conduct reporting an injury;

20 correct?

21         MR. DOUGLAS:  Objection.  Asked and answered.

22         THE COURT:  I'll allow it.  Go ahead.  Go ahead

23 and answer.

24         THE WITNESS:  Yes.

25 BY MR. KASTER:
              DANE FRESHOUR - CROSS

1    Q    So one of the things that you said just now when

2    you were talking, you were talking about your trainings

3    and I think you were describing trainings that you've

4    done, and you said yes, I have.  I just want to get to

5    the trainings on 20109.  So this event happened in

6    September of 2010?

7    A    Right.  That is correct.

8    Q    Do you know Heather Miller?

9    A    I do.

10   Q    Do you know that she was produced as the corporate

11   designee on this topic in this case?

12   A    Yes, I do.

13   Q    Have you reviewed the deposition that she provided?

14   A    Yes, I have.

15        MR. KASTER:  May I put this on the overhead,

16   Your Honor?

17        THE COURT:  You may.  I'm not showing it to the

18   jury yet, so we'll see what comes of your line of

19   questioning.

20        MR. KASTER:  It goes through this page on the

21   bottom where I've marked, if Your Honor --

22        MR. DOUGLAS:  Which page is that, Counsel?  I'm

23   sorry.

24        MR. KASTER:  Thank you.  Page 14, line 21.

25        THE COURT:  I --
                    DANE FRESHOUR - CROSS

1       MR. KASTER:  The next page through line 16,

2  Your Honor, is what I'm -- line 17.

3       THE COURT:  Okay.  All right.  And would you

4  like to show that to the jury?

5       MR. KASTER:  I would.  Yes, Your Honor.

6       THE COURT:  Okay.  I'm going to allow you to

7  put that on, and so I've turned it on and the jury can

8  now see it.

9  BY MR. KASTER:

10 Q    All right.  In your review of this deposition

11 transcript, Mr. Freshour, did you see this testimony.

12 Page 14, line 21.  Question by Mr. Morgan.

13      "Question:  All right.  Well, were you -- did you

14 attempt to try and make a complete and thorough search

15 for all of the company trainings on 20109 to include in

16 this document?

17      "Answer:  Yes, we did."

18      Next page.  Line one.

19      "Question:  Okay.  So there has not -- it is safe

20 to assume there hasn't been any trainings on 20109

21 before 2011?

22      "Answer:  No, it's not safe to assume that.

23      "Question:  Okay.

24      "Answer:  I don't have any specific awareness.

25      "Question:  So, now, counsel just pointed out
                    DANE FRESHOUR - CROSS

1  something to you on the second page of the document;

2  right?

3       "Answer:  Correct.  There's a particular HR staff

4  meeting that we had in 2008.

5       "Question:  Okay.

6       "Answer:  The HRs were advised of the Section 20109

7  amendment.

8       "Question:  Okay.  But aside from a staff meeting

9  with human resources professionals in 2008, are you

10 aware of any other trainings on 20109 before 2011?"

11      And the answer was "No."

12      Did you see that?

13 A    I see that, yes.

14 Q    And do you believe that to be a true statement?

15 A    I believe that is Heather Miller's true statement.

16 Q    Well, do you have a different truth?

17 A    I guess I would.  I think that we talk about

18 retaliation in a very broad sense.  We've been talking

19 about retaliation actually for a couple of decades

20 within the company.  When you look at the safety rule

21 that I pointed out at 26.8, the majority of the elements

22 that are found in FRSA are also in 26.8, and those have

23 been ongoing and on-trained.

24      Heather was not thinking about anti-retaliation,

25 she was thinking about a specific training that might be

DANE FRESHOUR - CROSS

1  titled 20109, and from that perspective, she probably

2  does not have knowledge of a training required called

3  20109.  However, we have constantly and methodically

4  been training on retaliation for many, many years.

5  Q    Do you understand that that was a corporate

6  designation, a 30(b)(6) deposition?  That was a

7  statement of the corporation in this case under oath?

8  Do you understand that?

9  A    I do understand that, yes.

10 Q    And the difference between other kinds of

11 anti-retaliation provisions and 20109 is specifically

12 that in 20109 for the first time, reporting injuries was

13 protected conduct; right?

14 A    I don't know if it's the first time.  If you look

15 at our -- at the rule that we just looked at, 26.8, we

16 also talked about reporting injuries and the retaliation

17 was prohibited for retaliating against employees who

18 brought forth safety concerns or illnesses or injuries.

19 Q    Now, I don't want to get confused between what's in

20 your internal policies and what's in the law.  Was 20109

21 the first time the law prohibited retaliating against

22 someone for reporting injuries to your knowledge?

23 A    To the best of my knowledge, yes, but I think our

24 policies were protecting us from crossing the law.

25 Q    What I'd like you to do is focus on my question if

                    DANE FRESHOUR - CROSS

1  you could, please.  So this was the first law that made

2  this illegal to your knowledge?

3  A    To the best of my knowledge, yes.

4  Q    And just so we're clear about that, because if we

5  look at 670, there's a lot of trainings here, division

6  trainings dated in 2013, 2012, 2012, 2012, 2013.

7  Nothing other than an HR professional meeting that

8  happened in 2008 that happened before these events in

9  September of 2010 on 20109; is that correct?

10  A    Specifically 20109.  However, the

11  anti-retaliation --

12  Q    If we could focus on my question, Mr. Freshour.

13           MR. DOUGLAS:  Your Honor --

14           THE COURT:  He is answering your questions.  I

15  think he's --

16           MR. KASTER:  Fair enough.

17           THE COURT:  You're making a point of

18  examination.  He will elaborate a little bit.  That's

19  all right.  Mr. Kaster makes a fair point though.

20  You'll get a chance to elaborate with counsel for BNSF.

21  So give a fair answer, but a short one.

22           THE WITNESS:  Yes, sir.

23  BY MR. KASTER:

24  Q    Now, so to your knowledge, nothing in 2007; right?

25  A    Not to my knowledge, no.

                    DANE FRESHOUR - CROSS

1  Q    And other than the HR professional meeting, which

2  Mr. Rankin wouldn't have been invited to, Mr. Veitz

3  wouldn't have been invited to, Mr. Barbee wouldn't have

4  been invited to, Mr. Wischover wouldn't have been

5  invited to; right?  Nobody in engineering.

6  A    They were not in attendance.

7  Q    So other than that in 2008, there was no other

8  training in 20109.

9  A    Not to my knowledge.

10  Q    And I think you told us in your direct examination

11  that there were annual trainings for management each and

12  every year by your department; is that correct?

13  A    That is correct.

14  Q    But nothing on 20109 in 2009 either?

15  A    Repeat the question.

16  Q    Nothing on 20109 in those annual trainings in 2009

17  either; right?

18  A    I can't -- I can't say that's accurate.

19  Q    Can you say that it's inaccurate?

20  A    Yes, because I'm sure we talked about it under the

21  auspices of the retaliation -- anti-retaliation process.

22  The new law had been emerged and I'm sure that that was

23  woven into our conversation in EEO presentations that

24  were given.

25  Q    Can you give me a specific presentation and a

                    DANE FRESHOUR - CROSS

1    specific event where that occurred?

2    A    Not without refreshing my memory.

3    Q    All right.  Well, the point of this exhibit as it

4    was prepared, Exhibit 670, was, in fact, to create a

5    complete list of those trainings; right?

6    A    That's beyond the scope of my knowledge.

7    Q    The title of the document that was prepared for

8    this corporate designation -- corporate deposition was

9    *FRSA Compliance Efforts*.  Do you see that?

10   A    Yes, sir, I do.

11   Q    So you reviewed this document; correct?

12   A    I did, yes, sir.

13   Q    And just out of curiosity, there are meetings that

14   occurred in the division in 2013 in the Twin Cities;

15   2013 in the Southwest Division; Kansas Division in 2012;

16   Texas Division in 2012, and then it goes down to the

17   Gulf Division in 2012.  Nothing in Chicago at all;

18   right?

19   A    Not from looking at this list.

20   Q    And you don't know of a division training that

21   occurred on 20109 in the Chicago Division before

22   September of 2010, do you?

23   A    I do not know that, no.

24   Q    And if we focus on the actors in this case,

25   Mr. Veitz, Mr. Rankin, Mr. Barbee, do you know of any
                    DANE FRESHOUR - CROSS

1  training that they received on 20109 prior to September

2  of 2010?

3  A    Not to my knowledge.

4         MR. KASTER:  That's all I have, Your Honor.

5         THE COURT:  Thank you.  Redirect, Mr. Douglas?

6         MR. DOUGLAS:  Yes, Your Honor.  Thank you.

7                   REDIRECT EXAMINATION

8  BY MR. DOUGLAS:

9  Q    Mr. Freshour, just a couple of questions.  You

10  mentioned during your testimony something called

11  *scenario-based training*.  Do you remember that?

12  A    Yes, I do.

13  Q    Now when you conduct your trainings, do you always

14  mention specifically the chapter, the number, the legal

15  citation to the laws that you're training on?

16  A    No.  It is cited in the underpinnings of the

17  foundation of the presentation, and so you would, for

18  example, quote the Civil Rights Act of 1964, the

19  Veterans Act of -- Vietnam Vets Act, the ADA, whatever

20  the foundation is for what you're training.  FRSA would

21  fall right in line with that, and the focus is on

22  changing behavior.  It is important for employees and

23  supervisors to know what behaviors are acceptable and

24  unacceptable because when they're in the heat of the

25  moment and they are interacting with employees, it is

                  DANE FRESHOUR - REDIRECT

1  important that they know what is acceptable behavior,

2  what would constitute retaliation, so that they can then

3  adjust their behavior and then know what their

4  obligations are under the law.

5  Q    Does this type of training differ from a college

6  course that some of us might be familiar with?

7  A    Yes, it would.  A college course would be more

8  didactic in nature where we're looking at a curriculum.

9  This would be giving positions, posing situations, and

10  asking the employees to resolve those situations and

11  think through the application of the law.

12  Q    Would this type of training include such techniques

13  as role playing?

14  A    They have, yes.

15  Q    And do these trainings cover retaliation of various

16  kinds?

17  A    All statutes, all of -- there's various statutes

18  with anti-retaliation clauses and it would cover all

19  retaliation.  The behavior being addressed is how to

20  avoid retaliation.

21  Q    Thank you.

22          MR. DOUGLAS:  I have nothing further.

23          MR. KASTER:  And I have nothing, Your Honor.

24          THE COURT:  Very good.  I haven't been very

25  diligent about checking in with the jury, but I'm
          DANE FRESHOUR - REDIRECT

1   confident that you're assertive enough to let me know if

2   you have anything that I miss.  So any questions for

3   this witness?  Very good.  Okay.

4        Mr. Freshour, thank you very much.

5        (Witness excused at 2:33 p.m.)

6            THE COURT:  The defense can call its next

7   witness.

8            MR. DOUGLAS:  Your Honor, may I request just a

9   five-minute break at this time?

10           THE COURT:  Sure.  It's going to be five

11  minutes -- let's make it ten and we'll come back at

12  quarter to three.

13       (Jury excused from courtroom at 2:34 p.m.)

14           THE COURT:  We'll all do whatever we want.

15       (Recess    2:35-2:51 p.m.)

16           THE COURT:  Are we ready to continue?

17           MR. DOUGLAS:  We are, Your Honor.

18           THE COURT:  Maybe too optimistic to think that

19  you've had a chance -- have people had a chance to look

20  at the Retirement Board Benefit instructions?  No is an

21  okay answer.  You'll get another chance, but I want to

22  have as much lead time as possible to have copies made.

