UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

MICHAEL KOZIARA,

              Plaintiff,          Case No. 13-CV-834-JDP

    vs.
                             Madison, Wisconsin
BNSF RAILWAY COMPANY,          March 2, 2015
                             9:20 a.m.
              Defendant.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT OF FIRST DAY OF JURY TRIAL
MORNING SESSION
HELD BEFORE THE HONORABLE JAMES D. PETERSON

APPEARANCES:

For the Plaintiff:
        Nichols Kaster, PLLP
        BY:  JAMES H. KASTER
             MATTHEW H. MORGAN
             NICHOLAS D. THOMPSON
        4600 IDS Center
        80 South Eighth Street
        Minneapolis, Minnesota  55402-2242

        Also Present:  Emilee Howe, Paralegal

For the Defendant:
        Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
        BY:  BRUCE J. DOUGLAS
             COLTON D. LONG
        Wells Fargo Center
        90 South Seventh Street, Suite 3800
        Minneapolis, Minnesota  55402

        Also Present:  Jennifer Lenander, Legal Assistant

CHERYL A. SEEMAN, RMR, CRR
Federal Court Reporter
120 North Henry Street, Room 520
Madison, Wisconsin  53703
1-608-255-3821

1   APPEARANCES:    (Continued)

2   For the Defendant:
            Jennifer Willingham, Corporate Counsel
3           Daniel Rankin, Corporate Representative
                BNSF Railway Company

4

5                          ***

6      (Called to order.)

7          THE CLERK:  Case No. 13-CV-834, *Michael Koziara*

8   *v. BNSF Railway Company*, called for jury selection and

9   trial.  May we have the appearances, please?

10         MR. MORGAN:  Good morning, Your Honor.  Matthew

11  Morgan and Jim Kaster from Nichols Kaster on behalf of

12  the plaintiff, Michael Koziara, who's seated at counsel

13  table with us.

14         THE COURT:  Thank you, very much.  Good morning

15  to you.

16         MR. DOUGLAS:  Good morning, Your Honor.  Bruce

17  Douglas and Colton Long from the firm of Ogletree Deakins

18  for the defendant, BNSF Railway Company.

19         THE COURT:  Good morning to you.  And good

20  morning to all of you.  This case involves the Federal

21  Railroad Safety Act, a law that prohibits railroads from

22  retaliating against employees for reporting work-related

23  injuries.

24     Mr. Koziara claims that he suffered a fracture to

25  his leg when he was supervising a crew near La Crosse,

1   Wisconsin.   In the course of investigating Mr. Koziara's

2   injury, BNSF, that's the railroad that employed him, and

3   the defendant in this case, came to believe that he had

4   stolen property from the railroad company a week before

5   his injury.   BNSF eventually suspended Mr. Koziara

6   from -- for his involvement in the accident that led to

7   his injury and terminated him for his theft.   Mr. Koziara

8   claims that BNSF suspended and then terminated him

9   because he reported an injury, in violation of the

10  Federal Railroad Safety Act.

11       We're now going to conduct what's called the *voir*

12  *dire*, which means that we're going to ask some questions

13  of you to make sure that you can be fair and impartial if

14  you were to be chosen as jurors in this case and to help

15  the parties decide which of you they would like to serve

16  as the jurors.   So we're going to ask you some questions

17  that you will have to answer and that's going to be

18  essentially our proceeding.

19       Before we do that, I'm going to ask Mr. Wiseman to

20  administer an oath so that you answer the questions

21  honestly.   Mr. Wiseman.

22            THE CLERK:   Would you please stand and raise

23  your right hand?

24            **PROSPECTIVE JURORS, SWORN**

25            THE CLERK:   Please be seated.

 1            THE COURT:  Okay.  So as I said, we're going to

 2   ask you some questions.  And there's a microphone that we

 3   will pass around at certain moments so that we can hear

 4   you clearly.  And there are some questions that I ask,

 5   like this first one that I'm going to ask, that if you

 6   have a "yes" answer, there are reasons that you may have

 7   or that we may have for wanting to take your answer over

 8   here at what we call *side bar*.  So we'll go over to the

 9   side so that nobody else can hear what your answers are.

10   And I'll listen and a designee from each side will listen

11   to your answers over here.

12        So, for example, I'll ask you the first question:

13   "Have any of you heard of this case before today?"  And

14   if you have, then I'm going to take you over to the side

15   and find out what it is that you heard, but I don't want

16   everybody else to hear what you might have heard about

17   this case if you had heard anything.  So I don't think

18   this is an especially high-profile case, but it's

19   possible you might have heard it.  So anybody heard of

20   this case before today?  Very good.

21        My next question is also an easy one.  And this one

22   you don't have to come over to side bar to answer this

23   one.  But the trial of this case will begin today and it

24   will probably last the rest of this week and it will

25   finish on Friday, March 6th.  Is there any one of you who

1    would be unable to serve as a juror for the week that

2    this trial will take?  If you have -- and I recognize

3    that jury service, although it's I think a very rewarding

4    and interesting experience, it is an imposition on the

5    rest of your life.  So is there anybody who has a

6    conflict that they just cannot avoid if the case were to

7    last all week?  Very good.  Very good.

8         Okay.  The next thing I'm going to do is I'm going

9    to ask that counsel for each side, one at a time, to

10   stand up and introduce themselves and the parties to this

11   case to see if any of you in the jury know them.  So with

12   that --

13         MR. MORGAN:  Thank you, Your Honor.  I'm Matthew

14   Morgan.  This is my partner, James Kaster.  We're from a

15   law firm known as *Nichols Kaster* in Minneapolis,

16   Minnesota.  Seated to Mr. Kaster's right is plaintiff

17   Mike Koziara.  He's the plaintiff in this case.  His wife

18   is in the first row sitting behind us.  That's Joan

19   Koziara.  And then also from my office is a paralegal.

20   Her name is Emilee Howe.  She's sitting there.  And

21   Mr. Nicholas Thompson, who's sitting in the first row

22   behind Ms. Howe.

23         THE COURT:  Okay.  Does anybody on the jury know

24   anyone that is affiliated with the plaintiff's side of

25   the case?  Good.  Same question now over to the

1   defendant's side of the table for BNSF Railway.

2          MR. DOUGLAS:   Thank you.   My name is Bruce

3   Douglas and I'm an attorney with the law firm of Ogletree

4   Deakins.   And I'm from the Minneapolis office, as are

5   these gentlemen from Minneapolis.   With me is my

6   colleague, Colton Long, an attorney in our office; our

7   legal assistant, Jennifer Lenander, who will be assisting

8   us at trial.

9       Also present today is a corporate representative for

10  BNSF Railway, Daniel Rankin, who is the general -- he's

11  the manager of the Chicago Division on the maintenance

12  side, which is the division where Mr. Koziara worked; and

13  also Jennifer Willingham, who is an attorney in the BNSF

14  Legal Department, which is headquartered in Fort Worth,

15  Texas.

16         THE COURT:   Do any of you know anyone from the

17  BNSF side of the case?   Okay.

18      I have to ask you the same question with regard to

19  people who might serve as witnesses here and so I'm going

20  to go down the list of witnesses that might be presented.

21  And so I'm going to give you kind of two lists.   The

22  lists might overlap a little bit.   Not all of these

23  witnesses are going to be called, so I don't want you to

24  think, oh, my goodness, how long is this going to be.

25  But because the list is sort of long, I'm just going to

 1   read the list.  And then if you just make a mental note

 2   if anybody on this list is somebody that you know, I'll

 3   find out at the end of the list.

 4        Okay.  So here, I'm going to read the first list:

 5   Chris Davis, Michael Heille, Joan Koziara, Michael

 6   Koziara, Al Mitchell, Daniel Rankin, Dan Stern, Brad

 7   Underhill, Mike Veitz, Eric Weber, Jerry Weis, Matt Wiens

 8   and Gary Wischover.  Any of those names sound familiar to

 9   you?  Good.

10        Another list again.  The lists are somewhat

11   overlapping, so you're going to hear some of the same

12   names:  Al Mitchell, Brad Underhill, Craig Morehouse, Dan

13   Stern, Dane Freshour, Daniel Rankin, David Bruring, Derek

14   Cargill, Don Jones, Eric Weber, Mark Moody, Michael

15   Heille, Michael Koziara, Michael Veitz.  Any of those

16   names sound familiar?  Very good.

17        Do any of you know me or any of the court personnel?

18   We have Andrew Wiseman.  We have Lynette Swenson -- I'm

19   sorry, Cheryl Seeman; my law clerk, Trevor Brown.  And

20   that's the court personnel.  Yes.  Let's see.  I'm going

21   to get used to doing this here, so this is Mr. Cegelski.

22             MR. CEGELSKI:  Yes.  I know Mr. Wiseman.

23             THE COURT:  And how do you know Mr. Wiseman?

24             MR. CEGELSKI:  We played soccer together quite a

25   number of years.

1          THE COURT:  All right.  And do you feel that

2  your relationship with Mr. Wiseman would unfairly

3  influence your decision in this case?

4          MR. CEGELSKI:  I do not.

5          THE COURT:  Very good.  Anyone else?

6      Do any of you know any of the other persons on the

7  jury panel?  Okay.  And I remind myself, too, that I want

8  to address the people in the gallery.  It's possible that

9  one of the people in the current panel would be excused.

10  And if that's the case, I'm going to ask one of you to

11  take their place.  And if that happens after we've gone

12  through all of these questions, we're going to have to do

13  kind of a quick makeup session with the replacement.  So

14  if you would, keep note of the questions that I'm asking

15  and recognize that I might have to do the speed version

16  of this with you if you end up back on the panel.  All

17  right.

18      I think each one of you has a little questionnaire.

19  And this is the point at which we're going to pass the

20  microphone to you.  We'll start with Mr. Bartzen, who is

21  Juror No. 1.  And we'll pass the microphone from person

22  to person while you tell us a little bit about yourself.

23          MR. BARTZEN:  Okay.  My name is Jeff Bartzen.  I

24  am 53.  I live in McFarland, Wisconsin.  We've lived

25  there since 1999.  I'm married with two children, ages 10

1  to 12.  I am currently a lawyer.  I've practiced in

2  Madison for about 24 years, mostly corporate and real

3  estate.  I have done a little insurance defense when I

4  was at Bell Gierhart.  My wife is a nurse at the UW

5  Hospital.

6      No military service.  I went through law school here

7  at UW-Madison.  Other than the state bar and the ABA, I

8  am a member of access -- excuse me, Dane County Public

9  Affairs, Ethics Committee for the Village of McFarland.

10  I'm trying to think.  A couple others.  I'm blanking for

11  the moment.  I have no bumper stickers.

12      Hobbies and leisure time: playing guitar, taking

13  walks, reading, mostly taking care of my kids really.

14  Favorite types of reading material, mostly history.  I

15  probably wrote a letter -- this is an interesting

16  question.  I think when Governor Thompson was running for

17  governor for the first time I worked for him and I think

18  I wrote a letter to the editor 30 years ago.

19      Favorite types of television shows, history-type

20  shows and sports.  I don't really listen to talk radio or

21  TV news channels.  Internet sites mostly for work, law

22  related; nonwork-related things like *Craigslist*, *Amazon*,

23  things like that.

24          THE COURT:  Okay.  Tell us a little bit more

25  about your law practice.  You said you did mostly

1-A-10

1   corporate and real estate now, but at some point you did

2   some litigation?

3           MR. BARTZEN:  I started my practice in '91

4   through '93.  I was chief counsel to Governor Thompson.