23  But that's okay.

24       All right.  Let's bring the jury back in.

25       (Jury brought in courtroom at 2:54 p.m.)
                DANE FRESHOUR - REDIRECT

1          THE COURT:  Mr. Douglas, you may call your next

2    witness.

3          MR. DOUGLAS:  Your Honor, at this time I'd like

4    to recall Mr. Freshour for a brief examination.

5          THE COURT:  Okay.  And is that any objection to

6    that?

7          MR. KASTER:  No, Your Honor.

8          THE COURT:  Okay.  Mr. Freshour, please return

9    to the stand.

10        **DANE FRESHOUR, DEFENDANT'S WITNESS, RECALLED**,

11         THE COURT:  You're still under oath.

12              CONTINUED REDIRECT EXAMINATION

13   BY MR. DOUGLAS:

14   Q    Mr. Freshour, during your examination just a little

15   bit ago, if we look at the top of the list, there was a

16   document we referred to, a certain policy on injury

17   reporting and a policy in the internal control plan.

18        Do you recall that?

19   A    Yes, I do.

20   Q    And we didn't cover that at the time and I'd like

21   to at this time ask you to take a look at what is on

22   your screen.  It's Exhibit 520.  Do you recognize that

23   cover page, sir?

24   A    Yes.  This is the cover plan for the Internal

25   Control Plan.

                   DANE FRESHOUR - REDIRECT

1   Q    And showing you then 326.  This particular policy,

2   do you recognize that policy, sir?

3   A    Yes, I do.

4   Q    Is that the injury reporting policy that you

5   referred to in your earlier testimony?

6   A    Yes, it is.

7   Q    Okay.

8         MR. DOUGLAS:  At this time, Your Honor, I would

9   move the admission of 520, the Internal Control Plan,

10  which includes these two pages.

11        MR. KASTER:  No objection.

12        THE COURT:  Okay.  520 is admitted and I've now

13  put it up for the jury.  If you want the jury to see it,

14  you'll have to roll back.

15  BY MR. DOUGLAS:

16  Q    Okay.  What was the initial effective date of this

17  policy, sir?

18  A    November 16th, 1998.

19  Q    And just in general, we'll pull out some portions

20  for the jury to look at, but in general what does this

21  policy address?

22  A    This policy addresses incident and accident

23  handling, injury handling.

24  Q    Okay.  And have you done trainings on this

25  particular policy?
                    DANE FRESHOUR - REDIRECT

1  A    Not on this particular policy, no.

2  Q    Have you attended training programs where this

3  policy has been discussed?

4  A    I have been involved where it's discussed, yes.

5  Q    Thank you.

6          MR. DOUGLAS:  I have no further questions.

7          MR. KASTER:  Nothing, Your Honor.

8          THE COURT:  All right.  Thank you,

9  Mr. Freshour.

10      (Witness excused at 2:56 p.m.)

11          MR. DOUGLAS:  Your Honor, you we may have one

12  more document for the witness.

13          THE COURT:  All right.  Mr. Freshour, you're

14  getting your exercise today.

15          MR. DOUGLAS:  Your Honor, I'd like to assure

16  you this is not the movie Groundhog Day.

17          THE COURT:  Good.

18      **DANE FRESHOUR, DEFENDANT'S WITNESS, RECALLED**,

19          <u>CONTINUED REDIRECT EXAMINATION</u>

20  BY MR. DOUGLAS:

21  Q    Mr. Freshour, are you familiar with an EEO policy

22  that BNSF has had in place for awhile?

23  A    Yes, I am.

24  Q    And EEO stands for?

25  A    Equal Employment Opportunity.
                DANE FRESHOUR - REDIRECT

1    Q    Can you put that up for us?

2            THE COURT:  Shall we resort to the paper?  Do

3    you have a paper copy?

4            MS. LENANDER:  We can print one.

5            THE COURT:  Whatever is fastest.  How about

6    that?  Maybe you can switch Mr. Long's laptop over to

7    yours.

8            MR. KASTER:  I have no objection to this, Your

9    Honor.

10           THE COURT:  Very good.  Why don't we make a

11   record of what this is and then we can proceed.

12           MS. LENANDER:  675.

13   BY MR. DOUGLAS:

14   Q    Mr. Freshour, showing you what's been marked as

15   675.  Do you recognize that document?

16   A    Yes.  HR 90.1.

17   Q    What is that, sir?

18   A    That is the Equal Opportunity Employment Policy.

19   Q    And does it cover forms of retaliation and

20   discrimination?

21   A    Yes, it does.

22   Q    Can you tell us what is the effective date of this

23   policy?

24   A    March the 1st, 1976, revised April, the 1st, 2009.

25   Next review date was April 11th -- April 1st, 2011.
                    DANE FRESHOUR - REDIRECT

1    Q    Very well.  Thank you.

2         MR. DOUGLAS:  I have no further questions for

3    the witness.

4         MR. KASTER:  Nothing, Your Honor.

5         THE COURT:  Very good.  All right.  I hesitate

6    to release you again, but I think this is it.  Thank

7    you, Mr. Freshour.

8       (Witness excused at 3:04 p.m.)

9         THE COURT:  And you may call your next witness.

10        MR. DOUGLAS:  Your Honor, at this time the

11   defense rests.

12        THE COURT:  Very good.  Is there any rebuttal

13   witnesses to be called?

14        MR. KASTER:  No, Your Honor.

15        THE COURT:  That is very good news.  Okay.

16   Fortunately it means I'm going to send the jury on to

17   your next break, so I'm going to excuse you until 3:15

18   so that we can get ready for the instructions and

19   closing arguments.

20      (Jury excused from courtroom at 3:05 p.m.)

21        THE COURT:  All right.  Very good.  The only

22   thing that I'm aware that we need to resolve is any

23   questions about the final instructions, and then I don't

24   know if there are any motions to be made before I

25   instruct the jury.
                    DANE FRESHOUR - REDIRECT

1          MR. LONG:  Your Honor, defendant does have one

2     suggestion, at least under compensatory damages,

3     actually a couple come to think of it.  The first one is

4     in the first paragraph.  "You may award compensatory

5     damages only for..." and the word here is injuries.  We

6     would suggest losses as opposed to injuries.  I

7     understand that in the one, two, three, four -- the

8     fourth paragraph it talks about injuries, and that's

9     referring to mental anguish, et cetera, et cetera.  That

10    might be appropriate, but it does seem kind of confusing

11    to only be referring only to injuries up here.  We would

12    suggest that losses would be a more appropriate word.

13          THE COURT:  It's a little bit inconsistent with

14    the second component of the compensatory damages.  I

15    could do losses or injuries, but I don't think you want

16    to expand it.

17          MR. LONG:  No.

18          THE COURT:  Losses or injuries?

19          MR. LONG:  I think we'd only prefer one word.

20    If injuries is what we get, that's perfectly fine.  I

21    just thought it was a little --

22          THE COURT:  Okay.  Let's go with injuries.

23    Okay.  Next concern.

24          MR. LONG:  The other concern is compensatory

25    damages.  This was just a suggestion we had for -- it's

1  the fourth paragraph again.  "You are to determine an

2  amount that will fairly compensate Mr. Koziara for the

3  injury that he has sustained."  We would suggest that it

4  would be appropriate to suggest that he may not have

5  sustained an injury or the jury is entitled to see it

6  that way, so we would suggest kind of a corrective

7  statement there that says if any, or some other sort

8  of --

9       MR. KASTER:  Why don't we just say if for any

10  injury that he has sustained instead of making it more

11  wordy.

12       MR. LONG:  I think if any seems like it's a

13  little bit clearer, more clearer than --

14       MR. DOUGLAS:  Your Honor, if I may make a

15  suggestion.  I know we've got too many people talking,

16  but I think that the compensatory damage instruction may

17  be inadvertently mixing concepts.  We're talking about

18  an injury in a generic sense and then we're talking

19  about an injury in a specific sense, which this is

20  really not a case about compensating him for the injury

21  that he may have suffered.  It's not a personal injury

22  case and I'm sure the Seventh Circuit instruction is

23  kind of geared toward that.

24       MR. MORGAN:  Doesn't that go back to the first

25  comment in the first paragraph?

1            THE COURT:  I think it does, and read as a

2      whole, I don't think there's any way that the jury can

3      be confused about the two categories of injury or loss

4      that it has.  It's specified very particularly here.

5      Frankly, we're at the point in the proceedings here

6      where I'm less concerned about wordsmithing and just

7      getting the instruction technically correct.  So I'd

8      rather move along and make sure that we get to the

9      Retirement Board Benefits correction and get this up so

10     that we can get the copies made.

11            MR. DOUGLAS:  I do have one, if I may, Your

12     Honor.  I have one point on the punitive damages

13     instruction.  The last sentence of the second paragraph.

14     Respectfully I would suggest that the last sentence, the

15     phrase after the comma *or in reckless disregard of*

16     *Mr. Koziara's rights under the FRSA*, I believe that the

17     sentence without that would be more consistent with the

18     Seventh Circuit patterned instruction.

19            THE COURT:  Your objection is noted.  We

20     reviewed the cases on punitive damages and that is the

21     instruction that we're going to give.

22            MR. LONG:  I apologize for the wordsmithing

23     again, Your Honor, but I do note it does appear -- just

24     in the second to last -- I guess it's the last sentence

25     of the second paragraph.  "An action is in reckless

1  disregard of Mr. Koziara if BNSF disciplined

2  Mr. Koziara..." I guess there should be a with there.

3  With knowledge.

4          THE COURT:  That is not wordsmithing, that's

5  just correct.  Thank you.

6          MR. LONG:  Fair enough.

7          THE COURT:  Okay.  Anything else from plaintiff

8  on the instructions?

9          MR. MORGAN:  I wanted to comment on the

10  Railroad Benefit instruction.

11          THE COURT:  Okay.

12          MR. MORGAN:  We'd object to the second sentence

13  of the instruction.  I think how that sentence reads, it

14  comments on certain evidence related to the benefit that

15  I'm not sure is appropriate here.  They've heard --

16  taking that sentence out, then the instruction is you've

17  heard this evidence and you can't increase or decrease

18  the amount of compensatory damages, and you're

19  instructing them on that.  But in terms of what they do

20  with the evidence after that is up to them.

21      I just think the second sentence unnecessarily

22  highlights a particular piece of evidence in this case

23  that's not -- we object to it.

24          THE COURT:  Your objection is noted.

25  Mr. Douglas, do you have a response to that?

1           MR. DOUGLAS:  Your Honor, I think based -- I

2    think it is -- I think it is a properly worded

3    instruction.  I think the jury needs to appreciate the

4    significance, without being told of all the legalities

5    of the significance of the disability claim and the

6    retirement.  I think that is fair for them to be told

7    that they can consider that.

8           THE COURT:  We deliberated on it.  I appreciate

9    your concern about commenting on a particularized piece

10   of evidence.  The facts of this case, I think, made the

11   benefits relevant for a very limited purpose.  To

12   instruct that they have heard evidence on the subject

13   but that they can't consider it doesn't really make any

14   sense, and so I think it's warranted that we have to

15   give the jury some indication of the limited purpose for

16   which they may consider the evidence.

17       So that is the decision that the Court has made, to

18   give them a little bit of guidance there to make sure

19   that they don't make improper use of it, but to just

20   give them the prohibition on the improper use without

21   any guidance on why they heard I thought was completely

22   confusing and risked more problems.  But your objection

23   is noted for the record.

24           MR. MORGAN:  That was the only comment.

25           THE COURT:  Very good.  Thank you.

1          MR. DOUGLAS:  One final thing, Your Honor.  On

2     page seven at the top, the duty to mitigate damages.