5   Then I went to private practice at Neider Boucher.  It

6   was Stolper Koritzinsky back then.  Mostly real estate

7   business.  Went there to Family Dollar in Charlotte,

8   worked on my own a little bit and then I got hired at

9   Bell Gierhart.  And while I mostly did the same stuff --

10  corporate real estate, securities-type stuff -- I did,

11  you know, get involved in some insurance defense work.

12  After that I went to --

13          THE COURT:  When was that and for how long a

14  period?

15          MR. BARTZEN:  I worked at Bell Gierhart from

16  2000 to 2005.  And of my time there, maybe 3 percent was

17  in insurance defense.  Then I went to Murphy Desmond for

18  seven years and then I'm back at Neider Boucher.

19          THE COURT:  Okay.  Very good.  And is Jim

20  Bartzen your brother?

21          MR. BARTZEN:  Not related, but somewhere down

22  the line I'm sure.  We've talked about this off and on.

23          THE COURT:  Very good.  Thank you.  Ms. Larson.

24          MS. LARSON:  I'm Victoria Larson.  I'm 57 years

25  old and I live in Verona, Wisconsin.  I am married.  I

1  have three adult children, a son-in-law, three beautiful

2  grandchildren.  I am currently an elementary school

3  teacher/librarian.  Let's see.  What else?  I've never

4  been in the military.  I have a bachelor's degree plus

5  many other credits after that.  I belong to the American

6  Library Association.  I have no bumper stickers.

7       My hobbies include cooking, sewing, reading, playing

8  with the grandchildren.  I have never written a letter to

9  the editor.  I don't watch a lot of TV.  If I do, it's

10 the Hallmark station or adventure stories, like, that

11 take place in Alaska.

12      I don't have my glasses on.

13      I don't listen to much radio.  And I use the

14 Internet for looking up information about children's

15 literature, using *Amazon* and that's about it.

16           THE COURT:  Okay.  Very good.  Thank you,

17 Ms. Larson.  Ms. Pritchett.

18           MS. PRITCHETT:  My name is Joann Pritchett.  I

19 live in Madison.  I've lived in Madison since 1976,

20 August.  Not married, just me and my dog.

21           THE COURT:  What kind of dog?

22           MS. PRITCHETT:  He's a Yorkshire terrier.  His

23 name is Brady Paul Michael Ryan Pritchett.  I am retired.

24 You will get there one day.  I highly recommend it.  I

25 was formerly the assistant dean at the UW-Madison School

1   of Pharmacy.  No adult children.  Like I said, just me

2   and my dog.  Military service, I was asked to work with

3   the Cuban boat-lift people over at Fort McCoy at one

4   time.  I have a PHD degree in health and educational

5   policy studies, including a degree in nursing.

6       Membership and organizations, I am currently a

7   member of the African American Health Network as well as

8   black -- the Foundation for Black Women's Wellness and

9   the Charles Hamilton Houston Institute, which deals

10  primarily with education for youth.

11      No bumper stickers on my car.  Hobbies, I enjoy

12  woodworking.  I build birdhouses out of scrap cedar wood

13  for fences.  I do Nordic walking, I'm into gardening and

14  I love making cheesecakes.  I like to read bios,

15  especially if it involves climbing Mt. Everest, K2 and

16  other mountains.

17      I have written many letters to the editor regarding

18  equality in terms of the reporting of women's sports.  I

19  enjoy watching *Criminal Minds* as well as CSI-type

20  programs.  I listen to *A Prairie Home Companion* 99

21  percent of the time on Saturdays, so don't call me at

22  five o'clock.  And I use the Internet primarily for

23  *Amazon* and stuff related to gardening, stuff like that.

24          THE COURT:  Very good.  Thank you.  I think

25  we'll get you home in time to watch *A Prairie Home*

1    *Companion.*   Sorry we didn't draw you in a patent case.

2    Mr. Castillo.

3              MR. CASTILLO:  Hi.  My name is David Castillo.

4    I'm from the Madison area.  I've lived here about three

5    years.  I'm married, have a three-year-old boy.  Current

6    producer, I actually am producer/director for Food

7    Network TLC.  I also -- my spouse is a teacher here in

8    Madison.

9              THE COURT:  Where does your spouse teach?

10             MR. CASTILLO:  Wingra.  She teaches Spanish.

11             THE COURT:  And what level?

12             MR. CASTILLO:  She teaches I believe second

13   grade.

14             THE COURT:  Okay.  Good.

15             MR. CASTILLO:  Organizations and groups.  I

16   don't have any bumper stickers.  I actually have an

17   entertainment media business degree here from Madison.  I

18   don't do much reading.  I have the Internet to do that.

19   I haven't written anything for a while.  I also do --

20   favorite types of television shows, I don't have time for

21   those.  But whenever I do get a chance, I watch some *Cake*

22   *Boss* on TLC.

23             THE COURT:  Is that a program that you work on?

24             MR. CASTILLO:  No, I don't work on that program.

25   I actually work for on *Mexican Made Easy* with Marcela and

1    one other thing.  I think it's called -- what's the name

2    of that program?  And I have worked on *The Chew*.  And I'm

3    trying to think of another one.  I think that's about it

4    right now.

5        For the Internet it's basically just on *Linda.com*,

6    just keeping learning on different types of production

7    work.  Other than that, that's pretty much it.

8            THE COURT:  Very good.  Thank you.  Ms. Beth.

9            MS. BETH:  My name is Deborah Beth.  I'm 46

10   years old.  Actually, 23 twice, we just say it that way.

11           THE COURT:  I understand.

12           MS. BETH:  Don't live in Madison.  I'm from

13   Janesville, Wisconsin.  I married a year ago.  For our

14   seven-year itch we got hitched.  We're going to reverse

15   karma.  We each have three children.  Occupation, I do

16   catering for Panera Bread.  We just transferred to

17   Janesville.  I miss Madison massively.  Janesville is not

18   Madison.

19       My husband is a welder.  He's a welder for Hufcor.

20   He's been building retractable walls for 26 years.  We

21   have three adult children, two grandchildren.  My son is

22   in his second year at Whitewater and said he wants to

23   work in the Middle East, be an ambassador for the Middle

24   East.  I said, "No, not so much, not so much."  But he's

25   drawn.

1        No military.  For schooling I am certified in all

2   kinds of things.  I'm a certified goldsmith.  I'm a

3   licensed radio announcer.  Just done a bunch of different

4   things.  Organizations, not so much.  Bumper stickers,

5   no.  Hobbies, I have a puppy.  So my hobby is sleep, wear

6   her out and sleep.

7        THE COURT:  What kind of dog?

8        MS. BETH:  She's a black lab.  And I've never

9   had a lab and she's so happy, happy all the time, happy.

10  So I'm kind of enjoying this week off actually.

11       THE COURT:  Glad we could help out.

12       MS. BETH:  Types of reading, I like

13  metaphysical.  Letters to the newspaper, no.  Types

14  television shows, I like the *Property Brothers* and *Love

15  It or List It* and that kind of stuff.  It's kind of neat.

16  I don't really listen to any talk, on, the radio.  That's

17  why I have preset and I just, when the song ends and they

18  start talking, I can skip over it.

19       Internet I can't stand.  I have children who will do

20  that for me.  I know how to check a horoscope once a

21  month.  That's what I use it for.  And that's about it.

22       THE COURT:  Thank you, very much.  Mr. Fronek.

23       MR. FRONEK:  Fronek, yes.  My name is Rich

24  Fronek.  I'm 60 years old.  I live in Lake Mills,

25  Wisconsin for the last two years.  Prior to that about 25

1   years in Fitchburg.  I am married.  I have two adult

2   children.  I am currently a product manager for a

3   diagnostic ECG device company called Mortara Instruments

4   in Milwaukee, Wisconsin.  My wife is a senior fitness

5   instructor working with senior citizens at the Fitchburg

6   Senior Center.  I have two adult children.  My daughter

7   is a senior producer in a digital studio in New York City

8   and my son is a general manager of a bar and restaurant

9   in downtown Milwaukee.

10      I have never served in the military.  I did go to

11   school at UW-Madison and received a master's degree in

12   biomedical engineering.  I'm currently a member of the

13   Madison History Roundtable and have held past leadership

14   positions in that group.  I don't have bumper stickers on

15   my car.

16      For hobbies and leisure activities I enjoy biking,

17   skiing.  I also like playing piano and singing.  Favorite

18   types of reading material, typically I'm kind of a Civil

19   War history buff, so I kind of like history, especially

20   American history.  I've never written a letter to the

21   editor.

22      Favorite types of TV shows, you know, I enjoy

23   sports, so ESPN seems to be a favorite.  I also like

24   documentaries and anything that might have to do with

25   history.  I do actually regularly listen to -- it's

1  actually sports talk radio.  I have a long commute to

2  Milwaukee sometimes, so it kind of fills the time pretty

3  well.  I also listen to, you know, public radio as well.

4  And I do use the Internet occasionally, mostly just for

5  browsing about sports, weather, things of that nature.

6          THE COURT:  Good.  So you moved to Lake Mills

7  because of the commute over to Milwaukee?

8          MR. FRONEK:  It cut it about in half, yeah.  And

9  both of my kids were in Milwaukee at the time, so it made

10 sense to do that.

11         THE COURT:  Good.  Thank you.  Ms. Burmeister.

12 Did I pronounce it right?

13         MS. BURMEISTER:  Yes, Burmeister.  Fay

14 Burmeister.  I'm 66.  I live in the Village of Wyocena,

15 which is a small, little village near Portage.  I am

16 married.

17         THE COURT:  You probably have to tell them where

18 Portage is.

19         MS. BURMEISTER:  It's about 30 miles north of

20 Madison.

21         THE COURT:  All right.  Thank you.

22         MS. BURMEISTER:  I am married and we have three

23 children.  I'm currently semi retired from the Miller &

24 Miller law firm in Portage.  I was the business manager.

25 I still do payroll and probate and trust tax returns.

1-A-18

```
 1  Basically that's -- I did all the accounting and the
 2  probate and trust accounting work.
 3          THE COURT:  And tell us a little bit about
 4  Miller & Miller.  What kind of work do they do?  Do they
 5  do litigation at all?
 6          MS. BURMEISTER:  Very very little and normally
 7  it's real estate litigation.
 8          THE COURT:  Okay.
 9          MS. BURMEISTER:  My spouse has been retired a
10  little over three years.  He was the Director of
11  Buildings and Grounds at the Pardeeville School District.
12  Our children are all adults.  Our oldest daughter is --
13  works at the Public Library in McFarland and at
14  Intermediate School Library.  Our oldest son is a lead
15  operator at a manufacturing firm in Portage,
16  Saint-Gobain.  And our youngest son is a union
17  electrician for H&H Electric here in Madison.
18          Never served in the military.  I do have a
19  bachelor's degree in applied math from UW-Madison.  I
20  belong to -- I belong to a lot of organizations.  I'm
21  currently the treasurer of the Portage Kiwanis Group.
22  And for the Wisconsin-Upper Michigan Kiwanis District,
23  I'm the Builders Club Administrator, which is a service
24  leadership club for middle school students.  I'm also the
25  treasurer for Friends of the Wyocena Public Library and
```

1  organist and several other positions in our church.

2     I have no bumper stickers.  For hobbies we do

3  bicycling, gardening, camping, some fishing, lots of

4  outdoor things.  For reading, I'd like to read more, but

5  mainly when I get done it's the newspaper and the Bible.

6  I've never written a letter to the editor.

7     My favorite types of television shows are network

8  news shows and comedies and I like the *CSI*-type shows.  I

9  do not listen regularly to talk radio or watch cable

10 television except my husband does watch *Fox News* and *CNN*,

11 so it's on at times when I'm home.