3          THE COURT:  Yes.

4          MR. DOUGLAS:  I would simply like to make a

5     record that the second sentence is not found in the

6     Seventh Circuit patterned jury instructions, and I do

7     have a concern that unreasonable risk is one thing, but

8     unreasonable inconvenience is another.  I think that

9     there was ample testimony in this case that the

10    principal reason that, an unreasonable expense.  The

11    reason Mr. Koziara did not seek work is because he's

12    collecting the benefits and that I don't think under the

13    law is really an excuse for mitigation -- for failure to

14    take mitigating steps.  Persons always have choices to

15    make.  They may have to take a job, for example, that's

16    fifty miles from home as opposed to twenty miles from

17    home.  That is inconvenient, but it is necessarily

18    unreasonably inconvenient.

19         I think in this case the obvious impact is that the

20    jury will assume that Mr. Koziara was justified in

21    saying well, I'm not looking for any other work

22    regardless of what it pays because I'll give up my

23    railroad benefits.  So I wanted to make a note of that;

24    that we do object to that second sentence.

25         THE COURT:  Okay.  Your objection is noted.  Is

1  the plaintiff the source of the instruction?  I'm not

2  sure -- at the moment sitting here, I'm not sure of the

3  source of the second sentence.

4        MR. MORGAN:  I can double-check, Your Honor.  I

5  don't know off the top of my head.  Let me check.

6        MR. DOUGLAS:  And I'm not sure either as I'm

7  sitting here where it came from.

8        THE COURT:  Mr. Brown, it's on you.

9        MR. DOUGLAS:  In that regard, Your Honor, I

10 think the second paragraph really takes care of that

11 pretty well.

12       MR. MORGAN:  Your Honor, I don't believe we

13 submitted a mitigation instruction.

14       THE COURT:  I'm informed that this is the

15 Court's standard instruction on mitigation.  I'm going

16 to leave the instruction.  I'll stick with the Court's

17 standard instruction.  I think we've got an argument.  I

18 think that you've got an argument that he can -- had to

19 choose.  I think the plaintiffs have an argument that it

20 wasn't a reasonable choice to take a low-paying job for

21 a year or so and sacrifice his retirement benefits for

22 that opportunity, so I'll leave that to the jury.  So

23 that instruction will stay.

24     With that are we finished?

25       MR. DOUGLAS:  All right.  Your Honor, then just

1  for the record, any objections that we've made are

2  reserved for the record?

3          THE COURT:  Absolutely.  And I do want to get

4  your -- I think you've indicated that the Railroad

5  Retirement Benefit Board -- Benefit is appropriately

6  worded from the defendant's position; is that correct?

7          MR. DOUGLAS:  Yes, Your Honor.

8          THE COURT:  Very good.  Thank you for that.

9  All right.  We'll bring the jury back in just a moment.

10  We need to get copies, but the first thing I want to do

11  is read the instructions.

12          MR. KASTER:  Your Honor, do I have a minute?

13          THE COURT:  We'll have a minute because we've

14  got to get copies made.  We'll stand in recess for five

15  minutes.

16      (Recess       3:15-3:26 p.m.)

17          THE CLERK:  This Honorable Court is again in

18  session.  Please be seated and come to order.

19          THE COURT:  I've got these final copies for you

20  to read along, and Mr. Wiseman will put the instructions

21  on.  Is there anything else we need to take up before I

22  instruct the jury?

23          MR. MORGAN:  No, Your Honor.

24          THE COURT:  Mr. Douglas, anything on behalf of

25  the defense?

1          MR. DOUGLAS:  No, Your Honor.

2          THE COURT:  Okay.  Let's bring the jury in.

3       (Jury brought in courtroom at 3:27 p.m.)

4          THE CLERK:  This Honorable Court is again in

5    session.  Please be seated and come to order.

6          MR. DOUGLAS:  Your Honor, may we have just a

7    brief sidebar with you?

8          THE COURT:  Sure.

9       (Discussion at sidebar at 3:28 p.m.)

10         MR. DOUGLAS:  Your Honor, just to be clear, do

11   we need to have -- ordinarily I would renew our motions

12   at the close of all the evidence.  We've already had

13   numerous motions, and if the Court would indicate that

14   if all the errors were reserved and I don't need to do

15   that at this time, that would be acceptable.  That would

16   be fine.

17         THE COURT:  That will be fine.  I'll allow you

18   to renew your motion.  I don't know if there's any other

19   motions you want to make for the record.

20         MR. DOUGLAS:  I understand.

21         MR. MORGAN:  No, Your Honor.

22         MR. DOUGLAS:  I just wanted to clarify that.

23         THE COURT:  Yep.  Very good.  Thank you.

24       (End of sidebar discussion at 3:28 p.m.)

25         THE COURT:  Here we go.  All right.  Ladies and

1   Gentlemen of the Jury.  Now that you have heard the

2   evidence and the arguments, I will give you the

3   instructions that will govern your deliberations in the

4   jury room.  Again, it is my job to decide what rules of

5   law apply to the case and explain those rules to you.

6   Also again, you'll have copies of these instructions

7   with you in the jury room.

8        You have two duties as a jury.  Your first duty is

9   to decide the facts from the evidence in the case.  This

10  is your job and yours alone.  Your second duty is to

11  apply the law that I give you to the facts.  You must

12  follow these instructions even if you disagree with

13  them.  Each of the instructions is important and you

14  must follow all of them.

15       Perform these duties fairly and impartially.  Do

16  not allow sympathy, prejudice, fear or public opinion to

17  influence you.

18       The verdict must represent the considered judgment

19  of each juror.  Your verdict, whether it is for or

20  against any party, must be unanimous.  You should make

21  every reasonable effort to reach a verdict.  In doing

22  so, you should consult with one another, express your

23  own views, and listen to the opinions of your fellow

24  jurors.  Discuss your differences with an open mind.  Do

25  not hesitate to reexamine your own views and change your

1   opinion if you come to believe that it is wrong.  But

2   you should not surrender your honest beliefs about the

3   weight or effect of evidence solely because of the

4   opinions of other jurors or for the purpose of returning

5   a unanimous verdict.  All of you should give fair and

6   equal consideration to all the evidence and deliberate

7   with the goal of reaching an agreement that is

8   consistent with the individual judgment of each juror.

9   You are impartial judges of the facts.

10          Your deliberations will be secret.  You will never

11   have to explain your verdict to anyone.

12          If you have formed any idea that I have an opinion

13   about how the case should be decided, disregard that

14   idea.  It is your job, not mine, to decide the facts of

15   the case.

16          The case will be submitted to you in the form of a

17   special verdict on damages consisting of four questions.

18   In answering the questions, you should consider only the

19   evidence that has been received at this trial.  Do not

20   concern yourselves with whether -- to be clear, you may

21   consider evidence that was presented in the liability

22   phase as well as evidence that was presented in the

23   damages phase.

24          Do not concern yourselves with whether your answers

25   will be favorable to one side or another or with what

1  the final result of the lawsuit may be.

2       There are question -- I'm deviating from the text

3  here to tell you that the verdict form has four

4  questions, but there are question flow instructions and

5  you should answer only the required questions.  Question

6  4 you will answer only if you give a certain answer to

7  Question 3.  So you will answer at least three

8  questions, possibly Question No. 4.

9       Answers not based on guesswork.  If, after you have

10 discussed the testimony and all the other evidence that

11 bears upon a particular question, you find that the

12 evidence is so uncertain or inadequate that you have to

13 guess at what the answer should be, then the party

14 having the burden of proof as to that question has not

15 met the required burden of proof.  Your answers are not

16 to be based on guesswork or speculation.  They are to be

17 based upon credible evidence from which you can find the

18 existence of facts that the party must prove in order to

19 satisfy the burden of proof on the question under

20 consideration.

21      These are the general instruction on --

22 instructions on damages.  On the damages question, the

23 party asking for damages has the burden of convincing

24 you, by the preponderance of the evidence, both that he

25 or she has been injured or damaged and the amount of the

1    damages.  The party seeking damages need not produce

2    evidence that is as exact as the evidence needed to

3    support findings on the other questions in the verdict;

4    in other words, in the liability phase.

5         Determining damages involves the consideration of

6    many different factors that cannot be measured

7    precisely.  In determining the damages, you must base

8    your answer on evidence that reasonably supports your

9    determination of damages under all of the circumstances

10   of the case.  You should award as damages the amount of

11   money that you find fairly and reasonably compensates

12   the named party for his or her injuries.

13        Do not measure damages by what the lawyers ask for

14   in their arguments.  Their opinion as to what damages

15   should be awarded should not influence you unless their

16   opinions are supported by the evidence.  It is your job

17   to determine the amount of damages sustained from the

18   evidence you have seen and heard.

19        Examine that evidence carefully and impartially.

20   Do not add to the damage award or subtract anything from

21   it because of sympathy to one side or because of

22   hostility to one side.  Do not make any deductions

23   because of a doubt in your mind about the liability of

24   any of the parties.

25        Compensatory damages.  You may award compensatory

damages only for injuries that Mr. Koziara has proven by
a preponderance of the evidence were caused by BNSF's
wrongful conduct.  Mr. Koziara seeks two categories of
compensatory damages and you must consider them
separately.

First.  You must determine the amount of any wages
and fringe benefits that Mr. Koziara would have earned
in his employment with BNSF from the date Mr. Koziara
could have returned to work from his injury to the date
Mr. Koziara intended to retire.

Second.  You must consider whether, as a result of
BNSF's wrongful conduct, Mr. Koziara endured mental or
emotional pain and suffering.  You should include both
the pain and suffering he has endured and any pain and
suffering that he is reasonably certain to experience in
the future.  No expert medical testimony or evidence of
the dollar value of mental or emotional pain and
suffering has been or needs to be introduced.  There is
no exact standard for setting the damages to be awarded
on account of pain and suffering.

You are to determine an amount that will fairly
compensate Mr. Koziara for the injury that he has
sustained.  It is up to you to apply your common sense
knowledge of human affairs to the facts as you find them
proved.

1    Your award must be based on evidence and not

2    speculation or guesswork.  This does not mean, however,

3    that compensatory damages are restricted to the actual

4    loss of money.  They include both the wages Mr. Koziara

5    lost and the mental aspects of his injury, even if they

6    are not easy to measure.

7        Taxes.  You must not consider the impact of taxes

8    on your award of compensatory damages.

9        Railroad Retirement Board benefits.  You have heard

10   evidence that Mr. Koziara received benefits from the

11   Railroad Retirement Board.  You may consider whether

12   Mr. Koziara was disabled in determining whether he is

13   entitled to compensation for last wages, but you may not

14   increase or decrease the amount of compensatory damages

15   because of any payments he received from the Railroad

16   Retirement Board.

17       The value of future earnings.  In determining the

18   amount of damages for any loss of Mr. Koziara that will

19   be incurred in the future, it is your duty to determine

20   the present worth of such future damages.  By present

21   worth I am referring to the fact that a lump sum of

22   money received today is worth more than the same sum

23   paid in installments over a period of months or years.

24   A sum received today can be invested and earn money at

25   current interest rates.  Your answer will reflect the

present value in dollars of an award of future damages
if you make a reduction for the earning power of money.

Keep in mind that this instruction does not apply
to the portion of future damages that represents future
pain and suffering.  In computing the amount of future
damages, you may take into account economic conditions,
present and future, and the effects of inflation.

Duty to mitigate damages.  A person who has been
damaged may not recover for losses that he or she could
have reduced by reasonable efforts.  Reasonable efforts
do not include efforts that might cause serious harm or
subject the person making the effort to an unreasonable
risk, unreasonable inconvenience, unreasonable expense,
disorganization of his or her business or loss of honor
and respect.