12    I use the Internet a lot for the groups that I'm in

13 so that Kiwanis has told me I had to be on Facebook.  But

14 I have, like, nine friends.  It's mainly for Kiwanis and

15 my need kids -- well, two of my kids.  My youngest won't

16 let me be a friend.

17          THE COURT:  We'll follow up with that.

18          MS. BURMEISTER:  I do use *Amazon* and other,

19 like, Kohl's and shopping sites, but basically it's for

20 e-mail.  So I guess that's it.

21          THE COURT:  Thank you, very much.  Well, you

22 have a busy semi retirement.  Mr. Rajani.

23          MR. RAJANI:  Yes.  My name is Hasmuk Rajani.  57

24 years of age.  And I live in the City of Madison.  I have

25 been here since 1980.  I am married with two kids.  My

1   current occupation, I work at the University of

2   Wisconsin-Madison here.  My wife basically does some

3   child care at home and also she works at a health club

4   doing the same thing on a part-time basis.  I have two

5   kids.  One just graduated last year and she just started

6   working for the University and the other one is a senior

7   at college.

8        I do not have any military service.  I graduated

9   with a degree in business at the University of

10  Wisconsin-Madison.  I do not belong to any organizations.

11  I do not have any bumper stickers.  And hobbies and

12  leisure: soccer, soccer and soccer.  I play.  I referee.

13  I coach.  And when I'm not doing that, I'm watching a lot

14  of football on TV; soccer, that is.

15       Favorite types of reading materials, just basically

16  anything, you know, like *Time Magazine;* magazines that

17  are related to, like, you know, different parts of the

18  world that kind of tie in with history and stuff.  I'm

19  into that.  I've never written a letter to an editor.

20       My favorite types of television shows, basically

21  like documentaries and sports.  I do watch television,

22  some ethnic channels here and there, and also watch a lot

23  of documentary and news-related stuff like CNN, PBS.  I

24  use the Internet mostly for e-mail and for work-related

25  stiff.

 1              THE COURT:  Very good.  And I don't think you

 2    told us what you did for the University.  What's your

 3    job?

 4              MR. RAJANI:  I work as a grants accountant.

 5              THE COURT:  Very good.  Okay.  I'm going to have

 6    you pass the microphone down to Mr. Viken, who's front

 7    row way on the other side.  Did I get it right, *Viken*?

 8              MR. VIKEN:  No, *Viken*.

 9              THE COURT:  *Viken*.

10              MR. VIKEN:  It's Norwegian.

11              THE COURT:  I'm sorry.

12              MR. VIKEN:  Hi.  My name is Bill Viken.  I live

13    in the town of -- actually, between Marshall and Cottage

14    Grove.  I've lived in this area pretty much since 1964.

15              THE COURT:  What happened in 1964 to bring you

16    to Madison?

17              MR. VIKEN:  I was born.  Oh, yeah, and I'm 50

18    years old, by the way.  My current occupation is I'm a

19    mechanical engineer for Webcrafters here in Madison.  My

20    wife is an IT buyer for DOT.  Oh, yes I am married.  I

21    forgot this one.  I have two children and one

22    grandchildren.  And, yes, I'm a former Marine.  I was

23    discharged in 1988.  I went to school at MATC for, oh,

24    one year and then decided that I wanted to do something

25    else, so I joined the Marine Corps.

 1          THE COURT:  Good.  Well, thanks for your

 2   service.

 3          MR. VIKEN:  Thank you.  I'm really not any

 4   members of no organizations.  Work keeps me pretty busy.

 5   I don't have any bumper stickers.  Hobbies and leisure,

 6   my father-in-law owns a 400-acre dairy farm, so that kind

 7   of keeps me busy on the side.

 8          THE COURT:  If you call that leisure.

 9          MR. VIKEN:  That's not really leisure, no.

10   Favorite types of reading material, history.  I like to

11   read history.  I've never wrote a letter to the editor.

12   Television shows: sports, history.  I do DVR *Matlock*, so

13   that's something.

14          THE COURT:  You're really up on the current

15   programming.

16          MR. VIKEN:  Yeah, yeah.  I'm just getting into

17   the '88 ones now, you know.  I listen to news in the

18   morning.  That's about it on the radio.  And I really

19   don't use the Internet for much.  I pay bills.  I guess

20   other than that, that's about it.

21          THE COURT:  Good.  Thank you.

22          MR. VIKEN:  Yep.

23          THE COURT:  Mr., is it, Thruman?

24          MR. THRUMAN:  It's *Thruman*.  The H is silent.

25          THE COURT:  Okay.

 1          MR. THRUMAN:  My name is Barry Thruman.  I'm 58

 2 years old.  I reside in Stoughton, Wisconsin.  Divorced

 3 with a girlfriend.  Current occupation, I am head

 4 building custodian at East High School for the Madison

 5 School System.  Two adult children, 21 and 19.  The

 6 oldest works at Culver's.  The youngest is going to

 7 school at MATC.  No military service.  Just have a high

 8 school education, nothing past high school.

 9     I don't belong to any memberships or groups.  I

10 don't have any bumper stickers.  Hobbies are fishing,

11 watching sports.  I don't really do a lot of reading

12 other than reading the newspaper and the sports page.

13 I've never written a letter to a newspaper or magazine.

14     Favorite shows are of course sports.  I watch

15 *American Idol*, *Pawn Stars*, other shows on the History

16 Channel, some cooking shows.  That's about it.  I don't

17 listen to talk radio.  The only thing I use the Internet

18 for is paying bills, the Weather Channel, Googling

19 something.  That's about it.

20          THE COURT:  Very good.  Thank you.

21 Mr. Cegelski.

22          MR. CEGELSKI:  My name is Todd Cegelski.  I'm 52

23 years old.  I live in the City of Verona.  I'm married

24 with three children.  My current occupation is I'm a

25 senior vice president at Johnson Bank in Madison.  I run

 1  the commercial real estate group.  My wife's former

 2  occupation, she's a former teacher for Verona School

 3  District.  I have two adult children.  My oldest son is a

 4  manager the Copps Grocery Store in Middleton and my

 5  middle son is a junior at UW-Eau Claire.

 6      I have no military service.  I have a bachelor's

 7  degree with a double major in finance and management from

 8  the University of Wisconsin.  I'm in two organizations

 9  that are work related: Downtown Madison, Inc. and the

10  Apartment Association of South Central Wisconsin.

11      No bumper stickers.  Hobbies and leisure: camping,

12  golf and travel.  Favorite types of reading material are

13  murder-mystery-type books.  Have you ever written a

14  letter to the editor?  No.  Favorite types of television

15  shows, I'm kind of a Netflix binge-watcher. *Breaking*

16  *Bad.*  Watching *Mad Men* now.  Got to catch up on House of

17  Cards as soon as I get done with *Mad Men*.

18      Talk radio, I listen to mostly sports then years

19  radio.  I don't listen to any of the other ones.  Use the

20  Internet for reading newspapers: *Madison.com*,

21  *JournalSentinal.com*.  Other sites are mostly to buy

22  things on the Internet.

23          THE COURT:  Okay.  Thank you.  Mr. Medley.

24          MR. MEDLEY:  Hello.  I'm Peter Medley.  I'm age

25  61.  I live in Madison.  I've lived here for about 30

1    years.  I am married.  No children.  I work -- I work for

2    the State of Wisconsin.  I work for the Insurance

3    Commissioner's Office.  I'm, like, a supervisor in our

4    Financial Bureau.  Let's see.  My wife is a -- had been a

5    teacher for 20 years.  She is retired now.  No children.

6    No military service.

7        I have a bachelor's from UW-Madison, an MBA from

8    UW-Milwaukee.  I'm a CPA, so I'm a member of, like, the

9    state and national CPA societies and I'm a member of the

10   Society of Financial Examiners, is what I do at work.

11   It's a special trade group for insurance examiner

12   regulators.  I don't have leadership positions in any of

13   those groups.

14       And I'm in a choir in the Madison area one night a

15   week.  No bumper stickers on my car.  For hobbies and

16   leisure it would be, like, in the summer going camping

17   and traveling and photography.  Favorite types of reading

18   material, again kind of mystery stories, detective

19   stories.  I haven't written a letter to the editor.

20       Television shows, I watch sports.  I watch the

21   *Turner Classic Movies*.  I watch old movies without

22   commercials.  And I guess we've been watching the *Big

23   Bang Theory* reruns on cable.  I don't regularly listen to

24   then years radio or cable TV news channels.

25       At work I use the Internet to keep up with, you

1  know, business and insurance news about the companies

2  that we regulate.  And then at home I mainly use it for

3  reading news and just following up on interesting

4  business or science articles or whatever.

5      I guess that hopefully answers all the questions.

6          THE COURT:  Thank you, very much.  Oh, one

7  follow-up.  You said your wife was a teacher.  Where does

8  she teach?

9          MR. MEDLEY:  Well, she's a special education

10  teacher retired from Middleton.  She taught in Mount

11  Horeb and Sun Prairie and then Middleton.

12          THE COURT:  Special ed?

13          MR. MEDLEY:  Special ed, yeah.

14          THE COURT:  Ms. Thompson.

15          MR. THOMPSON:  Hi.  My name is Tracy Thompson.

16  I'm 52 years old.  I live in Janesville, Wisconsin.  I'm

17  married.  I have two adult sons.  One is a freshman at

18  Madison and the other is a junior at Ripon College.  I

19  currently help take care of my mother-in-law, who is

20  legally blind, and my elderly parents.  My husband works

21  for General Motors in Chicago.  I have never been in the

22  military.  I went to -- graduated from high school.  Went

23  to tech school for a while.

24      Membership of the athletic club.  No bumper

25  stickers.  Hobbies: camping, biking, rollerblading.  I

1-A-27

1  like to work out and stuff.  Favorite types of reading

2  materials, basically the newspaper.  I have never written

3  a letter to the editor.  Favorite types of TV shows, I

4  like a lot of different TV shows: *American Idol*, *The*

5  *Boys*.  Then years radio: Clark Howard, Dave Ramsey; the

6  Janesville local then years radio, WCLO.  And I really

7  don't use the Internet much.

8          THE COURT:  Thank you, very much.

9  Mr. Hernandez.

10         MR. HERNANDEZ:  Good morning.  My name is Shaun

11  Hernandez.  I'm 28 years old.  I live in Madison.  I've

12  been a resident since 2004.  I am married.  I work for

13  the University of Wisconsin Medical Foundation Department

14  of Surgery as a manager.  My wife is a lecturer at the

15  University of Wisconsin.  No children.

16     No military service.  I have a master's degree in

17  public policy from UW-Madison.  A member of the

18  Association of Academic Surgical Administrators.  I'm on

19  the board of directors for that as well as the American

20  College of Health Care Executives.  I have a Bucky Badger

21  bumper sticker on my car.

22         THE COURT:  Good for you.

23         MR. HERNANDEZ:  Hobbies and leisure, mostly

24  running and yoga.  Nonfiction reading material.  Wrote a

25  letter once in high school to the editor.  We're

1   currently watching, let's see, *Sons of Anarchy*, *Downtown*

2   *Abbey*.  And I watch *Rick Stein* every night.  I listen to

3   NPR mostly on the way home from work.  And I use the

4   Internet mostly for work-related, market research, types

5   of things like that.

6           THE COURT:  All right.  And tell us what the

7   letter you wrote to the editor was.

8           MR. HERNANDEZ:  It was regarding requirements

9   for valedictorian for our high school.  My wife was

10  valedictorian.