If you find that a reasonable person would have
taken steps to reduce the loss, and if you find that
Mr. Koziara did not take such steps, then you should not
include as damages any amount that Mr. Koziara could
have avoided.  If you find that a reasonable person
would not have taken steps to reduce the loss under all
of the circumstances existing in this case, then you
should not consider Mr. Koziara's failure to act when
you determine damages.

It is BNSF's burden to satisfy you by the greater

1    weight of the credible evidence that Mr. Koziara should

2    have taken steps to reduce the loss and failed to do so.

3         Punitive damages.  You must also consider punitive

4    damages.  You may, but are not required to, assess

5    punitive damages against BNSF.  The purposes of punitive

6    damages are to punish a defendant for wrongful conduct

7    and to serve as an example or warning to that defendant

8    and others not to engage in similar conduct in the

9    future.

10        Mr. Koziara must prove by a preponderance of the

11   evidence that punitive damages should be assessed

12   against BNSF.  You may assess punitive damages only if

13   you find that the conduct of BNSF's managerial employees

14   or officers was in reckless disregard of Mr. Koziara's

15   rights to be free from retaliation.  An action is in

16   reckless disregard of Mr. Koziara's rights if BNSF

17   disciplined Mr. Koziara with knowledge that it would

18   violate the law or in reckless disregard of

19   Mr. Koziara's rights under the FRSA.

20        Mr. Koziara must prove by a preponderance of the

21   evidence that BNSF's managerial employees or officers

22   acted within the scope of their employment and in

23   reckless disregard of Mr. Koziara's right not to be

24   retaliated against.  You should not, however, award

25   Mr. Koziara punitive damages if BNSF proves that the

1  company made a good faith effort to implement and comply

2  with an anti-retaliation policy.

3       If you find that punitive damages are appropriate,

4  then you must use sound reason in setting the amount of

5  those damages.  Punitive damages, if any, should be in

6  an amount sufficient to fulfill the promises that I have

7  described to you, but should not reflect bias,

8  prejudice, or sympathy toward any party.

9       In determining the amount of any punitive damages,

10  you should consider the following factors:  The

11  reprehensibility of BNSF's conduct; the impact of BNSF's

12  conduct on Mr. Koziara; the relationship between

13  Mr. Koziara and BNSF; and the likelihood that BNSF would

14  repeat the conduct if an award of punitive damages is

15  not made.

16       As before, should you need to communicate with me

17  during deliberations, send a note to me through the

18  bailiff.

19       Now you're going to hear the closing arguments of

20  the parties, starting with the plaintiff.

21            MR. DOUGLAS:  Your Honor, may we approach

22  briefly?

23       (Discussion at sidebar at 3:40 p.m.)

24            MR. DOUGLAS:  Thank you for hearing us.  In

25  reading this instruction, I believe that you said

1   promises instead of purpose.

2          THE COURT:  Oh, of course.  Let me correct

3   that.

4          MR. MORGAN:  I didn't catch that.

5      (End of sidebar discussion at 3:40 p.m.)

6          THE COURT:  It has been pointed out to me that

7   I may have misspoken in one of the paragraphs on

8   punitive damages.  You have the text in front of you,

9   but I want to make sure I read it orally to you

10  correctly, so this is the paragraph, really the last

11  paragraph on punitive damages.

12      If you find that punitive damages are appropriate,

13  then you must use sound reason in setting the amount of

14  those damages.  Punitive damages, if any, should be in

15  an amount sufficient to fulfill the purposes that I have

16  described to you but should not reflect bias, prejudice

17  or sympathy toward either party.

18      In determining the amount of any punitive damages,

19  you should consider the following factors:  The

20  reprehensibility of BNSF's conduct; the impact of BNSF's

21  conduct on Mr. Koziara; the relationship between

22  Mr. Koziara and BNSF, and the likelihood that BNSF would

23  repeat the conduct if an award of punitive damages is

24  not made.

25      With that, we will hear the closing arguments of

1  the parties starting with Mr. Morgan.   (3:41 p.m.)

2          MR. MORGAN:  Thank you, Your Honor.  May it

3  please the Court.  Counsel.  Good afternoon everyone.

4      Thank you again for listening so carefully to the

5  evidence and for so thoughtfully considering

6  Mr. Koziara's side of the story.  I told you earlier

7  today that there are three components to the damages:

8  Wage loss, compensatory loss, and damages.  Let's dive

9  right into the wage loss in this case.

10      You heard from Mr. Koziara that he earned $24.10 an

11  hour at the time of the termination.  In the twelve

12  months before his injury, he earned $54,391 or $1,045.98

13  per week.  That information comes from the gross annual

14  figures of the exhibit that we entered into evidence

15  earlier today.

16      Mr. Koziara, although intended to retire at the age

17  of 60 before he injured his leg, has told us that what

18  he is requesting for -- what he is requesting is

19  actually 39 months to get him to that service month of

20  360, that target.  And so 39 months is January of 2011

21  until April of 2014.

22      The Court read an instruction on future loss.

23  Mr. Koziara is not asking you to award him any wage loss

24  in the future, and he isn't even asking you to award

25  wage loss up until today.  Through April of 2014.  That

1  total, 39 months equates to 168 weeks.  168 weeks at

2  $1,045.98 totals $175,724.64.  This is the number that

3  Mr. Koziara is asking you, the jury, to award him as

4  wage loss in this case and we believe we have shown by a

5  preponderance of the evidence that Mr. Koziara has

6  suffered this loss and is entitled to this loss for the

7  wrongful conduct of BNSF.

8       Mr. Koziara, and it is undisputed, told you that he

9  was cleared to return to work by his doctor in January

10 of 2011 with regard to the leg.  He did receive RRB

11 benefits.  That is true.  Mr. Douglas told you in the

12 opening that Mr. Koziara made an affirmative

13 representation that he was permanently disabled.  That

14 isn't true.  The disability briefing document -- there

15 was a medical record from a doctor that Mr. Koziara saw,

16 and we saw the notation to permanent, and it was

17 submitted to the Railroad Retirement Board.  But the

18 Railroad Retirement Board considered those records,

19 amongst others, and made the determination, just as

20 Mr. Koziara testified, that he was occupationally

21 disabled.  Mr. Koziara testified that there were a host

22 of other positions that he knew he would be able to do,

23 whether it was when he immediately returned in January

24 or February or March.  Whenever he would have returned

25 and no longer could have done the foreperson position,

1   there were other positions waiting.  He had the

2   seniority to work in those positions and it's reasonably

3   certain for you to determine that he would have worked

4   full time at least through April of 2014, most likely

5   until the age of 60 because that was his intention but

6   for the broken leg and the subsequent termination.

7        The Court's instruction to you on damages generally

8   says -- reads "You should award as damages the amount of

9   money that you find fairly and reasonably compensates

10  the named party for his or her injuries."  We believe

11  the $175,724 in past wages is that fair and reasonable

12  compensation for BNSF's conduct.

13       Now they're going to say he was disabled and he

14  couldn't work, but the question I'd ask you to think

15  about as you deliberate, if Mr. Koziara hadn't been

16  terminated in November of 2011 and was cleared to work

17  in January of 20 -- or excuse me.  If he hadn't been

18  terminated on November 9th of 2010 and he had returned

19  to work in January of 2011, do you think he would have

20  returned to work or not?  If the answer is yes, and we

21  think it's absolutely yes, then he's entitled to the

22  wage loss that we're asking you to award him.

23       BNSF is also going to argue that Mr. Koziara acted

24  unreasonably and didn't "mitigate" his damages or his

25  loss because he didn't look for another job.  The

1  instruction that the Court read in part states if you
2  find that a reasonable person would not have taken steps
3  to reduce the loss under all the circumstances existing
4  in the case, then you should not consider Mr. Koziara's
5  failure to act when you determine damages.
6      Now he testified that he didn't look for another
7  full-time job.  The last date he ever worked full time
8  for anyone was September 10th of 2010.  But he also told
9  you that if he made more than $1,000 a month for two
10 consecutive months, he believed he was going to lose,
11 and his wife Joan's spouse RRB benefits.  He believed
12 that.  That record is undisputed.  And so that, in
13 combination that Mr. Koziara has worked 32 years on the
14 railroad and was intending on retiring at 60, a
15 reasonable person would have done exactly what Mr.
16 Koziara did in this case.  And I will remind you on this
17 issue it's BNSF's burden to prove that Mr. Koziara was
18 acting unreasonably.  We don't believe the evidence
19 supports that at all.
20     Compensatory damages.  I want to read from the
21 Court's instructions again because I think it's an
22 instruction worth hearing again.  On the topic of
23 emotional distress and mental anguish, the instruction
24 reads in part "no expert medical testimony or evidence
25 of the dollar value of mental or emotional pain and

1  suffering has been or needs to be considered."

2      Mr. Douglas asked Mr. Koziara on cross-examination

3  this morning if he had sought out any medical treatment

4  and Mr. Koziara said no, he hasn't.  But he doesn't need

5  to show medical evidence in order to justify a claim for

6  compensatory damages.  That's what the instruction says.

7      The instruction goes on to read:  "There is no

8  exact standard for setting the damages to be awarded on

9  account of pain and suffering."  You all are to

10 determine an amount that will fairly compensate

11 Mr. Koziara for the injury that he has sustained.  It is

12 up to you to apply your common sense, knowledge of human

13 affairs to the facts as you find them proved.  Your

14 common sense.  Your understanding of the facts.  That's

15 what you all should rely on in consideration of the

16 evidence that you heard, most of which you heard today.

17     And what did you hear?  I suggest or submit to you

18 that it goes beyond, when you're thinking about the

19 compensatory amount, it goes beyond what you just heard

20 from Mr. Koziara and his wife.  It's the unstated truth.

21 It's how Mr. Koziara was on the stand explaining the day

22 he received the dismissal letter.  It's his body

23 language and his reactions in discussing how he had

24 sleepless nights; how it still affects him even today.

25 The unstated truth includes Ms. Koziara's testimony.  We

1   all saw her on the stand.  She's proud to be Michael

2   Koziara's wife.  And her testimony on a number of

3   topics.

4        But what I found the most interesting was today.

5   How has this changed Mike's life?  And she described to

6   you, both in sound and in demonstration with her own

7   subtle body language, how it impacted him, how it

8   continues to impact him.  That's important as you

9   consider this compensatory damage award.

10       You heard testimony from Mr. Koziara about how he

11  felt about receipt of both the suspension and the

12  termination notices, the discussion with Emily about

13  this is the only job he's ever known, and feeling really

14  upset, really sad.  Not angry, Ms. Koziara said, not

15  angry.  But upset.

16       He told you he had difficulty sleeping.  He told

17  you, and so did Ms. Koziara, that they had to sell their

18  home.  Now Mr. Koziara is not asking you for money on

19  any loss that he sustained on the home.  The purpose of

20  that evidence was to show you the sort of impact this

21  event, this significant event had on Mr. Koziara's life.

22  It caused a lot of unforeseen circumstances in August of

23  2010 to occur in the future.

24       You heard about -- you heard from Officer Moody.  I

25  mentioned it this morning.  He refers, on behalf of

1  BNSF, this giving away of twenty scrap switch ties to a

2  farmer friend, refers it to Buffalo County, with the

3  request that charges are pressed.  Mr. Koziara even

4  receives a phone call from Buffalo County, and he

5  described to you how he felt just in response to getting

6  that phone call.  And this still affects him today; not

7  nearly as much as it did in the days, certainly in the

8  months after November 9, 2010, but it still affects him

9  today.