11          THE COURT:  Thank you, very much.  Okay.  I have

12  some questions.  And you don't need to stand up for these

13  questions, but we will pass the microphone to you if you

14  raise your hand.  So basically I'm going to ask

15  questions -- some questions that are more specific to

16  this case.  These are the kind of thing if you have a

17  "yes" answer, you'll raise your hand and then we'll

18  follow up and get the details.

19      So have any of you or a close friend or family

20  member ever been injured while at work?  Raise your hand

21  if you or a close friend or family member have been

22  injured at work.  Okay.  We've got a couple -- three

23  yes's.  And we're going to do this -- it makes it easier

24  for me to keep track if we do it in order.  So this will

25  be Ms. Burmeister.

1              MS. BURMEISTER:  My husband, before he worked

2   for the school, worked at a sand plant.  It was Martin

3   Marietta and Unimin.  And he did hit his head on a

4   conveyor belt, but there was no serious -- he had to

5   report it, but there was no serious damage.

6              THE COURT:  And did he receive compensation for

7   his injuries?

8              MS. BURMEISTER:  No.

9              THE COURT:  Did he suffer any long-term effects?

10             MS. BURMEISTER:  Well --

11             THE COURT:  That's a matter of opinion.

12             MS. BURMEISTER:  Yeah.  He's 66 years old, so --

13             THE COURT:  All right.  Thank you.  And then I

14  think we have Mr. Viken and Mr. Thruman.  You can stay

15  seated.  Make yourself comfortable.

16             MR. VIKEN:  Thank you.

17             THE COURT:  Use the microphone though.

18             MR. VIKEN:  19 -- I'm trying to remember now.

19  Would have been 1990 I was removing some parts from a

20  press and it slipped out and I ended up having two back

21  surgeries.  Was off work for 11 months.

22             THE COURT:  Okay.  And was that a workers'

23  compensation --

24             MR. VIKEN:  Yes, it was.

25             THE COURT:  -- issue?  Okay.  And so you got

 1   compensation for your injury?

 2           MR. VIKEN:  For being -- what do you mean?

 3           THE COURT:  Well, you got your medical expenses

 4   paid and then you got --

 5           MR. VIKEN:  Yes

 6           THE COURT:  -- some time off work?

 7           MR. VIKEN:  Well, I was off work, yeah, for 11

 8   months with the two surgeries and rehab.

 9           THE COURT:  All right.  Mr. Thruman.

10           MR. THRUMAN:  Well, it's kind of a long story,

11   but back when I first started working with the district I

12   did injure a shoulder.  It was within the first year that

13   I was working with the district, would have been probably

14   '91 to '92.

15           THE COURT:  That's the school district of

16   Madison you're talking about?

17           MR. THRUMAN:  Right.  And over the years I --

18   you know, I filled out an accident report and had an MRI.

19   They couldn't find anything.  Had an arthrogram they,

20   couldn't find anything.  Over the years I kept having

21   problems with that shoulder.  And I started favoring that

22   shoulder, so the pain would alternate between both

23   shoulders.  One would bother me for three months.

24       Well, like, two years ago I ended up having both

25   surgeries three months apart on both shoulders.  And so I

1  suppose I could have really went back and said that this

2  was original injury, but I didn't treat it as workman's

3  comp.  I didn't want to deal with it.  So I just had to

4  use sick time, 55 days, you know, until I got on

5  long-term disability.  But, anyway, the shoulders are

6  better than they ever were.

7       And then I recently injured a wrist, a tendon, and I

8  reported that.  That was workman's comp.  But so far all

9  I've had is a cortisone injection and that's been seeming

10 to help so far.

11           THE COURT:  Very good.  Okay.  Thank you.

12           MR. MORGAN:  Your Honor, I think we may have had

13 one other person.

14           THE COURT:  Oh. Go ahead.  This is Mr. Medley?

15           MR. MEDLEY:  Yes, sir.  I had a workers' comp

16 about 40 years.  I was in my young 20s.  I worked at a

17 factory in Milwaukee on a punch press line and I injured

18 a finger.  This is where heavy pieces of metal come down

19 the line.  You grab a piece metal, put it on the machine,

20 you know, punch it, pull it off.  I smashed a finger

21 grabbing a piece of metal, so I -- I was out of work for

22 a week or two and got a -- it was a long time ago.  I've

23 forgotten some of the -- but, yeah, I did get some loss

24 of pay and some medicals.  But it was a pretty minor

25 injury, but it was many years ago.

1          THE COURT:  Good.  Was there anybody else with a

2    workplace injury?  Good.

3          Then the next question is, have you ever directly or

4    indirectly supervised employees.  And I can tell from

5    your earlier answers I must have some yes's to this.  So

6    the question is, have you supervised employees.  And if

7    the answer is "yes," we're going to follow up and kind of

8    find out about your supervision.  So I expect to have a

9    lot of these, so let's just go all the way back to

10   Mr. Bartzen here, Juror No. 1, and then we'll just go

11   right down the line.

12         And I'm going to guide you a little bit because what

13   we're really looking for is whether you have hiring and

14   firing responsibilities and particularly whether you were

15   responsible for investigating any workplace complaints.

16   So with that, Mr. Bartzen.

17         MR. BARTZEN:  My experience is very limited.  It

18   would be in the form of supervisory capacity over one

19   legal assistant at various jobs, hiring and firing

20   ability.  Never had to investigate anything.

21         THE COURT:  Okay.  Very good.

22         MS. PRITCHETT:  As the head nurse in the

23   recovery room at NYU in New York I supervised employees,

24   especially in the recovery room.  I had hiring and firing

25   responsibilities and I did fire one person because of

1  drugs.

2        THE COURT:  Okay.  And did you have

3  responsibilities for investigating workplace complaints?

4        MS. PRITCHETT:  Yes.

5        THE COURT:  Okay.

6        MS. BETH:  I've trained, just on the Madison

7  east side alone for Panera, I've probably trained and

8  supervised 500, 600 kids teaching them work ethics and

9  follow-through and rules and safety and like that.

10  Hiring and firing, that was never directly my

11  responsibility, but my opinion is respected.

12        THE COURT:  And just for the record, that's

13  Ms. Beth?

14        MS. BETH:  Yes.

15        THE COURT:  Thank you.  Okay.

16        MR. FRONEK:  My name is Rich Fronek.  For the

17  better part of my career as a project manager at an

18  engineering company, leading up engineering projects and

19  I did have hiring and firing responsibilities.

20      There is two different types of situations where one

21  of my employees that reported to me felt unsafe in the

22  workplace because one of the other members of the project

23  team, in conversation, said something to the effect that

24  they thought they were going to "go postal."  The other

25  employee -- I mean, it wasn't meant in -- I wasn't there

1    present at that conversation, but the employee did report

2    through the normal channels of the business; you know,

3    through the HR department; that they felt unsafe.  So I

4    was involved in that type of situation and that was

5    remedied without incident.

6       And then the other case was where I had went through

7    an interview process.  We had a couple of candidates that

8    applied for a position and I was the main person

9    responsible for hiring the person and I went and hired a

10   person.  And there was an audit of the business, I think

11   it was, like, the Equal Opportunity organization that

12   come in and done an audit on the hiring and was kind of

13   questioning why I hadn't hired a female for that

14   position.

15      But again, after, you know, presenting my case and

16   based on the evidence of what I felt that there was no

17   further claims or anything of that nature.

18             THE COURT:  Okay.  Good.  Thank you.

19             MS. BURMEISTER:  I worked for several years as

20   the village clerk-treasurer and I was responsible for the

21   election workers then and hired them, but there was never

22   any litigation with them or problems.  And I sort of

23   indirectly supervised people at the law firm to help them

24   with their billing software, but never hired or fired

25   any.  And there were no workplace litigation.

1-A-35

 1          THE COURT:  Okay.  And that's Ms. Burmeister.

 2   Mr. Rajani.

 3          MR. RAJANI:  I forgot to mention this

 4   previously, but I also work at the Madison Overture

 5   Center, which is right across the road.  And for a little

 6   while there I had a stint when I was working as the

 7   manager.  And I hired ushers who worked at the theater on

 8   a part-time basis.  So I did that for about ten years.

 9   But I stepped down working because that job turned full

10   time.  But I'm still working there as a manager, but I'm

11   not currently hiring.  But I did that for a little while,

12   for about eight, ten years.

13          THE COURT:  Okay.  Thank you.  So let's pass

14   that down to Mr. Viken.

15          MR. VIKEN:  Yeah.  I hire, and not on the firing

16   end so much as for -- like, the HR kind of goes through

17   that.  But on the hiring end for the engineering

18   department, I do that.  I guess we've never really had

19   any bad -- I've never had to fire anybody, so been pretty

20   lucky.

21          THE COURT:  Okay.  And do you have

22   responsibility for investigating complaints in the

23   workplace?

24          MR. VIKEN:  Yes, I do.

25          THE COURT:  All right.

1          MR. THRUMAN:  Well, I do supervise currently at

2     my position at Building Custodian 3 at East High School.

3     Before that I was Building Custodian 3 at West High

4     School.  Before that it was Building Custodian at

5     Hamilton Van Nuys, a combination school, but I'm not

6     responsible for hiring and firing.

7          I am in charge -- well, you know, if there's a

8     problem employee, you know, I would, what you call, *write*

9     *them up* and report that to Building Services.  Like I

10    said, I don't actually do the hiring or firing.

11         THE COURT:  Okay.  Very good.  And that was

12    Mr. Thruman.  Okay.  Mr. Cegelski.

13         MR. CEGELSKI:  Okay.  I've had about four

14    different positions over a period of 15 years, including

15    my current position where I have managed people.  And I

16    have, in all those positions, I have had hiring and

17    firing responsibilities.  And I am responsible in my

18    current position for investigating workplace complaints

19    from my employees.

20         THE COURT:  Okay.  Very good.

21         MR. MEDLEY:  Thank you.  Yes.  I'm a supervisor

22    in my current job.  Again, I work for the state.  It's a

23    civil service process.  I have been a supervisor for

24    about 25 years.  And I have certainly hired dozens of

25    people over that time, you know, been on -- our bureau

1   has hired, you know, 50 or a hundred people and I've been

2   on most of those interviews.  And I would have, you know,

3   had my own.  But I usually had about seven or eight

4   employees that I supervised.

5       Many years ago I was a manager at the Milwaukee

6   YMCA.  We had a problem with theft by the cleaning crew,

7   the nighttime cleaning crew.  And one night I overheard

8   two custodians talking in a closet in a closed room

9   about how -- the one telling the other about how he

10  performed his thefts, and so I fired that person on the

11  spot.

12      In the civil service job that I have now I did fire

13  one person; got another person to leave, like, one day

14  before the hearing on their performance.  But these were

15  kind of performance-related issues where you document the

16  quality of performance over a long period of time.

17  Because it's civil service, you know, the state has a lot

18  of supervisory control and review over any, you know,

19  supervisor's action.

20          THE COURT:  Okay.  Very good.  And that was --

21  that's Mr. Medley.

22          MR. MEDLEY:  Yes.

23          THE COURT:  Mr. Hernandez.

24          MR. HERNANDEZ:  Yes.  I currently supervise one

25  employee, was part of the team that hired her.  And I

 1    guess in theory I'm responsible for firing, but haven't

 2    had to fire yet.