10     So what is this worth?  What amount is fair and

11  equitable?  How do you measure the emotional impact on

12  Mr. Koziara?  Four-and-a-half years is a really long

13  time.  It's for you all to decide ultimately what is

14  just, what is fair.  But my suggestion to you is that it

15  far exceeds the amount in wage loss that he's asking

16  for.  It far exceeds $175,724.

17     Punitive damages.  There are two questions, as the

18  Judge indicated, on punitive damages or two questions on

19  punitive damages in the special verdict form.  They're

20  Questions 3 and 4.  The first question is the

21  prerequisite question:  Did defendant's managerial

22  employees or officers act in reckless disregard of

23  plaintiff's rights?  That's the first question.  And so

24  when we think about who those players are, who are those

25  individuals, we know it's Mr. Veitz.  We know it's

1   Mr. Wischover.  We know it's Mr. Rankin.

2        And the question is have you heard evidence that

3   those individuals acted with reckless disregard for

4   Mr. Koziara's rights?

5        An action -- this is from the Court's instruction.

6   "An action is in reckless disregard of Mr. Koziara's

7   rights if BNSF disciplined Mr. Koziara with knowledge

8   that it would violate the law or in reckless disregard

9   of Mr. Koziara's rights under the FRSA."

10        And there's a couple of pieces of evidence that I

11   want you to consider when you're thinking about whether

12   Mr. Veitz and Mr. Rankin, in particular, acted with

13   reckless disregard of Mr. Koziara's rights.

14        We just heard this afternoon from a division

15   manager in the Human Resources Department with BNSF.  He

16   came to testify.  But I took the deposition of the

17   corporate designee last year on the issue of FRSA

18   compliance at BNSF.  She did not testify, this other

19   individual; Mr. Freshour I believe is his last name,

20   did.  But there was a document that she created that is

21   in evidence now and the title of it is *FRSA Compliance*

22   *Efforts*.  And we heard a lot about it.  We heard a lot

23   about other policies, and I expect you will hear a lot

24   about other policies.  We don't contest that BNSF has

25   policies on compliance; EEO policies in particular.

1      EEO policies are not FRSA policies.  The FRSA, and

2  there's a document, one of the documents that

3  Mr. Douglas used, talked -- that you will see talks

4  about when the revisions to the FRSA took effect.  And

5  those revisions, if I recall, were from August of --

6  were in August of 2007.

7      You heard the testimony today that from -- between

8  August of 2007 and September of 2010 and November of

9  2010 when this occurred, there were no compliance

10  efforts taken by the company with regard to the officers

11  and managers in the engineering department.  There was

12  evidence that one meeting or training amongst human

13  resource professionals at the company occurred in 2008.

14  That's on the second page.  This is Exhibit D 670.  I

15  misspoke.  Excuse me.  That's right.  The second page.

16      So even if we include this in this range between

17  when the FRSA was amended to protect work-related

18  injuries and November 9, 2010, when this happened,

19  there's no compliance, no training specifically on the

20  FRSA.  That's undisputed testimony.  Undisputed

21  testimony.  And it comes from the person that BNSF

22  designated in this case to talk about the compliance

23  measures.

24      And then when Mr. Kaster asked the witness about

25  the training presentations, which is on page one which

1   you'll see, you can see all the dates, they're well

2   after 2010, the Chicago Division, the division

3   Mr. Koziara is in, isn't even included here.  And no one

4   could testify that Mr. Rankin or Mr. Veitz or anyone

5   attended any compliance, any compliance trainings on the

6   FRSA prior to 2010.  That is a significant point.  That

7   is reckless disregard.  But there's more.

8       There's an Incentive Compensation Plan that these

9   individuals receive that ties safety into bonus.  Now,

10  we heard the testimony of Mr. Weber.  He gave us some

11  math about how minute one particular injury is on an

12  overall safety bonus calculation.  But the injuries are

13  what are considered.  So maybe one doesn't mean a whole

14  lot, but two means more than one.  And so does fifteen

15  and so does a hundred.  The point is that there is

16  incentive for the officers and the managers to reduce

17  the number of injuries that occur in their division

18  across the division or across the country.  There is.

19  And I'd suggest to you that that's an important piece of

20  evidence when you're thinking about whether these

21  managers, these officers acted in reckless disregard.

22      There's more.  And you heard a lot of this from me

23  yesterday and in the days preceding yesterday about the

24  others that were on site on August 30th 2010, and on

25  September 9, 2010.  Two other individuals on September

1  9, 2010, were somewhat in the zone of danger.

2  Mr. Zielke on August 30th was operating the loader that

3  helped remove the switch ties.  None of those

4  individuals were disciplined or even received notices of

5  potential discipline, and none of them were injured.

6  There was one person singled out and it was the injured

7  person.  That's reckless disregard.

8      There's more.  Could you call up 1.1.2, please.

9  We've seen this a lot.  The Alert and Attentive Rule.

10  So what we heard from Mr. Rankin was that in order to

11  violate this rule, there has to be an injury.  If

12  there's no injury, there's no violation.  So what BNSF

13  does is focus on the rule violation, not the injury.

14  We're not disciplining the injury, we're disciplining

15  the rule violation.  But the rule is only implicated if

16  you're injured.  That's reckless disregard for the

17  rights of Mr. Koziara.

18      Could you call up 1.19, please.  We didn't see a

19  lot of this rule on the screens this week.  We heard

20  about it here and there.

21      And I put this up to suggest to you that the last

22  few days what you've heard from BNSF is a shifting

23  changing story, other pieces of evidence that they could

24  dream up to try and argue that the suspension and the

25  dismissal were justified.  This was one of the rules.

1.19.   Employees must not use railroad property for

their personal use.  We heard all about how Mr. Koziara

was using railroad property for his personal use, yet he

was never charged with this.  We hear it four-and-a-half

years later in a courtroom, but there's no allegations.

There's no notice of investigation with regard to 1.19.

None.

Credit or property.  1.25.  This was a rule that

was identified by Mr. Douglas in the opening statements

on Monday.  Employees must not sell or in any way get

rid of railroad property without proper authority.  We

heard all about how Mr. Koziara was getting rid of

railroad property without proper authority.  Mr. Veitz

says that he never gave consent.  This is another rule

that was not implicated at all in November of 2010.  At

all.  Yet we heard at least a suggestion on the very

first day of trial that this was something that

Mr. Koziara violated as well.  Why?  Why are they

offering up all of these other rules?  Because they knew

that Mr. Koziara didn't steal those ties.  They knew it.

Deserting his crew.  We also heard that.  Where is

that in the investigatory transcripts?  Where is that in

any of the review that we heard?  Where is that in any

of the notice of investigations for the dismissal, that

he deserted his crew?  We're talking about thirty yards.

1    Mr. Kaster can throw a football thirty yards.  From this

2    corner of the courtroom to this corner of the courtroom,

3    that's it.  Deserting his crew?

4        The reenactment report.  I focused a lot on the

5    reenactment report.  It's an important document.  I

6    agree with Mr. Veitz it is an important document and

7    it's an essential piece of evidence in this case.  It

8    shows reckless disregard.  He acknowledged it wasn't

9    accurate, yet every officer in the Chicago Division has

10   access to it.  They have Mr. Koziara placed in the wrong

11   spot.  But he told us, Mr. Veitz told us that the reason

12   for the reenactment report was to find the truth so that

13   we could decide what the truth was four-and-a-half years

14   later.

15       Buffalo County I've already talked about.  What is

16   the appropriate amount?  It's an amount that you believe

17   sends the message to BNSF that they shouldn't recklessly

18   disregard Mr. Koziara's rights to safely and lawfully

19   and in good faith report a work-related injury.

20       There are some bullet points on the eighth page of

21   the jury instructions, and the Court has read these.

22   "In determining the amount of any punitive damages, you

23   should consider the following factors:  The

24   reprehensibility of BNSF's conduct; the impact, the

25   impact of BNSF's conduct on Mr. Koziara; the

1  relationship, the 32-year relationship between

2  Mr. Koziara and BNSF; and the likelihood that BNSF would

3  repeat the conduct if an award of punitive damages is

4  not made."

5       We're going to leave that number to you to decide.

6  I'm not going to suggest a number to you.  I provided an

7  actual tangible number of wage loss.  I made a

8  suggestion to you of what we believe would be fair and

9  equitable compensatory damages.  But on punitive

10 damages, it's for you to decide.  With one caveat.  I'd

11 ask you to think about the evidence that I just went

12 over with you.  Think about whether that evidence

13 supports the notion that Mr. Rankin and Mr. Veitz acted

14 with reckless disregard of Mr. Koziara's rights.  And

15 come up with a number that you believe is just.

16       Thank very much for your time and attention this

17 week.      (4:07 p.m.)

18          THE COURT:  Mr. Douglas.

19          MR. DOUGLAS:  Yes, sir.  Ladies and Gentlemen,

20 good afternoon.  I appreciate the opportunity to speak

21 to you one last time.  At this point, we're addressing

22 the question of damages.  Mr. Morgan spoke to you about

23 the several categories of damages and I'd like to talk

24 to you about those categories as well.

25       The first category that I'd like to talk about is

1   the claim for lost wages.  Now this claim is based on

2   the idea that Mr. Koziara would have worked for BNSF

3   another 39 months if he had not been dismissed in

4   November of 2010 when he was able to return to work

5   after his fractured tibia healed in January of 2011, and

6   for that, they ask for roughly three years, 39 months of

7   wages.  The difficulty with that, of course, is that

8   first of all it's not at all clear that Mr. Koziara

9   would have continued working for a full 39 months for

10  any number of reasons.  But the other problem here is

11  that Mr. Koziara, in fact, was not able to perform the

12  job that he held at the time he was let go.

13       You've heard the testimony that Mr. Koziara applied

14  for and received benefits from the Railroad Retirement

15  Board.  The significance of that is that Mr. Koziara is

16  essentially disabled -- permanently disabled, if not

17  retired from the work force, and hasn't looked for work

18  in years.  Now, he has reasons for that.  But let me

19  cover a critical point with you.  If Mr. Koziara is

20  permanently disabled, then he is not able to work and

21  therefore he should not be awarded any wages.

22       Now Mr. Koziara is the one who authorized his

23  doctor to submit that report to the RRB, what you saw.

24  The RRB then determined that he was occupationally

25  disabled.  And if you read that report, you'll see what

1  that means is that he was not able to perform the job
2  that he held at the time.  That's what he's disabled
3  from.  He might have been able to perform other jobs.
4  He might have been able to perform other jobs on the
5  railroad if, in fact, he could have returned to the
6  railroad.  But there is no certainty that he could have.
7  There certainly could have been other jobs that he would
8  have looked for.
9      Now, what you're told is that Mr. Koziara did not
10  look for other work because he was afraid of losing his
11  benefits.  His benefits may have stopped for awhile if
12  he did take other work, but that in itself does not make
13  it reasonable not to seek work and mitigate your
14  damages.  Anyone who claims either an injury or even in
15  a breach of contract case, let's say a tenant leaves a
16  space suddenly and you have to go look for another
17  tenant, if you're the landlord you have a duty to
18  mitigate your damages by looking for other tenants.  You
19  can't hold the space vacant forever in most cases and
20  then pile the damages on the other party.
21      Likewise if an employee is dismissed, he has an
22  obligation to continue to look for work.  If he is
23  unable to work, then he doesn't have to look for work.
24  But likewise if he is unable to work, he's also not
25  entitled to damages for lost wages because of that.

1    In this particular case, Mr. Koziara received the

2    benefits that he was entitled from the RRB and as a

3    consequence elected not to seek additional work.  When

4    one essentially withdraws from the work force, he is no

5    longer entitled to a continuing wage loss.