 3          THE COURT:  Very good.  All right.  Thank you.

 4    Then the next question is -- and here's how we're going

 5    to handle this one because I'm sure we're going to get a

 6    lot of yes's on this one, too:  First of all, let's find

 7    out -- just raise your -- if your employer has a policy

 8    regarding workplace injuries, such as you must to report

 9    them within a certain period of time or you must report

10    them at all, or whatever.  So raise your hand if it has a

11    policy regarding workplace injuries.  Okay.  And just for

12    the record, keep your hands up so we can make a record

13    here.

14       So that's Mr. Bartzen says "yes," Ms. Larson,

15    Ms. Pritchett, Ms. Beth, Mr. Fronek, Ms. Burmeister,

16    Mr. Rajani, Mr. Viken, Mr. Thruman, Mr. Cegelski.

17    Mr. Medley and Mr. Hernandez.

18       Okay.  So I'm going to follow up a little bit.  I'm

19    going to start with the assumption that the workplace --

20    the policy requires you to report workplace injuries.  So

21    is there anyone who said "yes" to the question about

22    whether there was a policy and that policy does not

23    include the requirement that you report the injury?

24    Okay.  Good.  All right.  That's a good start for a

25    workplace injury policy.

1        Let's find out a little bit more about the policy.

2   So if you have -- if you're aware of your workplace

3   policy and it's more than the requirement that you report

4   workplace injuries, I'd like to find out a little bit

5   more about it.  So if you have more to add other than

6   there's a requirement that you timely report workplace

7   injuries, raise your hand if you have further

8   elaboration.  Okay.  All right.  Good.

9        Do any of you have responsibility for implementing

10  your employer's policy regarding workplace injuries?  Is

11  that part of your job to implement the policy on

12  workplace injuries?  Okay.  Have one hand from Mr. Medley

13  and Ms. Pritchett.

14            MS. PRITCHETT:  Quick question.  I'm retired.

15            THE COURT:  Yes.  My questions would pertain to

16  your past work.

17            MS. PRITCHETT:  Yes.

18            THE COURT:  Go ahead, Mr. Medley, as long as

19  you've got the mike.

20            MR. MEDLEY:  Okay.  Well, again, I'm a

21  supervisor.  I work for the state.  I am a supervisor, so

22  certainly our policy says report injuries.  As a

23  supervisor, if one of my employees reports an injury,

24  they're supposed to, like, report it to me.  And I, as a

25  supervisor, I have a form to fill out to explain how the

1  injury happened and did the employee need medical

2  treatment and stuff like that.

3       It's very rare.  As an office worker, we don't

4  injure ourselves very often.  I did have, you know,

5  probably once or twice over the years fill out a form and

6  would have talked to the employee to get the facts of how

7  they hurt themself and write up the supervisor's side of

8  the story or whatever.  And you're supposed to recommend,

9  could anything have been done to prevent it or minimize

10 the jury or whatever.  It's not a lot.  Probably most

11 places have that.  But as a supervisor, I would carry out

12 that role.

13       THE COURT:  And other than filling out the form

14 and getting the facts to fill out form, were there any

15 other aspects of investigation that you were involved in?

16       MR. MEDLEY:  No.  I'm not like an overall

17 trainer on safety or anything that.  Just, you know, if

18 one of my employees hurt themself, you know, report it to

19 your supervisor, you know, when you have that injury.

20       THE COURT:  All right.  Let's pass the

21 microphone back to Ms. Pritchett and she'll -- I think

22 you had your hand up; is that right?

23       MS. PRITCHETT:  Yes.

24       THE COURT:  Okay.

25       MS. PRITCHETT:  I was responsible for -- if one

1    of my employees, if they received a needle stick, there

2    was an exchange of bodily fluids or anything like that,

3    that was to be reported to me and then I reported it to

4    the next person up.

5              THE COURT:  All right.  And did you report that

6    by filling out a form like Mr. Medley described?

7              MS. PRITCHETT:  Completing a form, right.

8              THE COURT:  Yeah.  Were you otherwise involved

9    in the investigation of the injuries?

10             MS. PRITCHETT:  Yes.

11             THE COURT:  Okay.  And how were you involved

12   otherwise in the injury?  Other than filling out the

13   form, did you get involved otherwise in the

14   investigation, and how so?

15             MR. THOMPSON:  Just as far as the timeliness of

16   it, when did the incident occur, what occurred, when and

17   under what circumstances.

18             THE COURT:  Very good.  Ms. Larson.

19             MS. LARSON:  As a teacher, if a student is

20   injured under my supervision, I have to fill out a form

21   and contact the parents of what took place.

22             THE COURT:  Okay.  Good.  And other than filling

23   out the form, were you otherwise involved in any

24   investigation of the injury?

25             MS. LARSON:  Usually called into the office and

 1   questioned.

 2            THE COURT:  Okay.  And who would do the

 3   questioning?

 4            MS. LARSON:  The principal.

 5            THE COURT:  Very good.  Okay.  Any other hands?

 6   I think there was one here.  Ms. Burmeister.

 7            MS. BURMEISTER:  As village clerk-treasurer, I

 8   was responsible for the insurance, including the workers'

 9   comp insurance.  So there were at least a couple workers'

10   comp forms that I had to provide workers when they were

11   injured.  And there was one, the director of public

12   works, that had filed a workers' comp claim that went

13   to -- they asked me to go along with the village

14   president for a workers' comp hearing.  But it was

15   settled before we actually went through the hearing.

16            THE COURT:  Okay.  And was that an ordinary -- I

17   got the impression from the way you told the story that

18   that was a one-time event.  Was it part of your normal

19   interaction to accompany the village president to a

20   workers' compensation hearing?

21            MS. BURMEISTER:  Well, the Village of Wyocena is

22   very little.  It's, like, 800.  And so we just had --

23   that's the only workers' comp claim that they ever -- you

24   know, that went to the claim -- but I was responsible for

25   keeping a record of time and doing the payroll.

1         THE COURT:  I see.  Okay.  All right.  Thank

2  you.  Were there other affirmative responses on the

3  question of your involvement in reporting workplace

4  injuries?  Mr. Thruman.

5         MR. THRUMAN:  Well, about a year ago there was a

6  workman's comp injury to one of my staff.  It actually

7  had happened at East High School before I got to East.  I

8  was at West.  But during the investigation the attorneys

9  came out to the school.

10     This employee hurt his shoulder on a cafeteria

11  table.  And all parties involved in the suit, you know,

12  wanted to go over, you know, how the injury happened,

13  why.  And they wanted me to be present at this meeting

14  and have my input; ask me questions of what my opinion

15  was, which was that there was a defect of the table

16  because they didn't all work the same.  There was, like,

17  a hinge and a bar in the center of the table and these

18  tables got locked into position.  You're supposed to be

19  able to just take this bar and it unlocks the table so

20  you can fold it up and lift it.

21     Well, they did all kinds of measurements and stuff.

22  And it was my opinion that, you know, the welds were off

23  of the table, which caused this not to operate like the

24  other ones.  And so I was just involved of, you know,

25  bringing those aspects out, you know.  But I wasn't

1  really in charge of the investigation as far as that

2  goes.

3           THE COURT:  Good.  Thank you.  You can just hold

4  onto the mike and we'll get it to the next place it has

5  to be.  Actually, you might as well pass that down to the

6  court security officer for the moment because the next

7  question might require somebody to come over here at side

8  bar.

9       I know some of you have been members of unions, so I

10 have a couple questions about unions.  We'll just do --

11 this one we can just do by a show of hands.  How many of

12 you have been a member of a union in your workplace?

13 Raise your hand and I will just make a record here of

14 this.  And so this is Mr. Fronek, Ms. Burmeister,

15 Mr. Rajani, Mr. Thruman, Mr. Medley and Mr. Hernandez.

16 Okay.

17      And how many of you are currently members of unions

18 in your workplace?  Mr. Thruman.  Okay.

19      Same question, but now I'm going to expand it a

20 little bit to close friends or family members.  How many

21 of you have close friends or family members who are now

22 members of unions?  Okay.  And I'll just make a record

23 here.  We have Mr. Bartzen, Ms. Beth, Ms. Burmeister,

24 Mr. Viken, Mr. Thruman, Mr. Medley and Mr. Hernandez.

25 Okay.

 1      Now the question is whether you or any of your close

 2  friends and family members have filed a union grievance.

 3  And if you have a "yes" answer here, I'm going to take

 4  your response -- I'll make a record that you said "yes,"

 5  but then we're going to hear the story over here at side

 6  bar.  So have you or a close friend or family member

 7  filed a grievance through your union?  Okay.

 8  Mr. Thruman.

 9      MR. THRUMAN:  I have, but I don't remember what

10  it was for.

11      THE COURT:  Okay.  All right.  And Mr. Medley.

12      MR. MEDLEY:  Well --

13      THE COURT:  And again, I want the details over

14  here at side bar.  But if you need a clarification about

15  whether we need to come over to side bar, we can maybe do

16  that here.

17      MR. MEDLEY:  Well, it was not for myself.  My

18  wife was a teacher and was a union member as a teacher

19  and I believe she did file a grievance at some time.  I

20  don't -- I'm not sure I remember a lot of the details of

21  what it was.

22      THE COURT:  Okay.  So, well, let me put it to

23  you this way:  Do you remember any of the details?  And

24  don't tell me what they are.  I just want to know whether

25  we should take a minute.  It just takes a second to go

1  over here to the side to find out what you remember about

2  it.

3          MR. MEDLEY:  It was several years ago.  I don't

4  remember a lot of details.  I don't remember.

5          THE COURT:  All right.  We'll let that one go.

6  All right.

7          MR. MORGAN:  Your Honor, Ms. Burmeister.

8          THE COURT:  Ms. Burmeister, yes.

9          MS. BURMEISTER:  He mentioned a spouse.  My

10  spouse was the plant manager at Martin Marietta sand

11  plant.  He was involved in some grievance, but I don't

12  know the details.

13          THE COURT:  Okay.  All right.  So I think that's

14  a sufficient answer.  Counsel may tell me differently.

15  If they do, then we'll decide.  Okay.

16      So next question:  Have you ever filed a lawsuit, an

17  administrative charge or any other form of complaint

18  against an employer?  And again, this is a "yes."  Raise

19  your hand if the answer is "yes" and then we'll get the

20  details over here at side bar.

21      So again, this is about you.  Have you ever filed a

22  lawsuit, an administrative charge or any other form of

23  complaint against an employer?  Raise your hand if the

24  answer is "yes" and we'll get the details over at the

25  side.  Okay.

1      Same question, now expanding it out to close friends

2  or family members: ever file a lawsuit, administrative

3  charge or any other form of complaint against an

4  employer?  Okay.

5      Have you or a close friend or family member ever

6  been fired, suspended or laid off by an employer?  And

7  again if the answer is "yes" we'll get the details over

8  here at the side.  So have you or a close friend or

9  family member ever been fired, suspended or laid off by

10  an employer?

11      Okay.  And so we've got Mr. Fronek, Mr. Medley,

12  Mr. Rajani and Mr. Hernandez.  Okay.  And going to side

13  bar is really for your courtesy.  So, Mr. Fronek, would

14  you like to discuss this at side bar or do you want to

15  lay it all out here?

16          MR. FRONEK:  It's fine.  It was a company

17  downsizing.  A company I worked for had downsized.  And

18  so when they eliminated our division, all the employees

19  were let go.

20          THE COURT:  All right.  Very good.  Mr. Rajani,

21  same: do not hesitate to come over to side bar if you

22  don't want to then years about it.  But if it's a

23  downsizing and you don't care, we can do it efficiently

24  this way.  But if you want to come to side bar, come on.