6    The other issue is that it is clear that

7    Mr. Koziara could not return to the job that he had as a

8    foreman.  Even Mr. Koziara agreed with that.  And if you

9    look at the restrictions, that was in the document from

10   the RRB.  Mr. Koziara agreed that he could not perform

11   the work that he did before.  So the problem is there's

12   no real -- there's no solid evidence of what job he

13   could have performed.  He indicated perhaps he would

14   have taken a job at a few dollars less per hour.

15   There's no clarity on that, and you're going to have to

16   sort through that if you decide that he's entitled to

17   damages.

18   But I suggest to you that the answer is that

19   Mr. Koziara effectively became disabled, unable to work

20   and withdrew from the work force.

21   The significance of this also is that Mr. Koziara

22   did not became disabled because of the leg injury that

23   he -- that happened on September 9, 2010.  And I say

24   that with whatever happened on September 9, 2010, it's

25   clear that that's not the injury that caused or resulted

1   in the disability.  Apparently there were other

2   conditions that existed long before that that led to

3   Mr. Koziara being able to apply for disability benefits.

4        And you will recall that the RRB, the Railroad

5   Retirement Board, initially established his onset of

6   disability as his last day of work at BNSF, and

7   Mr. Koziara then submitted additional evidence to the

8   Board that got him a back dating, if you will, which I'm

9   not suggesting there is anything wrong with that, but

10  the RRB moved the date back to February 15 of 2010.

11  That's important, because in February of 2010 he was

12  still employed full time by BNSF.

13       So he was not -- he did not become disabled because

14  of this situation.  There were other things going on in

15  his life that caused that.  That's important when you

16  start to think of the potential wage loss.  Because if,

17  in fact, Mr. Koziara had other conditions that were

18  leading to his inability to work, we have no way of

19  knowing whether he would have lasted the entire 39

20  months that he is suggesting that he wanted to work.

21       So, I ask that you pay close to the fact that

22  Mr. Koziara not only was disabled from his job that he

23  had before, that Mr. Koziara also became disabled,

24  according to the RRB, even before his employment ended

25  at BNSF, and under those circumstances, we suggest to

1   you that he truly is not entitled to any wage loss

2   because he has not established that he actually was

3   capable of working in any position, let alone working at

4   BNSF.

5        Let me address the matter of compensatory damages.

6   Mr. Morgan has asked you to award the same amount for

7   compensatory damages as you might award for wage loss.

8   The evidence in this case, however, suggests that what

9   Mr. Koziara experienced, some sleepless nights, perhaps

10  some anxiety and some sadness is very much like what

11  most of us go through occasionally.  Everybody has a bad

12  day or a bad experience from time to time.  I had one

13  yesterday.  But the point is we grow and we get over

14  that.  We may have experienced anxiety, sleepless nights

15  for a period of time.  Did it continue continuously for

16  four-and-a-half years?  Mr. Koziara acknowledges that he

17  is much better now, suffers very few sleepless nights.

18  Mrs. Koziara says the same thing.

19        In the business world, unfortunately employees are

20  dismissed from their jobs every day.  There are layoffs,

21  restructurings, reorganizations, what have you.  Anyone

22  who's worked a long time in a job becomes attached to it

23  and likes it.  Mr. Koziara liked working for BNSF.  He

24  said as much.  So did his attorney.  But every time an

25  employee is separated from his employment or loses his

1   job doesn't automatically mean that that person is

2   entitled to additional money because he is upset or

3   stressed out or saddened by that.

4        There was nothing here other than the fact that he

5   was dismissed that could generate any amount of sadness,

6   depression, anxiety, whatever, and Mr. Koziara told you

7   that whatever was troubling him, whatever stress,

8   whatever anxiety, whatever he had wasn't enough --

9   wasn't serious enough for him to consult with a doctor

10  and he never did in all that time.  He did what all of

11  us do:  He coped, he managed, he got through it.  That

12  is not the kind of damage -- that is not the kind of

13  depression, anxiety, what have you for which we believe

14  damages are warranted.  So we urge you to be very

15  cautious in that area and I would suggest that really

16  any amount of damages for compensatory damage would be

17  inappropriate.

18       Let's talk about the punitive damages.  I want to

19  address this with you because it's important.  And in

20  that regard, I'd like to pay careful attention to the

21  punitive damage instruction.  Mr. Morgan called out one

22  particular paragraph to you.  I'll do the same.  And

23  this instruction says "You may assess punitive damages

24  only if you find that the conduct of BNSF's managerial

25  employees or officers was in reckless disregard of

1    Mr. Koziara's rights to be free from retaliation."

2    Reckless disregard.

3         Businesses have to operate.  Businesses have

4    employees.  That's how they operate.  And employees are

5    disciplined and discharged at various companies every

6    day.  The man that you heard the testimony from, Michael

7    Veitz, Dan Rankin, what they did is what they believed

8    was the correct decision to take in accordance with

9    BNSF's policies.

10        They had no ill will or dislike for Mr. Koziara.

11   They didn't go out to hurt him or harm him in any way.

12   And you also heard Mr. Koziara acknowledge that nobody

13   from BNSF came to his home, gave him a hard time,

14   anything like that.  He got his letters in the mail.

15   That was it.  He was concerned about it.  He exercised

16   his rights to appeal all the way up the chain.  But

17   these managers, you could evaluate their behavior.  Each

18   one of them said they had no ill will toward

19   Mr. Koziara.  In fact, Mr. Rankin told you he barely

20   knew Mr. Koziara.  He might have met him at a company

21   function or training event.

22        Mr. Veitz worked with him for a long time.  He said

23   he was a good employee.  He didn't have any issues with

24   him.  And most importantly, when I asked Mr. Koziara

25   what he thought about all the individuals:  Mr. Veitz,

Mr. Rankin, Barbee, Heille, all those people, some of them he didn't even know.  He had no problems with any of them.  So this isn't a case where anybody was out to get Michael Koziara.  BNSF would have been just as happy to have Mr. Koziara continue working for his 39 years.

You heard some interesting statistics, I think, or data from Derek Cargill.  I want to remind you of that.  Mr. Cargill was the Director the Employee Performance who came up here to testify, and he gave you a number of examples of employees of BNSF who were dismissed for theft.  And you know what was interesting about that?  Many of those employees had thirty or more years of service with the company.

Now that is significant because lots of employees at BNSF have been there their entire careers.  Mr. Rankin has been with BNSF for more than thirty years.  Mr. Veitz was with BNSF for more than thirty years and he retired.  It isn't that BNSF goes out of its way to get rid of people who have been there a long time.  Those are the most valued employees because of their experience, because of their seniority, and because of the contributions that they have made over the years.  The railroad needs those people.  So there's no evidence here that these gentlemen acted with any degree of bad faith or ill will towards Mr. Koziara and

1   there's nothing to indicate that what they did was in

2   reckless disregard of Mr. Koziara's rights under the

3   law.

4       In fact, when Mr. Koziara reported his injury to

5   Mike Veitz, even though it was several days after

6   Mr. Veitz felt that he should have had the information,

7   what's the first thing that Mr. Veitz said to

8   Mr. Koziara?  He said get your personal injury report

9   in.  Get your personal injury report in.

10      If BNSF were not interested in getting timely

11  injury reports from its employees, then why would it

12  print all these Personal Injury Report Forms and have

13  them at every location where people can pull them out of

14  their drawer and turn them in?  If BNSF weren't

15  interested and concerned about having employees report

16  their injuries, why would there be provisions in the

17  Internal Control Plan?  Why would it have all these

18  policies, including the Safety Action Plan that you have

19  with you that talk about the importance of reporting

20  your injuries quickly?

21      The reason for that is the first order of business

22  is the railroad wants to be sure that the employees

23  receive prompt medical treatment.  That's what those

24  policies say.  And they say that to the managers.  The

25  first thing you deal with is make sure the employee gets

1 medical treatment.  By the time of course that

2 Mr. Koziara reported his injury, there wasn't any need

3 to worry about getting him medical treatment.  He

4 already had the medical treatment.  But that's the first

5 order of business.

6      BNSF is extremely vigilant about retaliation

7 against employees for reporting injuries.  And it's not

8 just a matter of what the Federal Railroad Safety Act

9 requires.  You've heard the testimony.  The law was

10 amended and changed in about 2008 to add to that

11 provision of what is otherwise a whistleblower law to

12 allow people to sue or file complaints and sue if

13 they've ever been retaliated against for filing an

14 injury report.  2008.  You've seen the policies from

15 BNSF.  The policies about retaliation, discrimination,

16 go way back before the law was in effect.

17      Mr. Freshour told you about the anti-retaliation in

18 the code of conduct that goes back more than a decade,

19 if not longer.  Some of the anti-retaliation

20 anti-discrimination policies that we showed you for BNSF

21 goes back decades.

22      Now, what is the significance of those policies?

23 I'm sure some of you were wondering why did we call

24 Mr. Freshour up here?  Why did we have to put somebody

25 on the stand and take your valuable time to show you a

1  bunch of policies that may not seem all that importance

2  to you?  Let me explain.

3      The Court gave you jury instructions that read as

4  follows:  "Mr. Koziara must prove by a preponderance of

5  the evidence that BNSF's managerial employees or

6  officers act within the scope of their employment and in

7  reckless disregard of Mr. Koziara's right not to be

8  retaliated against."

9      But then the instruction says, and this is the most

10 important part:  "You should not, however, award

11 Mr. Koziara punitive damages if BNSF proves that the

12 company made a good faith effort to implement and comply

13 with an anti-retaliation policy."  That is the law.

14 That is the instruction that Judge Peterson has given

15 you.  That is the reason we went to all this trouble

16 today to have Mr. Freshour come in and talk about their

17 anti-retaliation policies.

18     Mr. Morgan will say to you well, you gave him this

19 list of training programs and so on and so forth and

20 there's nothing in there before 2009.  Well, Ladies and

21 Gentlemen, Mr. Freshour told you the law was only

22 changed in 2008, but they've covered the topic of

23 retaliation very broadly and in all contexts in the

24 training programs.  The officers of the company have to

25 review and certify on that code of conduct every year,

1  and that policy specifically speaks to no retaliation;

2  and the Internal Control Plan specifically speaks to how

3  to handle injuries.  And if you would take a look, when

4  you go back to your deliberations, I encourage you to

5  look at the Chicago Division Safety Action Plan and you

6  will see that policy and that document that went out to

7  everybody in the Chicago Division in 2010 instructing

8  the managers and everyone else how to handle employee

9  injuries to make sure that the injuries get reported and

10  get processed promptly and the employee gets prompt

11  medical treatment.

12       I want to remind you that in this case, although

13  you've heard a lot of the testimony about BNSF -- about

14  people being afraid to report injuries, and Mr. Koziara

15  told you he was -- he made up these stories because he

16  was afraid to report injuries, there is no evidence in

17  this case at all that Mr. Koziara was written up for or

18  punished for filing a late report of injury.  He gave

19  you his reasons for being afraid and making up that

20  story.  As he said, then I had the brainstorm to call

21  Brad Underhill and tell him I got hurt at home.  But he

22  changed his story again in this courtroom.  He changed

23  his story -- I'm sorry.  His testimony on his first day

24  was different from his deposition in this case only

25  months ago when he said that the story about the plow

1  falling on his foot was false, and then acknowledged

2  that it was true, and then again said it was false.

3      There's no reason for anyone to be making up those

4  kinds of stories.  There's nothing that Mr. Koziara

5  should have been afraid of and nothing that he really

6  was afraid of.  I can't explain those multiple stories

7  to you.  So I want to emphasize to you, it is not BNSF

8  that is making up shifting reasons or stories, it was

9  Mr. Koziara.

10      If you look at the two letters that you have, the

11  Level S suspension letter and the dismissal letter, you

12  will see that BNSF stated its reasons clearly and has

13  never deviated from those reasons.  What we have done is

14  we've shown you other policies that exist in the policy

15  manuals that Mr. Koziara should have been aware of.  All

16  that was about was to show you that there are other

17  policies that deflate this whole idea that I didn't know

18  it wasn't okay to take the ties.