25          MR. RAJANI:  Yes, pretty much the same thing.

```
 1              THE COURT:  Same thing, downsizing?

 2              MR. RAJANI:  Yes, cuts.

 3              THE COURT:  Okay.  Mr. Medley, same offer to

 4   you: we can do it over here or you can --

 5              MR. MEDLEY:  We can do it over there I guess.

 6              THE COURT:  Okay.  I'll will take one attorney

 7   from each side.

 8         (At side bar.)

 9              THE COURT:  Can you hear, Cheryl?  Tell us

10   your story.  Stand up close to the microphone and tell

11   us --

12              MR. MEDLEY:  Oh, I see, she's listening.

13              THE COURT:  We have a completely sophisticated

14   system for doing this.

15              MR. MEDLEY:  Okay.  Thank you.  This is about I

16   think 30 years ago I was sort of the accountant at a food

17   co-op in Milwaukee and had some differences of opinion

18   with the general manager that we didn't get resolved.

19   And so basically I got fired over I guess matters of

20   management opinions or attitudes about management policy.

21   And I was happy, say, later on that the manager was fired

22   and I was rehired to work at the same place again.  But I

23   did have that experience and it was certainly not fun,

24   you know.

25              THE COURT:  So how long were you in the fired
```

1-A-49

```
 1    and not-yet-rehired status?

 2              MR. MEDLEY:  Probably six to nine months or

 3    something like that.

 4              THE COURT:  Okay.

 5              MR. MEDLEY:  Again, this was about 30 years ago

 6    and so I apologize, the dates are not too fresh in my

 7    mind.

 8              THE COURT:  That's all right.  And did you raise

 9    any objection or complaint to the firing?

10              MR. MEDLEY:  Well, I mean, no.  I mean, they

11    have the right to fire people who you want to fire, you

12    know.

13              THE COURT:  Yeah.

14              MR. MEDLEY:  So I had no basis to file an appeal

15    or anything like that.

16              THE COURT:  Yeah.  Okay.  Any follow-up from

17    counsel?

18              MR. MORGAN:  No.

19              MR. DOUGLAS:  No, Your Honor.

20              THE COURT:  Okay.  Thank you, very much.

21              MR. MEDLEY:  Okay.  Thank you.

22         (End side bar.)

23              THE COURT:  All right.  That's how it's done.

24    So it's not very difficult or painful, so don't be shy.

25    Now we're down to the last person that I noted.  So,
```

1    Mr. Hernandez, do you want to go to side bar?

2          MR. HERNANDEZ:  No.  My father was a manager at

3    a steel plant and his division was eliminated, too, due

4    to downsizing.

5          THE COURT:  Very good.  Thank you.  Are there

6    any other?  I want to make sure I didn't miss anybody on

7    fired or suspended or laid off by an employer.  Okay.

8    Very good.

9       Next question is have you or has anyone close to you

10   ever been subjected to any form of discrimination or

11   retaliation in the workplace?  Discrimination or

12   retaliation in the workplace.  And we can follow up at

13   side bar if need be.  Ms. Burmeister.

14         MS. BURMEISTER:  Well, it would be my husband.

15         THE COURT:  Let me have you take the microphone

16   so we can hear you.

17         MS. BURMEISTER:  And it could apply to the last

18   question.  I mean, there was a meeting of minds that he

19   left Unimin.

20         THE COURT:  Why don't we go side bar and you can

21   tell us the details of this one.

22      (At side bar.)

23         THE COURT:  Go ahead.  Then years right into

24   that microphone.

25         MS. BURMEISTER:  Okay.  My husband started

1  working for Martin Marietta in the Sand Division and that

2  was bought out by Unimin.  Their style of management was

3  very different than what he had been trained in as Martin

4  Marietta.  It was the very last Martin Marietta plant

5  manager that was still working.  And their philosophy was

6  money was the main thing, where Martin Marietta was a

7  little more you had to keep your employees happy.

8        And so he didn't often agree with Unimin and so they

9  came to an agreement.  It was a severance package that we

10 had.  Actually, my boss, the one that owned my law firm,

11 looked over the agreement.  And he had to agree not to

12 work for a sand plant and got a generous severance

13 package.  But he did not agree with how the company

14 managed the plant.

15         THE COURT:  Okay.  And he reached an agreement

16 to leave, so I gather he didn't make any complaint or --

17         MS. BURMEISTER:  No.

18         THE COURT:  All right.

19         MS. BURMEISTER:  He signed the agreement and he

20 hasn't worked for a sand plant.

21         THE COURT:  Okay.  Very good.  Any follow-up?

22         MR. MORGAN:  Just one quick question:  Was he

23 told -- what prompted the separation?  Was he told he was

24 going to be let go or was it just a mutual parting of

25 ways?

1            MS. BURMEISTER:  Well, basically, like I said --

2   I wasn't there, so I don't know -- he obviously had good

3   performance.  And basically all of a sudden -- basically

4   they went to hiring mining engineers for plant managers.

5   He was the last one that wasn't a mining engineer.

6            MR. MORGAN:  Okay.

7            THE COURT:  And that question was from

8   plaintiff's counsel.  Anything for the defense?

9            MR. DOUGLAS:  No.

10           THE COURT:  Thank you, very much.

11       (End of side bar.)

12           THE COURT:  Okay.  The next question:  Have you

13  or anyone close to you ever been accused of retaliating

14  against someone?  This is a question kind of similar to

15  the last, but this is whether you have been accused of

16  retaliation.

17       Have you or anyone close to you sued, been sued or

18  participated in a lawsuit based upon the Federal Railway

19  Safety Act or any other employment laws?  I'm going to

20  read that one again because there are many other

21  employment laws besides the Federal Railway Safety Act.

22  But the question is whether you or anyone close to you

23  has sued, been sued or participated in a lawsuit based

24  upon employment loss.  Okay.  We have affirmative answers

25  from Ms. Burmeister, Mr. Cegelski and, Mr. Medley, are

1    you in or out?

2           MR. MEDLEY:  I'll tell my story, sure.

3           THE COURT:  Okay.  So, Ms. Burmeister, we just

4    had a side bar regarding your husband's experience.  Is

5    this a different experience than that?

6           MS. BURMEISTER:  It's different.

7           THE COURT:  Okay.  Why don't we go side bar and

8    find out the details.

9         (At side bar.)

10          THE COURT:  Go ahead.

11          MS. BURMEISTER:  This was my spouse.  But at his

12   last job as Director of Buildings and Grounds for the

13   school district, and it was -- there was a lawsuit

14   against the school that he had because it was on the

15   contract for plowing the grounds, the parking lots and

16   that, so he had to be a witness.  And it was settled, but

17   it was against the school district.  But as the Director

18   of Public Works, Buildings and Grounds, he had to be part

19   of it.

20          THE COURT:  Okay.  So he was a witness in the

21   suit against the district?

22          MS. BURMEISTER:  Right.

23          THE COURT:  Okay.  Very good.

24          MR. MORGAN:  I don't have any questions, Judge.

25          MR. DOUGLAS:  No.

```
 1              THE COURT:  Okay.  Thank you.
 2         (End of side bar.)
 3              THE COURT:  Okay.  So who else had "yes" answers
 4   for participations in lawsuits?  Mr. Cegelski and
 5   Mr. Medley.  Let's take -- oh, and Mr. Bartzen as well.
 6              MR. BARTZEN:  Just a question for Your Honor.
 7              THE COURT:  Sure.
 8              MR. BARTZEN:  I'm assuming when you ask the
 9   question you mean me personally or someone related to me,
10   not as part of my job?
11              THE COURT:  Correct.  Yes.  Okay.  So
12   Mr. Cegelski -- also, Ms. Burmeister's response suggests
13   an efficient way to handle some of this.  If the
14   participation that you're thinking of in response to this
15   question about participating in lawsuits was that the
16   person that you knew was a witness, we probably can
17   handle that without going side bar.  But if you are -- if
18   this person were either the target of the suit or the
19   plaintiff in the suit, that's probably appropriate to do
20   side bar.
21         So, Mr. Cegelski, shall we come over?
22         (At side bar.)
23              THE COURT:  Go ahead, Mr. Cegelski.
24              MR. CEGELSKI:  So it's about 20 years ago I was
25   a branch manager at Baraboo Federal Bank in Sauk City and
```

1   I had to fire our head teller for a variety of reasons.

2   But she in turn sued us, sued the bank, for sexual

3   discrimination.  So we had a lot of depositions we had to

4   prepare.  It was -- probably lasted over a year.  I can't

5   recall if it actually went to trial, but there was

6   some -- I don't know if it went to arbitration.  I think

7   it went to arbitration.  But it was decided there was a

8   small settlement paid and that was kind of the end of it.

9        THE COURT:  Okay.  And so part of the basis for

10  her lawsuit were the decisions that you made?

11       MR. CEGELSKI:  Correct.  I was the branch

12  manager.  I was the one who actually fired her.  So

13  she -- you know, part of it was that I had sexually

14  discriminated against her in the workplace.

15       THE COURT:  Okay.  And so were you named as a

16  defendant in that suit?

17       MR. CEGELSKI:  I can't recall if I was or if it

18  was just the bank and I was named.  I don't -- I never

19  had to get my own counsel.

20       THE COURT:  Mm-mm.  But you were one of the

21  persons who she alleged had discriminated?

22       MR. CEGELSKI:  Yes.  Correct.

23       MR. MORGAN:  Were you deposed?

24       MR. CEGELSKI:  Yes.

25       MR. MORGAN:  Did you give a deposition?

1          MR. CEGELSKI:  Yes.

2          MR. MORGAN:  Does that experience -- do you

3   think that affects your ability to be fair and impartial

4   in this case?

5          MR. CEGELSKI:  I've been deposed multiple times

6   since then.  I'm a commercial real estate lender.  So not

7   actual lawsuits, but, you know, directed at -- so would

8   that affect my ability to fairly judge?  I don't think

9   so.  I mean, what I do work related is different I think

10  than here.

11          MR. MORGAN:  Okay.

12          THE COURT:  Any other follow-up?

13          MR. DOUGLAS:  Nothing, Your Honor.

14          THE COURT:  Okay.  Thank you, Mr. Cegelski.

15      (End of side bar.)

16          THE COURT:  Was it Mr. Medley who also had an

17  answer?  I think you're it.

18          MR. MEDLEY:  Yeah.  Where's the mike?

19          THE COURT:  We're going to take you to side bar

20  unless you --

21          MR. MEDLEY:  I can then talk with the mike.

22          THE COURT:  Let me stop you before you do that.

23  This one is not just for your own privacy, but it's also

24  because if you have had an experience involving a

25  dispute, I'd rather not have the rest of the jury hear

1   about it.  So why don't we do this one at side bar.

2        (At side bar.)

3            THE COURT:  All right.  Mr. Medley.

4            MR. MEDLEY:  Sure.  Okay.  This relates to my

5   wife was a teacher in the Middleton school system.  She

6   was an officer in the teacher's union several years ago.

7   And there was an event that got some local publicity.

8   Some e-mails were shared among some teachers that

9   allegedly were improper.  And when the administration

10  discovered the e-mails, they took disciplinary actions

11  against several of the teachers or other administrators

12  who were sharing e-mails with each other.

13       And the union, which my wife was one of the officers

14  of the union, alleged that the levels of discipline among

15  the different teachers were improper, you know, were not

16  fair, reasonable or appropriate.  And the union -- one

17  teacher was suspended and the union had lengthy

18  negotiations and arbitration with the School Board over

19  that teacher's situation.  And again, I certainly don't

20  know all the details of it.  But after a couple of years

21  the teacher was reinstated and did return to work.  But

22  there was -- you know, in the local media there was some

23  discussion or news about it.