19      Let's talk about that aspect of it.  Mr. Morgan

20  suggested to you that BNSF singled out Mr. Koziara for

21  punishment because on September 9, 2010, although maybe

22  others were standing in the zone of danger -- we don't

23  know that, Mr. Mitchell came here and was asked if he

24  was standing right next to Mr. Koziara as Mr. Koziara

25  claimed and Mr. Mitchell said no, I was standing twenty

1  feet away or fifteen feet away.  The point is this:  If

2  Burlington Northern wanted to retaliate -- if this

3  really was a case of retaliation against Mr. Koziara for

4  an injury, wouldn't BNSF have fired him for the incident

5  on September 9 rather than giving him a Level S 30-day

6  record suspension?  Which as you all know by now, and

7  I'm sure you can recite this in your sleep, doesn't

8  result in any lost time or wages or anything else.  It's

9  a mark on your record.  It's a heads up to the employee

10  to behave yourself because you've got a 12-month

11  probation period.  If BNSF managers intentionally

12  retaliated against him or intended to retaliate against

13  him or discriminated against him in any way, that would

14  have been the incident to do it for.

15      But instead, what was he really dismissed for in

16  this case?  What was he dismissed for?  Not because he

17  filed an injury report.  He was dismissed for taking

18  BNSF property.  And let's just kind of cut through all

19  the smoke and all the mirrors about that.

20      Mr. Koziara will tell you that he had permission to

21  take the ties.  Mr. Veitz says adamantly he did not have

22  permission.  Mr. Veitz had no reason to go back on his

23  word.  He had given him permission some years ago to

24  take ties.  But they couldn't give that permission any

25  longer in the year 2010.  You heard all that.  You've

1  seen the rules and policies.  Those ties had to be

2  disposed of properly.

3      There's nothing really that connects the injury

4  report to the dismissal and it's clear that the tie

5  incident would have come to light anyway, as it did in

6  this case when several days later an employee approached

7  Mike Veitz and said "Hey, I've got some new information

8  for you."  So I submit to you it cannot be a matter of

9  reckless disregard of someone's rights to dismiss them

10  for what the managers believed in good faith was theft.

11  There's nothing here that undermines their reasons for

12  what they did.  They recommended dismissal of Mr. Veitz

13  because he took that property.  And you have heard ample

14  evidence from Derek Cargill and from others as well that

15  people who take BNSF property are uniformly dismissed.

16  It doesn't matter who they are.  It doesn't matter if

17  they're officers of the company.  It doesn't matter if

18  they're three-year veterans of the company or

19  thirty-year veterans of the property.  It doesn't matter

20  what the property is.  It can be a box of pencils.  It

21  can be scrap H-bars.  It can be scrap ties.  Why is that

22  not appropriate?  The property belongs to BNSF.  It

23  doesn't matter what it's worth.

24      Ladies and Gentlemen, you cannot run a railroad

25  stretching thousands of miles and having property laying

1    around the tracks, whether it's to be put in some place

2    or it's to be taken out and disposed of if any employee

3    at any time feels I can just take what I want.   The BNSF

4    right-of-way is not a candy store that people can just

5    reach in and take what they want.

6         Mr. Koziara can talk all he wants about I don't

7    know whose ties they were.   The fact of the matter is

8    they weren't his.   That's why he was let go.   And that

9    had nothing to do at all with that injury report.

10        So we now come to the instructions.   In Question 1

11   on compensatory damages, I suggest to you, Ladies and

12   Gentlemen, that the appropriate amount is zero because

13   Mr. Koziara has not established that he actually could

14   work or would work given his condition.   If he hadn't

15   applied for and received permanent disability benefits

16   from the RRB, it might be a different question.   But it

17   is clear that he is not capable of doing the job he had

18   before and there's no real credible evidence here that

19   you can rely on to say that he had some other job in the

20   railroad or that he could have taken.   Those

21   restrictions are so great that perhaps the only job

22   available for him anywhere might be an office job or a

23   sedentary job.   But yet he didn't look for any of those

24   jobs and that's an important factor for you to take into

25   account.

1        As far as emotional pain and suffering, we submit

2   to you that as difficult a situation is, a dismissal is

3   for any individual, that situation is one that we all go

4   through at some point in our lives and we're not all

5   entitled.  Every employee in the country is not entitled

6   to compensation for emotional distress because he or she

7   is let go by their employer.  Certainly they feel sad.

8   Certainly they're upset.  But that's not the occasion

9   for everybody to get paid.

10       As to the question of did the officers of the

11  company, the management, act in reckless disregard of

12  plaintiff's rights, I submit to you that on the issue,

13  certainly of his dismissal and of the suspension, they

14  were doing what they were trained to do.  They were

15  investigating rules violations.  They were not punishing

16  Mr. Koziara for his injury.  They were not punishing him

17  because he filed a report of an injury.  They encouraged

18  him to file that report.  And dismissing Mr. Koziara for

19  what they believed was theft of company property is not

20  acting in reckless disregard of his rights.

21       So Ladies and Gentlemen, we submit to you that the

22  appropriate amount for punitive damages in this case is

23  zero.

24       Now, I know that you are going to think long and

25  hard about everything we've all said here and you're

1  going to hear in a few minutes from Mr. Morgan to wrap

2  up this case so you can begin your deliberations.

3      I also want to remind you of what the Court has in

4  its instructions that each party is to be treated

5  fairly; that even a corporation like BNSF is to be

6  treated fairly.  It's not a matter of awarding money to

7  somebody for sympathy, you need to take into account the

8  reasons that BNSF gave for its actions, the action it

9  took.  Did that action really have anything to do with

10  the injury, and did the managers act in reckless

11  disregard of his rights?  No.  They did what managers do

12  every day.  They looked at the situation.  They took the

13  action they thought was right.  They weren't out to

14  punish Michael Koziara.  They acted in what they thought

15  -- they took action on what they thought were facts at

16  the time.

17      Ladies and Gentlemen, I'd like to thank you for

18  your time and thank you for being patient in listening

19  to me.  Thank you.      (4:37 p.m.)

20          THE COURT:  Mr. Morgan, your rebuttal.

21          MR. MORGAN:  Thank you, Your Honor.  Hello

22  again.  I'll try to be brief in my rebuttal comments.

23      I want to start with this instruction.  You.  "You

24  should award as damages the amount of money that you

25  find fairly and reasonably compensates the named party,"

1  that's Mr. Koziara, "for his injuries."  This is up to

2  you.  It's your decision, Ladies and Gentlemen.

3       Let's turn to each of the elements of the damages

4  very briefly.  Mr. Douglas still is conveying this idea

5  that Mr. Koziara was permanently disabled.  He was not

6  permanently disabled.  He received an occupational

7  benefit.  An occupational disability benefit.  That's

8  the state of the record here.  They're still making the

9  argument that he was permanently disabled.  He was not.

10      We heard phrases like essentially permanently

11 disabled.  No certainty.  No certainty that he would

12 have returned.  He might have been able to perform other

13 jobs.  On the question of wage loss, the issue is what

14 would have happened if Mr. Koziara hadn't been

15 terminated and was released back to work on January 17th

16 of 2011?  Would he have returned back to his position

17 and continued working, perhaps in a week or two weeks

18 time in another position, because his seniority allowed

19 for it or not?  That's the question.  That's the issue.

20 We think that the evidence overwhelmingly supports

21 Mr. Koziara's wage loss claim of $175,724.64.

22      On the subject of compensatory damages, Mr. Douglas

23 said that I suggested that the number should match the

24 wage loss number.  I didn't say that.  I said that the

25 compensatory damage number should well exceed the wage

1  loss number.  This wasn't just the loss of a job.  This

2  was the loss of a career.  A 32-year career.  A life

3  that Mr. Koziara knew and that he loved.  That's the

4  loss.  It's not just some job.  It's not some

5  downsizing.  You should consider that when you're

6  deciding the compensatory damage award.

7       On the question of punitive damages, Mr. Douglas

8  contends that there was no reckless disregard for

9  Mr. Koziara's rights.  Paying people in a way to create

10  an incentive to underreport injuries is reckless

11  disregard.  Knowing a law was passed and then not doing

12  anything about it in terms of compliance with the people

13  that are on the ground every single day managing and

14  supervising employees for three, four, five years,

15  certainly at no time before September of 2010, that's

16  reckless disregard.

17       Having a rule, a rule that implicates injuries that

18  we talked about, 1.1.2 is a rule.  Having an

19  investigation process when someone reports an injury

20  where the light is literally shining on that injured

21  person and no one else is reckless disregard; in

22  particular, when there are other noninjured employees,

23  in both instances here, on August 30th Mr. Zielke was

24  helping load those switch ties and on September 9,

25  Mr. Veitz says we didn't say it.  Mr. Koziara never said

1  it.  It was Mr. Veitz.  Two other employees, someone in

2  the zone of danger.

3      At the end of the day, the most compelling reason

4  for punitive damages is the most compelling evidence for

5  a substantial award of compensatory damages.  How they

6  treated a 32-year-old -- 32-year honest, hard-working

7  employee who engaged in protected legal conduct by

8  reporting a work-related injury.  That's the most

9  compelling reason and explanation for punitive damages.

10      Thank you all for your time and attention and for

11  your thoughtful consideration of the facts in this case.

12  (4:42 p.m.)

13          THE COURT:  Thank you to both Counsel for your

14  closing arguments.  I'll thank the jury again in advance

15  of your verdict, so I'm not thanking you for your

16  particular verdict, but again your attention.  It's

17  about not quite quarter to five.  I'll again leave it to

18  you to decide your schedule.  If you want to deliberate

19  after 5:30 tonight, that's fine, but if you would send a

20  note with the bailiff indicating how long you'd like to

21  work tonight.  Obviously if you don't want to work at

22  all tonight and you want to end at a normal hour, that's

23  just as fine.  You can come back tomorrow morning at

24  nine o'clock and begin deliberations again.  So that

25  would be fine.  I'll leave that up to you.

 1        So with that, Mr. Wiseman, would you swear the

 2   bailiff.

 3        (Bailiff sworn in at 4:44 p.m.)

 4        THE COURT:  Very good.  And we will again have

 5   the -- Counsel will send the exhibits in to you

 6   momentarily.  So with that, the case is in your hands.

 7        (Jury excused from courtroom at 4:44 p.m.)

 8        THE COURT:  Very good.  Why don't we -- let me

 9   thank you again for a well-tried case.  I want to take

10   just a minute, if we can, and just make a record of any

11   more specific record of motions or objections that want

12   to be preserved.  Objections I think are very well

13   preserved on instructions and all that, and my rulings,

14   that's fine.  But Mr. Douglas, if you want to renew any

15   of your motions, you can just let me know which ones you

16   intend to renew.

17        MR. DOUGLAS:  Certainly.

18        THE COURT:  And again, you don't need to go

19   into much substance, just give me the headlines and

20   we'll set the briefing schedule.

21        MR. DOUGLAS:  Thank you, Your Honor, for the

22   opportunity.  For the record, we renew our 50(a) motion

23   made before the close of the evidence on the punitive

24   damage phase.  I'd like to also, just out of an

25   abundance of caution, renew the Rule 50(a) motion that

1  we made prior to the close of the liability phase.  And

2  also to renew the motion for judgment notwithstanding

3  the verdict in the liability phase.