24       So my wife was not a witness or was not directly at

25  the bargaining table.  But as a member of her union,

 1  she -- you know, it was a major event for her union over

 2  this couple-year period.  And so the issue I think was

 3  more the fair, appropriate and reasonable management

 4  actions or treating workers appropriately based on the

 5  actions -- based on the content of the e-mails.  And I

 6  don't know all the details of how the -- I'm sure there's

 7  plenty of news media you can find on that if you wish to.

 8          THE COURT:  But just to make the record

 9  abundantly clear, your wife was not a complainant?

10          MR. MEDLEY:  No, she was not a complainant.  She

11  was not a participant in the e-mail.  She was a board

12  member of the union and it was a major issue for the

13  union -- for union-management relations at her school

14  over a couple of -- it took a couple years to resolve the

15  issue.

16          MR. MORGAN:  So there was a grievance filed?

17          MR. MEDLEY:  I assume so.  I mean, the school

18  administration took action against a number of the

19  teachers, including one teacher who I guess was either

20  fired -- or was fired.  And the union advocated on behalf

21  of that person to say that the level of discipline was

22  not appropriate or not treating the class of people in a

23  similar, fair way.  The one person, the union said, was

24  being singled out for more negative treatment than other

25  people.

1        I don't know all the particular facts of the -- how

2   many e-mails.  These were allegedly, like, adult content

3   e-mails that were shared on the -- with other adults on

4   the state -- on the school's e-mail system.

5        THE COURT:  Has that experience left you with

6   any preconceptions about how discipline is delivered to

7   union members?

8        MR. MEDLEY:  Any pre -- well, I guess I'd say I

9   think everything is, you know, case by case or facts and

10  circumstances.  I mean, you know, I'm not sure what you

11  mean by "preconception."

12       THE COURT:  Well, does that experience make it

13  difficult for you to be fair in this case and judge this

14  case on the basis of the evidence that's presented in the

15  courtroom?

16       MR. MEDLEY:  I don't think so.  I was just

17  recounting that, you know, again, in my wife's case, she

18  had a case of that nature and I was just sharing that

19  that happened.

20       THE COURT:  Good.  Thank you.

21       MR. MORGAN:  Thank, you, Mr. Medley.

22       (End of side bar.)

23       THE COURT:  Okay.  Because it's an important

24  question, I want to make sure that I don't overlook

25  anyone that had an answer to that.  The question was

1-A-60

1  about whether you or anyone close to you had sued, been

2  sued or participated in a lawsuit based on employment

3  loss.  Okay.  Good.

4       Do any of you have an opinion about -- let me phrase

5  it this way:  Do any of you have a strong opinion about

6  BNSF or railroads in general, whether favorable or

7  unfavorable?

8       Do any of you have a favorable or unfavorable view

9  of corporations in general?

10      Would each of you -- and this is a question I'm

11 going to set it by context.  If you found that the

12 evidence was in favor of a party who was bringing a

13 lawsuit against a corporation, would you be able to find

14 in favor of that party?  Would you be able to find in

15 favor of a party that was suing a corporation?

16      Any of you -- would any of you -- let's put it this

17 way so you -- I would expect fewer hands raised:  Would

18 any of you be unable to find in favor of Mr. Koziara?

19      Start again.  Would you be able -- any of you that

20 wouldn't be able to find in favor of the party that was

21 suing a corporation if the evidence supported a verdict

22 in their favor?  The question gets to whether you're so

23 in favor of corporations that you just can't manage the

24 thought of finding in favor of somebody who is suing a

25 corporation.

1    Have any of you ever been disciplined for workplace

2    conduct?  This is another question that we'll follow up

3    at side bar.  And again some of the subjects -- some of

4    the answers here that you would say "yes" to this

5    question about whether you've been disciplined you may

6    have discussed already.  So if that's the case, we don't

7    need to go over it again.  But have any of you ever been

8    disciplined for workplace conduct?  Okay.  Good.

9    Have any of you spent time in or around La Crosse,

10   Wisconsin?  The events in this case happened near

11   La Crosse.  So I want to find out if you have spent time

12   in or around La Crosse, Wisconsin.

13   The good news is that, Ms. Larson, we don't have to

14   go side bar to hear your answer.  I suppose it depends on

15   what you were doing in La Crosse, Wisconsin.  But unless

16   you ask, we'll have your answer in open court.

17   Ms. Larson, tell us about your experiences in La Crosse.

18        MS. LARSON:  I go shopping in La Crosse every

19   year the day after Thanksgiving.

20        THE COURT:  Our Black Friday sales aren't good

21   enough for you?

22        MS. LARSON:  Relatives within 50 miles of there.

23        THE COURT:  Very good.  And what are the

24   relatives, how close are they: your parents, family?

25        MS. LARSON:  My parents, my sister, brother,

1-A-62

 1  sister-in-law.

 2          THE COURT:  Very good.  Who else has a

 3  connection to La Crosse, Wisconsin?  Let's go right down

 4  the row to Mr. Fronek.

 5          MR. FRONEK:  My wife and I spent some time

 6  vacationing there because we bike and do tourist types of

 7  things.  We just spent time there vacationing.

 8          THE COURT:  Okay.  Very good.  All right.  Let's

 9  go down to the front row.  Anybody else spent time in

10  La Crosse, Wisconsin?

11          MR. HERNANDEZ:  Just vacationing.

12          THE COURT:  That was Mr. Hernandez who vacations

13  in La Crosse.  Ms. Burmeister.

14          MS. BURMEISTER:  We've also biked the bicycle

15  trails there.  But vacation there, that's basically all.

16          THE COURT:  Anybody else in the front row?

17  Okay.  This is a more general question about your --

18  whoops.  I don't want to overlook somebody.

19  Mr. Cegelski.

20          MR. CEGELSKI:  Just my son was in drum corps and

21  he had multiple shows at La Crosse and also some camping

22  and vacationing in the area.

23          THE COURT:  Okay.  Very good.  This is another

24  kind of general disposition question:  Do any of you

25  think there are simply too many lawsuits or too many

 1   lawyers?  I'm going to assume that Mr. Bartzen thinks

 2   there are too many lawyers.  Other than that, too many

 3   lawsuits or too many lawyers.  Anybody that has a general

 4   view that we're just too litigious and we go to court too

 5   often?  Okay.

 6       Here are some questions about your litigation

 7   experience and opinions.  First of all, I want to ask, do

 8   any of you have difficulty reading, hearing or

 9   understanding the English language?  That certainly

10   doesn't seem to be so far.

11       I know Mr. Bartzen will say "yes" to this.  But the

12   question is, have you ever studied law or worked in a law

13   office?  And I know that we've already gotten -- we've

14   got Ms. Burmeister's experience, Mr. Bartzen's

15   experience.  Anybody else that has studied law or worked

16   in a law office?

17           THE COURT:  Mr. Medley.

18           MR. MEDLEY:  I was going to say, I took a couple

19   courses in business law as a business major, but that's

20   not -- compare it to what people do in law school.

21           THE COURT:  I understand, but I appreciate the

22   answer.  So, yes, you've had some courses in business

23   law.  Okay.  Did those cover any of the legal areas that

24   are close to those at issue in this lawsuit, like

25   employment law, antidiscrimination laws?

 1          MR. MEDLEY:  Not that I remember.  I mean, it

 2    was, like, 40 years ago.

 3          THE COURT:  All right.  It won't be on the test.

 4    That's all right.  Okay.  We've spoken about certain

 5    kinds of lawsuits already and so I've asked whether

 6    you've been involved in lawsuits involving employment

 7    laws.  But have any of you otherwise been involved in a

 8    lawsuit as a plaintiff or a defendant?  Again, any kind

 9    of lawsuit at all other than what we've already talked

10    about in the employment context, but other kinds of

11    lawsuits: car-wreck cases, all that sort of stuff.  Okay.

12        Let's just go down the line.  Mr. Bartzen, tell us

13    about what lawsuits you've been involved in.

14          MR. BARTZEN:  I was a witness in a malpractice

15    claim.

16          THE COURT:  Okay.  Very good.  Ms. Larson.

17          MS. LARSON:  Accosted in a restaurant and that

18    case is still pending.

19          THE COURT:  Is that a criminal matter?

20          MS. LARSON:  Yes.

21          THE COURT:  Okay.  So you were the victim of a

22    criminal case -- of a criminal charge.  Okay.  And that's

23    still ongoing.  Where is that case pending?

24          MS. LARSON:  Here in Madison.

25          THE COURT:  Okay.  And that would be probably in

1  Dane County Circuit Court?

2          MS. LARSON:  Yes.

3          THE COURT:  Okay.  Very good.  Who else has been

4  involved in a lawsuit?  Let's go -- we'll do it in order,

5  so Mr. Castillo.

6          MR. CASTILLO:  A car accident.  He wanted I

7  guess to get more money than my insurance company was

8  going to give them.  So he went toward -- after me

9  instead of my insurance company.  But my insurance

10 company got involved in that and I didn't have to do

11 anything about it.

12         THE COURT:  Okay.  But there was a lawsuit

13 filed?

14         MR. CASTILLO:  Yes.

15         THE COURT:  Did it go to trial?

16         MR. CASTILLO:  No, it didn't.

17         THE COURT:  Okay.  And the insurance company

18 made a settlement with them?

19         MR. CASTILLO:  Mm-mm.

20         THE COURT:  Okay.  Very good.  Who else has been

21 involved in a lawsuit?  Ms. Beth.

22         MS. BETH:  Earnest money.  I was selling a house

23 and people put earnest money down and wanted the house.

24 And just about two days before actual closing, they said,

25 "Could we just skip it?  Could I just have my money

1    back?"

2         "No, you can't."

3         And they sued for the money and, you know, that kind

4    of thing, so civil lawsuit.

5              THE COURT:  All right.  And did that get

6    resolved by trial or was there a settlement involved?

7              MS. BETH:  In front of a judge, yeah.

8              THE COURT:  Okay.  And what was the result?

9              MS. BETH:  I got to keep the money.

10             THE COURT:  Okay.  Good for you.  All right.

11   Anybody else?  Okay.  Down into the front row then.

12   Mr. Cegelski has his hand moving.  Okay.  Mr. Cegelski,

13   you were involved in a lawsuit?

14             MR. CEGELSKI:  I have been involved in multiple

15   depositions related to my job, which is I'm in the

16   commercial real estate lending business and have been for

17   quite some time.  So I've been deposed, I don't know,

18   probably six or eight times related to three or four

19   different problem loans, if you will.

20             THE COURT:  Mm-mm.  All right.  And those would

21   be -- are those suits brought on behalf of your employer

22   against borrowers?

23             MR. CEGELSKI:  There would be suits that way,

24   also, suits from borrowers against our employer.

25             THE COURT:  Okay.  Very good.  Mr. Medley.

1          MR. MEDLEY:  I have two cases.  When I was,

2     like, eight years old I was in a pedestrian-auto

3     accident.  I was a pedestrian.  And I was, you know, a

4     child at the time.  But there was litigation and we did

5     receive a modest award for my medical injuries back in

6     the early 1960s.

7          Secondly, in terms of my current job, we did have a

8     contested administrative hearing about a year ago with an

9     action our office was taking with regard to one of the

10    insurance companies and I was deposed.  We had about a

11    five-day administrative hearing within our office.  So

12    that was, yes, I was cross-examined and things by the

13    attorneys on both sides.