4          THE COURT:  Okay.  Very good.

5          MR. DOUGLAS:  Thank you.

6          THE COURT:  Okay.

7          MR. MORGAN:  We oppose those motions, Your

8  Honor.

9          THE COURT:  I'm not surprised.  One last bit of

10  housekeeping.  It will take about two weeks to get the

11  transcripts prepared and so why don't you give me an

12  idea of when you would like -- and I will have the trial

13  on the books here in the next day or so, so we don't

14  need to rush the briefing particularly.  But I do want

15  to get to it while the trial is still fresh in my mind.

16  So given that the transcripts will be ready in about two

17  weeks, how long will it take you to prepare your briefs,

18  Mr. Douglas?

19          MR. DOUGLAS:  I would say it would be very nice

20  to have thirty days, if we could, from that time.

21          THE COURT:  Okay.  And how long for your

22  response briefs?

23          MR. MORGAN:  We'd like the same.

24          THE COURT:  So 30/30, and then fourteen days

25  for a reply.

1          MR. DOUGLAS:  That would be fine, Your Honor.

2          THE COURT:  Okay.  Let me -- I'll come up with

3    an order that's along those lines.  I just want to make

4    sure that we don't have the deadlines land on weekends.

5    But I'll issue a text order that sets a briefing

6    schedule.

7        Anything else you need from me before we close up?

8          MR. MORGAN:  Just one issue I wanted to

9    highlight.  Assuming there is some award, our intention

10   is to file a petition for attorney's fees and reasonable

11   costs, Your Honor.

12         THE COURT:  Okay.

13         MR. MORGAN:  And I'm not sure whether the Court

14   wants a briefing schedule on that or not or if we should

15   just file our position in due course and just let the

16   local rules accommodate the briefing on that.

17         THE COURT:  On -- I don't think that there is

18   any impediment to my setting a briefing schedule on

19   that.  I don't think it's the kind of thing that you've

20   got to make your motion by a particular time.  I think

21   it would probably be easiest on me if I do it all at

22   once, so why don't we set the same briefing schedule

23   with the same deadline.  For the defendant's motion for

24   judgment as a matter of law, you submit your motion for

25   attorney's fees.

1            MR. MORGAN:  Great.  There's fine.

2            THE COURT:  Just so we're clear about it, this

3    would be your motion for entitlement to your attorney's

4    fees.  If I grant that motion, then what I would -- what

5    I commonly do is I ask the parties to try and reach

6    agreement on the amount of those fees, and then barring

7    agreement, then I'll settle any disputes as to that.

8        So in your submission, you don't have to support

9    the amount of your fees.  We'll do that after I decide

10   whether you're entitled to them at all.

11           MR. MORGAN:  Okay.

12           THE COURT:  Mr. Douglas.

13           MR. DOUGLAS:  One more thing of clarification.

14   I'm reminded by my colleague that I may not have spoken

15   to renewing the motion I made this morning for 50(a) on

16   compensatory damages and I'd like for the record to --

17           THE COURT:  Yeah, I think you actually misspoke

18   a little bit.  I think 50(a) is on all elements of the

19   damages award.  So with that clarification, I appreciate

20   that.

21           MR. DOUGLAS:  Thank you.  If I understood the

22   Court correctly on any petition or motion for attorney's

23   fees, what plaintiff has to do is just make the motion

24   and then send in support -- how is that going to work in

25   this case?  I'm just trying to suggest that maybe if we

1   can, if at all possible, I know the Court prefers to

2   have the briefing on the other motions while the matter

3   is fresh, but the attorney's fee award would not

4   necessarily require that briefing at the same time.  I

5   just wanted to make that suggestion.  Thank you.

6          THE COURT:  Yeah.  I think my idea here is I'll

7   pick up this case again when your post-verdict motions

8   are under advisement and I'll pick it all up at one

9   time.  And so I don't know how substantial the briefs

10  are, but I just -- my only objective is I'd like to

11  engage the case one time just for efficiency's sake.

12      So in your brief, you'll all support your

13  entitlement to fees, then you'll respond to it, you'll

14  rebut, and then we'll deal with the amount of the fees,

15  if they're awarded later.  You can tell me what the

16  standard is.  Is this a -- is there a presumption in

17  favor of fee shifting?

18          MR. MORGAN:  I believe so.

19          THE COURT:  So your briefs might be mercifully

20  succinct then.  All right.  Very good.

21      (Recess         4:50-7:15 p.m.)

22          THE CLERK:  This Honorable Court is again in

23  session.  Please be seated and come to order.

24          THE COURT:  All right.  I understand we have a

25  verdict, so I don't think there's anything that we need

1   to do before we have the jury back.

2           MR. KASTER:  There is a matter I would like to

3   raise after the jury is done, and I will.

4           THE COURT:  All right.  Very good.

5        (Jury brought in courtroom at 7:15 p.m.)

6           THE CLERK:  This Honorable Court is again in

7   session.  Please be seated and come to order.

8           THE COURT:  I understand that -- I have

9   received a message that you have a verdict.  Juror

10  Pritchett, is that correct?

11          JUROR PRITCHETT:  Yes, Your Honor.

12          THE COURT:  And is it unanimous?

13          JUROR PRITCHETT:  Yes, Your Honor.

14          THE COURT:  Very good.  If you would give the

15  verdict to the bailiff, I'll have the bailiff bring it

16  over to me.

17       Mr. Wiseman, would you announce the verdict.

18          THE CLERK:  In the United States District Court

19  for the Western District of Wisconsin.  *Michael Koziara,*

20  *plaintiff v. BNSF Railway Company, defendant*.  Case

21  Number 13-CV-834.

22       "We, the jury, for our special verdict do find as

23  follows:

24       On Compensatory Damages.

25       Question No. 1.  What amount, if any, will fairly

1   and reasonably compensate plaintiff for his lost wages

2   and benefits from when he could have returned to work

3   from his injury to the time he would have retired?

4        Answer:  $175,724.64.

5        Question Number 2.  What amount, if any, will

6   fairly and reasonably compensate plaintiff for the

7   mental or emotional pain and suffering that he sustained

8   as a result of defendant's actions?

9        Answer:  $125,000.

10       Question No. 3.  Did defendant's managerial

11  employees or officers act in reckless disregard of

12  plaintiff's rights?

13       Answer:  Yes.

14       Question No. 4.  What amount of punitive damages,

15  if any, should be assessed against defendant?

16       Answer:  $125,000.

17       Signed by the presiding juror this 5th day of

18  March, 2015.  Madison, Wisconsin.

19            THE COURT:  All right.  Juror Pritchett, is

20  this your verdict?

21            JUROR PRITCHETT:  Yes, it is, Your Honor.

22            THE COURT:  Okay.  And I've lost my chart, so

23  I'm not sure I'll remember everyone.  Help me out here.

24       Juror Castillo, is this your verdict?

25            JUROR CASTILLO:  Yes.

1          THE COURT:  Juror Beth, is this your verdict?

2          JUROR BETH:  Yes.

3          THE COURT:  Juror Fronek, is this your verdict?

4          JUROR FRONEK:  Yes.

5          THE COURT:  Juror Rajani, is that your verdict?

6          JUROR RAJANI:  Yes.

7          THE COURT:  Juror Medley, is this your verdict?

8          JUROR MEDLEY:  Yes.

9          THE COURT:  Juror Thompson, is that your

10   verdict?

11          JUROR THOMPSON:  Yes.

12          THE COURT:  And Juror Hernandez, is this your

13   verdict?

14          JUROR HERNANDEZ:  Yes.

15          THE COURT:  Thank you all very much.  You are

16   excused from service and you are now no longer bound by

17   my order that you not discuss the case.  You can tell

18   whoever you want to about the case.  If you would -- I

19   have a little bit of business to transact with the

20   attorneys, but if you would wait, you don't have to do

21   this, but I would join you in the jury room for a moment

22   to see if you have any questions for me about service on

23   the jury and any suggestions on how we can improve the

24   juror experience.  So if you would care to wait for a

25   few minutes, I would join you for a few moments

1 afterwards.  But if you would like to hurry off to your

2 families, I understand.

3         So with that, you are excused.

4         (Jury excused from courtroom at 7:20 p.m.)

5         THE COURT:  All right.  Before I address

6 Mr. Kaster's concern, I wanted to let you know that I

7 have heard from our other court reporter.  Lynette is

8 able to get her part of the transcript done in two

9 weeks, but we have a vacation from Ms. Seeman and so

10 she's not going to quite be able to get it done.  So I

11 will issue an order that says that the briefing is going

12 to be due 30 days from the time that the transcript is

13 available.  I think she'll make an effort to get it

14 done, but because she has a vacation plan, I think we

15 might not quite make the two weeks.  So anyway, that's

16 what the order will be on that.

17         So with that, Mr. Koziara.

18         MR. KASTER:  The only thing I want to

19 address --

20         THE COURT:  You can stay seated.

21         MR. KASTER:  The only thing I want to address

22 is that we will be seeking equitable relief under the

23 statute for credit for the time that Mr. -- we believe

24 the time that Mr. Koziara would have continued to work,

25 which is a form of equitable relief under the statute.

1   We believe the Court has the power to address that in

2   the post-trial motions, and rather than raise that

3   earlier, we thought we would just alert the Court that

4   that's one of the forms of relief we'll be seeking.

5           THE COURT:  That's good.  And I'm going to

6   gather you don't need transcripts to do that?

7           MR. KASTER:  I don't think we do.  I don't

8   think we do.

9           THE COURT:  Well, let me also ask you this:  Is

10  that something you need a decision from the Court before

11  you're likely to get a decision on the other issues?

12          MR. KASTER:  I don't think we need that either,

13  Your Honor.  I think we could submit that as a part of

14  our fee petition.

15          THE COURT:  And I gather that it has --

16          MR. KASTER:  Or separate from the fee petition.

17          THE COURT:  And I gather it has to do with

18  basically reinstating him with respect to his benefits

19  so he can get his 30 years credit; is that correct?

20          MR. KASTER:  That's correct.

21          THE COURT:  That's essentially the request.

22          MR. KASTER:  Essentially that work-related

23  credit, yes.

24          THE COURT:  Okay.  That sounds good.  If it's

25  not urgent, then, as I said, I would like to just engage

1   the case once more and handle everything that's

2   outstanding.  So I appreciate the heads up on that.

3           MR. KASTER:  Terrific.

4           THE COURT:  Anything else?

5           MR. DOUGLAS:  No, Your Honor.  I don't believe

6   so.

7           THE COURT:  Okay.  Again, thank you very much

8   for a very well-tried case.  It was a pleasure working

9   with all of you.  The result is never equally pleasing

10  to all parties, but I hope the experience in the court

11  was good.  So thank you very much and I look forward to

12  seeing your briefs.

13          MR. DOUGLAS:  Thank you.

14          MR. KASTER:  Thank you.

15      (Proceedings concluded at 7:23 p.m.)

16

17                   *  *  *  *  *

18

19

20

21

22

23

24

25

1           I, LYNETTE SWENSON, Certified Realtime and

2   Merit Reporter in and for the State of Wisconsin,

3   certify that the foregoing is a true and accurate record

4   of the proceedings held on the 5th day of March 2015

5   before the Honorable James D. Peterson, District Judge

6   for the Western District of Wisconsin, in my presence

7   and reduced to writing in accordance with my

8   stenographic notes made at said time and place.

9   Dated this 13th day of March 2015.

10

11                          /s/_____

12                          Lynette Swenson, RMR, CRR
                            Federal Court Reporter
13

14

15  The foregoing certification of this transcript does not
    apply to any reproduction of the same by any means
16  unless under the direct control and/or direction of the
    certifying court reporter.

17

18

19

20

21

22

23

24

25