14          THE COURT:  Okay.  Very good.  Mr. Hernandez.

15          MR. HERNANDEZ:  Yeah.  I don't know how relevant

16    this is, but when I was in college I was a member of the

17    Student Judiciary of the Association of Students of

18    Madison and was on panels and *en banc* hearings for

19    various cases that came up.  And there were cases or one

20    case in particular that came up through the Circuit

21    Court.  So that's the degree to which I've been involved

22    in cases in the past.

23          THE COURT:  And so what kind of cases did the

24    Student Judiciary hear?

25          MR. HERNANDEZ:  Mostly dealing with funding

1-A-68

1  disputes related to allocation of funds, segregated fee

2  funds, by the University of Wisconsin to various student

3  organizations on campus.

4       THE COURT:  And then you said one of those ended

5  up going into -- beyond the Student Judiciary, actually

6  got into --

7       MR. HERNANDEZ:  Federal court.

8       THE COURT:  -- federal court?

9       MR. HERNANDEZ:  Correct.

10      THE COURT:  Okay.  Do you remember what case

11  that was?

12      MR. HERNANDEZ:  It was a *Roman Catholic*

13  *Foundation v. the University of Wisconsin.*

14      THE COURT:  Okay.  And that was a dispute over

15  funding something that was arguably a religious activity?

16      MR. HERNANDEZ:  Correct.

17      THE COURT:  Okay.  Very good.  Ms. Burmeister.

18      MS. BURMEISTER:  I don't know if this applies,

19  but I helped my parents because there was a lawsuit

20  bought against my father after he had had a stroke and my

21  mother was having memory problems which later was shown

22  to be stroke dementia.  And there was a lawsuit brought

23  against my father, as the insurance agent for a bar owner

24  who did not have workers' comp and should have gotten it

25  from my father.

1          THE COURT:  I see.  Okay.  And so did that case

2   go to trial?

3          MS. BURMEISTER:  No.  There was a settlement.

4          THE COURT:  Okay.  Some of you have included the

5   responses to this next question in your answers already.

6   So if we've already heard details, you don't need to

7   answer again.  But other than what you've already told

8   us, have you or a close friend or family member ever been

9   a witness in a lawsuit?  I know Mr. Cegelski told us

10  about his testimony as a witness.  Any others of you ever

11  been a witness in a lawsuit?

12      All right.  Good.  And I think we've already got a

13  lot of these answers, too, but I just want to make sure

14  for the sake of completeness:  Have any of -- have you

15  had a close friend or family member that has sued or been

16  sued by anyone?  Again, this isn't just limited to the

17  employment context.  But have a close friend or family

18  member ever sued or been sued by someone?  And again, if

19  you've already told us the story, we've already got it.

20  So, Mr. Hernandez, yes.

21          MR. HERNANDEZ:  My father sued a trucking

22  company.  There was an accident that he alleged they were

23  at fault for and there was a settlement involved.

24          THE COURT:  Okay.  Very good.  Thank you.  And

25  again, this is again we've heard a lot of this, including

1  Mr. Hernandez's answer here, but have you or a close

2  family member ever filed a claim for an injury as a

3  result of an accident?  Have you or a close friend or

4  family member ever filed a claim for an injury as a

5  result of an accident?  Mr. Medley has told us a story

6  along these lines as well, but any other stories of this

7  nature?  Okay.

8      Have any of you previously served on a jury?  All

9  right.  Let's go.  Mr. Cegelski.

10      MR. CEGELSKI:  I was on a jury when I lived in

11  Arizona probably 25-plus years ago.  It was a car

12  accident case.

13      THE COURT:  And did you find for the plaintiff

14  or the defendant?

15      MR. CEGELSKI:  The finding was it was really a

16  dollar amount of claims.  And my recollection is it was

17  somewhere in between what they had asked for and what

18  they were actually awarded.

19      THE COURT:  Okay.  And did you serve as the

20  foreman of that jury?

21      MR. CEGELSKI:  I did not.

22      THE COURT:  Okay.  Mr. Medley.

23      MR. MEDLEY:  I believe I was on a jury in Dane

24  County court, again probably 20 or more years ago.  I

25  guess the case had to do with a group of high school kids

1  who allegedly burglarized a house during their lunch hour

2  or something like that.

3          THE COURT:  So it was a criminal matter then?

4          MR. MEDLEY:  Right, it was a criminal matter.  I

5  guess the, I don't know, the defendants I think were

6  still under 18.  I don't remember what their ages were.

7  And I guess in this case we found the one defendant --

8  the one case that we had we found not guilty.

9          THE COURT:  Okay.  Good.  All right.  Thank you.

10 Anyone else serve on a jury?  Okay.

11     All right.  At the end of this case I'm going to

12 give you some instructions that will govern your

13 deliberations and your decision.  You're required to

14 follow these instructions even if you do not agree with

15 them.  Is there any one of you who would be unable or

16 unwilling to following my instructions at the end of the

17 case?

18     And the last question is, do any of you know any

19 reason whatsoever why you could not sit as a trial juror

20 with absolute impartiality to both of the parties in this

21 case?  Okay.  Good.

22     All right.  I will take one moment and ask one

23 counsel from each side to join me at side bar.

24     (At side bar.)

25          THE COURT:  I just want to give you the chance

1   to ask any follow-up questions on anything that I've

2   covered so far.

3          MR. MORGAN:  We don't have any.  I think it's

4   been pretty thorough.

5          MR. DOUGLAS:  It's been thorough.

6          THE COURT:  Very good.

7          MR. MORGAN:  Your Honor, after we -- I assume we

8   select the jury now.  Can we take a short break after

9   that?

10          THE COURT:  Not only we can, we will have to

11   because I have to take a plea, two pleas in a criminal

12   matter, so we'll have a very early lunch today.

13          MR. MORGAN:  Okay.  Fine.

14       (End of side bar.)

15          THE COURT:  Okay.  Mr. Wiseman, you can provide

16   the paperwork to counsel for exercising their peremptory

17   challenges.

18       Ladies and gentlemen, this process will take a

19   couple of minutes, so I won't have you leave the room.

20   After this process is done, very shortly after that we

21   will be taking our lunch.  But for these next few

22   minutes, if it's more comfortable for you, and you've

23   been sitting for a couple hours, you want to stand up,

24   you should feel free to do that.

25          (Peremptory challenges exercised at 11:00 a.m. until

1  11:07 a.m.)

2          THE CLERK:  The following jurors are excused and

3  may take a seat at the rear of the courtroom:  Jeff

4  Bartzen, Victoria Larson, Fay Burmeister, William Viken,

5  Barry Thruman and Todd Cegelski.

6      And the following jurors have been selected:  Joann

7  Pritchett, David Castillo, Deborah Beth, Richard

8  Fronek -- and if you four could just shift down to the

9  end -- Hasmuk Rajani -- Mr. Rajani, if you could take the

10  first seat at the end of the first row -- Peter Medley,

11  Tracy Thompson and Shaun Hernandez.  And if you three

12  could move to your left -- your right.  Excuse me.

13          THE COURT:  Very good.  Before I say a few

14  things to our jury, let me thank all of you who

15  participated in the voir dire and also the members of the

16  panel who didn't have to step up and submit yourselves to

17  questioning.  It was still a couple hours of your time.

18  And I want you to know that it is a very greatly

19  appreciated service to the Court that you came in and

20  responded to the jury subpoena and participated here this

21  morning.

22      I'm sorry you won't get the chance to hear the whole

23  case as a juror, but our courtrooms are open.  So if you

24  want to follow this case and watch as much of it as you

25  care to, you can do that.  But my most important message

1    to you is thank you, very much, for your candor in

2    answering my questions and for your willingness to

3    participate here today.

4         So with that, those of you on the other side of the

5    bar are excused with the Court's thanks.

6         So, Mr. Wiseman, would you like to administer the

7    oath to our new jurors?

8              THE CLERK:  If you would please stand and raise

9    your right hand.

10             **JURY PANEL, SWORN**

11             THE CLERK:  Please be seated.

12             THE COURT:  Okay.  I have some introductory

13   instructions that I'm going to give you, but I'm going to

14   do it after we take our lunch break today.  The trial day

15   is going to run from nine o'clock until 5:30 and we'll

16   take at least an hour for lunch and you'll have a break

17   in the morning and a break in the afternoon.  And I'm

18   already kind of testing your endurance here because I've

19   got another proceeding that I have to attend to over my

20   lunch hour.  I need to do that now, so we're going to

21   take that break now.

22        When we come back I will give you the more complete

23   set of instructions on how the trial will be run and what

24   your duties are.  And after I do that, then you'll hear

25   opening statements from the parties and we'll roll right

1  into the trial itself.

2      I'm going to give you just one very important

3  instruction now and that is that it's critically

4  important that we do two things here.  One, we need to

5  decide the case on the basis of the evidence that's

6  presented in this courtroom.  So I'm going to ask you

7  that you take pains to avoid hearing about this case.

8      Don't do any Internet research.  If this case

9  happens to show up in a newspaper, don't read the

10  article.  Don't even look at the headline if you can

11  avoid it.  I don't think this is going to be necessarily

12  front-page news.  But the activities in federal court

13  often get some news coverage, so please avoid hearing

14  about this case.

15      The second thing that we have to do is to make sure

16  that we keep an open mind and decide this case on the

17  basis of all of the evidence.  The one thing that you all

18  have in common is that you're serving as jurors in this

19  case, so naturally what you're most inclined to then

20  years about is this case.

21      But it's very important that you not do that because

22  once you express an opinion, it's just naturally human

23  nature to be reluctant to change that opinion once you've

24  kind of put it out on the table.  And some people, I'm

25  sure you're all very open-minded and fair people, but

1    once you sort of stake out your territory and say what

2    you think, then it's hard to back down.  And some people

3    have kind of an oppositional perspective and if you stake

4    out an opinion they might want to go the other way.  So

5    it really is important.

6        And the only way we can really be fair is to make

7    sure that you actually don't then years about this case

8    until you hear all of the evidence and then you sit down

9    to deliberate.  And then your objective really is to

10   really thoroughly then years about the case and exchange

11   your views.

12       And so I'm going to ask you to do something that's

13   difficult, I know, because it's what you have in common.

14   But then years about the weather; then years about the

15   Badgers; then years about anything you want except this

16   case.  So with that, avoiding finding out about the case,

17   don't then years about the case, and we will see you back

18   here at 12:30.  It's a little bit early for lunch today,

19   but we can manage.  Thank you, very much.

20       (Jury out at 11:14 a.m.)

21       THE COURT:  Very good.  We'll be back here at

22   12:30.  If there's anything you need to take up with the

23   Court ahead of time, we can do it right at 12:30.  I'm

24   not anticipating that there's anything further.  I'll do

25   the instructions, which will probably take 15 minutes or

1-A-77

1    so, and then we'll roll right into your opening

2    statements.

3              MR. MORGAN:  Very good.

4              THE COURT:  We'll see you at 12:30.

5              MR. MORGAN:  Thank you, Your Honor.

6         (Recess at 11:14 a.m.)

7                          ***

8              I, CHERYL A. SEEMAN, Certified Realtime and

9    Merit Reporter, in and for the State of Wisconsin,

10   certify that the foregoing is a true and accurate record

11   of the proceedings held on the 2nd day of March, 2015,

12   before the Honorable James D. Peterson, of the Western

13   District of Wisconsin, in my presence and reduced to

14   writing in accordance with my stenographic notes made at

15   said time and place.

16   Dated this 9th day of March, 2015.

17

18                           _____
                             /s/

19                           Cheryl A. Seeman, RMR, CRR
                             Federal Court Reporter
20

21

22
     The foregoing certification of this transcript does not
23   apply to any reproduction of the same by any means unless
     under the direct control and/or direction of the
24   certifying reporter.

25